# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

|  |  |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS and its President, Michael Fusella, individually; and PINELLAS COUNTY YOUNG REPUBLICANS, and its President Parisa Mousavi, individually, | Case No. 8:25-cv-02486 |
|  | **AMENDED COMPLAINT (Scrivener's Error Para 1)** |
| Plaintiffs, |  |
|  | **INJUNCTIVE RELIEF REQUESTED** |
| v. |  |
|  | **THREE JUDGES REQUIRED** |
| HOWARD W. LUTNICK, in his official capacity as Secretary of Commerce, and RON S. JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau, |  |
| Defendants. |  |

Plaintiffs, UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS; its President, Michael Fusella, individually; PINELLAS COUNTY YOUNG REPUBLICANS; and its President, Parisa Mousavi, individually (collectively "Plaintiffs"), by and through their undersigned counsel, sue Defendants, HOWARD W. LUTNICK, in his official capacity as the Secretary of Commerce of the United States, and RON S. JARMIN, in his official capacity as acting Director of the U.S. Census Bureau (collectively "Defendants"), and allege:

**INTRODUCTION**

1.     This is an action for declaratory and injunctive relief, challenging the constitutionality of the U.S. Census Bureau report for purposes of apportionment ("report") based upon the 2020 decennial Census (the "2020 Census"). In producing the report, the U.S. Census Bureau implemented two fundamentally flawed data collection methods: "Group Quarters Imputation," a statistical sampling process that created fictitious persons without actual enumeration, and "Differential Privacy," a noise injection system that systematically distorted Census data by adding statistical errors to protect confidentiality ("statistical methods"). These statistical flaws violate Article I, Section 2, Clause 3 of the U.S. Constitution (U.S. Const. Art. I, § 2, Cl. 3) (the Actual Enumeration Clause), Section 2 of the Fourteenth Amendment to the U.S. Constitution (U.S. Const. Art. XIV, § 2), and 13 U.S.C. § 195.

2.     Federal law prohibits the use of statistical sampling for congressional apportionment. 13 U.S.C. § 195. The challenged methodologies violated this statutory prohibition by creating population estimates through regression analysis and statistical inference rather than actual enumeration of persons. The 2020 Census report also violated the requirement to make an enumeration of persons as of April 1, 2020, using different census dates for populations of persons it sought to estimate through Group Quarters Imputation, in violation of 13 U.S.C. 141.

3. Pub. L. 105-119, § 209 prohibits the use of a "statistical method" for the Census that adds counts to the enumeration of the population because of statistical inference. Pub. L. 105-119, § 209(b)[1] (codified at 13 U.S.C. § 141, *note*[2]*).*

4. Defendants' reliance on unconstitutional population counts to determine the 2020 Census report and instructions to Congress for proposed Congressional apportionment, which then directed the several states, results in an inaccurate determination of the appropriate number of House of Representatives seats for each state, including Florida and the seats within the jurisdiction and venue of this Court, thus diluting the representative power of lawfully enumerated citizens. Florida also adopted the 2020 Census report for purposes of its own Legislature's redistricting, resulting in state districting that was based upon flawed data.

5. Plaintiffs seek a declaration that the 2020 Census report was unlawful insofar as it violated federal statutes and the Constitution by utilizing statistical methodologies to report something other than an actual enumeration.

6. Plaintiffs seek mandatory relief obligating Defendants to create a new 2020 Census report that does not use statistical methods.

7. Plaintiffs seek an injunction preventing the Defendants from using unlawful and unconstitutional statistical methods in the 2030 Census.

---

[1] Pub. L. 105-119, § 209, available at https://www.govinfo.gov/content/pkg/PLAW-105publ119/pdf/PLAW-105publ119.pdf
[2]13 U.S.C. § 141, note, available at https://www.law.cornell.edu/uscode/text/13/141

## PARTIES

8.      University of South Florida College Republicans ("USF Republicans") is a Tampa-based chapter of the College Republican National Committee and is part of the Florida Federation of College Republicans. The purpose and goal of this organization is to recruit, train, engage, and mobilize students to advocate for conservative ideals, participate in civic events, and increase their knowledge of the political process. USF's main campus address is 4202 E Fowler Ave, Tampa, FL 33620. This address is in the 15th Congressional District of Florida, which Republican Laurel Lee represents. *See* My Congressional District, U.S. Census Bureau, https://ziplook.house.gov/htbin/findrep_house?ZIP=33620.

9.      Michael Fusella is the President of USF Republicans and resides in the 15th Congressional District of Florida and within the Middle District of Florida.

