UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS and its President, Michael Fusella, individually; and PINELLAS COUNTY YOUNG REPUBLICANS, and its President Parisa Mousavi, individually, | No. 8:25-cv-02486-WFJ-SDM-RSR |
| Plaintiffs, | |
| v. | |
| HOWARD W. LUTNICK, in his official capacity as Secretary of Commerce, and GEORGE COOK, in his official capacity as Acting Director of the U.S. Census Bureau,[1] | |
| Defendants. | |

## ALLIANCE FOR RETIRED AMERICANS, CAMERON DRIGGERS, AND MANUEL GUERRERO'S MOTION TO INTERVENE AS DEFENDANTS

Proposed Intervenors, the Alliance for Retired Americans, Cameron

Driggers, and Manuel Guerrero, by and through undersigned counsel, hereby

_____

[1] George Cook replaced Ron S. Jarmin as Acting Director of the U.S. Census Bureau on September 19, 2025. *See* Fed. R. Civ. P. 25(d).

move to intervene in the instant matter under Federal Rules of Civil Procedure 24(a)(2) and 24(b). As explained in the below memorandum, intervention is necessary for the Proposed Intervenors to protect their interest in ensuring that in ensuring that they, their members, and their community are accurately counted and can vote in lawfully apportioned legislative districts.

## **INTRODUCTION**

More than four years and two general election cycles after the release of the 2020 Census results, the University of South Florida College Republicans, the Pinellas County Young Republicans, and their respective presidents ("Plaintiffs"), sue to invalidate the 2020 Census Report based on the manner in which the populations of a few thousand group housing facilities—college dormitories, nursing homes, and the like—were determined ("Group Quarters Imputation"), along with the Census Bureau's decision to introduce a small amount of statistical "noise" into certain reported population figures for privacy reasons ("Differential Privacy").

Plaintiffs offer far too little, far too late, to possibly justify the relief they seek. "Group Quarters Imputation" added just 16,500 people to Florida's population and just 169,000 people nationwide—a statistical drop in the

bucket.[2] "Differential Privacy" did not affect apportionment at all,[3] and had little effect on geographies larger than census blocks. [4] Nothing in the Complaint suggests any impact on Plaintiffs from the use of those methodologies, much less that Plaintiffs were harmed by the Census Bureau's use of those methodologies as compared to the reasonably available alternatives. As the Supreme Court has explained in rejecting a similar claim, the Census Bureau "uses imputation only as a last resort—after other methods have failed. In such instances, the Bureau's only choice is to disregard the information it has, using a figure of zero, or to use imputation in an effort to achieve greater accuracy." *Utah v. Evans*, 536 U.S. 452, 478 (2002). The Bureau did not act unlawfully in opting for accuracy. *Id.* at 479.

Proposed Intervenors the Alliance for Retired Americans—a national organization with 4.4 million retirees in all fifty states—and Florida university students Cameron Driggers and Manuel Guerrero are concerned, however, that the U.S. Department of Justice on behalf of Defendants Lutnick and Cook

---

[2] *See* U.S. Census Bureau, *Results from the 2020 Census Group Quarters Count Imputation* tbl. 12 (2023),
https://www2.census.gov/library/publications/decennial/2020/2020-census-group-quarters-imputation.pdf.
[3] *See* U.S. Census Bureau, *Differential Privacy and the 2020 Census* (2021),
https://www.census.gov/content/dam/Census/library/factsheets/2021/differential-privacy-and-the-2020-census.pdf.
[4] *See* U.S. Census Bureau, *Disclosure Avoidance and the 2020 Census Redistricting Data* 4–5 (2023),
https://www2.census.gov/library/publications/decennial/2020/census-briefs/c2020br-02.pdf.

is very unlikely to vigorously defend this case. Even before this lawsuit was filed, President Trump posted in August that he had "instructed our Department of Commerce to immediately begin work on a new and highly accurate CENSUS."[5] The Administration's interest therefore seems to be in attacking the 2020 census, not in defending it.

