# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS and its President, Michael Fusella, individually; PINELLAS COUNTY YOUNG REPUBLICANS, and its President Parisa Mousavi, individually; and BYRON L. DONALDS, in his official capacity as a Member of Congress, | Case No. 8:25-cv-02486 |
| | **SECOND AMENDED COMPLAINT** |
| Plaintiffs, | **INJUNCTIVE RELIEF REQUESTED** |
| v. | **THREE JUDGES REQUIRED** |
| HOWARD W. LUTNICK, in his official capacity as Secretary of Commerce, and GEORGE COOK, in his official capacity as Acting Director of the U.S. Census Bureau, | |
| Defendants. | |

Plaintiffs, UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLI-

CANS; its President, Michael Fusella, individually; PINELLAS COUNTY

YOUNG REPUBLICANS; and its President, Parisa Mousavi, individually; and

BYRON LOWELL DONALDS, in his official capacity as a Member of Congress

(collectively "Plaintiffs"), by and through their undersigned counsel, sue De-

fendants, HOWARD W. LUTNICK, in his official capacity as the Secretary of

Commerce of the United States, and GEORGE COOK, in his official capacity

as acting Director of the U.S. Census Bureau (collectively "Defendants"), and allege:

## INTRODUCTION

1.     This case challenges a census that counted imaginary people instead of real Americans. Federal law forbids using statistical tricks in the census—the Census Bureau did it anyway. Plaintiffs seek a declaration that the 2020 Census violated the Constitution and federal law, an injunction ordering a corrected Census report based on actual counting, and an injunction requiring that this manipulation not happen again in 2030. For the 2020 decennial Census (the "2020 Census"), the U.S. Census Bureau issued a report for purposes of apportionment ("report")  that used two forbidden statistical methods to count phantom people and distort population figures instead of counting the Americans who actually lived here on April 1, 2020. "Group Quarters Imputation" (hereinafter "Group Quarters Method") added millions of fictitious college students to dormitories that sat empty during the pandemic. Differential Privacy injected random noise into nearly every population count, producing results so distorted that some areas showed negative populations—a mathematical impossibility when counting real people. The combined effect: approximately 2.5 million phantom people were added to certain states, most of them blue states, while Florida—a red state—was systematically undercounted. Florida lost two House seats and two Electoral College votes that belonged to

2

it under the Constitution. At the same time, the voting power of every Floridian was diluted by these inflated counts in other states. This case challenges those violations. These statistical flaws violate Article I, Section 2, Clause 3 of the U.S. Constitution (U.S. CONST. art. I, § 2, cl. 3) (the Actual Enumeration Clause), Section 2 of the Fourteenth Amendment to the U.S. Constitution (U.S. CONST. art. XIV, § 2), 13 U.S.C. § 195, and Pub. L. No. 105-119, § 209.

2.    Federal law prohibits the use of statistical sampling for congressional apportionment. 13 U.S.C. § 195. The challenged methodologies violated this statutory prohibition by creating population estimates through regression analysis and statistical inference, rather than through the actual enumeration of persons. The 2020 Census report also violated the requirement to make an enumeration of persons as of April 1, 2020, using different census dates for populations of persons it sought to estimate through the Group Quarters Method, in violation of 13 U.S.C. § 141.

3.    Pub. L. No. 105-119, § 209 prohibits the use of a "statistical method" for the Census that adds counts to the enumeration of the population because of statistical inference. Pub. L. No. 105-119, § 209(b)[1] (codified at 13 U.S.C. § 141, *note).*

---

[1] Pub. L. No. 105-119, § 209, 111 Stat. 2440.

4.     Defendants' reliance on unconstitutional population counts to determine the 2020 Census report and instructions to Congress for proposed Congressional apportionment, which then directed apportionment and redistricting in the states, results in an inaccurate determination of the appropriate number of House of Representatives seats for each state, including Florida and the seats within the jurisdiction and venue of this Court, thus diluting the representative power of lawfully enumerated citizens. Florida also adopted the 2020 Census report for its own legislature's redistricting, resulting in state districting based on flawed data.

5.     Plaintiffs seek a declaration that the 2020 Census report was unlawful insofar as it violated federal statutes and the Constitution by utilizing statistical methodologies to report something other than an actual enumeration.

6.     Plaintiffs seek mandatory relief obligating Defendants to create a new 2020 Census report that does not use statistical methods.

