## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS et. al., | Case No. 8:25-cv-02486 |
| Plaintiffs, | **MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| HOWARD W. LUTNICK, et. al., | |
| Defendants. | |

## I.    Introduction

Plaintiffs University of South Florida College Republicans, Michael Fusella, *see* Exhibit 3, Pinellas County Young Republicans, Parisa Mousavi, *see* Exhibit 4, and the Hon. Byron L. Donalds, by and through undersigned counsel, move for summary judgment on the facts set forth in the Statement of Undisputed Material Facts ("SUMF") that the parties met and conferred upon and ask that this Court enter an order granting declaratory and injunctive relief.

## II.    Legal Standard

"Summary judgment must be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). A dispute is "genuine" if the

1

evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Id.* The nonmoving party must provide more than a "mere scintilla" of evidence. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III.    Summary of the Argument

In completing the 2020 Census, the Census Bureau used illegal and impermissible methods to determine the population of the United States. Group Quarters Count Imputation Procedure (GQCIP) and Differential Privacy, *see* Exhibit 9 at 213—two new statistical methodologies that Defendants unlawfully used to conduct the 2020 census, *see* Exhibit 5—are impermissible "sampling methods" under federal law. The combined use of GQCIP and Differential Privacy resulted in systematic population miscounting in the 2020 census. But for the use of these methods in the 2020 census, Florida would have gained two additional House seats and Electoral College votes. Exhibit 17; Exhibit 18 at 6. Additionally, the inaccuracy of the Census Bureau's 2020 census population count causes inaccurate state-level districting and resource allocation. Exhibit 10 at 7; Exhibit 11 ¶ 6. Considering that these unlawful methodologies "could" have changed the congressional representation or district of the Plaintiffs, they are entitled to relief.

## IV.    Argument

### A.    Plaintiffs have standing.

Public Law No. 105-119, § 209(b), 111 Stat. 2440, 2481 provides that "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law (other than this Act), in connection with the 2000 or any later decennial census, to determine the population for purposes of the apportionment or redistricting of Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method." Plaintiffs are "person[s] aggrieved" because they are "resident[s] of [Florida] whose congressional representation or district could be changed as a result of the use of a statistical method challenged" and a "Representative ... in Congress." *Id.* § 209(d).

To establish Article III standing, a plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). An injury in fact is "an invasion of a judicially cognizable interest, which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019).

University of South Florida College Republicans, Pinellas County Young Republicans, Michael Fusella, and Parisa Mousavi (the Florida Plaintiffs) can prove three concrete injuries due to inaccuracies in the 2020 census resulting from the challenged statistical methods: (1) deprivation of additional representation in Congress and the Electoral College; (2) inaccurate intra-state redistricting, which led to vote dilution; and (3) diminished federal funding for their communities as a result of the undercount.

The first injury is the prototypical injury in Section 209 cases. *Dep't of Com. v. U.S. House of Reps.*, 525 U.S. 316, 330 (1999) (holding that individual plaintiffs had standing where their state would be deprived of an additional House seat); *Utah v. Evans*, 536 U.S. 452, 460–61 (2002) (similar). The Census Bureau has admitted that Florida was undercounted by 3.48% in its official Post-Enumeration Survey. Exhibit 25 at 22. But for the use of the challenged statistical methods, Florida would have gained two additional House seats and Electoral College votes. Exhibit 17; Exhibit 18 at 6.

Regarding the second injury, Florida uses federal census data for "[a]ll acts of the Florida Legislature based upon population and all constitutional apportionments." FLA. STAT. § 11.031(1). And "[e]ach decennial census of the state taken by the United States shall be an official census of the state." FLA. CONST. art. 10 § 8(a). Florida Data Science for Social Good, a program of the University of North Florida, estimates that the 2020 census undercounted

4

Pinellas County by 2.7%. Exhibit 20; *see also* Exhibit 25 at 8. The Supreme Court has found this kind of injury sufficient to establish standing for individual plaintiffs. *U.S. House of Reps.*, 525 U.S. at 332.

Third, the undercount of Florida and its counties will result in less funding flowing to those communities from the federal and state government, injuring the Florida Plaintiffs. "'Citizens who challenge a census undercount on the basis ... that improper enumeration will result in loss of funds' to their state or locality have established a concrete and particularized injury." *Kravitz v. U.S. Dep't of Com.*, 366 F. Supp. 3d 681, 738 (D. Md. 2019) (quoting *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980)) (alterations adopted).

