UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, et al., | No. 8:25-cv-02486-WFJ-SDM-RSR |
| Plaintiffs, | |
| v. | |
| HOWARD W. LUTNICK, et al., | |
| Defendants. | |

## **INTERVENOR-DEFENDANTS' MOTION TO DISMISS**

This is a statutory and constitutional challenge by two political groups, their presidents, and one member of Congress to two statistical methods that the Census Bureau employed in the 2020 Census, conducted five years ago—specifically, Group Quarters Imputation and Differential Privacy. For at least three reasons, the Court should dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim.

First, Plaintiffs lack standing. They do not allege facts plausibly showing that Florida would have been apportioned an additional House of Representatives seat but for the challenged methods. Differential Privacy was not used on apportionment figures at all, and Group Quarters Imputation only

*added* to Florida's relative population. Nor do Plaintiffs allege facts plausibly showing that their votes are diluted in their existing districts—if anything, their allegations suggest their districts are *under*populated, making their votes weightier than they should be. And they do not show any concrete informational harm, either.

Second, Plaintiffs fail to state a claim. The challenged techniques do not violate the U.S. Constitution or the Census Act because they are not "sampling" as that term has been construed by the U.S. Supreme Court in this context. *Utah v. Evans*, 536 U.S. 452, 466–67 (2002). Group Quarters Imputation is indistinguishable from the imputation technique at issue in *Evans* for this purpose. *Id.* And Differential Privacy cannot violate the relevant prohibitions in any event because those prohibitions apply only to interstate apportionment, for which Differential Privacy was not used. *See* U.S. Const. art. 1, § 2, cl. 3; *id.* amend. XIV, § 2; 13 U.S.C. § 195.

Third, and finally, Plaintiffs' claims are time-barred, both by laches and by 28 U.S.C. § 1658(a)'s four-year fallback statute of limitations. The 2020 Census ended, and its results were reported, more than four years before Plaintiffs filed this case. In the intervening time, states across the country have drawn congressional, legislative, and local districts in reliance on the accuracy of the census results, and multiple elections have been conducted. Even if

Plaintiffs had claims, they waited far too long to raise them—and their challenges for 2030 are not yet ripe.

For these reasons, Intervenor-Defendants respectfully request that all of Plaintiffs' claims be dismissed.[1]

## BACKGROUND

Plaintiffs filed this lawsuit on September 15, 2025. In their operative Second Amended Complaint, they allege that the U.S. Census Bureau acted unlawfully in conducting the 2020 Census five years ago because of two challenged procedures: the use of "Group Quarters Imputation" to determine the population counts for certain group housing facilities, and the use of "Differential Privacy" to inject noise into certain data releases to protect the privacy of census responses. Doc. 43 ¶¶ 37–38, 55–56. Plaintiffs allege that these techniques violate the U.S. Constitution because they mean that the census conducted was not an "actual Enumeration" of "whole persons," and

---

[1] In the parties' conferral over this motion, Plaintiffs objected that a motion to dismiss is "wasteful and redundant." But the federal rules require a response to Plaintiffs' Second Amended Complaint, and having been granted intervention, Intervenor-Defendants are entitled to respond by moving to dismiss. *See* Fed. R. Civ. P. 12(b); Fed. R. Civ. P. 15(a)(3). Intervenor-Defendants take seriously the Court's admonition that their intervention not cause undue delay, and they will abide by the Court's scheduling order in all respects. This motion is not inconsistent with that order.

that they violate various federal statutes regulating census procedures. On November 20, the Court granted Intervenors' motion to intervene. Doc. 55.

Group Quarters Imputation was adopted in 2020 to determine the population of certain institutional living arrangements like nursing homes and college dormitories. *See id.* ¶¶ 37–38. Because the 2020 Census overlapped with the COVID-19 lockdown, "individuals who might have otherwise resided in short-term institutional living arrangements were instead residing at their permanent household, located elsewhere," making it difficult for the Bureau to ascertain directly the number of people in these facilities. *Id.* ¶ 37. For some such facilities, the Bureau allegedly determined their population by examining the populations of comparable "representative facilities." *Id.* ¶¶ 41–42. Plaintiffs contend that this methodology "did not produce population counts through direct enumeration of actual persons" and "guaranteed that some people would be double-counted." *Id.* ¶¶ 51, 53.

