## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, et al., | Case No. 8:25-cv-2486 |
| Plaintiffs, | **PLAINTIFFS' RESPONSE IN OPPOSITION TO INTERVENORS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| v. | |
| HOWARD W. LUTNICK, et al., | |
| Defendants. | |

## INTRODUCTION

Intervenors' Motion to Dismiss, ECF No. 60, ("Motion") should be denied for three reasons. *First*, although the Panel need only find that one plaintiff has alleged standing, each plaintiff here has sufficiently alleged the elements of Article III standing. *Second*, Plaintiffs have stated several plausible claims for relief including (1) that Group Quarters Count Imputation Procedure ("GQCIP") and Differential Privacy constitute statistical sampling, (2) that these procedures violate the Constitution, and (3) that the use of these procedures in 2020 violated the statutory obligation to take a census "as of" of April 1. 13 U.S.C. § 141(a). *Third*, none of Plaintiffs' claims are time barred because Plaintiffs suffer an ongoing injury, and in any event, no plaintiff had standing to sue until March 3, 2022. Thus, Plaintiffs respectfully ask the Panel to deny

the Motion and "expedite to the greatest possible extent the disposition of" this

matter. Pub. L. No. 105-119, § 209(e)(2), 111 Stat. 2440, 2482 (1997).

## LEGAL STANDARDS

To rule on a facial attack on subject-matter jurisdiction, the Panel needs

only "to look and see if [Plaintiffs] ha[ve] sufficiently alleged a basis of subject

matter jurisdiction, and the allegations in [their] complaint are taken as true

for the purposes of the motion." *McElmurray v. Consol. Gov't*, 501 F.3d 1244,

1251 (11th Cir. 2007). Similarly, to resolve the motion to dismiss for failure to

state a claim, the Panel "must accept as true all of the factual allegations con-

tained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and decide

whether Plaintiffs have stated a claim that is "plausible on its face," *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plaintiffs have met this standard

by alleging claims that "raise a reasonable expectation that discovery will re-

veal evidence" of Defendants' liability. *Id.* at 556.

## ARGUMENT

## I.    All Plaintiffs have standing

To invoke the constitutional power of federal courts to adjudicate a case

or controversy, Plaintiffs must allege an "injury in fact," "a causal connection

between the injury and the conduct complained of," and "that the injury will

be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560–61 (1992) (citation modified). Plaintiffs need only *allege* and not prove

2

the elements of standing to survive a motion to dismiss. *Id.* at 561 (explaining that each element must be supported "with the manner and degree of evidence required at the successive stages of the litigation"). And the Panel need only find that "one plaintiff" has alleged standing to seek each form of requested relief. *Town of Chester v. Laroe Ests.*, 581 U.S. 433, 439 (2017).

## A.    Congressman Donalds has standing

Plaintiffs have sufficiently pleaded that Congressman Donalds is injured by the degradation of census data, *see* ECF No. 43 ¶¶ 21, 80, and the Motion has not alleged otherwise. Intervenors attempt to place additional pleading requirements on Plaintiffs that courts have never required in census cases.[1] *See* ECF No. 60 at 10–11. In fact, Congress intended for census-related matters to be treated differently. Specifically, Congress contemplated this very type of injury and a remedy for it by creating a cause of action for Members of Congress. Pub. L. No. 105-119, § 209(d)(2).

Consistently, courts in census cases have found that "degradation" of census data is an "informational injury analogous to those that have supported Article III standing." *See, e.g.*, *Nat'l Urban League v. Ross*, 508 F. Supp. 3d 663, 690 (N.D. Cal. 2020); *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 611 (S.D.N.Y. 2019).

---

[1] Even when Intervenors' cited cases appear in census cases, they are used to support the very basic idea that an informational injury can satisfy Article III standing. Nothing more.

Census results are used for the "drafting of legislation," *Dep't of Com. v. New York*, 588 U.S. 752, 760 (2019), and Members of Congress regularly vote on bills to authorize or appropriate executive agency spending programs, including competitive grant programs that are based on census data. Congressman Donalds has voted on legislation affecting these programs, including programs that rely on granular data. Thus, Congressman Donalds has suffered an injury in the form of degradation of census data, and he will continue to suffer this injury absent relief from this Court.

