UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, et al., | No. 8:25-cv-02486-WFJ-SDM-RSR |
|      Plaintiffs, | |
| v. | |
| HOWARD W. LUTNICK, et al., | |
|      Defendants. | |

**INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiffs' pre-answer Motion for Summary Judgment, Doc. 50 (Mot.) relies in key respects on inadmissible, unsworn blog posts and articles that even on their own terms do not support the facts Plaintiffs assert. Other load-bearing factual assertions are unsupported altogether. At the very least, there are genuine disputes of material fact as to key elements of Plaintiffs' claims.

Start with standing. Plaintiffs' own evidence shows that the challenged methods did not affect the interstate apportionment of congressional seats. Plaintiffs offer no facts to suggest that their districts were negatively affected relative to other Florida districts, either—their evidence makes it equally likely that they benefitted. That leaves Congressman Donalds' alleged informational injury, but he does not show that he actually relies on census data for any legislative purpose, that the challenged statistical methods have made that data any less reliable for those purposes, or even that he—an individual House member—can assert any such institutional injury.

Plaintiffs fare no better on the merits. Their claim under a purported "prohibition on statistical methods" in Section 209(i) of Pub. L. No. 105-119 fails because Section 209 does not "prohibit" anything at all. Their other challenges to Group Quarters Imputation under the Census Clause and 13 U.S.C. § 195 are squarely foreclosed by the Supreme Court's decision in *Utah v. Evans*, 536 U.S. 452 (2002), which held that imputation is not "sampling" as

1

the term is used in Section 195 and that the Census Clause does not bar the use of any statistical methodology. Their "Census Day" argument ignores that the Census has always enumerated based on ordinary residence, not temporary location. And their remaining challenges to Differential Privacy fail because the Census Clause and Section 195 restrict Census methodology only for purposes of interstate apportionment of representatives and Differential Privacy undisputedly was not applied to apportionment data.

The Motion should be denied.

## BACKGROUND

Plaintiffs challenge the use of two allegedly "prohibited" statistical methods in the 2020 U.S. Census (and their potential use in the 2030 Census): "Group Quarters Imputation" (GQI) and "Differential Privacy" (DP).

The Census Bureau used GQI in 2020 to determine the population of certain institutional living arrangements like nursing homes and college dormitories for which it could not obtain a population count due to the COVID-19 pandemic. *See* Pl. Ex. 24 at 9. During the pandemic, many individuals who ordinarily resided in group quarters temporarily relocated elsewhere, which made it impossible in some cases for the Bureau to directly count the number of people usually residing in such facilities. *Id.*

The Bureau used GQI only as a last resort. The Bureau first attempted to correct group quarters data through extensive outreach. Pl. Ex. 26 at 8–9.

For 98% of group quarters, those efforts succeeded; GQI was used only for the remaining 2% of occupied group quarters. *Id.* at 8. For those quarters, the Bureau employed GQI to impute a population figure based on data from "similar, fully-reported group quarters." **Ex. A**, Decl. of Dr. Cory McCartan ¶¶ 21–22 (McCartan Decl.); Pl. Ex. 26 at 8. The Bureau then took quality control measures to address double-counting. *See* Pl. Ex. 24 at 19. GQI added just 169,000 people nationwide to the census count, of whom 16,500 were in Florida. *See* Pl. Ex. 26 at 25–26.

What Plaintiffs call "Differential Privacy" was also new in 2020. Federal law requires the Census Bureau to maintain the privacy of census responses. 13 U.S.C. § 9(a)(2). In past censuses, the Bureau accomplished this using a procedure called "swapping," which swapped households between census blocks to obscure individual data. McCartan Decl. ¶ 13. In 2017, the Bureau announced that it would use DP instead. Pl. Ex. 23 at 1. DP involved injecting statistical "noise" into selected data cells to mask personal information and reduce the risk of identity reconstruction. *Id.*; *see also* Pl. Ex. 16 at 3. DP was *not* applied to state-level population figures used for congressional apportionment. Pl. Ex. 23 at 1. And the noise injected is small relative to overall population figures. McCartan Decl. ¶¶ 15–17, 36.

