**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> HOWARD W. LUTNICK, Secretary of Commerce, *in his official capacity*, *et al.*, <br><br> *Defendants*. | Case No. 8:25-cv-2486-WFJ-SDM-RSR |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

This action challenges the Census Bureau's ("the Bureau") use of two methods for processing data in the 2020 decennial census. Specifically, Plaintiffs challenge the Bureau's use of a statistical imputation method used to provide information about missing data from certain group housing, known to the Bureau as Group Quarters Count Imputation ("GQCIP"), and a disclosure avoidance method used to protect respondent data privacy, referred to by Plaintiffs as Differential Privacy ("DP"). Plaintiffs' case contains numerous jurisdictional deficiencies, and they are not entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). This Court should dismiss this case for lack of subject matter jurisdiction, or in the alternative, deny Plaintiffs' Motion for Summary Judgment ("Motion") (Doc. 50) on the basis that Plaintiffs have failed to show there is no genuine dispute as to the material facts of jurisdiction.

# BACKGROUND

<u>The Decennial Census</u>

The U.S. Constitution requires that an "actual enumeration" take place every ten years "in such manner as [the U.S. Congress] shall by law direct," U.S. CONST. art. I, § 2, cl. 3, to apportion representation in the U.S. House of Representatives among the states according to their populations. *See Utah v. Evans*, 536 U.S. 452, 478 (2002) ("The decisions, for example, to use population rather than wealth, to tie taxes and representation together, to insist upon periodic recounts, and to take from the States the power to determine methodology all suggest a strong constitutional interest in accuracy."). "The textual word 'actual' refers in context to the enumeration that will be used for apportioning the Third Congress, succinctly clarifying the fact that the constitutionally described basis for apportionment will not apply to the First and Second Congresses." *Id.* at 474. Thus, the "actual enumeration" was juxtaposed against conjecture, and simply required the number of inhabitants to be determined, "without reference to counting methodology." *See id.* at 475.

The first decennial census in 1790 lasted nine months. *See An Act Providing for the Enumeration of the Inhabitants of the United States* ("1790 Census Act"), ch. 2, § 1, 1 Stat. 101, 101 (1790) ("The enumeration shall commence on the first Monday in August next, and shall close within nine calendar months thereafter."). Modern decennial censuses use April 1 as a reference day, *see* 13 U.S.C. § 141(a), and count each person at their usual residence on that date, regardless of when the information is submitted. *See, e.g.*, (Doc. 50-27, at 8) (noting that the Bureau made it clear to group

quarters "that the appropriate reference day for the collection was still April 1, 2020"). Thus, it is expected for the enumeration to begin prior to April 1, and to continue after that date. Indeed, the enumeration for the 2020 Census officially began on January 21, 2020, in a rural Alaskan village on the Bering Sea because travel in the region is too dangerous when the ice thaws in March and April, and summer travel would not allow enough time to complete a timely count. *The 2020 Count Began in Alaska*, U.S. Census Bureau (last revised Aug. 31, 2022), https://www.census.gov/library/spotlights/ 2020/alaska.html#:~:text=The%202020%20Census%20begins%20by,village%20on %20the%20Bering%20Sea.

Each decennial census is a vast undertaking that begins about a decade before the enumeration, and continues long after—indeed the operational planning for the 2030 Census began in 2019. *See* 2030 Census Planning Timeline, U.S. Census Bureau (Feb. 10, 2025), https://www.census.gov/content/dam/Census/programs-surveys/ decennial/2030-census/2030-census-timeline.pdf (showing that the planning timeline for the 2030 Census spans from 2019 to 2033). The Bureau cannot always put these operational plans for a decennial census into action as hoped, however. For example, the Bureau faced unprecedented challenges for the 2020 Census due to the global COVID-19 pandemic and related lockdowns.

The Enumeration of Group Quarters in the 2020 Census

In February 2020, the Bureau commenced its planned advanced contact program ("GQAC") by meeting group quarters personnel in person to obtain information on the upcoming enumeration, and to request information such as the

3

group quarters "contact person's information," the facility's "maximum population," and the facility's "expected population at the time of enumeration." *See* (Doc. 50-25 at 15–16). However, the advent of the COVID-19 pandemic in March 2020, and the initiation of lockdowns across the country, required the Bureau to modify its 2020 operations, including by conducting a program to re-contact group quarters after the GQAC operation from June 8–26, 2020, and delaying other portions of the enumeration by several months. *See* (Doc. 50-25 at 18–19). The Bureau planned to complete its enumeration of group quarters by June 5, 2020, but due to COVID-19, the in-person portion of this enumeration began on July 1, 2020, and concluded on August 26, 2020. *See* (Doc. 50-25 at 18–19). During this process, the Bureau learned that approximately 5,500 occupied group quarters facilities—2% of the national total of 267,000 group quarters—were missing population data ("unresolved group quarters"). *See* (Doc. 50-27 at 6, 11, 16).

