# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, et al., | Case No. 8:25-cv-2486 |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| HOWARD W. LUTNICK, et al., | |
| Defendants. | |

# INTRODUCTION[1]

This case does not require any further factual development. The foundation of Intervenors' Response is that Plaintiffs' submitted evidence is "unsworn" and "inadmissible." ECF 69 at 1. However, this is not the standard. Evidence may "be submitted in *inadmissible form* at the summary judgment stage" so long as it can be reduced to an admissible form at trial. *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (emphasis in original); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012). Counts I and II are pure questions of constitutional interpretation that do not turn on any facts. Plaintiffs' claims—that Defendants violated 13 U.S.C. § 195 when they deployed the Group Quarters Count Imputation Procedure ("GQCIP") and Differential Privacy ("DP") during the 2020 Census and that they violated 13 U.S.C. § 141(a) when they failed to count the population as of April 1—are established by the undisputed facts and publicly available information. Because there are no genuine disputes as to any material fact, the Panel should grant summary judgment to Plaintiffs. *See* FED. R. CIV. P. 56(a).

# ARGUMENT

**I.     Plaintiffs have established Article III standing.**

---

[1] Plaintiffs file one reply addressing the response of Intervenors, ECF 69, and that of Defendants, ECF 71, which make nearly identical arguments. Plaintiffs request that this Panel require Intervenors, for all future filings, to file an attestation confirming they have conferred with Defendants to ensure that their filings do not contain duplicative arguments.

1

All Plaintiffs have standing, and the Panel need only find that "one plaintiff" has standing to seek each form of requested relief. *Town of Chester v. Laroe Ests.*, 581 U.S. 433, 439 (2017).

## A.     Rep. Donalds has standing.

Plaintiffs have demonstrated that Rep. Donalds is injured by the degradation of census data. ECF 50 at 5–7 and 50-3. Intervenors and Defendants argue that an "asserted informational injury" must cause adverse effects to "satisfy Article III." ECF 71 at 15 (citing *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 1004 (11th Cir. 2020)). Rep. Donalds's declaration identified four programs that he voted to authorize and for which accurate census data is required to determine appropriate funding levels. *See, e.g.,* ECF 50-3 at ¶¶ 5–6 and n.1–3. Each of those votes is an action he took in reliance upon inaccurate data. Further, Public Law No. 105-119, § 209 ("§ 209") also establishes that Congressmen are entitled to accurate census data for its own sake and are provided a cause of action to obtain it.

Intervenors argue that Rep. Donalds lacks standing because his information injury is shared with all Members of Congress, citing *Raines v. Byrd*, 521 U.S. 811, 829 (1997). ECF 69 at 9. But in Intervenors' next cited case, the court states, "it is of 'some importance' that, like the plaintiffs in *Raines*, the [plaintiff] here has not been expressly authorized by Congress to represent its interests in this lawsuit." *Walker v. Cheney*, 230 F. Supp. 2d 51, 68 (D.D.C. 2002). That is not the case here,

as Congress contemplated this very type of injury and expressly created a remedy for individual Members of Congress in § 209.

Rep. Donalds has personally voted on legislation affecting congressionally authorized programs that rely on granular census data. ECF 50-3 ¶¶ 5–6, 8–9 and n. 1–6. The "degradation" of this census data—affecting Rep. Donalds's ability to appropriately vote on and "draft[] legislation," *Dep't of Com. v. New York*, 588 U.S. 752, 760 (2019)—is an "informational injury analogous to those that have supported Article III standing." *See, e.g.*, *Nat'l Urban League v. Ross*, 508 F. Supp. 3d 663, 690 (N.D. Cal. 2020) (citing *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 611 (S.D.N.Y. 2019). Thus, Rep. Donalds has suffered an injury in the form of degradation of census data.

Plaintiffs have also established that the degradation of census data was caused by the use of GQCIP and DP. *See, e.g.*, ECF 43 ¶¶ 68–73; *see also id.* ¶ 1. Defendants argue that "only" 169,000 people were added through GQCIP, resulting in an error rate of "only" 0.05 percent (or 0.08 percent for Florida, specifically). But Rep. Donalds is legally entitled to accurate data without unlawful manipulation; whether the unlawful manipulation is in the hundreds of thousands or millions is not a material fact for purposes of his standing. Rep. Donalds's injury is therefore fairly traceable to the challenged statistical methods. *See Dep't of Com. v. U.S. House of Reps.*, 525 U.S. 316, 332–34 (1999).