10.     Pinellas County Young Republicans ("Young Republicans") is a club intended to attract young people and provide for them an opportunity to achieve political expression and recognition, more effectively participate in the election process, and better develop and uphold the principles of the Republican Party as a service to the United States of America, the State of Florida, Pinellas County and its political subdivisions. The Young Republicans have an address at 9800 4th Street North, Suite 200 St. Petersburg, FL 33702. This address is in the 14th

Congressional District of Florida, which Democrat Kathy Castor represents. Govtrack.US, https://perma.cc/HGM6-SQ6N?type=image.

11.     Parisa Mousavi is the President of the Young Republicans and resides in the 14th Congressional District of Florida and within the Middle District of Florida.

12.     Defendants, Secretary Howard Lutnick and Ron Jarmin, are sued in their official capacities.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), and Pub. L. 105-119, § 209(b) (codified at 13 U.S.C. § 141, *note*) (providing persons aggrieved by the use of statistical methods in the Census report with a civil right of action for declaratory, injunctive, and other appropriate relief).

14.     This action is authorized by Pub. L. 105-119, § 209(b), which provides that "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law . . . in connection with the 2000 or any later decennial Census, to determine the population for purposes of the apportionment or redistricting of Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method."

15. Plaintiffs are both "aggrieved person[s]" within the meaning of Pub. L. 105-119, § 209(d)(1), which provides a private right of action for: "any resident of a State whose congressional representation . . . could be changed as a result of the use of a statistical method challenged in the civil action".

16. Defendants have diluted the Plaintiffs' members' representative capacity in Congress through the 2020 Census report. The plaintiffs, USF Republicans and Young Republicans, are represented by members of Congress whose districts are located in the Middle District of Florida. Because the statistical method affected Florida and the representative composition of the 14th and 15th congressional districts, as well as state legislative districts covering the same locales, where USF Republicans and Young Republicans' members reside, this Court has jurisdiction over the Defendants.

17. By using statistical methods for the 2020 Census report, the Commerce Secretary and Census Director directly aggrieved plaintiffs by basing Florida's apportionment of congressional districts on an unconstitutional and unlawful methodology. Plaintiffs were similarly affected when Florida adopted the 2020 Census report as the basis for local redistricting.

18. Venue is proper in this district under 28 U.S.C. §1391(b)(2) and (b)(3) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

19.     Pursuant to Pub. L. 105-119, § 209(e)(1), this action "shall be heard and determined by a district court of three judges in accordance with [28 U.S.C. § 2284]."

20.     28 U.S.C. § 2284 provides, in pertinent part: "(a) a district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts . . . . (b) In any action required to be heard and determined by a district court of three judges under subsection (a) of this section, the composition and procedure of the court shall be as follows: (1) Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. The judges so designated, and the judge to whom the request was presented, shall serve as members of the court to hear and determine the action or proceeding."

21.     Therefore, Plaintiffs respectfully request that the United States Court of Appeals Chief Judge for the Eleventh Circuit convene such a panel.

22.     Any final order of the panel shall be reviewable by direct appeal to the U.S. Supreme Court.

## FACTUAL AND LEGAL BACKGROUND

### Constitutional Framework for Census and Apportionment

23.     Article I, Section 2, Clause 3 of the U.S. Constitution (U.S. Const. Art. I, § 2, Cl. 3) requires an "actual Enumeration" of the population within every ten years "in such Manner as they shall by Law direct."

24.     Section 2 of the Fourteenth Amendment (U.S. Const. Art. XIV, § 2) provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State."

25.     Congress has enacted comprehensive legislation governing the decennial Census, codified at 13 U.S.C. § 141 *et seq.*, delegating authority to the Secretary of Commerce to conduct the decennial Census.

26.     The Permanent Apportionment Act, 2 U.S.C. § 2a, fixes the House of Representatives at 435 members and establishes the method for allocating seats based on state populations determined by the Census.

## <u>Congressional Prohibition on Statistical Methods</u>

27.     In 1997, Congress enacted Pub. L. 105-119, § 209, which expressly found that "the use of statistical sampling or statistical adjustment in conjunction with an actual enumeration to carry out the Census with respect to any segment of the population poses the risk of an inaccurate, invalid, and unconstitutional Census."

28.     Section 209(h)(1) defines "statistical method" as "an activity related to the design, planning, testing, or implementation of the use of representative sampling, or any other statistical procedure, including statistical adjustment, to add or subtract counts to or from the enumeration of the population as a result of statistical inference."