And if Plaintiffs do get the relief they seek—including their broader request to prohibit all "statistical methods," including but not limited to Group Quarters Imputation and Differential Privacy—Proposed Intervenors' interests will be threatened. The Alliance's membership includes many residents of nursing homes and other group living facilities, and the Alliance has a direct, significant, and legally protectible interest in ensuring that its members are accurately counted and can vote in lawfully apportioned legislative districts. Additionally, Mr. Driggers and Mr. Guerrero have a direct, significant, and legally protectible interest in ensuring that, as university students, they and their university communities are accurately counted and can vote in lawfully apportioned districts. The relief Plaintiffs seek is a direct and significant threat to those interests. To protect their interests, Proposed Intervenors seek intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2).

---

[5] Donald J. Trump (@realDonaldTrump), TruthSocial (Aug. 7, 2025, at 7:22 ET), https://truthsocial.com/@realDonaldTrump/posts/114987220997209419.

Alternatively, the Proposed Intervenors readily satisfy the requirements for permissive intervention under Federal Rule of Civil Procedure 24(b), and the Court should grant intervention on that ground. Doing so ensures that the vulnerable populations targeted by Plaintiffs' challenge have a voice in this litigation concerning their right to be appropriately counted and equally represented.

## BACKGROUND

### I.    The U.S. Census

Every ten years, the U.S. Census Bureau is tasked with conducting a count of the U.S. population. This duty is mandated by the U.S. Constitution, which provides that an "actual Enumeration" of the population must be conducted every ten years and "vests Congress with the authority to conduct that census 'in such Manner as they shall by law direct.'" *Wisconsin v. City of New York*, 517 U.S. 1, 5 (1996) (quoting U.S. Const. art. 1, § 2, cl. 3)). As the Supreme Court has emphasized, "[a]lthough each [census is] designed with the goal of accomplishing an 'actual Enumeration' of the population, *no census* is recognized as having been wholly successful in achieving that goal." *Id.* at 6 (emphasis added). Instead, despite the Census Bureau's faithful efforts, "[p]ersons who should have been counted are not counted at all or are counted at the wrong location . . . and persons who should have been counted only once are counted twice." *Id.*

Historically, the Census Bureau has relied on statistical methodologies commonly referred to as "imputation" to obtain the most accurate population count. *See Evans*, 536 U.S. at 458 (noting that imputation is used to fill in the gaps posed by "missing or confusing information," including the existence of a housing unit, whether a unit is vacant or occupied, and the number of people living in a unit). In 2020, the Census Bureau encountered an obstacle necessitating a new imputation strategy—the COVID-19 pandemic. With stay-at-home orders leading to the closure of college campuses, nursing homes, and prisons, several occupied group homes reported no population count during the data collection period for the 2020 Census. U.S. Census Bureau, *supra* note 2. This significantly differed from the 2010 Census, where every occupied group quarter reported a population count greater than zero. *Id.*

So in December 2020, the Census Bureau formed the "Group Quarters Imputation Team" to develop a statistically sound procedure for imputing population counts to those group quarters without a reported population count on Census Day. *Id.* First, the Bureau attempted to contact by phone several group quarters that had provided no data or confusing data. *Id.* at 4. For those group quarters that did not provide clarifying information, the Bureau relied on data it already collected on them along with relevant administrative records to impute the missing population count for 2020. *Id.* Lastly, the Bureau

engaged in investigative work to identify those group quarters with a valid population count of zero. *Id.* at 5.

The Census Bureau also employed a statistical methodology known as "differential privacy" during its preparation of the 2020 Census Report. Differential privacy is a disclosure avoidance method that works by injecting statistical noise into raw census data. *See Alabama v. United States Dep't of Com.*, 546 F. Supp. 3d 1057, 1064 (M.D. Ala. 2021). Differential privacy builds on the Census Bureau's history of seeking to encourage public cooperation with the census by protecting the privacy of respondents. *See id.* (explaining that the Census Bureau has alternated between "data swapping," "[data] suppression," and now differential privacy, all to protect respondents while preserving the utility of the census).