7.     Plaintiffs seek an injunction preventing the Defendants from using unlawful and unconstitutional statistical methods in the 2030 Census.

## PARTIES

8.    University of South Florida College Republicans ("USF Republicans") is a Tampa-based chapter of the College Republican National Committee and is part of the Florida Federation of College Republicans. The purpose and goal of this organization is to recruit, train, engage, and mobilize students to advocate for conservative ideals, participate in civic events, and increase their knowledge of the political process. USF's main campus address is 4202 E Fowler Ave, Tampa, FL 33620. This address is in the 15th Congressional District of Florida, which Republican Laurel Lee represents. *See Find Your Representative*, U.S. HOUSE OF REPS., https://perma.cc/U2MC-32PR.

9.    Michael Fusella is the President of USF Republicans and resides in the 15th Congressional District of Florida and within the Middle District of Florida.

10.    Pinellas County Young Republicans ("Young Republicans") is a club intended to attract young people and provide for them an opportunity to achieve political expression and recognition, more effectively participate in the election process, and better develop and uphold the principles of the Republican Party as a service to the United States of America, the State of Florida, Pinellas County and its political subdivisions. The Young Republicans have an address at 9800 4th Street North, Suite 200, St. Petersburg, FL 33702. This address is in the 14th Congressional District of Florida, which Democrat Kathy

Castor represents. *Florida's 14th Congressional District*, GOVTRACK.US, https://perma.cc/4BJS-NZQH.

11.     Parisa Mousavi is the President of the Young Republicans and resides in the 14th Congressional District of Florida and within the Middle District of Florida.

12.     Plaintiff Byron Lowell Donalds is an elected Member of Congress representing the 19th congressional district in Florida. He sues in his official capacity as an individual Member of Congress pursuant to Pub. L. No. 105-119, § 209(d)(2).

13.     Defendants, Secretary Howard Lutnick and George Cook, are sued in their official capacities.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), and Pub. L. No. 105-119, § 209(b) (codified at 13 U.S.C. § 141, *note*) (providing persons aggrieved by the use of statistical methods in the Census report with a civil right of action for declaratory, injunctive, and other appropriate relief).

15.     This action is authorized by Pub. L. No. 105-119, § 209(b), 111 Stat. 2440, which provides, "Any person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law … in connection with the 2000 or any later decennial Census, to determine the population for

purposes of the apportionment or redistricting of Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method."

16.    Plaintiffs USF Republicans, Fusella, Young Republicans, and Mousavi (collectively, the "Florida Plaintiffs") are "aggrieved person[s]" within the meaning of Pub. L. No. 105-119, § 209(d)(1), which provides a private right of action for: "any resident of a State whose congressional representation … could be changed as a result of the use of a statistical method challenged in the civil action." Rep. Donalds is an "aggrieved person" within the meaning of Pub. L. No. 105-119, § 209(d)(2), which provides a private right of action for "any Representative or Senator in Congress."

17.    Defendants have diluted the Florida Plaintiffs' representative capacity in Congress through the 2020 Census report. They are represented by members of Congress whose districts are located in the Middle District of Florida.

18.    Because the statistical methods affected Florida and the representative composition of the 14th and 15th congressional districts, as well as state legislative districts covering the same locales, where USF Republicans and Young Republicans' members reside, this Court has jurisdiction over the Defendants.

19.    The Florida Plaintiffs are further injured because Florida will receive less federal funding from programs that use census data to determine funding levels.

20.    The statistical methods affected the composition of the United States House of Representatives and altered the balance of power among the States that Members represent, creating a constitutionally non-compliant apportionment of the body to which they belong.

21.    Members of Congress additionally rely upon accurate census data to carry out their duties. Data from the 2020 Census is degraded due to the use of the challenged statistical sampling methods, which impairs the ability of Rep. Donalds to carry out his constitutional obligations.

22.    By using statistical methods for the 2020 Census report, the Commerce Secretary and Census Director directly aggrieved Plaintiffs by basing Florida's apportionment of congressional districts on an unconstitutional and unlawful methodology. Plaintiffs were similarly affected when Florida adopted the 2020 Census report as the basis for local redistricting.

23.    Venue is proper in this district under 28 U.S.C. §1391(b)(2) and (b)(3) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

24.     Pursuant to Pub. L. No. 105-119, § 209(e)(1), this action "shall be heard and determined by a district court of three judges in accordance with [28 U.S.C. § 2284]."