Representative Donalds suffers three concrete injuries: (1) an inaccurate balance of power between the states in Congress; (2) degradation of the reliability of the census data upon which he relies for his day-to-day work; and (3) a weakened Florida Delegation.

As to the first injury, the Framers deliberately chose to design the House of Representatives to balance the various state populations after a protracted debate, which resulted in the "Great Compromise." *See generally* MAX FARRAND, THE FRAMING OF THE CONSTITUTION OF THE UNITED STATES 99 (1913). It is for this reason that "the sole constitutional purpose of the decennial enumeration of the population is the apportionment of Representatives in Congress among the several States." Pub. L. No. 105-119, § 209(a)(2); *see also* Exhibit 1.

"The Constitution apportions power among the States based on their respective populations; consequently, changes in population shift the balance of power among them." *Utah*, 536 U.S. at 489 (Thomas, J., concurring in part and dissenting in part). Representative Donalds has suffered harm by having to serve in a Congress with a fictional balance of power.

Second, courts in census cases have consistently found that "degradation of data is thus an informational injury analogous to those that have supported Article III standing." *Nat'l Urban League v. Ross*, 508 F. Supp. 3d 663, 690 (N.D. Cal. 2020); *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 611 (S.D.N.Y. 2019), aff'd in part, rev'd in part on other grounds and remanded sub nom., *Dep't of Com. v. New York*, 588 U.S. 752, (2019) (finding that "degradation in the quality of census data" supported standing); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (collecting cases finding that "deprivation of information" supports standing).

Representative Donalds is dependent upon the granular data collected in the census to understand the potential impacts of legislation and funding requirements for a given area and to fulfill his constitutional obligations to his constituents. Exhibit 2 ¶ 6. "A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change[.]" *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927). It was for this reason that Congress found that "it is essential that

the decennial enumeration of the population be as accurate as possible." Pub.
L. No. 105-119, § 209(a)(6). "[W]here the legislative body does not itself possess
the requisite information—which not infrequently is true—recourse must be
had to others who do possess it." *McGrain*, 273 U.S. at 175. Representative
Donalds is harmed by not having the "requisite information" from the Census
to rely upon to adequately do his job.

Third, by denying Florida the number of seats to which it was entitled
under a constitutionally compliant census, the Defendants have weakened the
strength of the Florida congressional delegation relative to the other states. It
is now more difficult for Representative Donalds to represent his constituents,
and he has fewer fellow citizens he can call upon to advocate for Florida-fo-
cused issues.

Plaintiffs' injuries are also redressable. The Supreme Court has held
that malapportionment is judicially redressable, even following the transmis-
sion by the House of Representatives of the certificate informing each state of
the number of representatives to which it is entitled. *Utah*, 536 U.S. at 461–
62. Indeed, "[i]n such cases, the 'certificate' previously sent would have turned
out not to have been a proper or valid certificate, it being understood that these
statutes do not bar the substitution of a newer, more accurate version." *Id.*; *see
also Franklin v. Massachusetts*, 505 U.S. 788 (1992).

7

**B.    Federal statutes prohibit the statistical methods used here.**

**1.    Section 195 prohibits statistical sampling for con-
gressional apportionment.**

Federal law permits the use of statistical "sampling" in assembling de-
mographic data collected in connection with the census, "*[e]xcept* for the deter-
mination of population for purposes of apportionment of Representatives in
Congress among the several States." 13 U.S.C. § 195 (emphasis added). In
other words, apportionment cannot be based on data collected through the use
of statistical sampling.

The Supreme Court has defined "sampling" as any statistical method
that "extrapolat[es] … the features of a large population from a small one."
*Utah*, 536 U.S. at 467. Sampling uses statistical inference to add counts to the
enumeration, creating population estimates through statistical procedures ra-
ther than direct enumeration. *See Utah*, 536 U.S. at 465–69 (distinguishing
sampling from imputation); *U.S. House of Reps.*, 525 U.S. at 323–25, 341 (de-
scribing sampling methodology). Sampling stands in stark contrast to enumer-
ation, where census takers count individuals through direct contact with
households or by obtaining information about specific housing units from iden-
tifiable sources such as neighbors, landlords, or postal workers. *See id.* at 335.
The distinction is critical: Sampling *infers* population characteristics through
mathematical models applied to representative samples, while enumeration

8

*tallies* population through the individualized data collection of specific persons and housing units.