Differential Privacy was also new in 2020. The Bureau adopted it to "protect the confidentiality of" personal information in the census data, thereby "better protecting privacy." *Id.* ¶¶ 55, 69. Differential Privacy works by "injecting noise" into certain census data cells based on "probability distribution," thereby making it difficult to ascertain personally identifying information about residents of thinly populated cells. *Id.* ¶¶ 55–56 (citation omitted). Plaintiffs contend that the 2020 Census' use of Differential Privacy

4

"resulted in systematic population miscounting, including the addition of approximately 2.5 million persons," as well as "systematic undercounting in rural areas." *Id.* ¶¶ 71–72.

The results of the 2020 Census were released to the public in August 2021, but Plaintiffs waited until September 15, 2025—more than four years later—to bring this suit. Doc. 1.

## LEGAL STANDARD

In deciding a facial attack on subject matter jurisdiction, the Court takes the Complaint's non-conclusory factual allegations as true and asks whether they "sufficiently allege[] a basis of subject matter jurisdiction." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232–33 (11th Cir. 2008); *City of Pembroke Pines v. FEMA*, 510 F. Supp. 3d 1126, 1136 (S.D. Fla. 2021). A similar standard applies to a motion to dismiss for failure to state a claim: the Court considers "[t]he alleged facts, . . . stripped of all legal conclusions," and asks whether they "make a claim for relief not merely *possible*, but *plausible*." *Turner v. Williams*, 65 F.4th 564, 577 (11th Cir. 2023).

## ARGUMENT

### I. Plaintiffs lack standing.

To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would

be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

Plaintiffs claim Article III standing based on three forms of purported injury, but they do not allege facts plausibly showing any of them. They do not show that the practices they challenge affected, or likely will affect, the total number of House seats apportioned to the State of Florida. They do not show that their own districts were overpopulated, diluting their votes. And they do not allege a cognizable informational injury.

### A. Plaintiffs do not allege facts showing that the challenged procedures affected the number of House seats apportioned to Florida.

Plaintiffs allege that, "[b]ut for the use of the challenged statistical methods, Florida would have gained two additional House seats and Electoral College votes." Doc. 43 ¶ 77. But that is a legal conclusion, and Plaintiffs do not allege facts that plausibly support it. Just the opposite—their allegations, together with materials incorporated by reference or subject to judicial notice— show that the challenged methods did *not* affect the number of seats apportioned to Florida. Census Bureau documents—including those linked to from webpages Plaintiffs cite in their Complaint—confirm that Differential Privacy was "not applied to the apportionment count" "used to apportion seats

in the U.S. House of Representatives."[2] Census Bureau documents also confirm that Florida *gained* the second-most residents from Group Quarters Imputation of any state in the country—a total of 16,500.[3] If anything, Group Quarters Imputation therefore gave Florida an *extra* seat.

These documents are subject to judicial notice as matters of public record. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999); *Whitaker v. Miami-Dade Cnty.*, 126 F. Supp. 3d 1313, 1322 n.3 (S.D. Fla. 2015) (taking judicial notice of U.S. Census figures); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1301 n.21 (S.D. Fla. 2002) (taking judicial notice of U.S. Census forms); *Sims v. Baggett*, 247 F. Supp. 96, 108 (M.D. Ala. 1965) (taking judicial notice of census report showing the racial composition of particular counties). And Plaintiffs do not allege any facts that plausibly suggest that they are inaccurate. The only relevant factual allegation is Plaintiffs' assertion that "2.5 million phantom people were added to certain states" in the 2020 Census. Doc. 43 ¶¶ 1, 71. But Plaintiffs directly and exclusively base that allegation on a

---

[2] U.S. Census Bureau, *Differential Privacy and the 2020 Census* (July 2021) (attached as Ex. 23 to Plaintiffs' Motion for Summary Judgment, Doc. 50-24); *see also* U.S. Census Bureau, *Disclosure Avoidance for the 2020 Census: An Introduction* 25 (Nov. 2021), https://perma.cc/D57D-6EBL (linked to from the Census Bureau website cited in Doc. 43 ¶ 67).