Plaintiffs also allege facts that establish that the degradation of census data was caused by the use of GQCIP and Differential Privacy. *See, e.g.*, ECF No. 43 ¶¶ 68–73; *see also id.* at 2 (alleging that GQCIP "added millions of fictitious college students to dormitories that sat empty" and that Differential Privacy "injected random noise into nearly every population count"). Congressman Donalds's injury is therefore fairly traceable to the defendants' use of the challenged statistical methods. *See Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 332–34 (1999) ("There is undoubtedly a 'traceable' connection between the use of sampling in the decennial census and Indiana's … loss of a Representative," and finding traceability for intra-state vote dilution "[f]or the reasons discussed above.").

Plaintiffs further allege that Congressman Donalds's injury is redressable by a favorable ruling from this Panel—and Intervenors do not argue

otherwise. Thus, Plaintiffs have alleged facts sufficient to establish that Congressman Donalds has standing to bring this suit.

### B.    The Florida Plaintiffs have standing

Plaintiffs have alleged that Michael Fusella, the University of South Florida College Republicans, Parisa Mousavi, and the Pinellas County Young Republicans (collectively, "Florida Plaintiffs") are suffering continuing injury from: (1) the deprivation of representation in Congress and the Electoral College, (2) inaccurate intra-state redistricting, which led to vote dilution, and (3) diminished federal funding for their communities as a result of the undercount.

The deprivation of representation is the prototypical injury in Section 209 cases. *See House of Representatives*, 525 U.S. at 339 (holding that individual plaintiffs had standing where their state would be deprived of an additional House seat). The Census Bureau has admitted that Florida was undercounted by 3.48% in its official Post-Enumeration Survey. *See* ECF No. 43 ¶ 76. Plaintiffs have alleged and provided supporting evidence that Florida lost two seats in the House of Representatives and two electoral college votes because of the challenged statistical methods. *See* ECF No. 43 ¶ 77. By arguing with the underlying propositions and the quality of the cited articles, Intervenors concede that Plaintiffs have sufficiently pleaded injury and take up a fact question left to the province of a jury: whether the articles say what Plaintiffs purport they say and what weight should be given to them. Thus, Plaintiffs have alleged

facts sufficient to establish that the Florida Plaintiffs suffer from deprivation
of representation.

Plaintiffs also allege that the Florida Plaintiffs' injuries were caused by
the use of GQCIP and Differential Privacy in the 2020 Census. *See, e.g.*, ECF
No. 43 ¶¶ 68–73 (alleging that GQCIP and Differential Privacy led to under-
counts and distortions in the 2020 Census data). It is beyond dispute that Flor-
ida uses federal census data for "[a]ll acts of the Florida Legislature based upon
population and all constitutional apportionments." FLA. STAT. § 11.031(1)
(2025). Thus, inaccurate census data is bound to affect intra-state redistricting.

As for the injury, Plaintiffs have alleged that federal funding allocations
are based in part on census data. *See* ECF No. 43 ¶ 19. It follows that an un-
dercount, whether in absolute terms or relative to other states, would lead to
a loss of federal funding for the Florida Plaintiffs' communities, regardless of
whether this funding is allocated based on absolute or relative populations.
"When the federal government degrades the quality of that [census] data, it
therefore inflicts a cognizable injury on the sovereign interests of the reliant
states." *U.S. Dep't of Com.*, 351 F. Supp. 3d at 614.

The Supreme Court has found standing based on undercounts of "as little
as 2.5%," which would cause those plaintiffs to "lose out on federal funds that
are distributed on the basis of state population. That is a sufficiently concrete
and imminent injury to satisfy Article III." *Dep't of Com.*, 588 U.S. at 767; *see*

6

*also Van Cleve v. U.S. Secretary of Com.*, 2022 WL 1640669, at *4 (11th Cir. May 24, 2022); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 548 (E.D. Va. 1998) (collecting cases). Plaintiffs have sufficiently and plausibly alleged precisely that injury in this case.