Five years after the 2020 Census, Plaintiffs filed this lawsuit. They contend that Group Quarters Imputation and Differential Privacy violate the

U.S. Constitution's requirement that the census be an "actual Enumeration" of "whole persons," and that they violate various federal statutes regulating census procedures. Doc. 43 ¶¶ 37–38, 55–56.

## LEGAL STANDARD

"Summary judgment is appropriate only when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law." *Baker v. Upson Reg'l Med. Ctr.¸* 94 F.4th 1312, 1317 (11th Cir. 2024). Plaintiffs have the burden of proof, so they "must show *affirmatively* the absence of a genuine issue of material fact," with "credible evidence that would entitle [them] to a directed verdict if not controverted at trial." *Id.* (citation modified). "If the moving party fails to show that the facts underlying all the relevant legal questions . . . are not in dispute, then summary judgment should be denied—even if the non-moving party has introduced no evidence whatsoever." *Edmonson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1150 (11th Cir. 2022) (citation modified).

## ARGUMENT

### I.   Plaintiffs lack standing.

To have standing, a "plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 380 (2024). At the summary judgment stage, the invoking party must establish standing through evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs claim Article III standing based on three forms of purported injury, but they have failed to carry their summary judgment burden as to any of them. They do not show that the practices they challenge affected, or likely will affect, the total number of House seats apportioned to the State of Florida. They do not show that their own districts are overpopulated. And they do not allege a cognizable informational injury to Rep. Donalds.

### A. Neither challenged method affected interstate apportionment.

Plaintiffs' own exhibits refute their contention that the challenged methods cost Florida "two additional House seats and Electoral College votes." Mot. at 2 (citing Pl. Exs. 17, 18). DP could not have affected interstate apportionment because it was "not applied to the apportionment count." Pl. Ex. 23 at 1; *see also* McCartan Decl. ¶¶ 29–30. And while GQI did affect the statewide population numbers used for apportionment, Plaintiffs' own evidence shows that Florida *gained* 16,500 residents from GQI—the second-most of any state, Pl. Ex. 26 at 25, and that only 169,000 people were "imputed" nationwide—too few to affect the interstate apportionment of congressional districts in *any* state. *See* Pl. Ex. 1 at 46; McCartan Decl. ¶¶ 31–33.

5

Plaintiffs' reliance on documents discussing the 2022 Post-Enumeration Survey (PES)—which undisputedly *did* use prohibited "sampling"—does not change this. *See* Pl. Ex. 17; Pl. Ex. 25. The documents describe an undercount, but they do not say it was caused by GQI or DP. *See id.* One of them cautions—in bold lettering, no less—that while "the 2020 Post-Enumeration Survey can estimate undercounts and overcounts in the census, *PES data cannot answer why a particular state may have experienced one.*" Pl. Ex. 17 at 3 (emphasis added). And the PES could not possibly demonstrate the effects of GQI, because "[t]he PES did not produce estimates of coverage for the population living in group quarters (e.g. college dormitories and correctional facilities.)." Pl. Ex. 25 at 8; *see also* Pl. Ex. 17 at 2.[1]

Plaintiffs therefore do not offer any evidence—much less undisputed evidence—to support their raw allegation that the challenged statistical methods caused an undercount of Florida's total population. For that reason, they cannot establish standing based on either the loss of a congressional seat or a loss of federal funds. *See Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992). This also disposes of two of the three alleged injuries to Rep. Donalds: "an inaccurate balance of power between the states in Congress" and "a

---

[1] Even the unsworn blog post Plaintiffs cite about the PES, Pl. Ex. 18, does not say GQI or DP is to blame for any undercount, and it is inadmissible hearsay that cannot support summary judgment in any event. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012).

weakened Florida Delegation." Mot. at 5.