Many of the unresolved group quarters were temporarily evacuated due to the COVID-19 pandemic, but the Bureau could not simply count these temporary evacuees at another location because the location of enumeration is determined by regulation, called the Residence Rule. *See* Final 2020 Census Residence Criteria and Residence Situations Rule ("2020 Residence Rule"), 83 Fed. Reg. 5525 (Feb. 8, 2018). For example, some college students are "Counted at the on-campus or off-campus residence where they live and sleep most of the time. If they are living in college/university student housing (such as dormitories or residence halls) on Census Day, they are counted at the college/university student housing." *See* 83 Fed. Reg. at

5534. This is not a novel approach to determining residency for a decennial census. *See* 1790 Census Act, ch. 2, § 5, 1 Stat. at 103 ("every person occasionally absent at the time of the enumeration, [shall be counted] as belonging to that place in which he usually resides"); *see also Franklin v. Massachusetts*, 505 U.S. 788, 803–06 (1992) (discussing historical origins of usual residence standard). The Bureau had a choice— it could either accept an inaccurate population of zero for facilities that it knew were occupied according to the 2020 Residence Rule, or it could use what it believed to be the best available information for each facility to impute a population. The Bureau chose the latter course when it implemented GQCIP.

Ultimately, GQCIP added 169,000 people to the national apportionment count, *see* (Doc. 50-27 at 5), or 0.05 percent of the U.S. population, *see 2020 Census Apportionment Results Delivered to the President*, U.S. Census Bureau (Apr. 26, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-apportionment-results.html (reporting the U.S. resident population in 2020 as 331,449,281). GQCIP imputed 16,500 people to Florida's apportionment count, *see* (Doc. 50-27 at 26), amounting to 0.08 percent of the state's population. *See* (Doc. 50-2 at 7) (reporting Florida's apportionment population in 2020 as 21,570,527).

The Bureau's Disclosure Avoidance Program

Public trust in the confidentiality of private information submitted to the Bureau is essential to a successful decennial census, which is why Congress codified safeguards through the statutory scheme of Title 13. *See* 13 U.S.C. § 8(b) (noting that the Secretary of Commerce only has the authority to "furnish copies of tabulations and other

statistical materials which do not disclose the information reported by, or on behalf, any particular respondent"); 13 U.S.C. § 9(a)(2) ("Neither the Secretary[] nor any other officer or employee of the Department of Commerce or bureau or agency thereof," including the Bureau, "may . . . make any publication whereby the data furnished by any particular establishment or individual under this title can be identified."); *see also Baldrige v. Shapiro*, 455 U.S. 345, 355 (1982).

The risks of disclosure of private census information are serious. Without protections, every additional piece of information that is included in the data production for the decennial census (*e.g.*, every demographic question) enhances the ability of potential attackers to accurately identify individual respondents. As a result, the Bureau "has used a variety of tools to keep [census] data confidential" called "disclosure avoidance systems" ("DAS"). Disclosure Avoidance: Latest Frequently Asked Questions, U.S. Census Bureau, https://www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management/process/disclosure-avoidance/2020-das-updates/2020-das-faqs.html#accordion-ee136cb914-item-3d23656b21 (last visited December 19, 2025).

There are several types of DAS. *See id.* Since 1990, the Bureau has used noise-infusion based DAS to introduce uncertainty into data that is already collected, by adding statistical noise. *Id.* These types of methods allow the Bureau to "publish [census] data at lower levels of geography without putting [the] data at risk of disclosure." *Id.* Other DAS introduce uncertainty in different ways but also carry their own tradeoffs. *See* Comparing Differential Privacy With Older Disclosure Avoidance

6

Methods, U.S. Census Bureau, 3-4 (August 2021), https://www.census.gov/content/ dam/Census/library/factsheets/2021/comparing-differential-privacy-with-older-disclosure-avoidance-methods.pdf (discussing the limitations of prior DAS known as suppression and swapping); *see also* (Doc. 50-17 at 6). In 2008, the Bureau "began using a new disclosure avoidance system using a framework known as 'differential privacy,' to meet growing threats." Disclosure Avoidance: Latest Frequently Asked Questions, U.S. Census Bureau, https://www.census.gov/programs-surveys/decennial-census/ decade/2020/planning-management/process/disclosure-avoidance/2020-das-updates/2020-das-faqs.html#accordion-ee136cb914-item-3d23656b21 (last visited December 19, 2025).