### B. The other Plaintiffs have standing.

The remaining Plaintiffs[2] are injured by (1) the deprivation of representation in Congress and the Electoral College, (2) inaccurate intra-state redistricting, which led to vote dilution and a violation of Article 1 Section 2, and (3) diminished federal funding for their communities because of the undercount.

*First*, deprivation of representation is the prototypical injury in § 209 cases. *House of Reps.*, 525 U.S. at 339. The Census Bureau has admitted in its official Post-Enumeration Survey that Florida was undercounted by 3.48%.[3] *See* ECF 43 ¶ 76; ECF 52 ¶¶ 14–15; ECF 72 ¶ 14. Plaintiffs have provided supporting evidence that Florida lost two seats in the House of Representatives and two electoral college votes because of the challenged statistical methods. *See* ECF 43 ¶ 77.

*Second*, Defendants make much of their lack of direct institutional involvement in redistricting, ECF 71 at 13, but "even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *MacPhee v. MiMedx Group, Inc.*, 73 F.4th 1220, 1239–40 (11th Cir. 2023) (cleaned up). "In other words, standing is not defeated merely because the alleged

---

[2] This includes organizational Plaintiffs. Plaintiffs established that "at least one identified member ha[s] suffered or [will] suffer harm," ECF 71 at 16–17, as represented by the presidents of both organizations.

[3] Defendants take issue with Plaintiffs' reliance on the PES. However, the PES is a document Defendants published containing factual assertions by the Defendants. Plaintiffs use the PES to show that Defendants admit that there was an undercount in Florida. It is undisputed that the PES says what it says. Defendants seem to be asserting that the PES is unreliable because it is based "only on a sample of the population," an argument Plaintiffs echo regarding GQCIP.

injury can be fairly traced to the actions of both parties and non-parties." *Id.* at 1240 (cleaned up). Further, traceability can be found based "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 768. Because of DP, the data Florida relied on at the "level most important to those who are responsible for the districting phase of the apportionment process, is of a lower quality than that available for other levels of geography." ECF 50-12 ¶ 6.

*Third*, Defendants incorrectly assert that Plaintiffs have failed to provide evidence that DP affected Florida Districts, ECF 71 at 15 n.6, and thereby federal funding allocations. However, DP "as implemented, hides the true count of persons in every census block in the nation." ECF 50-12 ¶ 5. It follows that an undercount, whether in absolute terms or relative to other states, would necessarily lead to a loss of federal funding for the Plaintiffs' communities, ECF 43 ¶ 19, regardless of whether such funding is allocated based on absolute or relative populations. "When the federal government degrades the quality of that [census] data, it therefore inflicts a cognizable injury on the sovereign interests of reliant states." *U.S. Dep't of Com.*, 351 F. Supp. 3d at 614.

The Supreme Court has found standing based on undercounts of "as little as 2.5%," which would cause plaintiffs to "lose out on federal funds that are distributed on the basis of state population. That is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com.*, 588 U.S. at 767; *see also Glavin v. Clinton*, 19

5

F. Supp. 2d 543, 548 (E.D. Va. 1998) (collecting cases). The 3.5% undercount of Florida, calculated by the Defendants, therefore confers standing.

## II. There is no genuine dispute as to any material fact about Plaintiffs' constitutional claims.

In Counts I and II of the Second Amended Complaint, Plaintiffs allege that Defendants violated the Constitution's requirement that the Census Bureau conduct an "actual Enumeration" of "the whole number of persons in each State." U.S. CONST. art. I, § 2, cl. 3; amend. XIV, § 2. These claims turn entirely on the meaning of the U.S. Constitution—a pure question of law. *Pennekamp v. Florida*, 328 U.S. 331, 335 (1946) ("The Constitution has imposed upon [courts] final authority to determine the meaning and application of those words of that instrument which require interpretation to resolve judicial issues."). Intervenors appear to concede that these claims can be resolved without factual development. *See* ECF 60 at 14–16.

*Utah v. Evans* makes clear that census data must be based on a "deliberately taken count" of whole persons, rather than "conjecture" and "estimates." 536 U.S. 452, 475 (2002). But GQCIP used prohibited sampling methods to estimate the populations of large numbers of group residences (at least 5,500 such places, ECF 72 at 7 ¶ 4) based on samples of other, allegedly comparable group quarters.