29.     Section 209(i) provides: "Nothing in this Act shall be construed to authorize the use of any statistical method, in connection with a decennial Census, for the apportionment or redistricting of Members in Congress."

30.     Plaintiffs have been aggrieved by Defendants' use of statistical methods in violation of the Constitution and 13 U.S.C. § 195 in connection with the 2020 decennial Census. The 2020 Census report erroneously determined Florida's electoral apportionment population and the relevant districts within the Tampa Division of the Middle District of Florida.

**Group Quarters Imputation Technical Methodology and Flaws**

31.   On Census Day, April 1, 2020, due to the COVID lockdown, individuals who might otherwise have resided in short-term institutional living arrangements were instead residing at their permanent household, located elsewhere. Group Quarters Imputation, a statistical method, was used by the Census Bureau in 2020, which had the effect of creating a fictitious population at these institutions.

32.   According to former U.S. Census Bureau employee Adam Korzeniewski, Group Quarters Imputation used "linear regression analysis based off estimates from the Group Quarters themselves, yielding a ratio by which Census analysts would impute the population of each facility." Adam Korzeniewski, *Fictive Counting,* THE AMERICAN MIND (May 14, 2021), https://americanmind.org/salvo/fictive-counting/.

33.   Group Quarters Imputation had a significant practical impact on the 2020 Census report due, in part, to the COVID-19 pandemic.

34.   For example, by the end of March 2020, virtually all colleges and universities had closed their dormitories for at least a semester and sent students elsewhere. Consequently, by Census Day 2020 most college and university students had vacated group quarters and were residing in another location.

35.     Consistent with the instructions provided by the U.S. Department of Commerce and the U.S. Census Bureau, these persons were to be counted in the households in which they resided on Census Day.

36.     After the 2020 Census data collection for group quarters had closed, the responses were reviewed and the U.S. Department of Commerce and the U.S. Census Bureau determined that thousands of presumably occupied group quarters lacked any population count.

37.     Thereafter, an ad hoc group inside the U.S. Census Bureau known as the "GQ Count Imputation Team" was created, which in February 2021 developed and deployed the Group Quarters Imputation procedure to insert fictitious persons in many group quarters by imputation.

38.     In fact, contravening the statutory mandate, the GQ Count Imputation Team actually instructed group quarters contacts to provide population counts for their institution as of a point *prior* to the COVID-19 closures of the institution. This effectively moved Census Day for some group quarters from April 1, as expressly required by 13 USC § 141(a), to an unknown prior date. It also virtually guaranteed that persons who had resided in group quarters prior to COVID-19 would be double counted: first at home, and then fictitiously by Group Quarters Imputation as if they had been at their college or university on Census Day.

39.     Group Quarters Imputation was also used on group facilities like nursing homes, many of which were already shuttered or experiencing lower-than-historical occupancy on April 1, 2020.

40.     Group Quarters Imputation constituted statistical sampling (prohibited for congressional apportionment) rather than actual enumeration, because it ascribed fictional people to facilities that were legitimately empty on Census Day 2020 using mathematical models rather than counting real residents.

41.     Group Quarters Imputation constituted statistical sampling and statistical methods forbidden by federal law for Census enumeration.

42.     Moreover, even if Group Quarters Imputation was permissible (it is not), the manner in which it was deployed by the GQ Imputation Team in February 2021 ignored the statutory requirement to count the population as of April 1, 2020.

**Differential Privacy Technical Implementation and Accuracy Impacts**

43.     Differential Privacy, used by Defendants in the 2020 Census Report, constitutes an unconstitutional and unlawful statistical method.

44.     The Census Bureau implemented "differentially private (DP) algorithms to protect the confidentiality of tables in 2020 Census data products through injecting noise into almost every cell," which was "detrimental to data quality" according to the National Academies of Sciences final report. NAT'L ACADS.

OF SCIS., ENG'G & MED., ASSESSING THE 2020 CENSUS: FINAL REPORT 252 (2023), https://nap.nationalacademies.org/read/27150/chapter/14.

45.     While there can be no justification for using Differential Privacy because it is unlawful and unconstitutional, academic analysis has concluded that the Census Bureau's justification for Differential Privacy was fundamentally flawed. Steven Ruggles, *When Privacy Protection Goes Wrong: How and Why the 2020 Census Confidentiality Program Failed*, 38 J. ECON. PERSPECTIVES 201, 201 (2024), https://www.aeaweb.org/articles?id=10.1257/jep.38.2.201 (referencing the paper's abstract).