## II.   This Litigation

On September 15, 2025—more than four years after the release of the 2020 Census results—the University of South Florida College Republicans ("USF Republicans"), the President of USF Republicans Michael Fusella, the Pinellas County Young Republicans ("Young Republicans"), and the President of the Young Republicans Parisa Mousavi (collectively, "Plaintiffs"), filed this suit against the Secretary of Commerce and the Acting Director of the U.S. Census Bureau. Plaintiffs allege that the Census Bureau's use of Group Quarters Imputation and Differential Privacy in 2020 violated Article I,

Section 2, Clause 3 of the U.S. Constitution, Section 2 of the Fourteenth Amendment, 13 U.S.C. § 195, 13 U.S.C. § 141, and Pub. L. 105–119, § 209. Doc. 2 ¶¶ 1, 78–83. They contend, among other things, that these methods constitute unlawful "statistical sampling" and violate the requirement that the census be an "actual enumeration" of the population. *Id.* ¶¶ 1–2; *but see Evans*, 536 U.S. at 472-73 (holding that imputation differs from statistical sampling). Plaintiffs ask this Court to issue a declaratory judgment that the 2020 Census Report and the resulting apportionment of congressional seats among the states violated the U.S. Constitution and federal law, order Defendants to create a new 2020 Census Report that does not use *any* statistical methods and enjoin Defendants from using *any* statistical methods in preparation of the 2030 Census Report. Doc. 2 ¶¶ (a)–(f) (emphasis added).

## III.  Proposed Intervenors

Proposed Intervenors are (i) the Alliance for Retired Americans ("the Alliance"), a nationwide organization of retirees with 4.4 million members that is dedicated to fighting for economic and social fairness for retirees, *see* Ex. A, Declaration of the Alliance for Retired Americans ("Alliance Decl.") at ¶¶ 2–3, as well as (ii) Cameron Driggers, a student at the University of Central Florida, *see* Ex. B, Declaration of Cameron Driggers ("Driggers Decl.") at ¶ 3, and (iii) Manuel Guerrero, a student at the University of Central Florida, *see* Ex. C, Declaration of Manuel Guerrero ("Guerrero Decl.") at ¶ 3.

8

*Alliance for Retired Americans.* The Alliance is a 501(c)(4) nonprofit social welfare organization with 4.4 million members nationwide, including 206,373 in Florida. *See* Alliance Decl. ¶ 2. Its membership is composed of retirees, most of whom are over the age of 65, from public and private sector unions and community organizations, as well as individual activists. *Id.* ¶ 4. The Alliance's mission is to ensure social and economic justice and to protect the civil rights of retirees so they may enjoy dignity, personal fulfillment, and family security as senior citizens. *Id.* ¶ 3. Many of the Alliance's elderly members reside in group quarters such as nursing homes, assisted living facilities, and disabled group homes. *Id.* ¶ 7. As a result, Plaintiffs' request to erase from the census count 169,000 such residents residing in 5,500 group living facilities is particularly likely to cause harm to the Alliance's membership by undercounting them. *Id.*

Moreover, the accuracy of census data is essential for the equitable distribution of federal funds that support programs older Americans including the Alliance's members disproportionately rely on—including Medicare, Medicaid, and Social Security. *Id.* ¶ 5. The issuance of a new 2020 Census Report and a prohibition on *any* statistical methods in future censuses is therefore likely to cause harm to the Alliance's members through dilution of their vote, diminishment of their representation, and the loss of federal programs which enable its members to sustain their most basic needs. *Id.* ¶ 7.

9

***Cameron Driggers.*** Mr. Driggers is a graduate student at the University of Central Florida. *See* Driggers Decl. ¶ 3. He is registered to vote in Florida and resides in the 10th Congressional District, a community with a large student population, including students who live in residence halls. *Id.* ¶¶ 2, 4. As a working-class youth organizer from rural Florida, Mr. Driggers cares deeply about Florida and the people who live there and has thus dedicated his organizing efforts to advancing social and economic justice in the state. *Id.* ¶ 3. To that end, Mr. Driggers is concerned with the Plaintiffs' request that the U.S. Census Bureau not rely on statistical methods or methodologies of any kind when gathering census data because of his status as a graduate student. Knowing that the Census Bureau has historically relied on tools like group quarters imputation to better account for university populations who reside in dormitories, Mr. Driggers fears that the Plaintiffs' requested relief will dilute his vote and diminish his representation. *Id.* ¶ 6.