25.     28 U.S.C. § 2284 provides, in pertinent part: "(a) a district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts … (b) In any action required to be heard and determined by a district court of three judges under subsection (a) of this section, the composition and procedure of the court shall be as follows: (1) Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. The judges so designated, and the judge to whom the request was presented, shall serve as members of the court to hear and determine the action or proceeding."

26.     Therefore, Plaintiffs respectfully request that the United States Court of Appeals Chief Judge for the Eleventh Circuit convene such a panel.

27.     Any final order of the panel shall be reviewable by direct appeal to the U.S. Supreme Court.

## FACTS

## Constitutional and Statutory Framework for Census and Apportionment

28.    Article I, Section 2, Clause 3 of the U.S. Constitution requires an "actual Enumeration" of the population within every ten years, "in such Manner as they shall by Law direct."

29.    This requires a literal count of persons rather than mere estimation.

30.    Section 2 of the Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the *whole number of persons* in each State." U.S. CONST. art. XIV, § 2 (emphasis added).

31.    Congress enacted comprehensive legislation governing the decennial Census, codified at 13 U.S.C. § 141 *et seq*., delegating authority to the Secretary of Commerce to conduct the decennial Census.

32.    The Permanent Apportionment Act, 2 U.S.C. § 2a, fixes the House of Representatives at 435 members and establishes the method for allocating seats based on state populations determined by the Census.

33.    In 1997, Congress enacted Pub. L. No. 105-119, § 209 (codified at 13 U.S.C. § 141, *note*), which expressly found that "the use of statistical sampling or statistical adjustment in conjunction with an actual enumeration to

carry out the Census with respect to any segment of the population poses the risk of an inaccurate, invalid, and unconstitutional Census."

34.    This finding reflected Congress's judgment that statistical methods threaten the foundational principles of the constitutional republic by permitting manipulation of population data upon which the allocation of power depends.

35.    Section 209(h)(1) defines "statistical method" as "an activity related to the design, planning, testing, or implementation of the use of representative sampling, or any other statistical procedure, including statistical adjustment, to add or subtract counts to or from the enumeration of the population as a result of statistical inference."

36.    Section 209(i) further provides: "Nothing in this Act shall be construed to authorize the use of any statistical method, in connection with a decennial Census, for the apportionment or redistricting of Members in Congress."

### Group Quarters Method Technical Methodology and Flaws

37.    On Census Day, April 1, 2020, due to the COVID-19 lockdown, individuals who might otherwise have resided in short-term institutional living arrangements were instead residing at their permanent household, located elsewhere.

11

38.    The Group Quarters Method, a statistical method, was used by the Census Bureau in 2020, which had the effect of creating a fictitious population at these institutions.

39.    According to former U.S. Census Bureau employee Adam Korzeniewski, the Group Quarters Method used "linear regression analysis based off estimates from the Group Quarters themselves, yielding a ratio by which Census analysts would impute the population of each facility." Adam Korzeniewski, *Fictive Counting,* AM. MIND (May 14, 2021), https://perma.cc/89PM-C5R3.

40.    This is a prohibited statistical method that is either closely analogous to or constitutes representative sampling.

41.    This regression analysis selected representative facilities as "donors" and used their characteristics to infer the populations of other similar facilities—the essence of representative sampling.

42.    The methodology did not enumerate individual persons at specific addresses; instead, it sampled characteristics from certain group quarters facilities and applied statistical formulas to extrapolate population estimates for entire categories of facilities.

43.    The Group Quarters Method had a significant practical impact on the 2020 Census report due, in part, to the COVID-19 pandemic.

44.    For example, by the end of March 2020, virtually all colleges and universities had closed their dormitories for at least a semester and sent

12

students elsewhere. Consequently, by Census Day 2020, most college and university students had vacated group quarters and were residing in another location.

45.    Consistent with the instructions provided by the U.S. Department of Commerce and the U.S. Census Bureau, these persons were to be counted in the households in which they resided on Census Day.

46.    After the 2020 Census data collection for group quarters had closed, the responses were reviewed, and the U.S. Department of Commerce and the U.S. Census Bureau determined that thousands of possibly occupied group quarters lacked any population count.

47.    Thereafter, an ad hoc group inside the U.S. Census Bureau known as the "GQ Count Imputation Team" was created, which in February 2021 developed and deployed the Group Quarters Method procedure to insert fictitious persons in many group quarters by this method.