The prohibition on using statistical methods for apportionment has existed for over 200 years. The Supreme Court has emphasized this unbroken historical tradition, noting that early census acts explicitly required "actual inquiry at every dwelling-house, or of the head of every family," and that the requirement for enumerators to visit each home appeared in statutes governing the first fourteen censuses following 1790. *U.S. House of Reps.*, 525 U.S. at 335. Even when Congress enacted the precursor to § 195 in 1957—allowing the Secretary to use sampling for purposes other than apportionment, *id*. at 335–37—and the 1976 amendment to § 195—which made sampling mandatory for other demographic data collection if feasible, see Pub. L. No. 94-521, § 10, 90 Stat. 2459, 2464 (Oct. 17, 1976) (codified at 13 U.S.C. § 195)—Congress maintained the prohibition on sampling for apportionment itself.

The Executive Branch consistently accepted this interpretation of the Census Act until 1994. The Census Bureau itself concluded in 1980 that the amended Census Act "clearly" continued the "historical precedent of using the 'actual Enumeration' for purposes of apportionment, while eschewing estimates based on sampling or other statistical procedures, no matter how sophisticated." 45 Fed. Reg. 69366, 69372 (Oct. 20, 1980). The Solicitor General argued this same position before the Supreme Court in 1980 in *Carey v.*

9

*Klutznick. See U.S. House of Reps.*, 525 U.S. at 340–42 (citing Application for Stay in *Carey v. Klutznick*, O.T. 1979, No. A-354, p. 10). It was not until 1994 that the Executive Branch claimed for the first time that statistical sampling for apportionment would be consistent with the Census Act—a position the Supreme Court rejected in 1999. *U.S. House of Reps.*, 525 U.S. at 343.

### 2.    Section 209 prohibits the use of any statistical methods for congressional apportionment.

Public Law No. 105-119, § 2099(i) (codified at 13 U.S.C. § 141, note) expressly prohibits "the use of any statistical method, in connection with a decennial census, for the apportionment or redistricting of Members in Congress." The statute defines "[s]tatistical method" as "an activity related to the design, planning, testing, or implementation of the use of representative sampling, or any other statistical procedure, including statistical adjustment, to add or subtract counts to or from the enumeration of the population as a result of statistical inference." § 209(h)(1).

Congress enacted Section 209 to prevent statistical manipulation of the census in response to the Clinton Administration's proposal to use sampling for the 2000 Census. The legislative history reflects deep concern that statistical methods would open the door to political manipulation of population counts, thereby undermining the integrity of congressional apportionment and redistricting. Congress explicitly found in the statute itself that the use of sampling

10

or statistical adjustment "poses the risk of an inaccurate, invalid, and uncon-stitutional Census." § 209(a)(7).

The concern about political manipulation that motivated Section 209's enactment was rooted in the reality that statistical methods—unlike actual enumeration—inherently involve discretionary choices about sampling frames, adjustment algorithms, and demographic assumptions that could be exploited for partisan advantage. During congressional debate over census methodology, Speaker Newt Gingrich articulated this concern, urging his col-leagues: "Please do not ask the people of the United States to rely on politicians controlling pollsters to invent virtual people to get a grossly inaccurate count on behalf of some political party, because that undermines the Constitution and that undermines the very political process." 144 CONG. REC. H7211 (daily ed. Aug. 5, 1998) (statement of Speaker Gingrich). Courts must respect Con-gress's statutory choice.

### 3. The GQCIP is a prohibited "statistical method" un-der Section 209.

*First*, the GQCIP uses representative sampling through regression anal-ysis. As detailed in the Complaint, the methodology employed "linear regres-sion analysis based off estimates from the Group Quarters themselves, yielding a ratio by which Census analysts would impute the population of each facility." *See* Exhibit 8 at 3. This regression analysis selected representative facilities as

11

"donors" and used their characteristics to infer the populations of other similar facilities—the essence of representative sampling. Exhibit 26 at 4. The methodology did not enumerate individual persons at specific addresses; instead, it sampled characteristics from certain group quarters facilities and applied statistical formulas to extrapolate population estimates for entire categories of facilities.