[3] *See* U.S. Census Bureau, *Results from the 2020 Census Group Quarters Count Imputation* 20–22 (May 1, 2023), https://perma.cc/3XSK-J5XH (attached as Ex. 26 to Plaintiffs' Motion for Summary Judgment, Doc. 50-27).

blog post that does not plausibly support it, because it says nothing about Differential Privacy and it describes no facts connecting Group Quarters Imputation to what it says was a 2.5 million increase in "blue state" population over a prior estimate. *Id.* (citing Adam Korzeniewski, *Fictive Counting*, The American Mind (May 14, 2021), https://perma.cc/89PM-C5R3).[4] In sum, Plaintiffs are attempting to unwind years of careful agency directives, four years of congressional representation, and millions of dollars in Census-designated funding, all based on publicly available press releases a single blog post that itself fails to allege that Florida lost seats *because of* Group Quarters Imputation.

Plaintiffs therefore have not plausibly alleged facts showing that Florida would receive "an additional Representative if [census data] had been [collected] using some other source of 'more accurate' data." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992). At best, "they can do no more than speculate as to which states might gain and which might lose representation" upon the abolition of Group Quarters Imputation, while Differential Privacy

---

[4] Ironically, the "December population estimate" that the article uses as a baseline employs the kind of statistical estimation that Plaintiffs claim to object to. *See Evaluation Estimates*, U.S. Census Bureau (Oct. 8, 2021), https://www.census.gov/programs-surveys/popest/technical-documentation/research/evaluation-estimates.html (linked in Korzeniewski article).

had no such effect at all. *Fed'n. for Am. Immigr. Reform v. Klutznick*, 486 F.
Supp. 564, 570 (D.D.C. 1980); *see also Citizens for Const. Integrity v. Census
Bureau*, 669 F. Supp. 3d 28, 32 (D.D.C. 2023), *aff'd*, 115 F.4th 618 (D.C. Cir.
2024), *cert. denied*, 145 S. Ct. 2818 (2025) ("[T]o have standing . . . plaintiffs
alleging vote dilution injuries must show that their states would have had an
additional representative but for the government's error."). As a result, "none
of the plaintiffs are able to allege that the weight of [their] vote" was affected
by the Bureau's use of Group Quarters Imputation or Differential Privacy in
2020. *Klutznick*, 486 F. Supp. at 570.

### B. Plaintiffs do not allege facts showing intrastate vote-dilution.

Plaintiffs also do not allege facts plausibly showing that their specific
districts were overpopulated as a result of the challenged methods, diluting
their votes relative to those of other Floridians. *See* Doc. 43 ¶¶ 16, 18. Vote
dilution resulting from unequally populated districts *could* constitute injury-
in-fact, but "only to those persons domiciled in under-represented voting
districts." *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1070 (M.D.
Ala. 2021) (quoting *Wright v. Dougherty Cnty.*, 358 F.3d 1352, 1355 (11th Cir.
2004)). If anything, Plaintiffs' factual allegations suggest they are *over*-
represented. If Plaintiffs are correct that the Census Bureau "deployed the
Group Quarters Method procedure to insert fictitious persons" in their

9

districts, Doc. 43 ¶ 47, that would mean that Plaintiffs' districts are actually *underpopulated* by real people. This, in turn, would mean that Plaintiffs themselves are *over*-represented, because some of the census population in Plaintiffs' districts is (according to Plaintiffs) "fictitious." Any alleged errors, in other words, *expanded*—not contracted—the weight of Plaintiffs' votes.

Regardless, Plaintiffs do not allege facts showing that the populations of their districts were affected at all. They have not identified any group quarters in their districts that were affected by the Bureau's imputation methods. In Exhibit A to the Second Amended Complaint, they identify a list of addresses, all of which are located on the University of Central Florida's campus, outside of Plaintiffs' congressional districts, and they do not explain what that data purports to show. Nor do they allege any facts showing that Differential Privacy had any impact on their particular districts. Plaintiffs do not have standing where their allegations do not show that they "have . . . suffered any harm or injury by the malapportioned voting districts" and suggest that they "in fact . . . have benefitted from it." *Wright*, 358 F.3d at 1355.