### C.    Plaintiffs' claim regarding the 2030 census is ripe

Section 209 authorizes "[a]ny person aggrieved" to "obtain … injunctive … relief against the use of such method." Pub. L. No. 105-119, § 209(b). The statute defines "an aggrieved person" as "any resident of a State whose congressional representation or district *could be changed* as a result of the use of a statistical method." Pub. L. No. 105-119, § 209(d)(1) (emphasis added). This language unequivocally allows an aggrieved person to obtain forward-looking injunctive relief when a change to his representation or district is merely possible. Congress could have limited injunctive relief to plaintiffs whose representation "has been changed" or whose representation certainly "will be changed." But Congress used the words "could be changed." *Id.* Thus, forward-looking injunctive relief is plainly available.

Of course, the ripeness doctrine limits a court's ability to resolve claims that are based on purely speculative harm. But "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). Plaintiffs

need not establish that a future harm is guaranteed, only that the "risk" of future harm is "sufficiently imminent" and "substantial." *Id.*

Intervenors would have Plaintiffs wait until the Census Bureau decides to use the challenged methods to file suit. But Intervenors miss the point. The Census Bureau should not even have the option. The Census Bureau used GQCIP and Differential Privacy in 2020 and will likely use those methods again in 2030 absent relief from this Court. Plaintiffs allege that they have suffered—and continue to suffer—from the consequences of these unlawful methods. Given the nature of the harms, Plaintiffs' injuries are uniquely difficult for courts to remedy after the fact. Thus, insofar as prudential considerations bear on the ripeness analysis, *see Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993), those factors support reaching the merits of Plaintiffs' claims and providing relief *now*.

## II.    Plaintiffs have stated several plausible claims for relief

Plaintiffs' Second Amended Complaint states several plausible claims for relief including (1) that GQCIP and Differential Privacy are unlawful sampling methods, (2) that GQCIP and Differential Privacy violate Article I, Section 2 of the Constitution, and (3) that federal law requires the Census Bureau to count the population as it stands on April 1. And contrary to Intervenors' suggestion, none of these questions are foreclosed by precedent.

### A.    Plaintiffs have plausibly alleged that Defendants violated 13 U.S.C. § 195

The Census Act provides: "*[e]xcept for the determination of population for purposes of apportionment of Representatives in Congress among the several States*, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as 'sampling.'" 13 U.S.C. § 195 (emphasis added). The Supreme Court has repeatedly "read this language as forbidding apportionment-related use of 'the statistical method known as 'sampling.'" *Utah v. Evans*, 536 U.S. 452, 465 (2002).

Sampling is "the extrapolation of the features of a large population from a small one." *Id.* at 467. In other words, sampling is any procedure that "select[s] and observ[es] a part (sample) of the population in order to make inferences about the whole population." *Id.* (internal quotation marks omitted). The Supreme Court has contrasted sampling with imputation—that is, "the filling in of missing data as part of an effort to count individuals one by one." *Id.* To determine whether a procedure constitutes sampling or imputation, courts examine (1) the nature of the enterprise, (2) the methodology, and (3) the immediate objective of the procedure at issue. *Id.* at 466.

No court has resolved whether GQCIP or Differential Privacy constitutes an impermissible sampling method. The Supreme Court has defined "sampling," and considered whether a procedure known as "hot-deck imputation"

9

satisfied that definition. *See Utah*, 536 U.S. at 465–79. But the Court's 2002 decision in *Utah* could not possibly have opined on the nature, the methodology, or the immediate objectives of GQCIP and Differential Privacy because these novel procedures were used for the first time in 2020. *See* ECF No. 52 ¶¶ 4–5. Thus, Plaintiffs claims are not foreclosed by precedent. *Contra* ECF No. 60 at 14.

Contrary to Intervenors' suggestion, hot-deck imputation is materially distinct from GQCIP. After first attempting to count the total population in 2000, the Census Bureau deployed hot-deck imputation to fill in "gaps" and small amounts of missing information by "inferring that the address or unit about which it is uncertain has the same population characteristics as those of a 'nearby sample or "donor"' address or unit." *Utah*, 536 U.S. at 458.