### B. Plaintiffs do not have standing based on alleged effects on intrastate apportionment.

Plaintiffs also do not have standing based on any effect of DP and GQI on Florida's intrastate drawing of districts. *See* Mot. at 2 (citing Pl. Exs. 10, 11). Unequally populated legislative districts within a state injure only "those persons domiciled in under-represented voting districts." *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1070 (M.D. Ala. 2021) (quoting *Wright v. Dougherty Cnty.*, 358 F.3d 1352, 1355 (11th Cir. 2004)). And Plaintiffs do not show that *their* districts are overpopulated because of DP or GQI.

In particular, Plaintiffs do not show where the facilities to which GQI was applied are located, nor what the net effect of DP was on their districts' populations. *See* McCartan Decl. ¶¶ 35–38. The closest Plaintiffs come is by pointing to evidence that Pinellas County, where some of them live, was undercounted by 2.7%. Mot. at 4–5 (citing Pl. Ex. 20). But this exhibit, of unclear provenance, is inadmissible hearsay and improper expert testimony. And Plaintiffs offer no basis for concluding that the undercount it displays was caused by GQI or DP. *See id.* It cannot possibly have been, because the alleged 2.7% undercount is far too large to be attributable to the challenged methods. McCartan Decl. ¶¶ 18, 36–37. And according to the exhibit, the undercount in Pinellas County was *lower* than undercounts elsewhere in Florida, suggesting

7

that it may have *helped* Plaintiffs relative to other Floridians, not hurt them. *See* Pl. Ex. 20.

Plaintiffs therefore do not offer undisputed evidence from which a reasonable factfinder could conclude that their districts are overpopulated. They might equally be underpopulated. Plaintiffs therefore have not shown injury. And any intrastate apportionment harm would not be redressable by relief against the Census Bureau, in any event, because redressing it would require Florida—a separate sovereign that is not a party to this case—to redraw its districts. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (explaining an injury is not redressable when it would require the action of nonparties not under the defendants' control).

### C. Rep. Donalds has no informational injury.

Plaintiffs also failed to show that Rep. Donalds has an "informational" injury. It is not enough to say Rep. Donalds received inaccurate information; to assert an informational injury, he must show "downstream consequences from [his] receipt of allegedly misleading [information.]" *Trichell v. Midland Credit Mgmt., Inc.,* 964 F.3d 990, 1004 (11th Cir. 2020). "[A]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *Id.*; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (same). For at least three reasons, Rep. Donalds shows no adverse effects.

First, Rep. Donalds does not explain how *he* relies on census data to "do

his job." Mot. at 7. He avers that "[e]xecutive agency spending programs depend on state-level and granular Census data" for various purposes. Pl. Ex. 2 ¶ 5. But *Congress* does not use census data for those purposes. Even if Rep. Donalds "regularly votes" on bills to approve such spending programs, *id.* ¶ 7, he does not say that *he* relies on decennial census data in deciding whether to support them—or for any other purpose. He generically states that he "depend[s] on" census data to perform his "legislative duties," *id.* ¶ 4, but nowhere does he identify even one time when he looked at decennial census data to inform his vote.

Second, even if Rep. Donalds was injured in his legislative capacity by inaccurate census data, his injury would be shared by every member of Congress. It is thus an "institutional injury" that is "wholly abstract and widely dispersed." *Raines v. Byrd*, 521 U.S. 811, 829 (1997). Although "there is some authority . . . indicating that a *House of Congress* or a committee of Congress would have standing to sue to retrieve information to which it is entitled," Rep. Donalds is but a single member of the House. *Walker v. Cheney*, 230 F. Supp. 2d 51, 68 (D.D.C. 2002); *see also id.* ("[I]t is of 'some importance' that, like the plaintiffs in *Raines*, the [plaintiff] here has not been expressly authorized by Congress to represent its interests in this lawsuit."); *cf. McGrain v. Daugherty*, 273 U.S. 135 (1927) (upholding congressional subpoena enforcement).