In response to vulnerabilities identified in the DAS used in the 2010 Census, the Bureau implemented a DAS known as the TopDown Algorithm for the 2020 Census, *hereinafter* "DP."[1] Disclosure Avoidance for the 2020 Census: An Introduction, 5 (Nov. 2021), https://www2.census.gov/library/publications/decennial/2020/2020-census-disclosure-avoidance-handbook.pdf (explaining how Bureau-simulated

---

[1] The TopDown algorithm "has two parts: differential privacy algorithms and post-processing." Disclosure Avoidance for the 2020 Census: An Introduction, at 9 (Nov. 2021), https://www2.census.gov/library/publications/decennial/2020/2020-census-disclosure-avoidance-handbook.pdf. Differential privacy "algorithms add noise to the data, while post-processing imposes certain consistencies (for example, ensuring that the population totals for counties within a state sum to the state's total population)." *Id.* Referring to the TopDown Algorithm as "Differential Privacy" is technically imprecise since "Differential Privacy" refers only to the privacy accounting framework used to implement the noise infusion. However, to avoid confusion, Defendants here use the term "Differential Privacy" as Plaintiffs do, unless otherwise noted, to refer to the entire system—the combination of the noise infusion-based disclosure avoidance technique with the privacy accounting framework that governed its implementation in the 2020 Census.

reconstruction experiments conducted on tables published from the 2010 Census reconstructed 100 percent of the 2010 Census records with full accuracy for 46 percent of the population). This DAS was used to infuse a certain amount[2] of statistical noise into the population count of each census block[3] to protect data privacy. *Id.* at 9–10 (describing how noise is added to redistricting data).

## LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). "An issue of fact is 'genuine' if the record taken

---

[2] "The level of noise introduced is guided by a 'privacy-loss budget'" ("PLB"). Disclosure Avoidance for the 2020 Census: An Introduction, at 10-11 (Nov. 2021), https://www2.census.gov/library/publications/decennial/2020/2020-census-disclosure-avoidance-handbook.pdf. Determining the optimal PLB is a policy decision, set by the Data Stewardship Executive Policy committee, that balances the need for data accuracy with the protection of individual privacy. *Id.*; *see also* 2020 Census Program Memorandum Series: 2019.25, U.S. Census Bureau (October 21, 2019), https://www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management/plan/memo-series/2020-memo-2019_25.html.

[3] A "census block" is the "smallest level of geography you can get basic demographic data for, such as total population, by age, sex, and race." What are Census Blocks?, U.S. Census Bureau (July 11, 2011), https://www.census.gov/newsroom/blogs/random-samplings/2011/07/what-are-census-blocks.html. Census blocks are generally small in area, and in a city, a census block often corresponds to a city block bounded on all sides by roads, while in remote rural areas a census block may be vast. *Id.* All areas in the United States are assigned a census block. *Id.*

as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* (quoting *Hickson*, 357 F.3d at 1259–60).

## ARGUMENT

### I.    Plaintiffs Lack Article III Standing.

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "To have a case or controversy, a litigant must establish that he has standing, which requires proof of three elements." *City of S. Miami v. Governor*, 65 F.4th 631, 636 (11th Cir. 2023) (quoting *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020)). To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

Mere allegations of injury are insufficient to prevail on a motion for summary judgment. "Rather, a plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999).

The Court's standing inquiry here is more rigorous than in most other cases for two reasons. First, as to the 2030 Census, Plaintiffs "bear[] a more rigorous burden" than usual "to establish standing" because they "rest [their] claims for declaratory and injunctive relief on predicted future injury." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C.

Cir. 2015) (citation omitted). Second, the Court's "standing inquiry" is also "especially rigorous" because "reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Plaintiffs have not satisfied their burden here.[4]

### A. Plaintiffs fail to demonstrate an injury in fact.

"An injury in fact must be 'concrete,' meaning that it must be real and not abstract." *Food & Drug Admin.*, 602 U.S. at 381. The injury must also be "particularized; the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, n.1 (1992)). Finally, the injury must be "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420–422 (2013)). The injury in fact requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 388.

Plaintiffs begin their standing argument by arguing that they are "person[s] aggrieved" under Pub. Law No. 105-119, § 209. Mot. at 3. But setting aside whether Plaintiffs are aggrieved persons—they are not—possessing a cause of action under Section 209 does not independently establish standing. *See Spokeo, Inc. v. Robins*, 578

---

[4] Plaintiffs do not directly link the standing arguments in their Motion, *see* Mot. at 3–7, to any particular Count in the Second Amended Complaint ("Compl."), *see* Compl. ¶¶ 85–118, so Defendants address these arguments as though each applied to all five Counts.

U.S. 330, 341 (2016) ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."). Plaintiffs must also meet Article III's requirements.

Plaintiffs University of South Florida chapter College Republicans ("USF Republicans") and its president; Pinellas County Young Republicans (Young Republicans) and its president (collectively "Florida Plaintiffs"); and Congressman Byron Lowell Donalds each assert standing based on three alleged injuries, Mot. at 4–5, but none satisfies Article III.

### 1. Florida Plaintiffs' alleged apportionment injury is not concrete because Plaintiffs fail to show how either challenged method deprived Florida of additional congressional representation.

Florida Plaintiffs fail to demonstrate a concrete injury in fact under the theory that Florida was deprived of additional congressional representation due to the use of DP or GQCIP, *see* Mot. at 4, because they cannot—DP was not used in any way on the apportionment count, and GQCIP only added to Florida's population count, which benefited Plaintiffs rather than injured them.