Regarding DP, Defendants' main argument is that DP cannot be unconstitutional because it was not applied to apportionment data. However, it was applied to the data that Florida used to redistrict, an integral part of apportionment. *Compare*

6

*Wesberry v. Sanders,* 376 U.S. 1 (1964) (holding that Article 1 Section 2 protects the right to vote from faulty intrastate redistricting) *with U.S. Dep't of Com. v. Montana,* 503 U.S. 442 (1992) (holding that interstate variances did not violate the Wesberry standard). Plaintiffs do not argue that *Wesberry* should apply to interstate apportionment decisions, but that, rightly, *Wesberry* should apply to intrastate apportionment decisions, of which the census data is a critical factor.[4] *See* FLA. STAT. § 11.031(1) (Florida uses federal census data for "[a]ll acts of the Florida Legislature based upon population and all constitutional apportionments."); ECF 71 at 13.

Accordingly, the Panel should grant summary judgment to the Plaintiffs on Counts I and II.

### III. There is no genuine dispute as to any material fact about Plaintiffs' claims under 13 U.S.C. § 195.

In Count III of the Second Amended Complaint, Plaintiffs allege that Defendants violated 13 U.S.C. § 195 when they deployed the GQCIP and DP. Facts in the record make clear that the GQCIP is an impermissible statistical sampling method. Defendants admit that, due to the COVID-19 pandemic, numerous individuals were

---

[4] Intervenors implied argument that the census need not be accurate is misguided. ECF 69 at 19 n.6. While the discretion extended to the Bureau is broad, the Bureau has a duty to make logical, reasoned choices that are consistent with Congress's directives. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Through the Census Act, Congress has clearly imposed "a duty to conduct a census that is accurate." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019); *see also Utah v. Evans*, 536 U.S. 452, 478 (2002) (recognizing "a strong constitutional interest in [the] accuracy" of the enumeration) and Florida relies on the accuracy of this data.

no longer residing in group quarters on April 1, 2020. ECF 72 ¶ 10. No party disputes that after the 2020 Census data collection period had closed, the Census Bureau deployed a statistical method to insert fictitious persons into group quarters. ECF 50-7 at 6 (admitting GQIP is a statistical method); ECF 72 at 7 ¶ 2 (admitting that GQCIP added persons to the national population). This procedure was not used to fill in data gaps for specific individuals but to calculate population estimates for large group quarters. The population estimates were based not on neighboring facilities but on group quarters from hundreds or thousands of miles away. And unlike the hot-deck imputation procedure in *Utah*—which was used to fill in *missing* data for individual people—the GQCIP was used to add to the population count in facilities where no one resided at all because of the COVID-19 pandemic.[5] *See also* ECF 50-27 at 14 (admitting method used in GQIP "is different from the hot-deck imputation" upheld in *Utah*). It is also undisputed that the GQCIP affected census data used for apportionment purposes. ECF 72 ¶¶ 8–9.

There is also no material dispute that DP distorted data at the census block level, leading to misallocations of funding and political representation *within* Florida. *See, e.g.*, ECF 50-11 at 12 ("[T]he choice to not prioritize accuracy at the block

---

[5] Intervenors boldly assert that Plaintiffs did not provide any evidence that students were double counted at their family homes and dormitories. ECF 69 at 18-19. However, Plaintiffs showed that at least one Florida university reported 7,987 students in group housing when only 514 were present on April 1. ECF 43-2. There is a high likelihood that some of these students were counted twice despite the Bureau's "careful efforts to avoid it."

level leads to an additive effect in many cases."); ECF 69 (offering no evidence contrary to this conclusion); ECF 71 (same). As established above, DP was applied to the data at the redistricting phase of apportionment, thereby making DP an impermissible statistical method.

Thus, the Panel should grant summary judgment to the Plaintiffs on Count III.

### IV. There is no genuine dispute as to any material fact about Plaintiffs' claims under 13 U.S.C. § 141(a).

In Count IV of the Second Amended Complaint, Plaintiffs allege that Defendants violated 13 U.S.C. § 141(a) when they failed to count the population as it existed on April 1, 2020. All parties agree that Defendants did not count the population as it existed on April 1. ECF 69 at 18; ECF 71 at 2–3. Defendants and Intervenors argue that it was permissible to count empty dormitories as occupied because that was where the students "usually reside." But the cases they cite are distinguishable because they involve temporary displacement. By April 2020, students had left campus, and many were home. It was unclear when or whether the students would return. In some cases (i.e., graduation), many did not. Imputing populations to these facilities not as they existed on April 1 is a violation of section 141.