46.     Differential Privacy, an unconstitutional and unlawful statistical method, created systematic bias and geographic disparities. J. Tom Mueller & Alexis R. Santos-Lozada, *The 2020 US Census Differential Privacy Method Introduces Disproportionate Discrepancies for Rural and Non-White Populations*, 41 POPULATION RSCH. & POL'Y REV. 1417, 1417 (2022), https://link.springer.com/article/10.1007/s11113-022-09698-3 (referencing the paper's abstract).

47.     At the Census block level, Differential Privacy "resulted in larger errors and greater variation" with "impact most severe among Hispanic residents and multiracial populations, with the magnitude of the error occasionally exceeding the total number of minorities." Hansi Lo Wang, *The U.S. has a new way to mask Census*

*data in the name of privacy. How does it affect accuracy?*, SCIENCE (Dec. 2, 2023), https://www.science.org/content/article/u-s-has-new-way-mask-Census-data-name-privacy-how-does-it-affect-accuracy.

48.     The National Academies documented specific quantitative accuracy failures: "For example, a block with three Hispanic residents might appear to have zero or six Hispanic people after statisticians applied Differential Privacy." *Id.*

49.     The methodology produced negative population values and created inconsistencies across millions of tabulations.

50.     The Federal-State Cooperative Committee identified "illogical and implausible values" in demonstration products and documented systematic problems with data processing under the new system. Federal-State Cooperative Program for Population          Estimates          (Nov.          23,          2020), https://ofm.wa.gov/sites/default/files/public/dataresearch/pop/sdc/FSCPE_letter_to_DSEP_re_determination_of_invariants.pdf.

51.     The combined effect of these methodologies resulted in systematic population miscounting, including the addition of approximately "2.5 million persons to blue states above the December population estimate," creating artificial geographic redistribution of political representation. Adam Korzeniewski, *Fictive Counting,* THE AMERICAN MIND (May 14, 2021), https://americanmind.org/salvo/fictive-counting/.

52.     Differential Privacy's documented rural/urban bias and Group Quarters Imputation's geographic preferences created systematic undercounting in rural areas and overcounting in urban regions, distorting congressional apportionment and federal funding allocations.

53.     The intentional injection of statistical noise and creation of fictitious persons undermined the constitutional principle that representation should be based on actual population counts rather than statistical estimates or statistically manipulated data.

## CLAIMS FOR RELIEF

### COUNT I
*Violation of U.S. Const. Art. I, § 2 (Actual Enumeration Clause)*

54.     Plaintiffs reallege their allegations contained in paragraphs 1 through 53 as if set fully forth herein.

55.     Article I, Section 2, Clause 3 requires an "actual Enumeration" of the population for apportionment purposes.

56.     Defendants' use of statistical methods in the 2020 Census report means the apportionment was not based solely on an actual and complete enumeration.

57.     By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the 2020 Census report violated Article I, § 2 of the U.S. Constitution.

58.     Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that does not use statistical methods.

59.     Plaintiffs are also entitled to a preliminary injunction and ultimately a permanent injunction, enjoining Defendants from using statistical methods in the 2030 Census.

## COUNT II
### *Violation of the Fourteenth Amendment, § 2*
### *(Proper Interpretation of "Whole Number of Persons")*

60.     Plaintiffs reallege their allegations contained in paragraphs 1 through 53 as if set fully forth herein.

61.     The Fourteenth Amendment's reference to "whole number of persons" must be interpreted consistently with the Constitution's structure and the Amendment's purpose.

62.     Defendants' use of statistical methods in the 2020 Census report means the apportionment was not based solely on counting whole persons.

63.     By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the 2020 Census report violated § 2 of the 14th Amendment of the Constitution.

64.     Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that does not use statistical methods.

65.     Plaintiffs are also entitled to a preliminary injunction and ultimately a permanent injunction, enjoining Defendants from using statistical methods in the 2030 Census.

## COUNT III
### *Violation of 13 U.S.C. 195*
### *(Prohibition on Statistical Sampling)*

66.     Plaintiffs reallege their allegations contained in paragraphs 1 through 53 as if set fully forth herein.

67.     The challenged methodologies violated the Constitution's "actual Enumeration" requirement by substituting statistical estimation and data manipulation for direct population counting mandated by Article I, Section 2, Clause 3.

68.     Group Quarters Imputation violates 13 U.S.C. § 195's prohibition on statistical sampling for congressional apportionment by creating population estimates through regression analysis rather than enumerating actual persons.

69.     Both statistical methodologies violated federal statutory requirements for accurate enumeration under 13 U.S.C. § 141, which mandates that the 2020 Census report apportionment is accurate and based on reliable and high-quality data and does not rely on statistical methods.