***Manuel Guerrero.*** Mr. Guerrero is a student at the University of Central Florida. *See* Guerrero Decl. ¶ 3. Like Mr. Driggers, Mr. Guerrero is registered to vote in Florida and resides in the 10th Congressional District. *Id.* ¶ 2. And like Mr. Driggers, he is concerned that the Plaintiffs' request that the U.S. Census Bureau not rely on statistical methods or methodologies of any kind when gathering census data will dilute his vote and decrease his representation because of his status as a college student. *Id.* ¶ 6. He recognizes

that statistical methods or methodologies are a vital part of the Census Bureau's mission to collect an accurate population count, and that without such methods, he may not be able to enact the change he desires to. *Id.* ¶ 5.

## **ARGUMENT**

### I. **Proposed Intervenors are entitled to intervene as of right under Rule 24(a)(2).**

Proposed Intervenors are entitled to intervention in this case under Rule 24(a)(2) to protect their direct, significant, and legally protectible interests. Rule 24(a)(2) requires courts to grant intervention to any movant who "claims an interest relating to the property or transaction . . . and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Thus, to intervene as of right under Rule 24(a)(2), a movant must establish that: "(1) his application to intervene is timely; (2) he has an interest relating to the property or transaction which is the subject of the action; (3) he is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) his interest is represented inadequately by the existing parties to the suit." *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989). Each element is satisfied here.

### A. This Motion is timely.

First, the motion to intervene is timely. Courts measure timeliness by considering:

> (1) the length of time during which the proposed intervenor knew or reasonably should have known of the interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties as a result of the proposed intervenor's failure to move for intervention as soon as it knew or reasonably should have known of its interest; (3) the extent of prejudice to the proposed intervenor if the motion is denied; and (4) the existence of unusual circumstances militating either for or against a determination that their motion was timely.

*Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002). However, "timeliness is not a word of exactitude or of precisely measurable dimensions. The requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice." *Id.* (alteration omitted) (quoting *Chiles*, 865 F.2d at 1214).

There has been no delay, and thus there will be no prejudice to the parties from allowing intervention at this stage. Plaintiffs filed this action on September 15, 2025, and served the Amended Complaint on Defendants on September 19. Docs. 17–18. Defendants' Answer is not due until November 24—just under four weeks from the filing of this motion. Docs. 17–18. The only substantial activity on the docket is the designation of a three-judge panel to

this case, which was entered on October 20. Doc. 27. Courts routinely find motions to intervene to be timely under similar circumstances. *E.g.*, *Alabama v. U.S. Dep't of Com.*, No. 2:18-CV-772-RDP, 2018 WL 6570879, at *2 (N.D. Ala. Dec. 13, 2018) (finding timely a motion to intervene filed "less than two months after the Complaint was filed," where "[n]o discovery has been conducted, no scheduling order has been entered, and no motions have been heard by the court"); *id.* at *3 (collecting cases); *Chiles*, 865 F.2d at 1213 (motion to intervene was timely when filed seven months after original complaint, three months after the government filed its motion to dismiss, and before any discovery began).

### B. Proposed Intervenors have an interest in protecting their members, themselves, and their communities from undercounting and resulting vote dilution.

Second, Proposed Intervenors have a significant interest in protecting their members, themselves, and their communities from the dilution of their votes that would result from eliminating group quarters imputation from the census and thereby undercounting residents of group quarters. "Under Rule 24(a)(2), a party is entitled to intervention as a matter of right if the party's interest in the subject matter of the litigation is direct, substantial and legally protectable." *Georgia*, 302 F.3d at 1249. Satisfying this requirement is less demanding than establishing an Article III injury-in-fact. *See Chiles*, 865 F.2d

at 1213 (holding that "a party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24").

A proposed intervenor like the Alliance may assert its members' interests in litigation. *Meek v. Metro. Dade Cnty.,* 985 F.2d 1471, 1480 (11th Cir. 1993) (per curiam).  In the more restrictive context of Article III standing, the Eleventh Circuit has explained that

> an organizational plaintiff has standing to enforce the rights of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (citation modified). It is enough if "at least one member faces a realistic danger of suffering an injury." *Id.* (citation omitted); *see also Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021).