48.    The Group Quarters Method was also used on group facilities like nursing homes, many of which were already shuttered or experiencing lower-than-historical occupancy on April 1, 2020.

49.    The Group Quarters Method constituted statistical sampling and statistical methods forbidden by federal law for Census enumeration or congressional apportionment, rather than actual enumeration, because it ascribed

fictional people to facilities that were legitimately empty on Census Day 2020

using mathematical models rather than counting real residents.

50.    The Group Quarters Method adds counts as a result of statistical

inference.

51.    The methodology did not produce population counts through direct

enumeration of actual persons.

52.    Because of the way the Bureau implemented the Group Quarters

Method, it effectively moved Census Day for some groups from April 1 to an

unknown prior date. *See, e.g.,* Exhibit A, Data reported by the University of

Central Florida.

53.    This guaranteed that some people would be double-counted.

**Differential Privacy Technical Implementation and Accuracy Impacts**

54.    In addition to the Group Quarters Method, the Census Bureau also

employed a method called Differential Privacy during the 2020 Census.

55.    The Census Bureau implemented "differentially private (DP) algorithms to protect the confidentiality of tables in 2020 Census data products

through injecting noise into almost every cell," which was "detrimental to data

quality" according to the National Academies of Sciences final report. NAT'L

ACADS. OF SCIS., ENG'G & MED., ASSESSING THE 2020 CENSUS: FINAL REPORT

252 (2023), https://perma.cc/RZY2-YM84.

14

56.    Differential Privacy implements the use of representative sampling by drawing values from the Laplace distribution—a probability distribution used in statistics—to determine the magnitude and direction of statistical "noise" to inject into each census data cell. The Laplace distribution is meant for adding noise to random samples or statistical estimates and assumes all variables are independent and identically distributed—assumptions not true for census data. Census counts are deterministic facts about actual persons, not random variables or statistical estimates with inherent variance. Applying Laplace noise transforms these concrete counts into statistical estimates, fundamentally altering the purpose and accuracy of enumeration data designed to reflect real people at fixed locations on April 1, 2020.

57.    The methodology adjusts actual enumeration results by injecting statistical noise after enumeration has been completed.

58.    This modified census data, through post-processing algorithms, altered the population figures that the actual enumeration count had generated.

59.    Unlike traditional disclosure avoidance methods that protected privacy without changing aggregate counts, Differential Privacy *fundamentally adjusts* those counts through statistical procedures.

60.    Differential Privacy, an unconstitutional and unlawful statistical method, created systematic bias and geographic disparities. J. Tom Mueller & Alexis R. Santos-Lozada, *The 2020 US Census Differential Privacy Method*

*Introduces Disproportionate Discrepancies for Rural and Non-White Popula-*
*tions*, 41 POPULATION RSCH. & POL'Y REV. 1417, 1417 (2022),
https://perma.cc/ZB35-XDJV (referencing the paper's abstract).

61.    Academic analysis has concluded that the Census Bureau's justifi-
cation for Differential Privacy was fundamentally flawed. Steven Ruggles,
*When Privacy Protection Goes Wrong: How and Why the 2020 Census Confi-*
*dentiality Program Failed*, 38 J. ECON. PERSPECTIVES 201, 201 (2024),
https://perma.cc/S8V2-PEJ7.

62.    At the Census block level, Differential Privacy "resulted in larger
errors and greater variation" with "impact most severe among Hispanic resi-
dents and multiracial populations, with the magnitude of the error occasion-
ally exceeding the total number of minorities." Hansi Lo Wang, *The U.S. has a*
*new way to mask Census data in the name of privacy. How does it affect accu-*
*racy?*, SCIENCE (Dec. 2, 2023), https://perma.cc/D8N2-XUEZ.

63.    Additionally, the Laplace mechanism adds noise of similar magni-
tude across geographic levels regardless of population size. This means small
populations receive proportionally much more distortion than large ones, cre-
ating disproportionate harm to rural and minority communities. Christopher
T. Kenny, et al., *The use of differential privacy for census data and its impact*
*on redistricting: The case of the 2020 U.S. Census*, SCIENCE ADVANCES (Oct. 6,
2021), https://perma.cc/KMT4-NMT8. In other words, under Differential

16

Privacy, the more local the scope of the relevant data, the more irregular were the results. Differential Privacy thus also "leads to a likely violation of the 'One Person, One Vote' standard" because it creates inaccurate population counts within precincts and legislative districts, causing redistricting authorities to create state and federal legislative districts that contain unequal numbers of persons. *Id.*

64.    Thus, when states and municipalities go to create precincts, zones, wards, county commissioner districts, school board districts, or any other sub-division based on census population data, they do not actually have data; they have statistical models that vary widely from place to place.