*Second*, the GQCIP constitutes a "statistical procedure" that adds counts to the enumeration. The statutory definition encompasses not only "representative sampling" but also "*any other* statistical procedure, including statistical adjustment." Pub. L. 105-119, § 209(h)(1), 111 Stat. 2440, 2483 (emphasis added). The GQCIP's use of regression formulas to generate population estimates plainly constitutes a "statistical procedure" within the statute's broad reach. Moreover, it functions as a "statistical adjustment" by systematically adding population counts to facilities where actual enumeration yielded zero residents on Census Day.

*Third*, and most critically, the GQCIP did not produce population counts through direct enumeration of actual persons. Instead, it used mathematical models to infer what the population of empty facilities would have been if COVID-19 had not happened. Exhibit 6 at 2; Exhibit 26 at 4, 6–11. It is not the Census Bureau's job to figure out what might have been. Because of the GQCIP, the 2020 census represents an imprecise estimation of a world that

never was: an alternate universe where COVID-19 never happened. But COVID-19 *did* happen, and because of the GQCIP, the 2020 Census Report is divorced from reality.

The GQ Count Imputation Team instructed group quarters contacts "to provide population counts for their institution from *prior* to when it closed due to COVID-19," Exhibit 7; Exhibit 21; Exhibit 24; Exhibit 26 at 2 ("GQ contacts were instructed to provide counts prior to closing because of COVID-19"), and then used regression analysis to project those historical populations forward to Census Day. This temporal extrapolation exemplifies statistical inference—using data from one time period to estimate characteristics of another. The resulting population counts were not based on enumerating persons actually present on April 1, 2020, but rather on statistical inferences drawn from pre-pandemic data. This is precisely what Section 209 prohibits: adding counts to the enumeration through statistical inference rather than actual counting of real persons.

The GQCIP thus fails all three critical factors that *Utah* identified as distinguishing permissible imputation from prohibited sampling. First, as to the "nature of the enterprise," *Utah*, 536 U.S. at 466, the GQCIP did not fill in gaps from an enumeration effort—it created entirely new population counts where no enumeration of Census Day populations occurred. Second, as to methodology, *id.*, the GQCIP used regression analysis rather than the

13

neighbor-to-neighbor inference approved in *Utah*. It applied statistical models rather than direct data transfer, selecting "donor" facilities to represent entire populations through statistical inference rather than the fortuitous availability of geographically proximate data. Third, as to immediate objective, the GQCIP did not seek to determine the characteristics of individual missing units after enumeration efforts had failed. Instead, it sought to estimate the total population of entire facilities, applying ratios to create aggregate counts. Its goal was population estimation for categories of group quarters, not gap-filling for specific housing units where enumeration proved incomplete. *See id.* at 466–67. Exhibit 24 at 9–10.

### 4. Differential Privacy constitutes a prohibited sampling and statistical method.

Differential Privacy constitutes a prohibited "statistical method" under Section 209 of Public Law 105-119. First, it implements the use of representative sampling by drawing values from the Laplace distribution—a probability distribution used in statistics—to determine the magnitude and direction of noise to inject into each census data cell. Exhibit 10; Exhibit 16. This sampling from statistical distributions to distort population counts constitutes "representative sampling" within the meaning of Section 209(h)(1). The methodology does not sample from the actual population, but it does employ the statistical technique of sampling from a defined distribution to generate the noise values

that are then added to or subtracted from enumeration data. Exhibit 9 at 214; Exhibit 10; Exhibit 15; Exhibit 23.

Assuming, *arguendo*, the Differential Privacy's sampling from probability distributions did not constitute "representative sampling," the methodology still falls within Section 209's prohibition against "any other statistical procedure . . . to add or subtract counts to or from the enumeration of the population as a result of statistical inference." Differential Privacy intentionally adds statistical noise to virtually every cell of census data and subtracts from accurate counts through random statistical adjustments determined by algorithmic procedures. SUMF ¶ 12. These additions and subtractions directly alter enumeration counts based on statistical procedures designed to achieve a mathematical privacy guarantee. *Id.* at 13; *see also* Exhibit 9 at 215; Exhibit 11 ¶ 5. The Census Bureau cannot dispute that it adds and subtracts population counts through Differential Privacy. Exhibit 12.

Differential Privacy also constitutes "statistical adjustment" expressly prohibited by Section 209. *See* Exhibit 11 ¶ 2. The methodology adjusts actual enumeration results by injecting noise after enumeration has been completed, modifying census data through post-processing algorithms that systematically alter the population figures that emerge from the enumeration itself. Exhibit 11 ¶¶ 5–6. Unlike traditional disclosure avoidance methods that protect

15

privacy without changing aggregate counts, Differential Privacy fundamentally adjusts those counts through statistical procedures. Exhibit 10.