## C.    Plaintiffs do not allege facts showing informational injury.

Plaintiffs also fail to allege facts showing that Representative Donalds suffered an "informational injury" because he was deprived of "accurate census data." Doc. 43 ¶¶ 21, 80. "[A]n asserted informational injury that causes no

adverse effects cannot satisfy Article III." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020). Instead, to assert such an injury, a plaintiff must identify "downstream consequences" from being deprived of accurate information. *Id.*; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (same). Thus, a plaintiff who fails to show that he "took [] or failed to take *any action* because of" his alleged informational injury lacks standing. *Frank v. Autovest, LLC*, 961 F.3d 1185, 1188 (D.C. Cir. 2020); *see also Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 338 (7th Cir. 2019) (alleged informational injury did not confer standing on plaintiff who failed to "allege that she would have used the information at all"; "the bare harm of receiving inaccurate or incomplete information" was insufficient).

The Second Amended Complaint fails to identify *any* concrete harm from Rep. Donalds's alleged deprivation of accurate census data. Rep. Donalds claims vaguely that inaccurate census data has hindered his ability to "carry out his constitutional obligations," but he has not identified a single instance where this has impacted his capacity to effectively vote, introduce legislation, or exercise oversight. Doc. 43 ¶ 21. The SAC's conclusory allegations are not enough to show Article III standing; to survive even a facial attack, Plaintiffs must advance "a sufficient amount of *non-conclusory allegations*" showing that Rep. Donalds suffered an injury-in-fact. *Tomelleri v. Natale*, No. 19-CV-81080,

11

2020 WL 5887151, at *2 (S.D. Fla. July 16, 2020) (emphasis added). They have

failed to do so.[5]

### D.    Plaintiffs' challenge to the speculative use of "statistical methods" in the 2030 Census is unripe.

Finally, Plaintiffs' challenge to the potential use of "statistical methods"

in the 2030 Census, and request for an injunction as to the 2030 Census, is

entirely speculative and therefore unripe. *See Alabama,* 546 F. Supp. 3d at

1072 (merely showing "that consequences *may* flow from the Bureau's decision

to deliver 'skewed' redistricting data" is "too speculative to pass muster as an

'injury-in-fact'"). "A claim is not ripe for adjudication if it rests upon contingent

future events that may not occur as anticipated, or indeed may not occur at

all." *Texas v. United States*, 523 U.S. 296, 300 (1998). "Standing and ripeness

present the threshold jurisdictional question of whether a court may consider

the merits of a dispute." *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir.

2006).

Plaintiffs have failed to allege facts showing any likelihood that the use

of statistical methods in the 2030 Census Report will injure them. As *Alabama*

---

[5] Plaintiffs suggest in passing that Rep. Donalds has been injured as a member
of Congress due to Florida's alleged underrepresentation in the House of
Representatives. Doc. 43 ¶ 82. Even if this would be a cognizable injury if true,
as explained above, the Second Amended Complaint's allegations indicate that
Florida is *over*-represented compared to other states. *Supra* Argument § I.A.

explained, "we cannot know whether differential privacy will inflict the harm alleged by the Individual Plaintiffs until the Bureau releases a final set of redistricting data." 546 F. Supp. 3d at 1071–72. The same is true of Group Quarters Imputation, or any other alleged "statistical method." Plaintiffs' claims here are even more premature than the claims in *Alabama*, because in *Alabama*, it was at least clear that the Census Bureau *would* be using the challenged method—in that case, Differential Privacy—in the upcoming census. *See id.* at 1064 ("[T]he Bureau announced in September 2017 that it would employ a new and more proactive measure of disclosure avoidance for the 2020 Census—'differential privacy.'").

Here, Plaintiffs' request for prospective relief relies entirely on the speculative possibility that the Census Bureau will choose to use the challenged statistical methods in the 2030 Census, a decision Plaintiffs have themselves already described as unlikely. *See* Doc. 45 at 9 ("[E]ven if GQM were lawful, there is no reason to believe that it continues to be necessary (or even useful) *absent* the COVID-19 pandemic."). Thus, as Plaintiffs concede, absent the extraordinary circumstances of the COVID-19 pandemic, there is no reason to assume that Group Quarters Imputation—or any other particular

statistical method—will be used in the 2030 Census, let alone that Plaintiffs will be injured thereby.[6]

## II.    Plaintiffs fail to state a claim on the merits.

Plaintiffs also fail to state a claim on the merits. Their constitutional claims and their claim under 13 U.S.C. § 195 are foreclosed by *Utah v. Evans*, their census day claim is inconsistent with centuries of practice, and their Section 209 claim is irreconcilable with the statute's text.