The situation in 2020 was quite different. Plaintiffs allege that the Census Bureau's first attempt to count the population yielded reasonably accurate and reasonably complete data—*i.e.*, the Census Bureau determined that thousands of group quarters lacked a population because of the COVID-19 pandemic. *See* ECF No. 43 ¶¶ 43–48. Nevertheless, the Census Bureau deployed a linear regression model to insert fictitious persons into group quarters. *Id.* ¶¶ 38–39, 41, 47–48. GQCIP was not used to fill in data gaps for specific individuals but rather to calculate population estimates for large group quarters. The population estimates were based not on neighboring facilities but on group

quarters from hundreds or thousands of miles away. And unlike hot-deck imputation—which was used to fill in *missing* data for individual people—GQCIP was used to add to the population count where Plaintiffs allege that no one was missing at all. The Census Bureau itself admits that the method it used to implement GQCIP "is different from the hot-deck imputation used to impute housing unit counts." U.S. CENSUS BUREAU, RESULTS FROM THE 2020 CENSUS GROUP QUARTERS COUNT (May 1, 2023), https://perma.cc/FKV8-R8F2. It only vaguely resembles hot-deck imputation insofar as it is used to supplement an initial population count. But GQCIP is orders of magnitude different in scale, scope, and methodology; GQCIP is different in *kind*. Thus, Plaintiffs have stated a claim that GQCIP constitutes an unlawful sampling method.

Plaintiffs have likewise alleged that Differential Privacy constitutes a sampling method. Plaintiffs point out that the Census Bureau admits that Differential Privacy is a "scientific framework" that "added … variations from the actual count." ECF No. 43 ¶¶ 67–69. Unlike hot-deck imputation, this procedure did not fill gaps in missing data. Instead, it added and subtracted data from the actual population count.

This action raises unique legal questions regarding the nature, the methodology, and the immediate objectives of GQCIP and Differential Privacy. *Utah* should guide the Panel's analysis when resolving Plaintiffs' Motion for Summary Judgment, but it certainly does not foreclose Plaintiffs' claim.

11

**B.    Plaintiffs have plausibly alleged that GQCIP and Differential Privacy violate the "actual Enumeration" requirement of Article I, Section 2**

Plaintiffs sufficiently pleaded that GQCIP violated the "actual Enumeration" requirement of the Constitution because it negated the true results of the "actual enumeration," which yielded few to no residents in certain group quarters. ECF No. 43 ¶¶ 43–49. Intervenors contend that *Utah* forecloses this argument because GQCIP was simply a methodology applied to the "counting process," which Congress has authority to regulate. ECF No. 60 at 14–16. However, GQCIP cannot be considered a methodology when it acted to replace the actual "count"—few to no residents—with estimated populations that were not living in certain group quarters on April 1. Contrary to Intervenors' assertions, this is exactly the situation *Utah* did *not* reach and that the Court need now decide, specifically whether "the substitution of statistical methods for efforts to reach households and enumerate each individual," is authorized by the Constitution. *Utah*, 536 U.S. at 477.

The Second Amended Complaint also states a claim that the use of Differential Privacy in the 2020 Census violates Article I, Section 2 by replacing accurate data with noise to create intentionally inaccurate population counts, specifically at the block level. ECF No. 43 ¶¶ 55–73. Intervenors attempt to claim that Differential Privacy is not a sampling method—it is—but that even if it is, it does not violate the Constitution because it was not applied to

12

apportionment data. ECF No. 60 at 15–16. However, it was applied to data that Florida used to redraw congressional districts ("redistricting data"), which the Supreme Court has held is part and parcel of apportionment. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) (holding that malapportioned congressional districts violate Article I, section 2). Apportionment is, in its purest form, representation by the numbers, and this principle does not stop at the divvying out of representatives based on state population. "[E]qual numbers of people ought to have an equal no. of representatives … and representatives of different districts ought clearly to hold the same proportion to each other, as their respective constituents hold to each other." *Id.* at 11 (cleaned up).