Finally, Plaintiffs offer no evidence that the challenged statistical

methods negatively affected the accuracy of 2020 census data. The Census Bureau uses imputation "as a last resort" because it is "more accurate than leaving the gaps blank." Pl. Ex. 21 at 3. And DP produces only minimal statistical noise—at the county level the average "error" is only 1.86 people. McCartan Decl. ¶¶ 16–17, 36; *see* 13 U.S.C. § 9. Plaintiffs therefore do not show that the challenged methods make census data less accurate in a way that could cause "downstream consequences."[2] And to the extent Plaintiffs argue the data is "inaccurate" simply because it was obtained using "prohibited" methods, that is just another way of saying they were injured because "the law . . . has not been followed." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). "[A]n injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427.[3]

## II.    Plaintiffs are not entitled to summary judgment on the merits.

Plaintiffs also fail to justify summary judgment on the merits. Section

---

[2] That distinguishes the two census cases cited by Plaintiffs. Mot. at 6; *see Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 690 (N.D. Cal. 2020) (denying motion to dismiss where local governments plausibly alleged that a census undercount would "degrade granular census data that they rely on to deploy services and allocate capital"); *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 610 (S.D.N.Y. 2019) (plaintiffs suffered informational injury where it was "undisputed" that "the addition of the citizenship question *will* result in harm to the quality of census data."). These cases also predate *TransUnion* which made clear that an "informational injury" requires "downstream consequences." 594 U.S. at 442.

[3] Plaintiffs lack standing to challenge the use of these methods in the 2030 Census for the additional reason that it is speculative whether they will be used at all, as Intervenors have explained. *See* Doc. 60 at 12–13.

209 does not prohibit any statistical method. GQI qualifies as an "actual Enumeration" under the Census Clause, is not prohibited "statistical sampling" under 13 U.S.C. § 195, and does not violate the Census Day requirement of 13 U.S.C. § 141. DP was not used for interstate apportionment, which is the only purpose for which the Census Clause requires an "actual Enumeration" of "whole persons" and for which Section 195 restricts the use of statistical sampling. And Plaintiffs' claims are untimely in any event.

## A. Section 209 does not itself prohibit statistical methods.

Plaintiffs' claim that GQI and DP are "prohibited statistical methods" under Section 209 fails because Section 209 does not itself "prohibit" anything. It merely authorizes a lawsuit by those "aggrieved by the use of any statistical method in violation of the Constitution or any provision of law *(other than this Act)*." Act of Nov. 26, 1997, Pub. L. No. 105-119, § 209(b), 111 Stat. 2440, 2481 (emphasis added).[4] This is no accident. In the midst of a dispute over the Clinton Administration's plan to use true statistical sampling in the 2000 Census—by following up with only *some* households that did not return their census forms—Congress tried to prohibit "sampling or any other statistical procedure," but President Clinton vetoed that legislation. *See Dep't of Com. v.*

---

[4] Section 209(i), which Plaintiffs cite, provides only that the Act in which it was enacted may not be "construed to *authorize* the use of any statistical method"—it does not say that it *prohibits* any such method. (emphasis added).

11

*U.S. House of Reps.*, 525 U.S. 316, 326–27 (1999).

Section 209 was the compromise that resulted, crafted to allow the House of Representatives to seek judicial review of whether *existing* law already prohibited the contemplated statistical sampling. *See id.* The House did so, and the Supreme Court ruled that 13 U.S.C. § 195 did prohibit the planned sampling. *See id.* But the House never suggested that Section 209 itself contained a substantive prohibition, and its text makes clear that it does not. Plaintiffs' claimed violation of Section 209 therefore fails.[5]

### B. GQI is consistent with the Census Clause, Section 195, and Section 141.

Plaintiffs' challenge to GQI under the Census Clause and 13 U.S.C. § 195 also fails, because GQI complies with the requirements of both laws as set forth in *Utah v. Evans*, 536 U.S. at 473. And contrary to Plaintiffs' arguments, it counts population as of Census Day in compliance with 13 U.S.C. § 141.

### 1. The Census Clause

*Evans* rejected Plaintiffs' argument that the term "'actual Enumeration' require[s] the Census Bureau to seek out each individual." 536 U.S. at 473. Instead, it held that the "general word 'enumeration' . . . refers to a counting process without describing the count's methodological details." *Id.* at 474.