Neither DP "nor any other form of statistical noise" was applied to the 2020 state population counts used to apportion seats in the U.S. House of Representatives. (Doc. 50-24 at 2) ("Differential privacy is not applied to the apportionment count.").

The 2020 Census apportionment counts[5] were published on April 26, 2021. *See* 2020 Census Operational Adjustments Due to COVID-19, U.S. Census Bureau, https://www.census.gov/programs-surveys/decennial-census/decade/2020/ planning-management/operational-adjustments.html#accordion-d68a9774e4-item-9aab874fd0 (last visited December 19, 2025). But the Bureau's Data Stewardship Executive Policy committee did not even select the parameters for the DAS (*i.e.*, the TopDown Algorithm) to be applied to the 2020 Census redistricting data until June 2021. Census Bureau Sets Key Parameters to Protect Privacy in 2020 Census Results, U.S. Census Bureau (June 9, 2021), https://content.govdelivery.com/accounts/ USCENSUS/bulletins/2e32ea9. Further, the DAS team did not apply those parameters to the algorithm to be used on the data until mid-to-late June 2021. 2020 Census Disclosure Avoidance System Development & Release Timeline, U.S. Census Bureau, at 6 (June 17, 2025), https://www2.census.gov/programs-surveys/ decennial/2020/program-management/data-product-planning/disclosure-avoidance-system/das-development-timeline.pdf. Since DP did not impact congressional apportionment, Florida's congressional representation was not influenced by DP and Florida Plaintiffs cannot show any related injury.

Further, GQCIP added 16,500 people to Florida's count, which benefited Florida Plaintiffs by increasing Florida's apportionment count. (Doc. 50-27 at 26). In fact, Florida gained the second-most residents from GQCIP—more than forty-eight

---

[5] The "2020 Census Report." *See, e.g.*, Compl. ¶ 1). *But see infra* note 13.

other states. (Doc. 50-27 at 25–27). Without the use of GQCIP in the 2020 Census, unresolved group housing units would have been imputed to a population of zero and Florida would have lost more people than forty-eight other states. *See id.* Since GQCIP only added to Florida's population count, it cannot have deprived Florida of additional congressional representation and Florida Plaintiffs cannot show such an injury.

Florida Plaintiffs attempt to link the Post-Enumeration Survey ("PES")—which estimated that the 2020 Census undercounted Florida by 3.48 percent—to Florida's loss of representation in Congress. *See* Mot. at 4 (citing (Doc. 50-26 at 23)). But the PES is not an enumeration and it is neither a substitute for nor a recreation of the decennial census. Rather, the PES surveys only "a sample of the population" based on information obtained from only a select sample of housing units. *See Post-Enumeration Surveys*, U.S. Census Bureau, https://www.census.gov/programs-surveys/decennial-census/about/coverage-measurement/pes.2020.html#accordion-92bf5711c0-item-057b366dd9 (last visited December 19, 2025). The PES also does not provide any estimates for the group quarters population. *Source and Accuracy of the 2020 Post-Enumeration Survey Person Estimate*, U.S. Census Bureau, 2 (March 2022), https://www2.census.gov/programs-surveys/decennial/coverage-measurement/pes/2020-source-and-accuracy-pes-estimates.pdf ("[T]he PES excluded people living in Remote Alaska areas or in group quarters."). As a result, the PES cannot bridge the gap between Florida Plaintiffs' meager facts and any actions by the Bureau.

Florida Plaintiffs cannot show that Florida was deprived of additional congressional representation due to the Bureau's use of DP or GQCIP, much less that Florida "would have had an additional Representative if the allocation had been done using some other source of 'more accurate' data." *Franklin*, 505 U.S. at 802. Thus, Florida Plaintiffs fail to demonstrate a concrete injury in fact, and they lack Article III standing to pursue any of their claims on the basis of deprivation of representation.

### 2. Florida Plaintiffs' alleged vote dilution injury is a general grievance rather than a particularized injury.

"For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). Florida Plaintiffs claim that they suffered from "inaccurate intra-state redistricting, which led to vote dilution." Mot. at 4. But Florida Plaintiffs do not show that their specific congressional districts were overpopulated, diluting their votes relative to other districts in Florida. The individual Florida Plaintiffs do not even establish that they are registered voters, or that they voted in any local elections or plan to vote in any future elections. Simply residing in a specific congressional district is too generalized to confer Article III standing. *Gill v. Whitford*, 585 U.S. 48, 49 (2018) ("A plaintiff who complains of gerrymandering, but who does not live in a vote gerrymandered district, asserts only a generalized grievance against governmental conduct of which he or she does not approve." (citation modified)). If anything, Florida Plaintiffs would have benefited from the addition of allegedly "fictitious," Second Amended Complaint, (Doc. 43 ¶¶ 1, 38, 47, 73), persons in their districts by