Federal law requires the Census Bureau to "take a decennial census of population as of the first day of April," 13 U.S.C. § 141(a), and the meaning of "as of" is a pure "question of law," *see Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 237 (11th Cir. 1995). "As of" in Section 141(a) takes on its ordinary

9

meaning and requires the Census Bureau to count the population as it stands on April 1, as opposed to some date before or after it.

The only relevant facts are undisputed, and the Panel should grant the Plaintiffs summary judgment on Count IV.

### V.   Plaintiffs' injuries are redressable.

As the Defendants point out, "an entitlement certificate can be corrected if it is 'found to rest upon a serious error.'" ECF 71 at 22 (quoting *Utah*, 536 U.S. at 462). *Utah* held that "the statute ... permit[s] 'certificate' revision in ... cases of error, and we include among them cases of court-determined legal error leading to a court-required revision of the underlying Secretarial 'report.'" 536 U.S. at 462. Here, the certificate rests upon a serious error, the inclusion of two illegal statistical sampling methods in its calculation, and this Court is empowered to order its correction by § 209 and *Utah*.

Under *Utah*, this Court can grant the relief Plaintiffs seek. *Utah* explained that a plaintiff has standing if a court-ordered "change in a legal status (that of the 'report')" would provide "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." 536 U.S. at 464. With respect to apportionment and allocation of funding (both interstate and intrastate), there is at least a high likelihood, if not a certainty, that a modified report would lead to the injuries being redressed. For Rep. Donalds, a modified report would also

*directly* redress the injury to his interest in accurate population data.

Even if the intervening Congressional elections bar the entitlement certificate procedure, this Court can still correct the malapportionment caused by the Defendants' illegal conduct. The Supreme Court has held that equitable remedies must be "sufficiently 'analogous' to any relief available in the court of equity in England at the time of the Founding." *CASA, Inc. v. Trump*, 606 U.S. 831, 832 (2025) (quoting *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999)). Equity courts at the time of the Founding had the power to cancel the letter patent conferring upon towns the right to send representatives to Parliament, and thereby to modify apportionment.[6] Ultimately, in weighing whether to award relief, this court should "rely upon general equitable principles." *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

Given the serious constitutional issues raised in this case, the Panel should make use of an analogous remedy to correct the malapportionment caused by the Defendant's use of illegal sampling methods.

## CONCLUSION

The Plaintiffs' Motion for Summary Judgment should be granted.

---

[6] "In England, a bill in equity lies to set aside letters patent obtained from the King…" *Field v. Seabury*, 60 U.S. (19 How.) 323, 332 (1856); *U.S. v. Am. Bell Tel. Co.*, 128 U.S. 315, 360 (1888); *Mowry v. Whitney*, 81 U.S. (14 Wall.) 434, 440 (1871); *U.S. v. Stone*, 69 U.S. (2 Wall.) 525, 532 (1864);. *see also* Edward Coke, *Fourth Part of the Institutes of the Laws of England* (1648) (describing "the highest point of [the chancellor's] jurisdiction" as being "to cancel the kings letters patents under the great seal, and daming the inrolment thereof.").

11

DATED: December 23, 2025

/s/ *Emily Percival*
Emily Percival (FBN 119313)
James K. Rogers (AZ Bar No. 027287)*
Ryan Giannetti (DC Bar No. 1613384)*
Crystal Clanton (AL Bar No. 1746D29O)*
Robert A. Crossin (IN Bar No. 39340-49)*
**America First Legal Foundation**
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
Phone: (202) 964-3721
emily.percival@aflegal.org
james.rogers@aflegal.org
ryan.giannetti@aflegal.org
crystal.clanton@aflegal.org
bobby.crossin@aflegal.org

Respectfully submitted,

R. Quincy Bird (FBN 105746)
Timothy W. Weber (FBN 86789)
Jeremy D. Bailie (FBN 118558)
**Weber, Crabb & Wein, P.A.**
5453 Central Avenue
St. Petersburg, FL 33710
Telephone: (727) 828-9919
Facsimile: (727) 828-9924
timothy.weber@webercrabb.com
jeremy.bailie@webercrabb.com
quincy.bird@webercrabb.com

*Admitted *pro hac vice*

*Counsel to Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ *Emily Percival*
Emily Percival