70.     By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the use of Group Quarter Imputation constitutes a prohibited sampling under 13 U.S.C. § 195.

71.     Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that does not use statistical sampling.

72. Plaintiffs are also entitled to a preliminary injunction and, ultimately, a permanent injunction enjoining Defendants from using statistical sampling in the 2030 Census.

**COUNT IV**
*Violation of 13 U.S.C. § 141(a)*
*(Establishment of Census Day)*

73. Plaintiff's reallege their allegations contained in paragraphs 1 through 53 as if set forth fully herein.

74. 13 U.S.C. § 141(a) provides, in relevant part, that "The Secretary shall . . . take a decennial census of population as of the first day of April of such year."

75. 13 U.S.C. § 141, mandates that the 2020 Census report apportionment is accurate and based on reliable and high-quality data as of April 1, 2020.

76. By instructing contacts at group quarters to provide population counts for their institution from prior to when it closed due to COVID-19 in March 2020, the GQ Count Imputation Team intentionally used data known to misrepresent the current population of the United States as of April 1, 2020.

77. This conduct, taken at the direction of Defendants' predecessors in the Biden administration, violated the statutory mandate to count the population of the United States of America "as of the first day of April" of the decennial census year.

78.     By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the use of Group Quarter Imputation in the 2020 Census violated 13 U.S.C. § 141(a).

79.     Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that accurately reflects the population of the United States as of April 1, 2020.

80.     Plaintiffs are also entitled to a preliminary injunction and, ultimately, a permanent injunction enjoining Defendants from using any data known not to reflect the "population as of the first day of April" in the 2030 Census.

### COUNT V
*Violation of Pub. L. 105-119, § 209*
*(Prohibition on Statistical Methods)*

81.     Plaintiffs reallege their allegations contained in paragraphs 1 through 72 as if set fully forth herein.

82.     Pub. L. 105-119, § 209(b) provides that "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law . . . in connection with the 2000 or any later decennial Census, to determine the population for purposes of the apportionment or redistricting of Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method."

83.    The 2020 Census report's reliance upon Group Quarter Imputation and Differential Privacy implements a "statistical method" as defined in Pub. L. 105-119, § 209(h)(1).

84.    This statistical method adds counts to the enumeration based on inference about who qualifies as a constitutional "person" rather than the actual enumeration of lawful inhabitants. It also makes assumptions and inferences that add counted persons.

85.    By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the 2020 Census report apportionment was based upon an unlawful "statistical method" under Pub. L. 105-119, § 209

86.    Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that does not use statistical methods.

87.    Plaintiffs are also entitled to a preliminary injunction and ultimately a permanent injunction, enjoining Defendants from using statistical methods in the 2030 Census.

## **DEMAND FOR A THREE JUDGE PANEL**

**WHEREFORE**, Plaintiffs demand judgment against Defendants HOWARD LUTNICK and RON JARMIN as follows:

(a) Convene a three-judge district court pursuant to Pub. L. 105-119, § 209(e)(1) and 28 U.S.C. § 2284;

20

(b) Issue a declaratory judgment that:

    1. The 2020 Census report violated the Constitution and federal law by using statistical sampling and statistical methods;

    2. The 2020 Census report's apportionment violates the U.S. Constitution and federal law;

(c) Issue preliminary and permanent injunctive relief:

    1. Enjoining Defendants from using statistical sampling and statistical methods for the 2030 Census report, including Differential Privacy and Group Quarter Imputation.

(d) Issue mandatory relief:

    1. Obligating Defendants to create a new 2020 Census report that does not use statistical sampling or statistical methods.

(e) Award Plaintiffs' costs and attorneys' fees as appropriate;

(f) Grant such other and further relief as this Court deems just and proper.

DATED: September 15, 2025

                      Respectfully submitted,

                      */s/ R. Quincy Bird*
                      R. Quincy Bird (FBN 105746)
                      Timothy W. Weber (FBN 86789)
                      Jeremy D. Bailie (FBN 118558)
                      **WEBER, CRABB & WEIN, P.A.**
                      5453 Central Avenue
                      St. Petersburg, FL 33710
                      Telephone: (727) 828-9919

Facsimile: (727) 828-9924
Timothy.Weber@webercrabb.com
Jeremy.Bailie@webercrabb.com
Quincy.Bird@webercrabb.com
Secondary:
lisa.willis@webercrabb.com
honey.rechtin@webercrabb.com
natalie.deacon@webercrabb.com

*Counsel to Plaintiffs*