Here, if Plaintiffs succeed in forcing the Census Bureau to issue a new 2020 Census Report that erases residents of nursing homes, student dormitories, and other group living facilities from the census count, Proposed Intervenors who live in those facilities, whose members do, or who live in communities with substantial numbers of such facilities, will risk dilution of their votes and diminishment of their representation due to the undercounting

of the population of their communities. Alliance Decl. ¶ 7; Driggers Decl. ¶ 6; Guerrero Decl. ¶ 6.

The one-person, one-vote principle enshrined in the Fourteenth Amendment requires states to "draw congressional districts with populations as close to perfect equality as possible." *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016). This demands "a good-faith effort to achieve precise mathematical equality." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969) (citing *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)). And the mathematical equality of congressional districts is measured using the population count from the most recent decennial census. *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003). If Plaintiffs succeed in *removing* voters from the census count by prohibiting the Census Bureau from using Group Quarters Imputation, that will result in their congressional districts being underpopulated, as measured by census data. Voters would have to be *added* to the district to make up for the lost population, thereby diluting the votes of the voters who are already in that district, as compared to the existing district. *See Baker v. Carr*, 369 U.S. 186, 207–08 (1962) (voters had standing to challenge alleged malapportionment of electoral districts).

Worse still, Plaintiffs seek the abolition of *any* "statistical methodologies" in the census—not just Group Quarters Imputation and Differential Privacy. That sweeping relief would virtually ensure an inaccurate count, with

15

particular impact on the Alliance's members who reside in group quarters, and on Mr. Driggers and Mr. Guerrero as university students in communities with large numbers of college students. "The Census Bureau has *never* relied exclusively upon headcounts to determine population," and "since at least 1940," has deployed varying forms of imputation "to fill in gaps." *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 352, 354 (1999) (Breyer, J., concurring in part and dissenting in part) (emphasis added). Even "[t]he Framers [] had experience with various statistical techniques," and deployed such techniques for the purpose of estimating the populations of counties who "failed to turn in any census data." *Evans*, 536 U.S. at 498 (Thomas, J., concurring in part and dissenting in part). Plaintiffs' demand that the Census Bureau refrain from relying on statistical methodologies of any kind is thus antithetical to Proposed Intervenors' interest in ensuring that they, their members, and their communities are accurately counted in the census, no matter where they might live.

## C. Proposed Intervenors' interests may be impaired by this action.

It follows from the nature of Proposed Intervenors' interests in this action that "disposition of the action, as a practical matter, may impede or impair [their] ability to protect that interest." *Chiles*, 865 F.2d at 1213. "Whether a movant is situated in such a way that the disposition of the case,

as a practical matter, may impede or impair its ability to protect his interest is 'closely related' to the nature of its interests." *Retina-X Studios, LLC v. ADVAA, LLC*, 303 F.R.D. 642, 654 (M.D. Fla. 2014) (quoting *Chiles*, 865 F.2d at 1214). The relief Plaintiffs seek in this case would not just "practically disadvantage" the Proposed Intervenors' ability to protect their members' interests, it would actively *harm* those interests.

### D. The existing parties do not adequately represent Proposed Intervenors' interests.

Finally, the existing parties do not adequately represent Proposed Intervenors' interests because they do not share those interests. The inadequate representation requirement "is satisfied if the [proposed intervenor] shows that representation of his interest 'may be' inadequate." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). "[T]he burden of making that showing should be treated as minimal." *Id.*

Representation "might not" be adequate when the proposed intervenor and an existing party have "similar, but not identical interests." *Stone v. First Union Corp.*, 371 F.3d 1305, 1312 (11th Cir. 2004). That is because "[t]he fact that the interests are similar does not mean that approaches to litigation will be the same." *Chiles*, 865 F.2d at 1214 (citing *Trbovich*, 404 U.S. at 539). For instance, an existing party "may wish to emphasize different aspects of" the conduct at issue. *Stone*, 371 F.3d at 1312; *see also Chiles*, 865 F.2d at 1215

("Dade County may decide not to emphasize the plight of the aliens held at Krome but focus instead on the effect that Krome has on those who live outside its walls. . . . We conclude that this possibility sufficiently demonstrates that the detainees' interests are not adequately represented."). The Supreme Court has recently cautioned that courts should not conduct the adequacy of representation analysis at too "high [a] level of abstraction," and reaffirmed that, even where the parties' interests "seem[] closely aligned," the burden to demonstrate inadequate representation remains "minimal" unless those interests are truly "identical." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 196 (2022) (citation omitted).