65.    The National Academies documented specific quantitative accuracy failures: "For example, a block with three Hispanic residents might appear to have zero or six Hispanic people after statisticians applied Differential Privacy." *Id.*

66.    The methodology produced negative population values—an obvious impossibility—and created inconsistencies across millions of tabulations.

67.    The Bureau's own characterizations of Differential Privacy confirm that it constitutes a statistical method and sampling. *See Understanding Differential Privacy*, U.S. Census Bureau, https://perma.cc/4F4P-YRPM (describing Differential Privacy as a "scientific framework" and admitting that the Census Bureau "added ... variations from the actual count").

17

68.    The Census Bureau has acknowledged that differential privacy works by "adding statistical noise—small, random additions or subtractions—to every published statistic" and that "this process requires balance" because "[i]f too much noise is introduced, the data will be of no use." CONG. RESEARCH SERV., IF12957, Census Bureau Data: Selected Access, Privacy, and Penalty Issues (2024), https://perma.cc/LY3D-N7JG; see also SIMSON L. GARFINKEL ET AL., DIFFERENTIAL PRIVACY AT THE US CENSUS BUREAU: STATUS REPORT 2, https://perma.cc/3TSJ-UDKV (presentation to Nat'l Inst. of Standards & Tech., Jan. 27, 2020) (noting that epsilon parameter "control[s] the tradeoff between privacy and accuracy").

69.    It further admits that the system sacrifices enumeration accuracy to achieve a purported statistical privacy metric. Even worse, Differential Privacy did not even achieve its stated objective of better protecting privacy. Differential Privacy "does not prevent accurate prediction of sensitive attributes any more than the swapping methodology used in the 2010 Census." Kenny, *supra*, ¶ 63.

70.    The Federal-State Cooperative Committee identified "illogical and implausible values" in demonstration products and documented systematic problems with data processing under the new system. Letter from the Federal-State Coop. Program for Population Estimates to the U.S. Census Bureau Data

Stewardship Executive Policy Comm. (Nov. 23, 2020), https://perma.cc/AN6B-HDJ4.

71.    The combined effect of these methodologies resulted in systematic population miscounting, including the addition of approximately "2.5 million persons to blue states above the December population estimate," creating artificial geographic redistribution of political representation. Korzeniewski, *supra* ¶ 39.

72.    Differential Privacy's documented rural/urban bias and Group Quarters Method's geographic preferences created systematic undercounting in rural areas and overcounting in urban regions, distorting congressional apportionment and federal funding allocations. Mueller, *supra* ¶ 60.

73.    The intentional injection of statistical noise and creation of fictitious persons undermined the constitutional principle that representation should be based on actual population counts rather than statistical estimates or statistically manipulated data.

## HARM

74.    The use of unlawful statistical sampling caused significant, concrete harm.

75.    Plaintiffs have been aggrieved by Defendants' use of statistical methods in violation of the Constitution, 13 U.S.C. § 195, 13 U.S.C. § 141(a), and Pub. L. No. 105-119, § 209 in connection with the 2020 decennial Census.

The 2020 Census report erroneously determined Florida's electoral apportionment population, including the relevant districts within the Tampa Division of the Middle District of Florida.

76.    For example, the Census Bureau has admitted the State of Florida was undercounted by at least 3.48%. COURTNEY HILL ET AL., U.S. CENSUS BUREAU, CENSUS COVERAGE ESTIMATES FOR PEOPLE IN THE UNITED STATES BY STATE AND CENSUS OPERATIONS 16 (June 2022), https://perma.cc/K7Q4-WFZ7.

77.    But for the use of the challenged statistical methods, Florida would have gained two additional House seats and Electoral College votes. *2020 Census Count Errors & Congressional Apportionment*, AM. REDISTRICTING PROJ. (June 13, 2022), https://perma.cc/7FZJ-S8M8; *see also* Press Release, the Hon. Ron Desantis, Gov. of Fla., Governor Ron DeSantis Announces Effort to Correct Census Undercount (Aug. 20, 2025), https://perma.cc/ASV2-28ZG.