The Census Bureau's own characterizations of Differential Privacy confirm that it employs statistical inference. Exhibit 5 at 2; Exhibit 14 at 2; *see also* Exhibits 15–16. The Bureau has acknowledged that the methodology injects noise into census data and admits the inherent privacy-accuracy tradeoff—an admission that the system sacrifices enumeration accuracy to achieve a statistical privacy metric. *Id.* Section 209's prohibition cannot be evaded by asserting that the statistical method serves a different purpose (privacy protection) than the methods Congress contemplated in 1997. The statute's language is clear: it prohibits "*any* . . . statistical procedure" that adds or subtracts counts "as a result of statistical inference," without exception. § 209(h) (emphasis added). Differential Privacy is therefore explicitly covered by Section 209(h)(1)'s prohibition and cannot lawfully be used for congressional apportionment or redistricting.

### C.    The GQCIP and Differential Privacy violate the Constitution.

#### 1.    The Constitution requires a literal, individual counting of persons.

The Constitution requires an "actual Enumeration," U.S. CONST. art. I, § 2, cl. 3. The original meaning of "actual Enumeration" is unmistakably clear: Dictionaries from the time of ratification establish that an "actual

Enumeration" means a real, literal count of people. 536 U.S. at 492 (Thomas, J., concurring in part and dissenting in part) (collecting sources); *see also Dep't of Comm. v. New York*, 588 U.S. 752, 803 (2019) (Breyer, J., concurring in part and dissenting in part) (explaining that an "actual Enumeration" means an "actual count of every resident"). The Framers explicitly distinguished the "actual Enumeration" required by the Constitution from mere estimations. For example, during the debate over the first Census Act, Madison noted that the census required by the Constitution would provide an "exact number of every division" as compared to "assertions and conjectures." 2 THE FOUNDERS' CONSTITUTION 139 (P. Kurland & R. Lerner eds. 1987). And in describing the results of the first census, Thomas Jefferson distinguished "actual" returns from those added in red ink by "conjecture[e]." 8 THE WRITINGS OF THOMAS JEFFERSON 229 (A. Lipscomb ed. 1903). Aware of these linguistic distinctions, the Framers consciously required an "actual Enumeration." U.S. CONST. art. I, § 2, cl. 3.

### 2. The GQCIP violates the "actual Enumeration" requirement of Art. I, sec. 2, cl. 3.

The GQCIP violated the Constitution's "actual Enumeration" requirement in three ways: (1) it failed to meet the standard of a permissible imputation and was instead an impermissible sampling; (2) it counted fictitious people rather than real people; and (3) it systematically double-counted individuals.

*First*, traditional imputation, as described in *Utah*, fills in gaps from actual enumeration efforts after "all efforts have been made to reach every household" and represents a "last resort" when "ordinary questionnaires and interviews have failed." *Utah*, 536 U.S. at 470, 478–79. The GQCIP employed in the 2020 census crossed the line from permissible gap-filling into prohibited sampling by creating population counts where no genuine enumeration occurred. The GQCIP generated population estimates for facilities that the Census Bureau knew to be empty on April 1, 2020. Exhibit 6 at 2. The Bureau did not exhaust enumeration efforts only to find itself uncertain about occupancy details; rather, it confronted facilities with zero actual occupants on Census Day and used regression analysis to impute populations based on pre-pandemic data. *Id.* ¶¶ 32, 37–38.

*Second*, the GQCIP counted fictitious people rather than real human beings. It used linear regression analysis based on estimates from group quarters facilities, yielding ratios by which census analysts would impute the population of each facility. *See* Exhibit 8 at 3. This approach fundamentally differs from the neighbor-to-neighbor method outlined in *Utah* where actual enumeration was occurring but enumerators were allowed to impute information about residents by asking a neighbor or mailman. 536 U.S. at 455. The GQCIP improperly substituted statistical inference for direct counting.

18

*Third*, the GQCIP systematically double-counted individuals. The departure from actual enumeration becomes starkest when examining facilities that were known to be empty on census day. Due to COVID-19 pandemic closures, virtually all colleges and universities had closed their dormitories and sent students home by the end of March 2020. On April 1, 2020—the legally mandated census day—these dormitories stood empty. *See* 13 U.S.C. § 141(a); *see also* Exhibit 1. Yet rather than recording the actual population of zero that existed in these facilities on census day, the Census Bureau used regression analysis to impute fictitious populations to these empty buildings.