### A.    *Utah v. Evans* forecloses Plaintiffs' constitutional claims.

The Supreme Court's holding in *Utah v. Evans* forecloses Plaintiffs' first two counts, which allege that the Census Bureau violated the U.S. Constitution because it failed to conduct an "actual Enumeration" of the population that exclusively counted "whole persons." Doc. 43 ¶¶ 87, 93. *Evans* squarely rejects the legal basis for these claims, holding that the "general word 'enumeration' .

---

[6] The Second Amended Complaint also alleges in passing that the Individual Plaintiffs and Republican Organizations are harmed "by having inaccurate, incomplete, or absent data" for purposes of "local representation and apportionment" and "creating equal voting districts within their counties," and because "Florida will receive less federal funding from programs that use census data to determine funding levels." Doc. 43 ¶¶ 19, 83–84. These threadbare allegations are insufficient to establish standing. Plaintiffs conspicuously fail to identify any "federal funding" that will be diverted from Florida, or any specific impact of the alleged Census inaccuracies on "local representation" and "equal voting districts within their counties," even in their motion for summary judgment. *See* Doc. 50 at 4–5. And as noted above, any alleged inaccuracies in the Census inured to the *benefit* of the Individual Plaintiffs and Republican Organizations (and Florida writ large).

. . refers to a counting process without describing the count's methodological details," and the Census Clause's reference to "'such Manner as' Congress itself 'shall by Law direct'" provides a "breadth of congressional methodological authority," not a limitation on that authority. 536 U.S. at 474. *Evans* therefore held that as long as the Census Bureau *tried* to reach each household and used imputation "only after it has exhausted its efforts to reach each individual," and did not "substitute[e] . . . statistical methods for efforts to reach households and enumerate each individual," there is no constitutional violation. *Id.* at 477.

That holding controls here. Plaintiffs' allegations show that the Census Bureau used Group Quarters Imputation "[a]fter the 2020 Census data collection for group quarters had closed," when they discovered that they "lacked any population count" for "thousands of possibly occupied group quarters." Doc. 43 ¶ 46. Under the circumstances, "the Bureau's only choice [was] to disregard the information it has, using a figure of zero, or to use imputation in an effort to achieve greater accuracy." *Evans*, 536 U.S. at 478. The Bureau did not act unconstitutionally in choosing accuracy. *Id.*

The Bureau's use of Differential Privacy was also constitutional. At the outset, the fact that Differential Privacy was not applied to the apportionment population count, *supra* note 2, precludes any constitutional claim. The Census Clause mandates an "actual Enumeration" for one specific purpose—so that "Representatives and direct Taxes [may] be apportioned among the several

15

States . . . according to their respective numbers." U.S. Const. art. I, § 2, cl. 3; *see also id.* amend. XIV, § 2 (providing for counting "whole . . . persons" in "apportion[ing]" representatives "among the several States"). Differential Privacy did not affect the apportionment numbers, so it cannot have violated these provisions. And regardless, Differential Privacy was not a substitute for attempting to reach each household, but a data-processing step after that outreach occurred, so it would not violate the Census Clause as construed in *Evans* in any event. 536 U.S. at 477.

**B.    Section 195 applies only to interstate apportionment and does not foreclose imputation.**

*Evans* also forecloses Plaintiffs' Count III, under 13 U.S.C. § 195. Section 195 authorizes "the use of the statistical method known as 'sampling'" by the Census Bureau "[e]xcept for the determination of population for purposes of apportionment of Representatives in Congress among the several States." Group Quarters Imputation does not violate Section 195 because it is not "sampling." As *Evans* explained, "the statutory phrase 'the statistical method known as "sampling"' does not cover the Bureau's use of imputation." 536 U.S. at 473. And the "hot deck imputation" at issue in *Evans* is indistinguishable from Group Quarters Imputation for this purpose. The key distinguishing features between "imputation" and "sampling" are that imputation (1) involves "the filling in of missing data as part of an effort to count individuals one by

16

one"; (2) uses "methodology [that is] not that typically used by statisticians seeking to find a subset that will resemble a whole through the use of artificial, random selection processes; but that used to assure that an individual unit (not a 'subset'), chosen nonrandomly, will resemble other individuals (not a 'whole') selected by the fortuitous unavailability of data"; and (3) has as its "immediate objective" the "filling in of missing data; not extrapolating the characteristics of the 'donor' units to an entire population." *Id.* at 467.