Differential Privacy violates the requirement under Article I, Section 2 that the Representatives be apportioned according to each state's "respective numbers" because it creates inaccurate population counts within precincts and legislative districts, causing redistricting authorities to create state and federal legislative districts that contain unequal numbers of persons. ECF No. 43 ¶ 63; *see Wesberry*, 376 U.S. at 17; *but see Wisconsin v. City of New York*, 517 U.S. 1, 16–18 (1996).[2] Insofar as Intervenors may say Plaintiffs take issue with Florida's act of redistricting, it is not the drafting of the boundary lines that is

---

[2] Although the Court in *Wisconsin* could find "no way a court can apply the *Wesberry* standard to the Federal Government's decisions regarding the conduct of the census," the Court in *Wisconsin* was considering a purely discretionary decision of the Secretary. In the current case, Plaintiffs allege that the Secretary engaged in nondiscretionary actions by choosing to use prohibited sampling methods. Therefore, the *Wesberry* standard could and should apply.

at issue, but rather the data upon which the lines are drawn. States may not "draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others." *Wesberry*, 376 U.S. at 14. Defendants are responsible for this violation.

### C.    Plaintiffs have plausibly alleged that Defendants violated 13 U.S.C. § 141(a)

Federal law requires the Census Bureau to "take a decennial census of population as of the first day of April." 13 U.S.C. § 141(a). The meaning of "as of" is a pure "question of law," *see Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 237 (11th Cir. 1995), and to date, no court has opined on its meaning in a precedential opinion. *But see Franklin v. Massachusetts*, 505 U.S. 788, 819 n.20 (1992) (Stevens, J., concurring) ("[T]he statute requires the Secretary to take a decennial census of population 'as of the first day of April' in every 10th year. Thus, persons who die in February or March, or who are not born until May or June, are not to be counted." (citation omitted)).

Plaintiffs contend that "as of" means "on." *See* ECF No. 43 ¶¶ 104–111; ECF No. 50 at 21–22. In other words, Section 141(a) requires the Census Bureau to count the population as it stands on April 1.[3] Intervenors attempt to use the Census Bureau's concept of "usual residence" to support their

---

[3] Plaintiffs do not argue that the Census Bureau is barred from taking steps before or after April 1 to effectuate the census. *Contra* Doc. 60 at 19. Plaintiffs simply contend that the Census Bureau must ascertain the population as of April 1, rather than some other date.

allegation that, even though students were "elsewhere" on April 1, 2020, the "place where [they] live[ ] and sleep[ ] most of the time" was their dormitory. ECF No. 60 at 19–20. But the Census Bureau's own criteria requires that students living in "college/university student housing (such as dormitories or residence halls) *on Census Day*," be counted in their student housing. Final 2020 Census Residence Criteria and Residence Situations, 83 FR 5525-01, 5534 (Feb. 8, 2018). On April 1, 2020, many dormitories and residence halls were empty.[4] ECF No. 43 ¶ 49. In fact, the Census Bureau's criteria uses the phrase "as of Census Day" one time, while using the phrase "on Census Day" 88 times. Final 2020 Census Residence Criteria. Thus, the Census Bureau itself thinks that Americans should be counted where they are located *on* Census Day.

Plaintiffs contend that the plain text of Section 141(a) controls. Intervenors respond that contrary historical practice overcomes the text's plain meaning.[5] But "[t]ext controls over contrary historical practice." *United States v. Rahimi*, 602 U.S. 680, 718 n.2 (2024) (Kavanaugh, J., concurring), and in any event, "novel legal questions are not amenable to resolution at the motion to

---

[4] The same holds true for nursing homes. The Census Bureau criteria for residents of "nursing facilities/skilled-nursing facilities" requires that patients be counted at the facility if they were in the facility "on Census Day." Final 2020 Census Residence Criteria at 5534–35.