---

[5] By failing to address this point in response to Intervenors' Motion to Dismiss, *see* Doc. 60, Doc. 65, Plaintiffs have abandoned their Section 209 claim. *See Coal. For the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000).

Those "methodological details" are left to Congress. *Id*. *Evans* therefore upheld the Census Bureau's use of "hot-deck imputation" to fill in missing details (including occupancy) for addresses for which accurate information was unavailable. *Id*. at 458–459. In doing so, *Evans* emphasized that the Constitution affords Congress and the Census Bureau a "breadth of . . . methodological authority," and it rejected the challenger's attempt to supersede the plain meaning of "enumeration" by subjecting it to a range of specialized requirements, none of which the Framers intended. 536 U.S. at 474, 476–77.

GQI is indistinguishable from the "hot-deck imputation" process that *Evans* upheld. In hot-deck imputation, the Bureau,

> [I]mpute[d] the relevant information by inferring that the address or unit about which it [wa]s uncertain ha[d] the same population characteristics as those of a nearby sample or donor address or unit— *e.g.*, its geographically closest neighbor of the same type (*i.e.*, apartment or single-family dwelling) that did not return a census questionnaire by mail.

*Id*. at 458 (citation modified). GQI, too, involves "infer[ring] the populations of . . . similar facilities" using the "characteristics" of "donor" facilities. Mot. at 12; *see* McCartan Decl. ¶¶ 19–23, 28.

Moreover, like hot-deck imputation, GQI is a "last resort" measure that was implemented only after "ordinary questionnaires and interviews have failed." Mot. at 18 (citing *Evans*, 536 U.S. at 470, 478–79). The Bureau's first

step was to "decrease[] the number of [cases requiring GQI] by conducting a series of processing operations based on data we already had or obtained later, and direct subject matter reviews," which "resolved many issues." Pl. Ex. 26 at 8. For example, the Bureau attempted to correct potentially erroneous Group Quarters data in various ways, including by "trying to contact" the group facility in question by telephone, using publicly available information, and conducting "investigative research" such as a "review of notes" from field agents. *Id.* at 8–9. The Bureau implemented GQI only after it exhausted its enumeration efforts and determined that "the information supplied" by possibly occupied group quarters was "contradictory[] or incomplete," just like in *Evans*, 543 U.S. at 457. *See also id.* at 457–58 (noting that hot deck imputation was used if "no one wrote back, . . .agents in the field produced confused responses, or . . . those who processed the responses made mistakes").

Plaintiffs' argument that GQI differed in some material respect from the procedure in *Evans* misreads *Evans*. As *Evans* explained, hot-deck imputation "imputes the relevant information by *inferring* that the address or unit about which [the Bureau] is uncertain *has the same population characteristics as those of a nearby sample or donor address or unit*." 536 U.S. at 458 (citation modified) (emphasis added). In other words, hot-deck imputation was applied precisely where the Bureau could *not* "ask a neighbor or mailman." Moreover, the Court acknowledged that "[c]ensus takers have long asked heads of

14

households, neighbors, landlords, postal workers, or other proxies about the number of inhabitants in a particular place," but noted that such "hearsay" is "no more accurate, . . . no less inferential, and rests upon no more of an individualized effort for its inferences than the Bureau's method of imputation." *Id.* at 477 (citation modified).

Plaintiffs also argue that GQI differs from "the neighbor-to-neighbor method" used in "hot deck" imputation because it "counted fictitious people rather than real human beings," Mot. at 18, but that argument assumes, entirely without evidentiary support, that the facilities in question had no usual, long-term residents. The Bureau's whole reason for applying GQI was its conclusion that the quarters in question "*were occupied* on April 1, 2020 (the reference day for the census) but didn't provide a population count." Pl. Ex. 21 at 5 (emphasis added). Plaintiffs offer no evidence that the Bureau was wrong to reach that conclusion—they just assume there were no occupants.