14

being overrepresented as a result. *See Wright v. Dougherty Cnty.*, Ga., 358 F.3d 1352, 1355 (11th Cir. 2004) (finding appellants failed to meet the injury in fact requirement when they benefited from malapportioned voting district). Since Florida Plaintiffs fail to demonstrate more than a generalized grievance, they lack standing to assert this vote dilution injury for any of their claims.[6]

### 3. Representative Donalds fails to demonstrate an informational injury.

To assert an informational injury, a plaintiff must identify "downstream consequences" from being deprived of accurate information. *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020). "An 'asserted informational injury that causes no adverse effects cannot satisfy Article III.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (quoting *Trichell*, 964 F.3d at 1004). Plaintiffs assert that "Representative Donalds is dependent upon the granular data collected in the census to understand the potential impacts of legislation and funding requirements for a given area and to fulfill his constitutional obligations to his constituents." Mot. at 6. Representative Donalds' declaration narratively references "competitive grants [that] depend[] on designations determined by census data," and his "vot[ing] on legislation" affecting "programs that rely on granular data." (Doc. 50-3 at 3-4). But he fails to

---

[6] Florida Plaintiffs' third claimed injury from diminished federal funding to their communities as a result of any potential undercount fails for the same reasons—they assert only general allegations of injury through diminished funding, rather than undisputed evidence of it. And further, they do not show how GQCIP could have harmed funding in their districts when it increased the population of those districts, or how DP could have caused injury when there is no evidence in the record of its impact on Florida districts.

establish a concrete harm that has impacted his ability to perform his duties, such as actions that he "took [] or failed to take" because of the information he received. *Frank v. Autovest*, LLC, 961 F.3d 1185, 1188 (D.C. Cir. 2020). His general descriptions of his job responsibilities do not identify any specific harm and are insufficient to show concrete and particularized "downstream consequences." *Trichell*, 964 F.3d at 1004. Absent such concrete injury, Representative Donalds "can complain only about receiving information that had no impact on [him]." *Id.* at 1002.

As for Representative Donalds' other alleged injuries, as discussed, DP did not impact apportionment and GQCIP only added to Florida's population. *See supra*, Part I. A. 1. Just as Florida Plaintiffs fail to identify a concrete injury, *id.*, Representative Donalds can neither identify a particular injury of "an inaccurate balance of power between the states in Congress" nor "a weakened Florida Delegation," in relation to the challenged methods. Mot. at 5, 7. Representative Donalds lacks Article III standing to assert these informational injuries as to any of his claims.

## B. Plaintiffs fail to establish organizational standing.

"An organization can establish standing in two ways: (1) through its members (i.e., associational standing) and (2) through its own injury in fact that satisfies the traceability and redressability elements." *Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. Of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022). To establish standing through its members, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests

16

it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiffs do not establish that USF Republicans is made up of any members at all—other than its President—much less that any of its members reside in Florida, are registered to vote, or would otherwise "have standing to sue in their own right." *Id.* Although Plaintiffs state in their Motion that Young Republicans' members "include voters in Florida's 13th, 14th, and 15th Congressional Districts," (Doc. 50-5 at ¶ 2), residence and voting status, without more, is insufficient to confer anything but a "generalized grievance" for purposes of Article III standing. *See supra*, Part I. A. 2.; *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (noting a litany of cases "have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm"); *Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1204 (11th Cir. 2018) (reaffirming "the requirement that an organization name at least one member who can establish an actual or imminent injury"). Plaintiffs also fail to allege, much less provide undisputed evidence, that the organizations suffered their own injuries in fact. *But see, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (finding standing under a diversion of resources theory when "a defendant's illegal acts impair the organization's

ability to engage in its own projects by forcing the organization to divert resources in response"). Plaintiffs lack organizational standing.

### C. Any injuries are not fairly traceable to the challenged methods.

Article III standing requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation modified). Plaintiffs fail to show such causal connection between their injuries and the Bureau's use of DP or GQCIP. As a result, Plaintiffs lack Article III standing.

### 1. Plaintiffs do not show that the GQCIP or DP caused any undercount in the Florida apportionment count.

Plaintiffs attempt to link the PES to Florida's loss of representation in Congress. *See* Mot. at 4 (citing (Doc. 50-26 at 23)). But Plaintiffs neither cite evidence to suggest that GQCIP or DP had any connection at all to the undercount indicated in the PES, nor do they show that the PES count was more accurate than the actual apportionment count.