That is particularly true where, as here, the party on which the proposed intervenor must rely to represent its interests is the government. Federal courts "have often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003). A government-official defendant's interests are "necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998). The Supreme Court has also recently emphasized this point, explaining that public officials must "bear in mind broader public-policy implications," whereas

18

private litigants—like Proposed Intervenors—seek to vindicate their own rights "full stop." *Berger*, 597 U.S. at 196 (citing *Trbovich*, 404 U.S. at 538–39).

It does not matter if the Proposed Intervenor seeks the same outcome in litigation as the government defendant. "Needless to say, a prospective intervenor must intervene on one side of the 'v.' or the other and will have the same general goal as the party on that side." *Driftless Area Land Conservancy v. Huebsch*, 969 F.3d 742, 748 (7th Cir. 2020). "[T]he government's representation of the public interest may not be identical to the individual parochial interest of a particular group just because both entities occupy the same posture in the litigation." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011) (citation modified). "An obvious example is that the [government defendant] might deem the potential for costly litigation in this case a suboptimal use of its resources and might therefore enter into a more generous settlement agreement with Plaintiffs that might run contrary to Proposed Intervenors' interests." *Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 24 C 1867, 2024 WL 3454706, at *4 (N.D. Ill. July 18, 2024)

For instance, in *Georgia*, the Eleventh Circuit held that Florida's interest in "ensur[ing] that Georgia's actions do not deprive Florida of its equitable share of water," was not represented by the Army Corps of Engineers, "which has no independent stake in how much water reaches the Apalachicola." 302

F.3d at 1256. The same was true of a private proposed intervenor, Southeastern Federal Power Customers, Inc. ("SeFPC"), which had a private economic interest at stake. The Eleventh Circuit explained: "We do not believe that a federal defendant with a primary interest in the management of a resource has interests identical to those of an entity with economic interests in the use of that resource." *Id.* at 1259. The Eleventh Circuit also rejected the argument that the Corps adequately represented SeFPC's interests just because "in this proceeding their positions are identical: they both believe that Georgia's water supply request should be denied." *Id.* Agreement on the desired outcome of the litigation, the court explained, "does not mean that the Corps and SeFPC have identical positions or interests. The Corps seeks to protect its decision making process, whereas SeFPC seeks to protect the economic and statutory interests of its members." *Id.*; *see also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, No. 2:15-CV-01893-JEO, 2017 WL 5476781, at *2 (N.D. Ala. Apr. 14, 2017) ("The Corps has an interest in defending the process it undertook to issue the Permit, but unlike Global Met has no vested interest in whether the Permit is actually reinstated.").

Here, the Secretary and Census Director similarly have "no independent stake" in protecting Proposed Intervenors and their members against unlawful vote dilution. Their interest, as in *Georgia*, is "to protect [the Census Bureau's] decision making process." 302 F.3d at 1259. And though the Plaintiffs purport

20

to be vindicating an interest in avoiding vote dilution, the relief they seek would actually have the opposite effect—of systematically undercounting people like Proposed Intervenors, their members, and their communities. Proposed Intervenors, therefore, stand alone in representing the parochial interests of the vulnerable populations who Plaintiffs seek to remove from the census count.

Moreover, there is a substantial likelihood in this case that the Defendants will "enter into a settlement agreement with Plaintiffs that would jeopardize [Proposed Intervenors'] interests." *Jud. Watch*, 2024 WL 3454706, at *5. The Amended Complaint goes out of its way to underscore that the challenged statistical methods were undertaken "at the direction of Defendants' predecessors in the Biden administration." Doc. 2 ¶ 77. In a Truth Social post on August 7, less than a month before this case was filed, President Trump called for a "new and highly accurate CENSUS based on modern day facts and figures." [6] Florida Governor Ron DeSantis, an ally of the administration, alluded to the possibility of a collusive settlement in a tweet responding to this lawsuit, saying: "No need to go through litigation if both sides agree that states like Florida got shortchanged."[7] Secretary Lutnick, in

---

[6] Donald J. Trump (@realDonaldTrump), *supra* note 5.