78.    Such undercounting deprives Florida of representation in Congress and dilutes the voting power of Floridians in Presidential elections by depriving the State of electoral college votes to which it is entitled.

79.    The inaccuracy of the Census Bureau's unlawful methods also causes inaccurate state-level districting and resource allocation.

80.    Representative Donalds has suffered informational injury that impairs his ability to engage in appropriate lawmaking.

81.    The Florida Plaintiffs are also harmed by the fact that Florida has been deprived of two Congressional seats by the faulty apportionment.

82.    Representative Donalds is harmed because his ability to advocate for Floridians in concert with the other members of the Florida congressional delegation is diluted by virtue of the State of Florida being underrepresented in the House and other states being overrepresented.

83.    The Florida Plaintiffs are harmed by having inaccurate, incomplete, or absent data for the purposes of local representation and apportionment at the state, county, and local level.

84.    The Florida Plaintiffs are harmed by having inaccurate, incomplete, or absent data for the purposes of creating equal voting districts within their counties.

## CLAIMS FOR RELIEF

### COUNT I
*Violation of U.S. CONST. art. I, § 2 (Actual Enumeration Clause)*

85.    Plaintiffs reallege their allegations contained in paragraphs 1 through 84 as if set fully forth herein.

86.    Article I, Section 2, Clause 3 requires an "actual Enumeration" of the population for apportionment purposes.

87. Defendants' use of statistical methods in the 2020 Census report means the apportionment was not based solely on an actual and complete enumeration.

88. By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the 2020 Census report violated Article I, § 2 of the U.S. Constitution.

89. Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that does not use statistical methods.

90. Plaintiffs are also entitled to a preliminary injunction and ultimately a permanent injunction, enjoining Defendants from using statistical methods in the 2030 Census.

## COUNT II
### *Violation of the Fourteenth Amendment, § 2*
### *(Proper Interpretation of "Whole Number of Persons")*

91. Plaintiffs reallege their allegations contained in paragraphs 1 through 84 as if set fully forth herein.

92. The Fourteenth Amendment's reference to "whole number of persons" must be interpreted consistently with the Constitution's structure and the Amendment's purpose.

93. Defendants' use of statistical methods in the 2020 Census report means the apportionment was not based solely on counting whole persons.

22

94.     By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the 2020 Census report violated § 2 of the 14th Amendment of the Constitution.

95.     Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that does not use statistical methods.

96.     Plaintiffs are also entitled to a preliminary injunction and ultimately a permanent injunction, enjoining Defendants from using statistical methods in the 2030 Census.

## COUNT III
### *Violation of 13 U.S.C. § 195*
### *(Prohibition on Statistical Sampling)*

97.     Plaintiffs reallege their allegations contained in paragraphs 1 through 84 as if set fully forth herein.

98.     The challenged methodologies violated the Constitution's "actual Enumeration" requirement by substituting statistical estimation and data manipulation for the direct population counting mandated by Article I, Section 2, Clause 3.

99.     The statistical methods violate 13 U.S.C. § 195's prohibition on statistical sampling for congressional apportionment by creating population estimates through regression analysis rather than enumerating actual persons

and by deliberately injecting false information that distorted Census data by adding statistical errors.

100.   Both statistical methodologies violated federal statutory requirements for accurate enumeration under 13 U.S.C. § 141, which mandates that the 2020 Census report apportionment is accurate and based on reliable and high-quality data and does not rely on statistical methods.

101.   By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the use of the statistical methods constitutes prohibited sampling under 13 U.S.C. § 195.

102.   Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that does not use statistical sampling.

103.   Plaintiffs are also entitled to a preliminary injunction and, ultimately, a permanent injunction enjoining Defendants from using statistical sampling in the 2030 Census.

## COUNT IV
*Violation of 13 U.S.C. § 141(a)*
*(Establishment of Census Day)*

104.   Plaintiffs reallege their allegations contained in paragraphs 1 through 84 as if set fully forth herein.

105.   13 U.S.C. § 141(a) provides, in relevant part, that "The Secretary shall ... take a decennial census of population as of the first day of April of such year."

106.   13 U.S.C. § 141 mandates that the 2020 Census report apportionment be accurate and based on reliable and high-quality data as of April 1, 2020.