This violation of the Actual Enumeration Clause is not remedied by characterizing the GQCIP as "imputation" rather than "sampling." The constitutional requirement for "actual Enumeration" operates independently of statutory definitions. Even if a methodology might theoretically fall within permissible statutory imputation under Section 195—which the GQCIP does not—it must still satisfy the constitutional standard of actual enumeration. While Congress has discretion in directing the "Manner" of the census, "it does not have unbridled discretion ... it must follow the Constitution's command of an actual Enumeration." *Utah*, 536 U.S. at 495 (Thomas, J., concurring in part and dissenting in part). The GQCIP's use of regression-based estimation to create fractional and fictitious persons in facilities known to be empty on Census

19

Day cannot be reconciled with the constitutional requirement to conduct an actual enumeration of whole persons actually present.

### 3. Differential Privacy violated the Constitution's "actual Enumeration" requirement.

Unlike traditional disclosure avoidance methods that protect privacy without altering aggregate counts, Differential Privacy deliberately injected "statistical noise" into census data, adding and subtracting population counts through random statistical distributions applied to virtually every data cell. SUMF ¶ 12. This methodology distorted actual enumeration results through post-processing mathematical manipulation. The Census Bureau does not dispute that Differential Privacy added to and subtracted from actual person counts—indeed, that is the acknowledged purpose of the system.

The Differential Privacy methodology generated negative population values—a mathematical impossibility when counting actual persons. Exhibit 10. At the Census block level, Differential Privacy "'resulted in larger errors and greater variation' with 'impact most severe among Hispanic residents and multiracial populations, with the magnitude of the error occasionally exceeding the total number of minorities.'" Exhibit 12 at 3; *see also* Exhibit 10, Exhibit 13. The National Academies documented that "a block with three Hispanic residents might appear to have zero or six Hispanic people" after the Differential Privacy algorithms were applied—errors of 100% or 200% that render the data

useless for its constitutional purpose. Exhibit 12 at 3. These errors were not random or evenly distributed; they created systematic rural/urban bias, disproportionately affected certain racial and ethnic groups, and produced block-level discrepancies that exceeded the actual populations of those blocks. *See generally*, Exhibit 11 ¶¶ 5-6.

This systematic distortion violated the fundamental constitutional principle that apportionment must be based on the "counting [of] the *whole number* of persons in each State." U.S. CONST. amend. XIV, § 2 (emphasis added). As the National Academies concluded, injecting noise into "almost every cell" was "detrimental to data quality," Exhibit 22 at 325, a striking admission that the Census Bureau deliberately degraded the accuracy of its enumeration to implement a statistical system that the Constitution and federal law prohibit.

### D.   The GQCIP violated 13 U.S.C. § 141(a).

The GQCIP violated the statutory requirement that the census count the population "as of the first day of April," 13 U.S.C. § 141(a), by using pre-Census Day data to generate population estimates. *See* Exhibit 1. The GQ Count Imputation Team instructed group quarter contacts "to provide counts prior to closing [of the institutions] because of COVID-19." Exhibit 26 at 6. These contacts were asked to supply counts from March 2020 or earlier and this data was then used to impute populations to facilities on April 1, 2020. The Census Bureau thereby intentionally used data known to misrepresent the current

population of the United States as of April 1, 2020. This practice effectively moved Census Day for group quarters facilities backward in time to some unspecified pre-pandemic date.

The use of pre-Census Day data also caused systematic double-counting. College students were properly counted at their family homes on April 1, 2020, where they resided on Census Day after campuses closed in March. But these same students were then fictitiously imputed back to their dormitories based on pre-April 1 occupancy data. This methodology virtually guaranteed that persons who had resided in group quarters prior to COVID-19 would be double counted—first at home, and then fictitiously by the GQCIP as if they had been at their college or university on Census Day. *See* Compl. Exhibit A.