Group Quarters Imputation checks each of these boxes. It involves "the filling in of missing data"—specifically, data about the populations of "possibly occupied group quarters" that "lacked any population count," Doc. 43 ¶ 46—"as part of an effort to count individuals one by one." It employs a methodology designed to ensure  that an "individual unit chosen nonrandomly"—a particular group quarters with a zero population count—"will resemble other individuals"—other, similar group quarters that did not have missing or incorrect data. And its "immediate objective" was the not "extrapolating the characteristics of the 'donor' units to an entire population," because it was aimed at determining the actual population counts of specific group quarters.

As for Differential Privacy, it is not "sampling" either, because it involves a privacy protective masking of data at the end of the census process—not an "extrapolation of the features of a large population from a small one." *Evans*, 536 U.S. at 467. And regardless, the Bureau's use of Differential Privacy

cannot have violated Section 195 because it was not used "for purposes of apportionment of Representatives in Congress among the several States." 13 U.S.C. § 195; *supra* note 2. For other purposes, Section 195 affirmatively *authorizes* "sampling," so the Census Bureau's use of Differential Privacy would not violate Section 195 even if it met the "sampling" definition.

### C.    Group Quarters Imputation counts individuals as of census day.

Plaintiffs' Count IV, which alleges that the Census Bureau failed to "count the population as of April 1, 2020" as required by statute, Doc. 43 ¶¶ 107–08, fails for related reasons. Plaintiffs allege that the Census Bureau used information about the population of group quarters *before* April 1, 2020, to impute population of those quarters as of April 1. Doc. 43 ¶ 107. But the "hot deck" imputation upheld in *Evans* similarly relied on information collected from nearby households collected over a period of time *before* Census Day through mail-in forms and repeated personal visits by Bureau employees. 536 U.S. at 457–58. To accept Plaintiffs' interpretation would mean that all data used in the census count must be collected *on* Census Day. The Census has *never* been conducted that way. *See* Jennifer D. Williams, Cong. Resch. Serv., R46237, The 2020 Census: Frequently Asked Questions 1 (2020), https://www.congress.gov/crs-product/R46237 ("The count starts before, and census activities continue beyond, April 1."). Such a requirement would also be

inconsistent with the statutory text, which requires a determination of population "*as of* the first day of April"—a phrasing that recognizes that the population will not literally be determined *on* the first day of April. And it would ignore the statute's grant of broad discretion to the Secretary of Commerce to conduct the census "as of the first day of April . . . in such form and content as he may determine, including the use of sampling procedures and special surveys." 13 U.S.C. § 141(a).

Moreover, since the first Census in the Eighteenth Century, the Census Bureau has *always* attempted to ascertain the "usual residence"—the "place where a person lives and sleeps most of the time"—of each person residing within the United States. *Kostick v. Nago*, 878 F. Supp. 2d 1124, 1129 (D. Haw. May 22, 2012). The Census thus does not attempt to ascertain where each resident in the United States is *literally present* on April 1. For example, "[c]ollege students are counted where they live at college," even if they happen to be at their parents' house on April 1. *Common Cause v. Trump*, 506 F.Supp.3d 39, 42–43 (D.D.C. 2020). This, of course, is exactly what Plaintiffs allege Group Quarters Imputation involved—the counting of some college students or other residents in group living arrangements who may have been temporarily elsewhere on April 1, 2020 due to the COVID-19 pandemic. Doc. 43 ¶14. The Bureau properly sought to count those individuals in their group

housing facilities—the place where those individuals "live[d] and sle[pt]" "*most of the time*." *Kostick*, 878 F. Supp. 2d at 1129.

### D. Section 209 does not itself prohibit statistical methods.

In an apparent effort to evade *Evans*'s construction of Section 195, Plaintiffs' Count V attempts to assert a claim for a violation of Section 209 of Pub. L. 105-119. But while Section 209 creates a cause of action to challenge prohibited sampling, a would-be challenger must find the prohibition elsewhere. Section 209 does not *itself* prohibit sampling. It authorizes a lawsuit by those "aggrieved by the use of any statistical method *in violation of the Constitution or any provision of law (other than this Act)*." Act of Nov. 26, 1997, Pub. L. No. 105-119, § 209(b), 111 Stat. 2440, 2481 (emphasis added). Section 209's plain text expressly requires Plaintiffs to identify some *other* source of law for their claimed violation. And that source cannot be Section 209(i), as Plaintiffs argue in their Motion for Summary Judgment, both because Section 209(i) is part of the same "Act" as Section 209(b) and because Section 209(i) provides only that the Act in which it was enacted may not be "construed to *authorize* the use of any statistical method"—it does not say that it *prohibits* any such method. And the legislative history bears out this plain-text understanding—Section 209 was a compromise measure after President Clinton vetoed an attempted statutory prohibition on "sampling or any other statistical procedure," intended to allow for judicial review of whether existing