[5] Even if historical practice could overcome text, Plaintiffs reject Intervenors' historical analysis. There is no doubt that the actual counting of the population has not been completed within 24 hours, but the population being counted has consistently been that which existed as of census day. To paraphrase Justice Stevens's example, although a census taker might count a household after April 1, a child born after that date should not be counted.

dismiss stage." *Hayden v. Ala. Dep't of Pub. Safety*, 506 F. Supp. 3d 944, 956 (M.D. Ala. 2007); *see also* 5B WRIGHT & MILLER, FEDERAL PRACTICE AND PRO-CEDURE: CIVIL 2d § 1357 at 341–43 (1990). It is at least plausible that Congress intended the ordinary meaning of "as of" when it used those words in Section 141(a). *See United States v. Fisher*, 289 F.3d 1329, 1338 (11th Cir. 2002) ("The plain language is presumed to express congressional intent and will control a court's interpretation"). Thus, Plaintiffs have stated a claim that Defendants violated Section 141(a).

## III.   Plaintiffs' claims are timely

Plaintiffs allege ongoing injuries, *see* ECF No. 43 ¶ 17, 19–22, so the statute of limitations does not apply. And even if the statute of limitations did apply, Plaintiffs filed this civil action within the applicable limitations period, so the defense of laches is unavailable.

### A.    The statute of limitations does not apply

Plaintiffs allege ongoing injuries, *see* ECF No. 43 ¶ 17, 19–22, 71–72, 77–84, so the statute of limitations does not apply. *Does v. Whitmer*, 751 F. Supp. 3d 761, 838 (E.D. Mich. 2024) ("[s]tatutes of limitations are simply inapplicable" to "suits seeking prospective relief for ongoing injuries"); *Leal v. Azar*, No. 2:20-CV-185-Z, 2020 WL 7672177, at *6–*7 (N.D. Tex. Dec. 23, 2020).

Even if the statute of limitations did apply, Plaintiffs' claims are timely. The federal catch-all statute, 28 U.S.C. § 1658(a), provides that "a civil action

16

arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." But a statute of limitations does not begin to run until the plaintiff has suffered a cognizable injury. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 801 (2024) ("'reject[ing]' the possibility that a 'limitations period commences at a time when the [plaintiff] could not yet file suit'").

At the earliest, the Florida Plaintiffs were injured on March 3, 2022, when Florida finalized its intra-state redistricting based on 2020 Census data. They suffered a new injury on January 3, 2023, when the 118th Congress was seated.[6] And the other injury—the loss of federal funding for their communities—occurred for the first time even later, when Members of Congress voted on the allocation of resources or when those resources were actually distributed. In any event, the statute of limitations does not apply here because all of these injuries are ongoing. Plaintiffs remain affected by inaccurate maps, deprivation of representation, and loss of federal funding.

Congressman Donalds was injured at the earliest on January 3, 2023, when he first suffered from a weakened Florida Delegation and an inaccurate

---

[6] Plaintiffs contend that they suffered from the deprivation of representation for the first time on January 3, 2023. But if the Panel determines that this injury occurred when the new congressional maps were signed into law, the injury occurred on April 22, 2022. *See* Press Release, the Hon. Ron DeSantis, Gov. of Fla., Governor Ron DeSantis Signs Legislation to Create Lawful Congressional Districts and Remove Special Interest Carveouts (Apr. 22, 2022), https://perma.cc/Q3V8-SK7W.

balance of power between the States in Congress. His informational injury occurred even later when he relied on inaccurate census data in the course of carrying out his duties. And as with the Florida Plaintiffs' injuries, Congressman Donalds's injuries remain ongoing.

Plaintiffs filed this action on September 15, 2025. ECF No. 1. Thus, no matter which injury is used as the starting point, this action falls comfortably within the applicable statute of limitations. Intervenors contend that the relevant starting point is 2018 or 2021, when the Census Bureau formally announced its decision to use Differential Privacy and GQCIP. But Plaintiffs lacked Article III standing until they suffered an injury that was "particularized"—that is, one that "affect[ed] [them] in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). Indeed, when a group of plaintiffs in 2021 tried to challenge Differential Privacy, a three-judge panel denied relief because the alleged harms were "speculative" and "premature" because the census had not yet been finalized, and apportionment had not yet been completed. *Alabama v. Dep't of Com.*, 546 F. Supp. 3d 1057, 1069–74 (M.D. Ala. 2021). If this Court were to adopt the Intervenors' analysis, then plaintiffs would *never* be able to challenge Differential Privacy and GQCIP—they would either always be too early or too late. But that is not the law. A statute of limitations does not begin to run until the plaintiff can file suit. *Corner Post*, 603 U.S. at 801.