Finally, Plaintiffs offer no factual support for their claim that GQI led to "systematic double-counting." Mot. at 22. In fact, the 2020 Census questionnaire asked, with respect to each person identified as part of a household, "Does this person usually live or stay somewhere else?" One of the potential responses was: "Yes, for college." *See* **Ex. B**. This enabled the Bureau to avoid double-counting college students who were temporarily living with their parents due to the COVID-19 pandemic. *Id.* Plaintiffs ignore this de-

15

duplication procedure.

## 2. Section 195

*Evans* similarly forecloses Plaintiffs' claim that GQI constitutes "the statistical method known as 'sampling'" in violation of 13 U.S.C. § 195. Mot. at 8. *Evans* held that hot-deck imputation is not "sampling," and its reasons for doing so apply equally to GQI.

*First*, GQI did not involve "the extrapolation of the features of a large population from a small one, but the filling in of missing data as part of an effort to count individuals one by one." *Evans*, 543 U.S. at 467. The Bureau used GQI to fill in missing data on the sliver of Group Quarters for which the Bureau's other methods did not yield reliable information. Pl. Ex. 26 at 8.

*Second*, the imputation method "was not that typically used by statisticians seeking to find a subset that will resemble a whole . . . but that used to assure that an individual unit (not a 'subset'), chosen nonrandomly, will resemble other individuals (not a 'whole') selected by the fortuitous unavailability of data." *Evans*, 543 U.S. at 467. In using GQI, the Bureau attempted to supply missing information for "individual unit[s]" that were "selected by the fortuitous unavailability of data." *Id.*; *see* McCartan Decl. ¶ 28.

*Third*, "the Bureau's immediate objective was the filling in of missing data." *Evans*, 536 U.S. at 467. The Bureau tried to directly obtain a population count for each group quarters, and succeeded for 98% of them. Pl. Ex. 26 at 4.

It used GQI only for the 2% of group quarters which the Bureau concluded were occupied but for which it had no other data, "in order to avoid placing the figure 'zero' next to a listed address when it [wa]s possible to do better." *Evans*, 536 U.S. at 470.

Plaintiffs' contrary argument that any "mathematical model" which "infers population characteristics" and does not rely on "tall[ying]" via "individualized data collection" constitutes sampling, Mot. at 8–9 (emphasis removed), is impossible to square with *Evans*. *Evans* held that "sampling" in Section 195 had a narrow and "technical meaning," encompassing only those circumstances where "a subset of the population . . . is used to gain information about the entire populations." *Evans*, 536 U.S. at 467 (citation omitted). Plaintiffs acknowledge this definition, Mot. at 8, but they do not explain how GQI satisfies it. It does not.

### 3. Section 141.

Plaintiffs' argument that GQI violated the Bureau's obligation to count the population "as of the first day of April," *e.g.*, Mot. at 21 (quoting 13 U.S.C. § 141(a)), also fails. The census counts people at their "usual residence" as of April 1, even if they are temporarily living elsewhere. "[T]he first census conducted in 1790 required that persons be allocated to their place of 'usual residence,'" and the "usual residence" standard "has been used by the Census Bureau ever since to allocate persons to their home States." *Franklin*, 505 U.S.

at 803–04. "Usual residence . . . can mean more than mere physical presence";
for example, the "first enumeration Act itself provided that 'every person
occasionally absent at the time of the enumeration [shall be counted] as
belonging to that place in which he usually resides in the United States.'" *Id.*
at 804 (quoting Act of Mar. 1, 1790, § 5, 1 Stat. 103). Even long absences do not
displace a person from his "usual residence." *Id.*