### 2. The Bureau is not involved in intrastate redistricting.

While the U.S. Constitution requires congressional apportionment to be based on an "actual enumeration" of the population, it is silent on what data and what specific parties play a role in intrastate redistricting. For example, the Florida Constitution requires the Florida Legislature to apportion the State of Florida into senatorial and representative districts. Fla. Const. art. III, § 16. In contrast, Idaho

reapportions the state legislature by means of a bipartisan commission. Idaho Const. art. III, §§ 2, 4, 5. States have broad discretion when it comes to state redistricting, and some states, like Florida, elect to use decennial census data for legislative and congressional redistricting. *See, e.g.*, Fla. Stat. § 11.031(1) ("All acts of the Florida Legislature based upon population and all constitutional apportionments shall be based upon the last federal decennial statewide census."). However, the Bureau is not involved in any actual intrastate redistricting decisions, including Florida Legislative apportionment duties. Although the Bureau provides data to States that may be used in legislative redistricting, *see* Pub. L. 94-171, the Bureau does not control how that data is used or interpreted on an intrastate level. *See* Disclosure Avoidance for the 2020 Census: An Introduction, at 2 (November 2021) https://www2.census.gov/library/ publications/decennial/2020/2020-census-disclosure-avoidance-handbook.pdf (providing "key considerations and recommendations for data users working with the 2020 Census redistricting data," such as aggregating "very small geographic areas, such as census blocks," "into larger geographic areas before use").

Indeed, the Bureau provides a redistricting product to the states, but is transparent about its capabilities and quality so States can determine whether the product meets their intrastate redistricting needs. 2020 Census Program Memorandum Series: 2019.25, at 1 (Oct. 31, 2019), https://www2.census.gov/programs-surveys/decennial/2020/program-management/memo-series/2020-memo-2019_25.pdf ("It is imperative that the Census Bureau show users that the 2020 DAS will produce high quality data, and to give those users an accurate demonstration of

19

the system's capabilities so that they can determine whether the products will meet their needs."). Since the Bureau has no actual role in intrastate redistricting decisions or the implementation of redistricting data in intrastate apportionment, Plaintiffs' alleged intrastate redistricting injuries are not fairly traceable to the Bureau, let alone to the implementation of GQCIP and DP in the 2020 Census.

Even if the Bureau were involved in intrastate redistricting, Plaintiffs fail to show a causal connection between their alleged intrastate redistricting injuries and the Bureau's use of DP and GQCIP. The Bureau produces many different census data products using the data collected from each decennial census. *See* Decennial Census of Population and Housing Technical Documentation, U.S. Census Bureau (Last Revised May 25, 2023), https://www.census.gov/programs-surveys/decennial-census/technical-documentation/complete-technical-documents.html (providing technical documentation, including a variety of data products, for different decennial censuses). The only Census Bureau data product from the 2020 Census that Plaintiffs discuss is the 2020 apportionment data, *see* Mot. at 2, 4–7—which contains no intrastate information that can be used for state redistricting and therefore cannot have caused any of the state redistricting harm discussed by Plaintiffs. *See* (Doc. 50-2 at 7). Plaintiffs fail to identify any state redistricting Census Bureau data products whatsoever.

Further, Plaintiffs have not shown what 2020 Census data the Florida Legislature used for redistricting that connects one of their injuries to the implementation of GQCIP and DP in the 2020 Census. Yet, even if Plaintiffs could

20

point to such data, they still fail to show a causal connection to their alleged intrastate redistricting injuries for two reasons. First, for DP to impact intra-state redistricting, the random noise infusion into the counts of individual census blocks would have to add up to an appreciable population error when the census blocks are aggregated into larger geographies such as state electoral or other districts. But Plaintiffs offer no evidence whatsoever of the magnitude of any potential population error introduced by DP into aggregations of census blocks—let alone undisputed evidence, *see* Rule 56(a)—and as a result they are unable to link the use of DP in the 2020 Census to any particular Florida intrastate redistricting injury. Similarly, Plaintiffs offer no evidence about where any particular imputed counts from GQCIP in the 2020 Census may have interfered with the state redistricting process. As a result, Plaintiffs fail to show any causal connection between GQCIP and DP on the one hand, and a particular, concrete injury through state redistricting.[7]

### D. None of Plaintiffs' alleged injuries are redressable by the relief they seek.[8]

To demonstrate redressability, a plaintiff must show "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). When redressability "depends on

---

[7] Plaintiffs' arguments as to Article III injury via improper allocation of federal funding also suffer from the same causal defects. *See* Mot. at 4–5.

[8] Plaintiffs seek "a declaratory judgment that the 2020 Census report violated Article I, § 2 of the U.S. Constitution," "mandatory relief that obligates the Defendants to create a new 2020 Census report that does not use statistical methods," and "a preliminary injunction and ultimately a permanent injunction, enjoining Defendants from using statistical methods in the 2030 Census." Compl. ¶¶ 88–90, 94–96, 101–03, 109–11, 116–18.

the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, . . . [standing is] 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).

### 1. Plaintiffs' alleged injuries cannot be redressed by the production of a new census report.

Plaintiffs seek a new census report because they cannot request the relief that would redress their alleged injuries—two more congressional seats. However, this case does not qualify for an entitlement certificate[9] revision, and an act of Congress is the only remedy that could provide redress. Even if a new census report could be ordered, a new report from the Bureau would not, by itself, reapportion congressional seats among the states, alter intrastate redistricting, or retroactively correct census-designated funding allocations.

### a. This case does not qualify for entitlement certificate revision under *Utah v. Evans*, and only Congress can provide redress.