[7] Ron DeSantis (@RonDeSantis), X (Oct. 8, 2025, 16:49 ET), https://x.com/RonDeSantis/status/1976027122683740316.

March 2025, disbanded five advisory panels of experts from the scientific community who provided advice to the Census Bureau.[8] Whatever the position of the Census Bureau might have been previously, "the change in the Administration raises the possibility of divergence of interest or a shift during litigation." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1169 (10th Cir. 2017) (citation modified).

## II. Alternatively, Proposed Intervenors should be granted permissive intervention.

At the very least, Proposed Intervenors should be granted permissive intervention to protect their important interests in this case. "Permissive intervention under Fed. R. Civ. Proc. 24(b) is appropriate where a party's claim or defense and the main action have a question of law or fact in common and intervention will not unduly prejudice or delay the adjudication of the rights of the original parties." *Georgia*, 302 F.3d at 1250.

First, as demonstrated by the Proposed Answer filed concurrently with this motion under Rule 24(c), Proposed Intervenors' defenses plainly share questions of law and fact in common with the main action. Proposed

---

[8] Jeffrey Mervis, *Panels giving scientific advice to Census Bureau disbanded by Trump administration*, Science (Mar. 6, 2025, 11:35 ET), https://www.science.org/content/article/panels-giving-scientific-advice-census-bureau-disbanded-trump-administration.

Intervenors seek to defend the 2020 Census both on the merits of the Plaintiffs' claims and on procedural and jurisdictional grounds.[9]

Second, allowing permissive intervention will not unduly prejudice or delay the adjudication of the rights of the original parties, for the reasons described above. The same timeliness analysis "applies whether the court is considering a motion for intervention as a matter of right or permissive intervention." *Alabama*, 2018 WL 6570879, at *2 (citing *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1516 (11th Cir. 1983)). The Court should therefore grant permissive intervention to allow the Proposed Intervenors to defend the census—an essential pillar of American democracy—from Plaintiffs' baseless and dangerous attacks. *See, e.g.*, *Evans*, 536 U.S. at 510 (Thomas, J., concurring in part and dissenting in part) (noting that the census is a "phenomenon with no [foreign] parallel," which is essential to the "destiny" of the American people); *New York v. United States Dep't of Com.*, 351 F. Supp. 3d 502, 514 (S.D.N.Y. 2019) (finding that "[g]iven the stakes, the interest in an accurate [census] count is immense").

---

[9] In compliance with Rule 24(c), Proposed Intervenors attach a Proposed Answer to this Motion. Proposed Intervenors believe, however, that the Amended Complaint should be dismissed under Federal Rule of Civil Procedure 12(b), and intend to file a Rule 12(b) motion by no later than the named Defendants' deadline to respond to the Amended Complaint.

## <u>CONCLUSION</u>

For the foregoing reasons, Proposed Intervenors respectfully request that this Court grant them intervention as of right—or in the alternative, grant permissive intervention.

Dated: October 28, 2025

Respectfully submitted,

*/s/ Frederick S. Wermuth*
Frederick S. Wermuth (Lead Counsel)
Florida Bar No. 0184111
Quinn B. Ritter
Florida Bar No. 1018135
**KING, BLACKWELL, ZEHNDER**
**& WERMUTH, P.A.**
25 East Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
fwermuth@kbzlaw.com
qritter@kbzwlaw.com

*Counsel for Proposed Intervenors Alliance*
*for Retired Americans, Cameron Driggers,*
*and Manuel Guerrero*

## LOCAL RULE 3.01(G) CERTIFICATION

The undersigned certifies that counsel for the Proposed Intervenors conferred with counsel for the Plaintiffs regarding the motion to intervene, that the parties do not agree on the resolution of the motion, that the motion is opposed, and that the conference occurred via email. Counsel for Proposed Intervenors have not yet been able to confer with Counsel for Defendants, who have not yet entered an appearance.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared. I further certify that I served the foregoing upon Defendants via certified mail on October 28, 2025.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111