107.   By instructing contacts at group quarters to provide population counts for their institutions from before they closed due to COVID-19 in March 2020, the GQ Count Imputation Team intentionally used data known to misrepresent the current population of the United States as of April 1, 2020.

108.   This conduct, taken at the direction of Defendants' predecessors in the Biden administration, violated the statutory mandate to count the population of the United States of America "as of the first day of April" of the decennial census year.

109.   By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the use of the Group Quarter Method in the 2020 Census violated 13 U.S.C. § 141(a).

110.   Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that accurately reflects the population of the United States as of April 1, 2020.

111.   Plaintiffs are also entitled to a preliminary injunction and, ultimately, a permanent injunction enjoining Defendants from using any data known not to reflect the "population as of the first day of April" in the 2030 Census.

## COUNT V
### *Violation of Pub. L. No. 105-119, § 209*
### *(Prohibition on Statistical Methods)*

112.   Plaintiffs reallege their allegations contained in paragraphs 1 through 84 as if set fully forth herein.

113.   Pub. L. No. 105-119, § 209(b) provides that "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law … in connection with the 2000 or any later decennial Census, to determine the population for purposes of the apportionment or redistricting of Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method."

114.   The 2020 Census report's reliance upon the Group Quarter Method and Differential Privacy implicates a "statistical method" as defined in Pub. L. No. 105-119, § 209(h)(1).

115.   These statistical methods add and subtract counts in the enumeration based on inference about who qualifies as a constitutional "person" rather than the actual enumeration of lawful inhabitants. They also make assumptions and inferences that add and subtract counted persons.

116.   By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the 2020 Census report apportionment was based upon an unlawful "statistical method" under Pub. L. No. 105-119, § 209.

117.   Plaintiffs are also entitled to mandatory relief that obligates the Defendants to create a new 2020 Census report that does not use statistical methods.

118.   Plaintiffs are also entitled to a preliminary injunction, and ultimately a permanent injunction, enjoining Defendants from using statistical methods in the 2030 Census.

## DEMAND FOR A THREE-JUDGE PANEL

**WHEREFORE**, Plaintiffs demand judgment against Defendants HOWARD LUTNICK and GEORGE COOK as follows:

(a)   Convene a three-judge district court pursuant to Pub. L. No. 105-119, § 209(e)(1) and 28 U.S.C. § 2284;

(b)   Issue a declaratory judgment that:

1.   The 2020 Census report violated the Constitution and federal law by using statistical sampling and statistical methods;

2.   The 2020 Census report's apportionment violates the U.S. Constitution and federal law;

(c)   Issue preliminary and permanent injunctive relief:

    1.  Enjoining Defendants from using statistical sampling and statistical methods for the 2030 Census report, including Differential Privacy and Group Quarter Method.

(d)  Issue mandatory relief:

    1.  Obligating Defendants to create a new 2020 Census report that does not use statistical sampling or statistical methods.

(e)  Award Plaintiffs' costs and attorneys' fees as appropriate; and

(f)  Grant such other and further relief as this Court deems just and proper.

DATED: November 12, 2025           Respectfully submitted,

*/s/ James Rogers*

James K. Rogers (AZ Bar No. 027287)*

Emily Percival (FBN 119313)

Ryan Giannetti (DC Bar No. 1613384)*

Crystal Clanton (AL Bar No. 1746D29O)*

Robert A. Crossin (IN Bar No. 39340-49)*

**America First Legal Foundation**

611 Pennsylvania Ave., SE #231

Washington, D.C. 20003

Phone: (202) 964-3721

james.rogers@aflegal.org

emily.percival@aflegal.org

ryan.giannetti@aflegal.org

crystal.clanton@aflegal.org

bobby.crossin@aflegal.org

R. Quincy Bird (FBN 105746)

Timothy W. Weber (FBN 86789)

Jeremy D. Bailie (FBN 118558)

**Weber, Crabb & Wein, P.A.**

5453 Central Avenue

St. Petersburg, FL 33710

Telephone: (727) 828-9919

Facsimile: (727) 828-9924

timothy.weber@webercrabb.com

jeremy.bailie@webercrabb.com

quincy.bird@webercrabb.com

Secondary:

lisa.willis@webercrabb.com

honey.rechtin@webercrabb.com

natalie.deacon@webercrabb.com

*Admitted pro hac vice*

*Counsel to Plaintiffs*