### E.    The GQCIP and Differential Privacy affect both apportionment and redistricting.

The unlawful methodologies employe in the 2020 census affected interstate apportionment, the foundational mechanism by which congressional power is distributed among the states. According to analysis of the 2020 census, the combined effect of the GQCIP and Differential Privacy resulted in the addition of approximately 2.5 million persons to certain states, "creating artificial geographic redistribution of political representation." Exhibit 8. Specifically, Florida's congressional seat allocation was adversely affected by the Census Bureau's use of the GQCIP and Differential Privacy, as these statistical

techniques systematically manipulated population counts that determine the allocation of seats in the House of Representatives. *See* Exhibit 17; Exhibit 19. Florida's share of representation in Congress may have been diminished relative to what it would have received had the census been conducted lawfully. The balance of power among States was fundamentally altered by these methodologies.

The constitutional violations in the 2020 census cascaded downward to corrupt redistricting at the intrastate level as well. Florida, like other states, adopted the 2020 Census Report as the legal and demographic foundation for redistricting state legislative districts, county commission districts, school board districts, and other local governmental bodies. State legislative districts throughout Florida were drawn based on population data that included fictitious persons created through the GQCIP and systematically distorted counts produced by Differential Privacy. The Census Bureau's unlawful methodologies infected the entire structure of representative government within the State. Congressional district boundaries within Florida reflect not the actual distribution of the population, but rather a demographically false picture created by adding imaginary college students to empty dormitories and injecting statistical noise throughout census tabulations.

Local redistricting was similarly harmed: city councils, county commissions, school boards, and special districts that used census data for their own

redistricting processes unwittingly drew district lines based on population figures that violated federal law. The harm is pervasive and structural—every level of representative government that relies on census data now operates under a redistricting scheme built on a legally and factually defective foundation, perpetuating the constitutional violation with each election cycle until the census is corrected and redistricting can be based on lawful enumeration.

## F.    Plaintiffs are entitled to the requested relief.

Plaintiffs respectfully ask this Court to declare that (1) the 2020 Census Report violated the "actual Enumeration" requirement in the United States Constitution, *see* U.S. CONST. art. 1, § 2, cl. 3; (2) the 2020 Census Report violated the Fourteenth Amendment, *id.* amend. XIV; (3) the use of the GQCIP violated 13 U.S.C. §§ 141(a) and 195, Pub. L. No. 105-119, § 209; (4) the use of the Differential Privacy method violated 13 U.S.C. § 195 and Pub. L. No. 105-119, § 209; and (5) the 2020 census apportionment was based on methodologies that violate both the United States Constitution and federal law.

Plaintiffs also seek injunctive relief in the form of (1) a permanent injunction enjoining Defendants from using statistical sampling and statistical methods for the 2030 Census Report, including Differential Privacy and Group Quarter Method, and (2) a mandatory injunction requiring a new 2020 Census Report that does not rely on unlawful statistical methods.

## V.     Conclusion

For the foregoing reasons, this Court should grant summary judgment in favor of the Plaintiffs on all counts. If the Court denies Plaintiffs' Motion for Summary Judgment, Plaintiffs request that the Court enter summary judgment for Defendants under Federal Rule of Civil Procedure 56(f)(1), allowing Plaintiffs to immediately appeal. *See also,* Pub. L. No. 105-119, § 209(e)(2) (conferring on the district court a duty to expedite cases brought under this section).

DATED: November 14, 2025                                Respectfully submitted,

*/s/ Emily Percival*
James K. Rogers (AZ Bar No. 027287)*          R. Quincy Bird (FBN 105746)
Emily Percival (FBN 119313)                            Timothy W. Weber (FBN 86789)
Ryan Giannetti (DC Bar No. 1613384)*          Jeremy D. Bailie (FBN 118558)
Crystal Clanton (AL Bar No. 1746D29O)*       **WEBER, CRABB & WEIN, P.A.**
Robert A. Crossin (IN Bar No. 39340-49)*      5453 Central Avenue
**AMERICA FIRST LEGAL FOUNDATION**            St. Petersburg, FL 33710
611 Pennsylvania Ave., SE #231                     Telephone: (727) 828-9919
Washington, D.C. 20003                                Facsimile: (727) 828-9924
Phone: (202) 964-3721                                  timothy.weber@webercrabb.com
james.rogers@aflegal.org                              jeremy.bailie@webercrabb.com
emily.percival@aflegal.org                            quincy.bird@webercrabb.com
ryan.giannetti@aflegal.org                            Secondary:
crystal.clanton@aflegal.org                           lisa.willis@webercrabb.com
bobby.crossin@aflegal.org                             honey.rechtin@webercrabb.com
                                                              natalie.deacon@webercrabb.com

                                                              *Admitted pro hac vice*

                                                              *Counsel to Plaintiffs*

25