law already prohibited statistical sampling. *See Dep't of Com. v. U.S. House of Reps.*, 525 U.S. 316, 326–27 (1999).[7]

To succeed on a claim under Section 209, Plaintiffs would therefore need to find some other, substantive prohibition on the methodologies they challenge. For the reasons already given, they do not have one.

## III.   Plaintiffs' claims come too late.

Finally, Plaintiffs' challenges to the 2020 census are time barred, both by laches and the relevant statute of limitations. Under the defense of laches, a the "defendant must show: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that the delay caused defendant undue prejudice." *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1546 (11th Cir. 1984). This requires the Court to evaluate the length of Plaintiffs' delay, "measured from the time at which the plaintiff knows or should know she has a provable claim," and to assess whether such delay was reasonable or inexcusable. *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d

---

[7] The proposed sampling procedure at issue in this inter-branch fight was statistical sampling in the traditional sense—the Bureau wanted to follow-up with only a *sample* of households that did not return their census forms, rather than sending enumerators to every such household. *See id.* at 324. The Court held that this was "sampling" that would violate 13 U.S.C. § 195 if used to determine interstate apportionment. *See id.* at 343–44.

1199, 1206 (11th Cir. 1997). Ultimately, "[t]he test for determining laches is a flexible one." *Citibank*, 724 F.2d at 1546.

Plaintiffs waited more than five years to challenge the use of Differential Privacy and Group Quarters Imputation in the 2020 Census. The Bureau first announced its plan to use Differential Privacy in 2017. *See Alabama*, 546 F. Supp. 3d at 1064. One year later, the Bureau "formally adopted" Differential Privacy for use in the 2020 Census. *Id.* The Bureau announced its use of Group Quarters Imputation by no later than April 2021.[8] Apportionment data corresponding to the 2020 Census was released to the public that same month.[9] And in August 2021, redistricting data corresponding to the 2020 Census was released to the public.[10] In sum, the Bureau's use of the challenged methods was no secret—it was broadcast to the public by mid-2021 at the very latest, as confirmed by sources cited in Plaintiffs' complaint. *See* Doc. 43 ¶ 39.

Plaintiffs' delay is substantial and inexcusable. *See Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999) (laches barred gerrymandering claim

---

[8] *See* Pat Cantwell, *How We Complete the Census When Households or Group Quarters Don't Respond*, U.S. Census Bureau (Apr. 16, 2021), https://perma.cc/63TY-DE8G.

[9] *See* Doc. 50-2.

[10] *See 2020 Census: Redistricting File (Public Law 94-171) Dataset*, U.S. Census Bureau (Aug. 12, 2021), https://www.census.gov/data/datasets/2020/dec/2020-census-redistricting-summary-file-dataset.html.

when "Plaintiffs delayed bringing this action for at least five years" after learning of the alleged violation), *aff'd sub nom. Chandler v. Harris*, 529 U.S. 1084 (2000); *Sanders v. Dooly Cnty., Ga.*, 245 F.3d 1289, 1290–91 (11th Cir. 2001) (per curiam) (plaintiffs challenging districting plan who waited "over six years after the first use of the plan" had exhibited "inexcusable delay" that barred their claim for injunctive relief); *Alabama*, 546 F. Supp. 3d at 1074 (finding that the plaintiffs choice "to sit on their hands" after learning of differential privacy in 2017 indicated "an absence of the kind of irreparable harm required to support a preliminary injunction"). Because "[n]owhere . . . in any of Plaintiffs' submissions to this Court is there a sufficiently compelling reason advanced, legal or equitable, as to why this suit was not filed earlier," Plaintiffs delay is inexcusable. *Maxwell v. Foster*, No. CIV.A.98-1378, 1999 WL 33507675, at *3 (W.D. La. Nov. 24, 1999).