18

### B.    The defense of laches does not apply

The defense of laches cannot be invoked when an action is brought within the applicable statute of limitations. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 331 (2017). Because the statute of limitations does not apply in this case—and even if it did, this action was brought within the applicable statute of limitations—the defense is unavailable. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014).

Even if laches were available, Intervenors have failed to make the requisite showing. To invoke the defense of laches, a defendant must demonstrate: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1005 (2021).

Intervenors cannot establish that this action was delayed because, as explained above, Plaintiffs sued within the applicable statute of limitations. *See Henderson v. United* States, 517 U.S. 654, 659 n.6 (1996) ("the filing of the complaint within the limitation period render[s] the action timely"). And Intervenors—a non-profit organization and two college students—have not suffered any prejudice by the timing of this suit. It is true that if Plaintiffs prevail, Defendants will need to redraw congressional maps and use those maps going forward. But unlawful maps are not insulated from judicial review merely

19

because the remedy requires expenditure of government resources, and there is no showing that such expenditure is greater now than it would have been had this suit been brought earlier. *Contra* ECF No. 60 at 23.

What is more, the principal reason for invoking the defense of laches is wholly lacking here. The "concern" motivating the laches defense "is that the loss or obscuration of evidence will make the doing of equity either doubtful or impossible." *Matter of Georgian Villa, Inc.*, 10 B.R. 79, 85 (N.D. Ga. 1981). Intervenors do not contend—nor could they—that the passage of time has eroded any evidence or rendered resolution of the claims more difficult.

At bottom, "[l]aches is an equitable doctrine committed to the sound discretion of the district court." *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 n.12 (11th Cir. 1984). Even if it could be invoked here, the importance of this case counsels against its application. The Constitution requires the results of the census to be used for purposes of apportionment. *See* U.S. CONST. art. I, § 2, cl. 3; amend. XIV, § 2. Apportionment affects the allocation of members in the Electoral College. *See* U.S. CONST. art. II, § 1, cl. 2. The Census Bureau used two novel and unlawful procedures for the first time in 2020 to calculate the population for purposes of apportionment. Plaintiffs are entitled to have this Panel adjudicate whether those procedures were lawful.

## CONCLUSION

Intervenors' Motion to dismiss should be denied.

DATED: December 17, 2025                    Respectfully submitted,

*/s/ Emily Percival*                        R. Quincy Bird (FBN 105746)
James K. Rogers (AZ Bar No. 027287)*        Timothy W. Weber (FBN 86789)
Emily Percival (FBN 119313)                 Jeremy D. Bailie (FBN 118558)
Ryan Giannetti (DC Bar No. 1613384)*        **Weber, Crabb & Wein, P.A.**
Crystal Clanton (AL Bar No. 1746D29O)*      5453 Central Avenue
Robert A. Crossin (IN Bar No. 39340-49)*    St. Petersburg, FL 33710
**America First Legal Foundation**          Telephone: (727) 828-9919
611 Pennsylvania Ave., SE #231              Facsimile: (727) 828-9924
Washington, D.C. 20003                      timothy.weber@webercrabb.com
Phone: (202) 964-3721                       jeremy.bailie@webercrabb.com
james.rogers@aflegal.org                    quincy.bird@webercrabb.com
emily.percival@aflegal.org
ryan.giannetti@aflegal.org
crystal.clanton@aflegal.org                 *Admitted *pro hac vice*
bobby.crossin@aflegal.org

                                            *Counsel to Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2025, I electronically filed the fore-going with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

*/s/ Emily Percival*
Emily Percival (FBN 119313)