Consistent with this two-hundred-year history, the Census Bureau today
defines "usual residence" as "the place where a person lives and sleeps most of
the time." **Ex. C** at 1. It applied that definition during the 2020 Census by
enumerating "[p]eople in certain types of group facilities . . . at the group
facility," even if they were not literally present in the facility on April 1. *Id.*
That is consistent with decades of practice. *See Borough of Bethel Park v.
Stans*, 449 F.2d 575, 579 (3d Cir. 1971) (affirming the Bureau's decision to
"count [college students] in the states where they lived while attending
college"); *Common Cause v. Trump*, 506 F. Supp. 3d 39, 43 (D.D.C. 2020)
(similarly noting that "[c]ollege students are counted where they live at
college."); *Kostick v. Nago*, 878 F. Supp. 2d 1124, 1129 (D. Haw. 2012)
("Students enrolled at a Hawaii university or college who were usual residents
of Hawaii on April 1, 2010 were or should have been counted by the 2010
Census as part of the 2010 Census count for Hawaii."). And while Plaintiffs
argue that students were counted both "at their family homes on April 1, 2020"

18

and at "their dormitories based on pre-April 1 occupancy data," Mot. at 22, they

offer no evidence that this happened, and they ignore the Bureau's careful

efforts to avoid it. *See* Ex. B.

### C. Differential Privacy was not used for state-level apportionment.

Plaintiffs' challenge to DP fails for an even more straightforward

reason—DP was not used on the state-level population figures that determined

the apportionment of congressional seats. Pl. Ex. 23. It therefore cannot have

violated the "actual Enumeration" provision of the Census Clause or Section

195, because the plain text of both provisions shows that they govern only

interstate apportionment, not other uses of census data. The Census Clause

mandates an "actual Enumeration" for one specific purpose only—so that

"Representatives and direct Taxes [may] be apportioned among the several

States . . . according to their respective numbers." U.S. Const. art. I, § 2, cl. 3;

*see also id.* amend. XIV, § 2 (providing for counting "whole . . . persons" in

"apportion[ing]" representatives "among the several States").[6] And Section 195

affirmatively *authorizes* sampling other than "for purposes of apportionment

of Representatives in Congress among the several States." 13 U.S.C. § 195. The

---

[6] *Wesberry v. Sanders*, 376 U.S. 1 (1964), requires only that *states* "make a good-faith effort to achieve precise mathematical equality." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969). This requirement "does not translate into a requirement that the Federal Government conduct a census that is as accurate as possible." *Wisconsin v. City of New York*, 517 U.S. 1, 17 (1996). *Contra* Doc. 65 at 13.

use of DP on census data *other than* that used for interstate apportionment therefore cannot possibly have violated either provision.

Moreover, even if the Census Clause and Section 195 applied, DP is consistent with both provisions. It is not "sampling" as *Evans* defines it, because it involves a privacy protective masking of data at the end of the census process—not an "extrapolation of the features of a large population from a small one." *Evans*, 536 U.S. at 467; McCartan Decl. ¶ 26. And it was not a substitute for attempting to reach each household, but a data-processing step after that outreach occurred, so it would not violate the Census Clause as construed in *Evans* either. 536 U.S. at 477.

### D. Plaintiffs' claims are untimely.

Finally, Plaintiffs' claims are time-barred by laches and under 28 U.S.C. § 1658(a)'s four-year statute of limitations. *See* Doc. 60 at 21–25. Their claims accrued, at the latest, with the release of the 2021 redistricting data in August 2021, by which time Plaintiffs' alleged interstate apportionment harm and any informational harm were complete, and their alleged intrastate apportionment harm was clear and inevitable. But Plaintiffs sat on their hands while two federal elections were held under maps drawn based on the data they now challenge. Plaintiffs cannot receive summary judgment on time-barred claims.

### <u>CONCLUSION</u>

The Court should deny Plaintiffs' motion for summary judgment.

Respectfully submitted this 19th day of December, 2025.

/s/ David R. Fox
David R. Fox* (Lead Counsel)
Richard A. Medina*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law

*Admitted Pro Hac Vice*

/s/ Frederick S. Wermuth
Frederick Wermuth
Florida Bar No. 0184111
Quinn B. Ritter
Florida Bar No. 1018135
**KING, BLACKWELL, ZEHNDER
& WERMUTH, P.A.**
25 East Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
fwermuth@kbzlaw.com
qritter@kbzwlaw.com

*Counsel for Intervenor-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar. No. 0184111