Under *Utah v. Evans*, an entitlement certificate can be corrected if it is "found to rest upon a serious error—say, a clerical, a mathematical, or a calculation error, in

---

[9] An "entitlement certificate" is referred to herein as the process by which the House informs each State of the number of Representatives to which it is entitled after a decennial census. Under 13 U.S.C. § 141(b), the decennial census is "reported by the Secretary to the President." The President then sends "Congress a statement showing the whole number of persons in each State" and "the number of Representatives to which each State would be entitled." 2 U.S.C. § 2a(1). The House must then send each State "a certificate of the number of Representatives to which such State is entitled." 2 U.S.C. § 2a(b).

census data or in its transposition." 536 U.S. 452, 462 (2002). But the *Evans* Court recognized the challenges that would arise with an entitlement certificate revision after Representatives have already been selected and limited its redressability holding to cases where serious errors are "uncovered before new Representatives are actually selected." *Id.* Under those circumstances, relief is not "necessarily 'impracticable'" "if a lawsuit is brought soon enough after completion of the census and heard quickly enough." *Id.* at 462–63 (referencing "impracticable" from Pub. L. 105-119, § 209(e)(2)); *see also House of Representatives*, 525 U.S. at 332 (recognizing the inherent problem with judicial challenges to census operations once apportionment is complete by stating, "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issues presented here, because such a pause would result in extreme—possibly irremediable—hardship"). Congress also knew of this problem. *See* Pub. L. 105-119, § 209(a)(8) ("[I]t would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted . . . ."); *see also* Pub. L. 105-119, § 209(e)(2) (requiring courts "hearing an action brought under this section . . . to expedite to the greatest extent possible the disposition of any such matter"). An entitlement certificate revision in this case is "impracticable." *See Evans*, 536 U.S. at 462.

This case does not involve "a clerical, a mathematical, or a calculation error, in census data or in its transposition," much less an error "uncovered before new Representatives are actually selected." *Id.* New Representatives were elected years before Plaintiffs initiated this case. This case is thus nothing like *Evans*.

23

Since they fall outside the *Evans* paradigm, Plaintiffs' alleged injuries are remediable only by an act of Congress. Under 2 U.S.C. § 2a(b), there exist two means by which State entitlement to congressional apportionment can be altered once the President transmits the decennial reapportionment statement to Congress. 2 U.S.C. § 2a(b). The first is through the process of conducting the next census and reapportionment under § 2a(a), and the second is Congress' enactment of a new statute. 2 U.S.C. § 2a(b) ("Each state shall be entitled, . . . until the taking effect of a reapportionment under this section or subsequent statute."). There are no other means for post-entitlement reapportionment in this case. The new census report Plaintiffs seek cannot redress their alleged injuries.

### b. A new "census report" for apportionment would not, by itself, reapportion congressional seats among the states or alter intrastate redistricting.

Apportionment is reserved to Congress and the Executive Branch. *See* 2 U.S.C. § 2a. Even if Plaintiffs were to succeed and this Court were to order the Secretary to produce "a new 2020 census report" for apportionment,[10] their injury would not be

---

[10] Plaintiffs only challenge, and request relief in the form of, a new "2020 Census report," *see, e.g.*, Compl. ¶¶ 87–90, but there is no such thing as just one "2020 Census report" since the Bureau historically produces, and publicly publishes, many different data products using decennial census data. *See* Decennial Census of Population and Housing Technical Documentation, U.S. Census Bureau (Last Revised May 25, 2023), https://www.census.gov/programs-surveys/decennial-census/technical-documentation/complete-technical-documents.html (providing technical documentation, including a variety of data products, for different decennial censuses); 2020 Census Data Products: United States, U.S. Census Bureau, https://www2.census.gov/programs-surveys/decennial/2020/program-management/glance_data_products.pdf (last visited Dec. 19, 2025). One data set produced by Census is the apportionment population count, which is used to apportion seats

redressed "unless the President accepts the new numbers, changes his calculations accordingly, and issues a new reapportionment statement to Congress." *Franklin*, 505 U.S. at 824 (Scalia, J., concurring in part). However, the President "is not expressly required to adhere to the policy decisions reflected in the Secretary's report," *Franklin*, 505 U.S. at 799, and the President is neither a party to this action, nor could he be enjoined by an order of this Court. *Franklin*, 505 U.S. at 802. ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866))). Similarly, a new census report could not reallocate generally alleged, census-designated federal funding. Redressability of Plaintiffs' claims "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562. But Plaintiffs have not produced any evidence that the choices of those independent actors "will be made in such manner as to . . . permit redressability," *id.*, and thus Plaintiffs have no Article III standing.

II.    **Plaintiffs' challenge to the use of "unconstitutional statistical methods" in the 2030 Census is speculative and unripe.**

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*,

---

in the U.S. House of Representatives. (Doc. 50-2). The Bureau produces several other census products, many of which are well beyond the scope of this case. Plaintiffs do not distinguish between the apportionment population count and any of the redistricting products, using the same term "2020 Census report" to refer to both. *See, e.g.*, Compl. ¶¶ 1, 4, 22; Mot. at 23.