Plaintiffs' delay has also caused substantial prejudice. During the five years while Plaintiffs have sat on the sidelines without bringing suit, 44 states have redrawn their congressional districts in reliance on the 2020 Census Report, all 50 states have redrawn state and local districts, and two federal elections have been held in the newly drawn districts. If Plaintiffs prevail, all of that work would have to be redone. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 687 (2014) (laches may bar a claim where the plaintiff's undue delay would "work . . . unjust hardship on innocent third parties");

*Motley v. Taylor*, 451 F. Supp. 3d 1251, 1278 (M.D. Ala. 2020) (noting that expending government resources is a relevant factor to consider when assessing a laches defense). And as a result of Plaintiffs' delay, the Census would have to be redone in the midst of the 2026 midterm election, after primary elections have been already held in many states, and thus "work[] a needlessly chaotic and disruptive effect upon the electoral process." *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (citations omitted); *cf. Evans*, 536 U.S. at 463 (holding that similar claims were redressable in part because "several months would remain prior to the first post-2000 census congressional election").

Plaintiffs' claims are also barred by 28 U.S.C. § 1658(a)'s four-year "catch-all" limitations period for "civil action[s] arising under an Act of Congress enacted after" December 1, 1990. "[A] cause of action 'aris[es] under an Act of Congress enacted after December 1, 1990' . . . if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 382 (2004) (quoting 28 U.S.C. § 1658). Because Plaintiffs' cause of action rests on Section 209—a post-1990 enactment

that lacks its own limitations provision—28 U.S.C. § 1658 supplies the applicable four-year limitations period.[11] Doc. 43 ¶¶ 1, 3, 12, 112–18.

Although historically, "statutes of limitation are not controlling measures of equitable relief," *Holmberg v. Ambrecht*, 327 U.S. 392, 396 (1946), Section 1658 by its plain terms does not distinguish between legal and equitable forms of relief: it applies to all "civil action[s] arising under an Act of Congress enacted" after 1990. 28 U.S.C. § 1658(a); *see also* Fed. R. Civ. P. 2 ("There is one form of action—the civil action"). Claims accrue when the plaintiff has "a complete and present cause of action." *Foudy v. Indian River Cnty. Sheriff's Off.*, 845 F.3d 1117, 1123 (11th Cir. 2017) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Plaintiffs' cause of action accrued, at the absolute latest, when the Bureau released redistricting data in August 2021. *See supra* note 10. Because this action was filed more than four years later, Plaintiffs' claims are untimely.

## <u>CONCLUSION</u>

The Court should dismiss the Second Amended Complaint.

---

[11] Section 209 was codified in a note to 13 U.S.C. § 141 on November 26, 1997 and codified in a note to 13 U.S.C. § 141. *See* Doc. 43 ¶ 3.

Dated: November 26, 2025

Respectfully submitted,

*/s/ David R. Fox*
David R. Fox*
Richard A. Medina*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW,
Suite 400
Washington, D.C.
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law

*Special admission

*/s/ Frederick S. Wermuth*
Frederick Wermuth (Lead Counsel)
Fla. Bar No. 0184111
Quinn B. Ritter
Fla. Bar. 1018135
**KING, BLACKWELL, ZEHNDER
& WERMUTH, P.A.**
25 East Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
fwermuth@kbzlaw.com

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

The undersigned certifies that counsel for the Intervenor Defendants conferred by email with counsel for the Plaintiffs and the Defendants regarding the motion to dismiss, that the parties do not agree on the resolution of the motion, and that the motion is opposed.

Defendants currently take no position on the motion but reserve their rights to supplement that position after review.

Plaintiffs oppose the motion and requested that Intervenor Defendants include the following as a statement of position:

> "Intervention should not materially alter the course of the litigation. The court has made that clear, admonishing that intervenors would not delay the proceedings. Given the inevitable overlap of the issues in a Motion to Dismiss and the pending Motion for Summary Judgment, consideration of a Motion to Dismiss at this stage is wasteful and redundant. This case should proceed straight to summary judgment."

Intervenor Defendants offered to confer by phone as well, but no party accepted that offer.

*/s/ Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar. No. 0184111

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 26, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

<u>*/s/ Frederick S. Wermuth*</u>
Frederick S. Wermuth
Florida Bar. No. 0184111