523 U.S. 296, 300 (1998) (citation modified). "If an action for prospective relief does not contain a concrete injury requisite for standing because the injury alleged has not fully materialized, it generally will not be ripe for review." *Alabama v. United States Dep't of Com.*, 546 F. Supp. 3d 1057, 1071 (M.D. Ala. 2021). Plaintiffs' request for prospective relief relies entirely on speculation that the Bureau will choose to use the challenged methods in the 2030 census. Mot. at 24 (seeking a "permanent injunction enjoining Defendants from using statistical sampling and statistical methods for the 2030 Census Report, including Differential Privacy and Group Quarter Method").

However, Plaintiffs neither identify any specific methods that will be used for processing data in the 2030 decennial census, nor do they show any likelihood that the use of any specific methods in the 2030 census will injure them. *Food & Drug Admin.*, 602 U.S. at 381 ("[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury."); *see Alabama*, 546 F. Supp. 3d at 1071 (noting that simply alleging "that consequences may flow from the Bureau's decision to deliver 'skewed' redistricting data to the State" using a challenged method "is simply too speculative to pass muster as an 'injury-in-fact'"). Plaintiffs' injury is speculative, and their challenge is unripe as to the 2030 Census.

## III.    Plaintiffs' inexcusable delay bars review of their claims.

Even if this Court finds that Plaintiffs have standing, the doctrine of laches bars their claims. To invoke laches, Defendants must show: "'(1) a delay in asserting a right or a claim; (2) that the delay was not excusable;' and (3) that the delay caused defendant undue prejudice." *Citibank, N.A. v. Citibanc Grp.*, Inc., 724 F.2d 1540, 1546

(11th Cir. 1984) (quoting *Env't Def. Fund, Inc. v. Alexander*, 614 F.2d 474 (5th Cir. 1980)). This case satisfies all three elements.

Plaintiffs waited more than three years to bring this action. The Bureau announced in 2019 its plans to use DP, by April 2021 the Bureau publicly released the 2020 Census apportionment data, and by August 2022, the Bureau had published an overview of its use of GQCIP. *See* 2020 Census Disclosure Avoidance System Development & Release Timeline, U.S. Census (June 17, 2025), https://www2.census.gov/programs-surveys/decennial/2020/program-management/data-product-planning/disclosure-avoidance-system/das-development-timeline.pdf (listing July 19, 2019 as the date the "Bureau announce[d] that it will use differential private disclosure methods to protect all 2020 Census products"); Census 2020: High-Level Overview of Group Quarters Count Imputation, 2020 Census Program Memorandum Series: 2022.08, U.S. Census Bureau (signed Mar. 3, 2022), https://www2.census.gov/programs-surveys/decennial/2020/program-management/memo-series/2020-memo-2022_08.pdf (discussing the use of GQCI); *see also Alabama*, 546 F. Supp. 3d at 1064. (deciding a 2017 challenge to the Bureau's planned use of DP in the 2020 census).

Plaintiffs knew of the challenged methods for more than three years, and they identify no obstacle that prevented an earlier filing. *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1206 (11th Cir. 1997) ("[D]elay is to be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement."). Plaintiffs' three-year delay is inexcusable.

Further, Plaintiffs' delay caused undue prejudice. During the delay, federal, state, and local governments have relied on the final 2020 Census figures for redistricting, congressional representation, and budgetary allocations. These substantial reliance interests could not be unwound without significant disruption. *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 236 (6th Cir. 2007) ("[W]hen the relief sought will work an *unjust* hardship upon the defendants or upon innocent third parties, the courts, as a co-equal branch of the federal government, must ensure that judgments never envisioned by the legislative drafters are not allowed to stand."). *But cf. Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 687 (2014) (finding "no unjust hardship on innocent third parties").

\* \* \*

For the foregoing reasons, the Court should dismiss this case for lack of subject matter jurisdiction, or in the alternative, deny Plaintiffs' Motion for Summary Judgment on the grounds that there exists a genuine dispute of material fact as to whether this Court has subject matter jurisdiction. *See* Fed. R. Civ. P. 56(a).

Dated: December 19, 2025          Respectfully submitted,


                                  BRETT A. SHUMATE
                                  Assistant Attorney General


                                  ALEXANDER K. HAAS
                                  Director


                                  STEPHEN M. ELLIOTT
                                  Assistant Branch Director


                                  */s/ Kevin K. Bell*
                                  KEVIN K. BELL
                                  (GA Bar No. 967210)
                                  KATHRYN L. ALKIRE
                                  (FL Bar No. 1050146)
                                  Trial Attorneys
                                  United States Department of Justice
                                  Civil Division, Federal Programs Branch
                                  1100 L St. NW
                                  Washington, DC 20005
                                  Phone: (202) 305-8613
                                  E-mail: Kevin.K.Bell@usdoj.gov

                                  *Lead Counsel for Defendants*