## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNIVERSITY OF SOUTH FLORIDA
COLLEGE REPUBLICANS, MICHAEL
FUSELLA, PINELLAS COUNTY YOUNG
REPUBLICANS, PARISA MOUSAVI, and
BYRON L. DONALDS,

      Plaintiffs,

**Case No. 8:25-cv-2486-WFJ-TGW**
**THREE-JUDGE COURT**

v.

SECRETARY OF COMMERCE and ACTING
DIRECTOR, U.S. CENSUS BUREAU,

      Defendants,

ALLIANCE FOR RETIRED AMERICANS,
MANUEL GUERRERO, and CAMERON
DRIGGERS,

      Intervenors-Defendants.

_____/

Before ROSENBAUM, Circuit Judge, and JUNG and MERRYDAY, District
Judges.

BY THE COURT:

### OPINION & ORDER

Before the Court is the Alliance for Retired Americans, Cameron Driggers,

and Manuel Guerrero's ("Intervenors") motion to dismiss the Second Amended

Complaint ("Complaint") filed by University of South Florida College Republicans

and its president, Michael Fusella; Pinellas County Young Republicans and its

1

president, Parisa Mousavi; and U.S. Representative Byron L. Donalds ("Plaintiffs")

against Secretary of Commerce Howard W. Lutnick and acting Director of the U.S.

Census Bureau George Cook ("Defendants").  Dkt. 60.  Plaintiffs responded in

opposition to the motion, Dkt. 65, and Intervenors replied in further support, Dkt.

74.  For the reasons discussed below, the Court grants the motion and dismisses the

Complaint without prejudice and with leave to amend.

## I.    Background[1]

### A. The Parties

Plaintiff University of South Florida College Republicans ("USF

Republicans") is a chapter of the College Republican National Committee based in

Tampa, within Florida's 15th Congressional District.  Dkt. 43 ("SAC") ¶ 8.  The

group describes its goal as recruiting, training, and mobilizing students to "advocate

for conservative ideals" and "participate in civic events," increasing their familiarity

with the political process.  *Id.*  Plaintiff Michael Fusella is the president of USF

Republicans.  *Id.* ¶ 9.  He resides in Florida's 15th Congressional District.  *Id.*

Plaintiff Pinellas County Young Republicans ("Pinellas Young Republicans")

is an organization designed to "attract young people and provide for them an

opportunity to achieve political expression and recognition, more effectively

participate in the election process, and better develop and uphold the principles of

---

[1] Unless otherwise noted, this section recounts facts as alleged in Plaintiffs' Complaint, which the Court accepts as true for purposes of resolving this motion to dismiss.

2

the Republican Party." *Id.* ¶ 10.  Pinellas Young Republicans has an address in St. Petersburg, Florida, within the state's 14th Congressional District.  *Id.*  Plaintiff Parisa Mousavi is a resident of the 14th Congressional District who serves as president of Pinellas Young Republicans.  *Id.* ¶ 11.

Plaintiff Byron Lowell Donalds is a member of the U.S. House of Representatives, where he represents Florida's 19th Congressional District.  *Id.* ¶ 12. He has served in Congress since January 2021.  *Donalds, Byron*, Biographical Directory of the U.S. Cong., https://bioguide.congress.gov/search/bio/D000032 [https://perma.cc/GU8P-FTZB] (last visited Jan. 25, 2026).[2]

Defendant Howard W. Lutnick is the U.S. Secretary of Commerce.  SAC at 1. In that capacity, he leads the U.S. Department of Commerce, which encompasses the U.S. Census Bureau.  *See Bureaus and Offices*, U.S. Dep't of Com., https://www.commerce.gov/bureaus-and-offices [https://perma.cc/9TLJ-TY5S] (last visited Jan. 25, 2026).  Defendant George Cook is performing the duties of Director of the U.S. Census Bureau, which is responsible for conducting the decennial census.  *See* 13 U.S.C. § 141(a); SAC at 1.

Intervenor Alliance of Retired Americans is a nonprofit organization with 4.4 million members nationwide, including more than 200,000 in Florida.  Fiesta Decl. ¶ 2, Dkt. 29-1.  Its membership consists of retirees, many of whom live in "group

---

[2] The Court may take judicial notice of official government publications and websites.  *See* Fed. R. Evid. 201(b)(2); *Coastal Wellness Centers, Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018); *Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015).

quarters like nursing homes and assisted living facilities." *Id.* ¶ 7. Intervenor Cameron Driggers is a graduate student at the University of Central Florida. Driggers Decl. ¶ 3, Dkt. 29-2. Driggers is a registered voter in Florida's 10th Congressional District, where he lives in on-campus student housing. *Id.* ¶ 4. Intervenor Manuel Guerrero is an undergraduate student at the University of Central Florida. Guerrero Decl. ¶ 3, Dkt. 29-3. Guerrero, too, is a registered voter in Florida's 10th Congressional District who lives in on-campus student housing. *Id.* ¶ 4.

### B. *Group Quarters Imputation and Differential Privacy*

The Census Bureau used two statistical methods that form the basis for this suit: group quarters imputation and differential privacy. During the 2020 Census, the COVID-19 pandemic was affecting where many people were located and the Census Bureau's efforts to reach them. For instance, after completing its data collection for the 2020 Census, the Census Bureau and Department of Commerce recognized that "thousands of possibly occupied group quarters lacked any population count." SAC ¶ 46. So the Census Bureau used group quarters imputation to address the problem of missing data from many "group quarters" such as nursing homes and college dormitories. *Id.* ¶¶ 1, 48. To do so, the Census Bureau formed a "GQ Count Imputation team." *Id.* ¶ 47.

In February 2021, the GQ Count Imputation Team "developed and deployed" a method of group quarters imputation. *Id.* ¶ 47. The method employed linear regression analysis that used data from other group quarters to "impute" population

counts for the affected group quarters.  *Id.* ¶ 39.  In March and April 2021, the

Census Bureau discussed in official public posts its approach to imputing population

counts for group quarters.  *See* Pat Cantwell, *How We Complete the Census When*

*Households or Group Quarters Don't Respond*, U.S. Census Bureau (Apr. 16, 2021),

https://www.census.gov/newsroom/blogs/random-samplings/2021/04/

imputation-when-households-or-group-quarters-dont-respond.html

[https://perma.cc/FX39-GMCS].  By May 2021, the practice had come under

public criticism.  *See* SAC ¶ 39 (citing Adam Korzeniewski, *Fictive Counting*, Am.

Mind (May 14, 2021), https://americanmind.org/salvo/fictive-counting/

[https://perma.cc/8JH4-TA7D] [hereinafter *Fictive Counting*].

　　　Differential privacy addresses a separate issue.  Federal law generally prohibits

the Census Bureau and its employees from publishing data that one can use to

identify particular establishments or individuals who responded to the census.  *See* 13

U.S.C. § 9(a).  So over the years, the Census Bureau has used a variety of methods to

reduce the risk that someone could "reidentify" an individual census respondent

from the data tables that the Bureau releases.  Nat'l Acads. of Scis., Eng'g & Med.,

*Assessing the 2020 Census: Final Report* 291, 293 (2023),

https://www.nationalacademies.org/read/27150/chapter/14

[https://perma.cc/CV8Q-BQ29].  Differential privacy is one such technique.  The

method adds "statistical noise," in other words, "small, random additions or

subtractions" to the data in those tables.  SAC ¶ 68 (quoting Taylor R. Knoedl,

5

Cong. Research Serv., IF12957, *Census Bureau Data: Selected Access, Privacy, and Penalty Issues in Titles 13 and 26,* U.S. Code, at 2 (2024)).

In December 2018, the Census Bureau formally announced that it would use differential privacy in the 2020 Census. *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1064 (M.D. Ala. 2021). The Census Bureau intended the technique to protect respondents' confidentiality. SAC ¶ 55. Some outside observers later criticized the practice as sacrificing data quality. *Id.* ¶¶ 55, 60. Among other alleged issues, critics assert that the practice causes "systematic undercounting in rural areas and overcounting in urban regions." *Id.* ¶ 72.

The Census Bureau released numerous data sets and publications after the 2020 Census. On April 26, 2021, it publicly released the state-by-state population figures that are used to apportion the number of members of the U.S. House of Representatives for each state. Press Release, 2020 Census Apportionment Results Delivered to the President (Apr. 26, 2021), https://www.census.gov/newsroom/ press-releases/2021/2020-census-apportionment-results.html [https://perma.cc/X84Q-YLEU] [hereinafter Apportionment Press Release]; *see also* 2 U.S.C. § 2a (requiring the President to submit state population counts to Congress, determining apportionment of congressional seats). A few months later, on August 12, 2021, the Census Bureau publicly released its "redistricting file" data set, *see 2020 Census: Redistricting File (Public Law 94-171) Dataset*, U.S. Census Bureau (Aug. 12, 2021), https://www.census.gov/data/datasets/2020/dec/2020-census-redistricting-summary-file-dataset.html [https://perma.cc/D8FN-ESLG] [hereinafter *Redistricting*

*Dataset*], which Florida and other states use to draw legislative district lines, *see* SAC ¶ 22.

After each census, the Census Bureau conducts a post-enumeration survey that seeks to estimate the possible "coverage error" in the Bureau's population counts.  *See* SAC ¶ 76 (citing Courtney Hill et al., U.S. Census Bureau, *Census Coverage Estimates for People in the United States by State and Census Operations: 2020 Post-Enumeration Survey Estimation Report* 16 (2022), https://www2.census.gov/programs-surveys/decennial/coverage-measurement/pes/census-coverage-estimates-for-people-in-the-united-states-by-state-and-census-operations.pdf [https://perma.cc/P6W8-SH8N]).  The survey data after the 2020 Census suggested that the census undercounted Florida's population by approximately 3.48 percent.  *See id.*  A nonprofit organization called the American Redistricting Project calculated that adjusting states' population counts to match the survey's estimated overcounts and undercounts would have caused Florida to receive two additional U.S. House of Representative seats and Electoral College votes.  *Id.* ¶ 77.

### C.  Procedural History

On September 15, 2025, USF Republicans, Fusella, Pinellas Young Republicans, and Mousavi ("Florida Plaintiffs") sued Defendants, requesting a three-judge panel.  Dkts. 1, 2.  Plaintiffs filed their Second Amended Complaint a couple of months later, in November 2025, adding Congressman Donalds to the case.  Dkt. 43.

Plaintiffs allege that the Census Bureau's use of group quarters imputation and differential privacy violates several federal statutes and constitutional provisions. They assert claims that using these methods violated the U.S. Constitution's Enumeration Clause, U.S. Const. art. I, § 2 (Count I); Section 2 of the Fourteenth Amendment, U.S. Const. amend. XIV (Count II); 13 U.S.C. § 195's prohibition on employing statistical sampling for congressional apportionment (Count III); 13 U.S.C. § 141(a)'s directive that the decennial census reflect the "population as of the first day of April of such year" (Count IV); and Section 209 of the 1998 Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, which allows civil suit by any person "aggrieved by the use of any statistical method" in connection with the decennial census, Pub. L. No. 105-119, § 209(b), 111 Stat. 2440, 2481 (1997) (Count V). Plaintiffs seek declaratory and injunctive relief requiring Defendants to "create a new 2020 Census report" without the use of statistical methods and prohibiting them from using the challenged techniques as part of the 2030 Census. SAC at 27–28.

This case was randomly assigned to Judge Jung, who referred Plaintiffs' request for a three-judge panel to the Chief Judge of the U.S. Court of Appeals for the Eleventh Circuit. Dkt. 25. Chief Judge William Pryor designated the three judges forming this panel to hear the case together if the case warrants a three-judge panel. Dkt. 27. After receiving additional briefing on the question, the Court concluded that the three-judge panel should hear the case. *See* Dkt. 57 ¶¶ 5–6.

Plaintiffs and Intervenors then filed the two dispositive motions pending before the Court.  In November 2025, Plaintiffs moved for summary judgment before discovery, and Defendants and Intervenors opposed Plaintiffs' motion.  Dkts. 50, 69, 71.  Later that month, Intervenors moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim.  Dkt. 60.  Plaintiffs opposed. Dkt. 65.  A couple of months later, on January 7, 2026, Plaintiffs moved to stay discovery pending disposition of the two pending dispositive motions.  Dkt. 76. Intervenors opposed the motion, but Defendants did not.  *See* Dkt. 78.

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to contain "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss.  *Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1238 (11th Cir. 2025) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That means that "a plaintiff must 'plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration accepted)).

Courts will grant a Rule 12(b)(6) motion to dismiss based on the statute of limitations having run if the untimeliness is apparent on the face of the complaint. *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1319–20 (11th Cir. 2021).  When assessing the "face" of the complaint, we must consider "the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on [R]ule

9

12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Wells v. Brown*, 58 F.4th 1347, 1357 n.2 (11th Cir. 2023) (en banc) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

## III. Discussion

Intervenors argue that the Court must dismiss Plaintiffs' Complaint because, among other reasons, it is time-barred by the four-year statute of limitations in 28 U.S.C. § 1658. We agree. Our discussion follows in three parts. First, we explain that Section 1658 applies a four-year statute of limitations in this case. And that period begins to run when the challenged conduct occurred. Second, we show that the conduct that Plaintiffs challenge happened more than four years before they sued. Third, we consider and reject Plaintiffs' contrary arguments.

### A. Section 1658's Four-Year Statute of Limitations

Section 1658 provides a default statute of limitations for "civil action[s] arising under an Act of Congress enacted after" December 1, 1990. 28 U.S.C. § 1658(a). "Except as otherwise provided by law," such actions "may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658(a). Plaintiffs sue under Pub. L. No. 105-119, § 209(b), 111 Stat. at 2481, which Congress enacted in 1997. SAC ¶ 15. Plaintiffs don't argue that a different statute of limitations displaces Section 1658's four-year default. So we conclude that a four-year statute of limitations applies here.

10

Eleventh Circuit precedent dictates that this statute of limitations began to run when the Census Bureau carried out the conduct that Plaintiffs now challenge. Courts typically choose between one of two rules for the start date of a statute of limitations. The "occurrence rule" "begins the limitations period on the date that the violation of the plaintiff's legal right occurred." *MSPA Claims 1, LLC v. Tower Hill Prime Ins.*, 43 F.4th 1259, 1265 (11th Cir. 2022). The "discovery rule" "commences the limitations period on the date the plaintiff discovered or should have discovered the cause of action." *Id.* In *MSPA Claims*, the Eleventh Circuit concluded that Section 1658(a)—the source of the statute of limitations in this case—incorporates an occurrence rule. *Id.* at 1267. That holding binds us.[3] In any event, Plaintiffs don't argue for application of a discovery rule.

---

[3] The *MSPA Claims* court discussed an earlier Eleventh Circuit decision that, at a minimum, suggested courts should "look[] through § 1658(a) to the 'specific cause of action at hand'" to determine whether Section 1658 applies the occurrence rule or discovery rule for a given cause of action. *MSPA Claims*, 43 F.4th 1259, 1266 n.2 (11th Cir. 2022) (quoting *Foudy v. Miami-Dade County*, 823 F.3d 590, 594 (11th Cir. 2016)). But the court clarified that *Foudy*'s holding is limited to whether Section 1658(a) is ambiguous, characterizing its "look through" methodology as dictum. *Id.* The court then arrived at a more far-reaching conclusion: that Section 1658's language and structure incorporate an occurrence rule—with no need to examine the underlying cause of action. *See id.* at 1267.

Even if we were applying *Foudy*'s look-through methodology, we would reach the same conclusion and apply an occurrence rule in this case. *Foudy* dealt with alleged unlawful disseminations of personal information from a Florida Department of Highway Safety and Motor Vehicles database. *See Foudy v. Miami-Dade County*, 823 F.3d at 594. The *Foudy* court discerned from Supreme Court precedent the following rule: "in the absence of a clear Congressional directive or a self-concealing violation, the court should not graft a discovery rule onto a statute of limitations." *Foudy*, 823 F.3d at 593–94. No one has argued that Congress has clearly directed us to apply a discovery rule here or contended that the well-documented and publicized methods of the census are somehow self-concealing.

11

### B. The Timing of the Census Bureau's Challenged Conduct

Applying the occurrence rule, the statute-of-limitations question in this case is straightforward.  Plaintiffs challenge conduct that concluded, at the latest, in August 2021.  But they waited more than four years after that to sue, in September 2025.  So their claims are time-barred.

As recounted above, the Census Bureau released its state-by-state population counts on April 26, 2021, *see supra*, Apportionment Press Release; *supra*, *Fictive Counting*, and those numbers are necessarily used to apportion seats and Electoral College votes.  Plaintiffs assert that the Census Bureau's population numbers erroneously undercounted Florida's population.  SAC ¶ 75.  This undercount, they continue, caused Florida to be apportioned two fewer congressional seats, corresponding to two fewer Electoral College votes.  *Id.* ¶ 1. Plaintiffs further explain their view that this undercount injures Florida Plaintiffs by diluting their voting power in presidential elections and injures Congressman Donalds by weakening his "ability to advocate for Floridians in concert with the other members of the Florida congressional delegation" because the delegation would otherwise have two additional members.  *Id.* ¶¶ 78, 82.

Plaintiffs' theory is that the Census Bureau's use of group quarters imputation and differential privacy caused these injuries.  *See* SAC ¶¶ 1, 77.  And as a simple matter of logic, an injury can't be caused by conduct that hasn't happened yet.  So assuming Plaintiffs have adequately pled that group quarters imputation and differential privacy caused Florida's undercount, as is necessary for us to credit those

12

allegations, the Census Bureau's use of those statistical methods must have occurred by April 26, 2021, when the Census Bureau released its counts that had used those methods.[4]

The Complaint doesn't suggest that the Census Bureau further applied group quarters imputation and differential privacy to census data after the April 2021 release. But even if it had, Plaintiffs would fare no better. On August 12, 2021, the Census Bureau publicly released its more granular redistricting data. *See supra*, *Redistricting Dataset*. So again, the Census Bureau's conduct that affected that data release must have already occurred. Indeed, nothing on the face of the Complaint shows that Plaintiffs' alleged injuries stem from Census Bureau conduct that happened after that time. Even assuming the occurrences alleged here happened on August 12, 2021, then, Plaintiffs had to file this case by August 12, 2025. Instead, they filed on September 15, 2025. As a result, their claims are time-barred.

---

[4] Because we dismiss this case for untimeliness under the statute of limitations, we do not consider or resolve questions of standing other than with respect to Congressman Donalds's alleged delegation-strength injury. *See infra* at 16–18. For that same reason, we need not and do not determine whether the Complaint establishes a link between Plaintiffs' asserted injuries and the Census Bureau's two statistical methods with well-pleaded factual allegations. That, of course, is a requirement for this court to have subject-matter jurisdiction. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). And we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). For the same reason, we need not decide whether we should disregard those allegations as contradicted by documents the Complaint incorporates by reference, *cf. F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 63 (11th Cir. 2013) ("We . . . treat specific facts demonstrated by exhibits as overriding more generalized or conclusory statements in the complaint itself."), or, as Intervenors argue, with judicially noticeable facts, Dkt. 51 at 4–5.

### C. Plaintiffs' Unavailing Counterarguments

Plaintiffs don't argue they are challenging conduct that occurred within the four years before they sued. Rather, they contend they don't have to. They raise two arguments. We address each in turn.

First, Plaintiffs argue that the statute of limitations didn't begin to run until at least March 2022 because, they say, that was the first time they would have had standing to sue. Dkt. 65 at 17 (citing *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 801 (2024)). They are mistaken. To be sure, the Supreme Court in *Corner Post* explained the traditional rule that a claim accrues "when the plaintiff has a complete and present cause of action," meaning a limitations period typically can't begin until the plaintiff could "can file suit and obtain relief." 603 U.S. at 800 (citations omitted). And to sue, of course, a plaintiff must meet the requirements for Article III standing: injury in fact, causation, and redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). But Plaintiffs haven't shown any reason why their causes of action are "complete and present" today but weren't in April 2021 or, at the latest, by August 12, 2021.

Florida Plaintiffs contend they couldn't have sued until March 3, 2022, when Florida completed its redistricting using the 2020 Census data. Dkt. 65 at 17. Essentially, they assert that they lacked an injury in fact until that date. Not so. Florida Plaintiffs' argument overlooks their allegations that apportionment based on the 2020 Census diluted the strength of their votes in presidential elections. SAC ¶¶ 77–78. Plaintiffs complain that Florida has an insufficient number of Electoral

14

College votes because of the 2020 Census.  *Id.* ¶ 77.  That number, though, is a function of how many Members of Congress Florida has.  And the answer to that question was settled as of April 2021, when the Census Bureau released its apportionment data.  Florida Plaintiffs' asserted Electoral College vote-dilution injury doesn't rely on later actions Florida took to redraw its political districts.

Indeed, in *Department of Commerce v. U.S. House of Representatives*, the Supreme Court held that an Indiana voter's vote-dilution injury "undoubtedly" satisfied the injury-in-fact requirement Article III standing when he filed suit *before* apportionment and substantially in advance of the first election to be held using data from the challenged census.  *See* 525 U.S. 316, 331–32 (1999).  That plaintiff filed suit in February 1998—four years and nine months before the first general election to be held with legislative districts reflecting Indiana's likely loss of a congressional seat.  *See id.* at 327.  In contrast, had Florida Plaintiffs sued in August 2021, that would have been three years and three months before the 2024 general election for President.

Perhaps, as Florida Plaintiffs contend, they eventually also had their votes diluted for congressional and state legislative elections when Florida redistricted based on 2020 Census data.  But that doesn't fix their timeliness problem.  Plaintiffs had "complete and present" causes of action when they suffered a corresponding injury in fact from the conduct they challenge.  *See Corner Post*, 603 U.S. at 813.  The Eleventh Circuit's precedents hold that "the continuing *effects* of a discrete violation" don't extend the statute of limitations, even though the continuation of a defendant's

15

violative *conduct* can. *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1335 (11th Cir. 2006) (emphasis added). Instead, the "cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in [injury]. The cause of action accrues even though the full extent of the injury is not then known or predictable." *Wallace v. Kato*, 549 U.S. 384, 391 (2007) (quoting 1 C. Corman, *Limitation of Actions* § 7.4.1 (1991)); *see also Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1035 (5th Cir. 1977) ("[W]here a defendant commits an act injurious to plaintiff outside the limitations period, and damages continue to result from that act within the limitation period, no new cause of action accrues for the damages occurring within the limitations period because no act committed by the defendant within that period caused them.").[5] So whether the challenged conduct also contributed to a second (or third or fourth) injury in fact later on is simply irrelevant to the statute-of-limitations question. In short, Florida Plaintiffs haven't explained why they would have lacked standing to bring this suit in April 2021 but have standing today.

Congressman Donalds's time-bar problem is similar. Start with his alleged informational injury. He asserts that inaccuracies in 2020 Census data "impair[] his ability to engage in appropriate lawmaking" and "to carry out his constitutional obligations" because "Members of Congress . . . rely upon accurate census data to

---

[5] All decisions the Fifth Circuit issued by the close of business on September 30, 1981, are binding as precedent within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

carry out their duties." SAC ¶¶ 21, 80. But he's been a Member of Congress since January 2021. *See supra*. Even assuming for purposes of this order that these allegations constitute a cognizable injury, Congressman Donalds suffered it as soon as the Census Bureau released data preventing him from "rely[ing] upon accurate census data to carry out [his] duties." *Id.* ¶ 21. Again, that happened in April 2021, or August 2021, at the latest. So that alone is enough to hold that Congressman Donalds's suit is time-barred.

Even if we ignored his asserted informational injury, Congressman Donalds's "delegation strength" theory leads to the same conclusion. Plaintiffs allege that the challenged statistical methods injured Congressman Donalds "because his ability to advocate for Floridians in concert with the other members of the Florida congressional delegation is diluted by virtue of the State of Florida being underrepresented in the House." *Id.* ¶ 82. But this is Florida's injury in fact, not Congressman Donalds's.[6] And the claim would be time-barred, in any event. The

---

[6] Florida, not Congressman Donalds, is harmed if it lacks the number of votes it should be capable of having if all Florida representatives were to vote the same way. *See Utah v. Evans*, 536 U.S. 452, 459–61 (2002) (holding that Utah had standing based on an injury in fact of being denied an additional Representative in apportionment). Congressman Donalds has no cognizable interest in having greater political influence based on the number of his colleagues from Florida. The Supreme Court's decision in *Raines v. Byrd*, 521 U.S. 811, 821 (1997), requires this conclusion. There, the Court considered the claim by Members of Congress that the Line Item Veto Act "diluted their Article I voting power." *Id.* at 817 (brackets omitted). The plaintiffs didn't have a concrete injury in fact because they did not "claim that they have been deprived of something to which they *personally* are entitled—such as their seats as Members of Congress after their constituents had elected *them*. Rather, [their] claim of standing [wa]s based on a loss of political power, not loss of any private right, which would make the injury more concrete." *Id.* at 821. We elect Congressmen to represent their constituents—"as trustee for his constituents, not as a prerogative of personal power." *Id.* And similar to the plaintiffs in *Raines*, Congressman Donalds has failed to show a particularized injury because he has "not been singled out for specially unfavorable treatment as opposed to other

size of Florida's delegation was set by April 2021, when the Census Bureau released the apportionment numbers resulting from the 2020 Census, so the statute of limitations on any injury Florida suffered as a result began running at that time.

Second, Plaintiffs propose that statutes of limitation do not apply to "ongoing injuries." Dkt. 65 at 16. This position is legally baseless. Sure, the "continuing *violations* doctrine" tolls the statute of limitations for a claim when the defendant's violation continues into the limitations period. *Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007) (emphasis added). But later consequences of past violative conduct don't extend the limitations period. *Id.* Plaintiffs' citations to out-of-circuit district court decisions don't help them. Those two decisions, one of which was vacated, stand merely for the proposition that ongoing *enforcement* of an unconstitutional law—that is, ongoing conduct that continues to violate the Constitution—extends the limitations period. *See Does v. Whitmer*, 751 F. Supp. 3d 761, 838 (E.D. Mich. 2024); *Leal v. Azar*, No. 2:20-CV-185-Z, 2020 WL 7672177, at *7 (N.D. Tex. Dec. 23, 2020), *vacated and remanded sub nom. Leal v. Becerra*, No. 21-10302, 2022 WL 2981427 (5th Cir. July 27, 2022). That's not what Plaintiffs allege happened here. As we've explained, their theory requires that the Census Bureau finished its use of group quarters imputation and differential privacy—the occurrences that Plaintiffs allege caused their injuries—*before* it released the 2020 Census data in April and August 2021.

---

Members" from Florida. *Id.* The Florida delegation's alleged "diminution of legislative power . . . necessarily damages all Members of Congress" from the state equally. *Id.*

18

* * *

In sum, the Complaint is time-barred on its face.  So the Court grants

Intervenors' motion to dismiss for failure to state a claim.  Although Plaintiffs did

not request leave to amend in the event the Court granted Intervenors' motion,

whether to dismiss with prejudice is a matter of this Court's discretion.  *See Wagner v.

Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc).  We

dismiss without prejudice and with leave for Plaintiffs to amend their pleadings.

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS** Intervenors' motion to

dismiss.  Dkt. 60.  The case is dismissed without prejudice.  Plaintiffs have leave to

amend and refile within 14 days.  The Court **DENIES** as moot Plaintiffs' motion for

summary judgment, Dkt. 50, and motion to stay discovery pending resolution of the

two dispositive motions, Dkt. 76.

**DONE AND ORDERED** on February 3, 2026.


s/ **ROBIN S. ROSENBAUM**
UNITED STATES CIRCUIT JUDGE


s/ **WILLIAM F. JUNG**
UNITED STATES DISTRICT JUDGE

19

Judge MERRYDAY concurring:

*Spokeo, Inc. v. Robins*, 13 S. Ct. 1540 (2016), famously addresses standing under
Article III and affirms that a plaintiff's necessary "injury in fact" requires the
"invasion of a legally protected interest" that is both "concrete and particularized"
and "actual or imminent, not conjectural or hypothetical" and affirms "that
intangible injuries can nevertheless be concrete."  136 S. Ct. at 1548–49.  *Spokeo*
reiterates that "Congress may elevate to the status of legally cognizable injuries
concrete, *de facto* injuries that were previously inadequate in law."  136 S. Ct. at 1549
(cleaned up).  And, of course, *Spokeo* affirms that "the risk of real harm" can "satisfy
the requirement of concreteness" and that in some cases a plaintiff "need not allege
any *additional* harm beyond the one Congress has identified."  136 S. Ct. at 1549
(court's emphasis).  In his concurrence, Justice Thomas surveys the origin and
history of standing and notes that "different limitations on a plaintiff's right to bring
suit depend[] on the type of right the plaintiff sought to vindicate."  Justice Thomas
discusses the distinctive treatment of a "public right" and a "private right."  *See*, *e.g.*,
*Bost v. Illinois St. Bd. of Elections*, 2026 WL 96707 (January 14, 2026) (citing *Spokeo*
and finding that every candidate for election has a personal interest in, and an
actionable right to, fair election rules and enjoys standing to enforce the right in court
before the election).  Whether these plaintiffs attempt to enforce a "private right" or a
"public right" exceeds the scope of this order, except to note the dependence of
(1) the applicable statutory limitation and laches on (2) standing.  Presumably,
neither the applicable limitation nor laches creates a bar before a prospective plaintiff

20

acquires standing, the timing of which depends on, among other things, the nature of the right asserted.

In November 1997, Congress passed the "1998 Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act," § 209, 111 Stat. 2480, in which Congress finds (among other things):

> (5) the decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs;
>
> (6) it is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States;
>
> (7) the use of statistical sampling or statistical adjustment in conjunction with an actual enumeration to carry out the census with respect to any segment of the population poses the risk of an inaccurate, invalid, and unconstitutional census;
>
> (8) the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted[.]

Pub. L. No. 105–119, Title II, § 209(a), 111 Stat. 2440, 2481. The Act creates a private right of action for any "aggrieved person," that is, "any resident of a State whose congressional representation or district could be changed as a result of the use of a statistical method; any Representative or Senator in Congress; and either House of Congress." Pub. L. No. 105–119, § 209(d), 111 Stat. at 2482.

Section 209 defines the "use of a statistical method" to include use in a "dress rehearsal" or "other simulation" conducted in preparation of a decennial census.

Pub. L. No. 105–119, § 209(c), 111 Stat. at 2481–82.  And Section 209 deems the

"2000 Census Operational Plan" and a report ordered by Title VIII of Public Law

105–118[7] to constitute final agency action "sufficiently concrete and final" to render

the use of certain statistical methods in the 2000 decennial census "reviewable in a

judicial proceeding."  Pub. L. No. 105–119, § 209(c), 111 Stat. at 2482.  The same

rule likely extends to the 2030 "Operational Plan," now available.

https://thecensusproject.org/2025/07/28/first-2030-census-operational-plan-
released/ (last visited Jan. 30, 2026).

       The remedies available under the Act are declaratory judgment, injunction,

and any other "appropriate" relief against the unlawful use of a statistical method.

Pub. L. No. 105–119, § 209(b), 111 Stat. at 2481.  The Act imposes on any district

court that hears an action under Section 209 a duty "to advance on the docket and to

expedite to the greatest possible extent the disposition of any such matter" and

provides for review by appeal directly to the Supreme Court.  Pub. L. No. 105–119,

§ 209(e)(1), 111 Stat. at 2482.  Because of the duty "to advance . . . and to expedite"

and because of the burden on the Supreme Court to review by appeal any final

decision, this panel should disfavor any piecemeal determination of the claims and

---

[7] Title VIII of the "1997 Emergency Supplemental Appropriations Act for Recovery from Natural Disasters, and for Overseas Peacekeeping Efforts, Including Those in Bosnia" directs the Department of Commerce to provide to Congress within thirty days of enactment of the Act a "comprehensive and detailed plan outlining its proposed methodologies for conducting the 2000 decennial census and available methods to conduct an actual enumeration of the population." The plan must specifically include, among other things, (1) a list of all statistical methodologies the Bureau may use to conduct the census, (2) an explanation of each statistical methodology that may be used, and (3) a list of statistical errors that may occur from each statistical methodology's potential use. Pub. L. No. 105–118, Title VIII, 111 Stat. 158, 217.

decide as many issues as possible on a record as complete as possible and present to the Supreme Court the best opportunity to achieve in one appeal a final disposition of the action.

The plaintiffs assert a claim for violation of Article I, Section 2 of the United States Constitution; a claim for violation of Section 2 of the Fourteenth Amendment; a claim for violation of 13 U.S.C. § 195; and a claim for violation of 13 U.S.C. § 141(a). The plaintiffs request both retrospective and prospective relief. For each claim, the plaintiffs request (1) a mandatory injunction requiring the creation — without the use of statistical sampling or statistical methods — of a new 2020 census report and (2) a prohibitive injunction against the use of statistical methods in the 2030 census.

The majority concludes that, as presently pleaded, each of the plaintiffs' four claims appears barred by the four-year limitation in 28 U.S.C. 1658(a). If one assumes that Section 209, standing alone, creates a claim and bestows standing, the moment from which timeliness is measured is quite early, perhaps earlier than the majority suggests. Otherwise, determining the time of accrual of each claim and the acquisition of standing to assert each claim requires determining, among other things, the nature of the right asserted by the plaintiffs, the extent of "injury" the plaintiffs must allege, and the time each plaintiff acquired standing.

The plaintiffs request retrospective relief, but practical difficulty inheres in retrospective relief for an unconstitutional decennial census. Section 209(a)(8) explicitly acknowledges this "impracticability." But *Utah v. Evans*, 122 S. Ct. 2191

(2002), rejects the argument that Section 209 expresses a congressional intent to stringently bar jurisdiction over post-census lawsuits.  *Utah* explains that if "a lawsuit is brought soon enough after completion of the census and heard quickly enough," retrospective relief is not necessarily impracticable.  122 S. Ct. at 2198–99 (2002) ("The language is open to a more flexible reading that would permit correction of a certificate found to rest upon a serious error—say, a clerical, a mathematical, or a calculation error, in census data or in its transposition.  And if that error is uncovered before new Representatives are actually selected, and its correction translates mechanically into a new apportionment of Representatives without further need for exercise of policy judgment[.]").  Here, the plaintiffs sue after the certificate, after the apportionment, after the representatives assumed their seat, after Congress convened and organized, after sundry legislation was enacted or defeated, and the like.

Section 209 expresses a clear congressional intent to create an avenue for prospective, pre-census relief.  Congress at Section 209(a)(6)–(8) finds that an accurate and constitutional census is essential; that the use of statistical sampling and statistical adjustment creates the risk of an inaccurate, invalid, and unconstitutional census; and that the vastness and complexity of the decennial census renders retrospective relief impracticable.  Further, Section 209 defines an "aggrieved person" as a resident whose representation "could be changed" — not a resident whose representation "has been changed."  The operative provisions of Section 209, especially considered in light of the enacted congressional policy findings, evidence

24

congressional intent to create a mechanism generally intended for prospective, pre-census relief.

The Supreme Court has reviewed claims under Section 209 for pre-census relief. *Department of Commerce v. United States House of Representatives*, 119 S. Ct. 765 (1999), reviewed two challenges to the Bureau's planned use of certain statistical sampling methods in connection with the 2000 census. In February 1998, residents of thirteen states sued and requested (1) a declaration that the Bureau's planned use of certain sampling procedures was unlawful, unconstitutional, or both and (2) an injunction against use of the sampling procedures in the 2000 census. 119 S. Ct. at 771. Justice O'Connor, delivering Part II of the opinion and joined in Part II by a majority of the court, first notes that the district court correctly determined the case was ripe for review. 119 S. Ct. at 772 ("In addition, the District Court below correctly found that the case is ripe for review, and that determination is not challenged here."). Turning to standing, Justice O'Connor considers the affidavit of Ronald F. Weber, Ph.D. in political science and a professor of government at the University of Wisconsin, who utilized data published by the Bureau to estimate the year 2000 populations of, and the net undercount rates for, each state. Using the 1990 method of enumeration and under the Bureau's planned method of enumeration in 2000, Weber concludes to "a virtual certainty that Indiana will lose a seat" in the House. 119 S. Ct. at 773. *United States House of Representatives* holds that the "expected loss of a Representative to the United States Congress undoubtedly satisfies the injury-in-fact requirement of Article III standing." 119 S. Ct. at 774.

25

The threat of voter dilution was sufficiently concrete because, among other reasons, the Bureau, to timely effect a change, would have had to alter the plan for the 2000 census no later than March 1999 — less than two months after the court's opinion — and because Section 209(2) deems the Census 2000 Operational Plan to constitute a final agency action "sufficiently concrete and final to now be reviewable in a judicial proceeding."  119 S. Ct. at 774; § 209(c)(2), 111 Stat. at 2482.  Also, *United States House of Representatives* finds Weber's affidavit sufficiently establishes traceability and redressability, 119 S. Ct. at 774, and sufficiently establishes the plaintiff-appellees' standing to sue on another asserted basis: the expected effects of statistical sampling methods on intrastate redistricting.  119 S. Ct. at 774–75.

The plaintiffs plead no facts to show that the Bureau will use either "group quarters imputation" or "differential privacy" in the 2030 census and provide no similar expert report (which is not to say that one is required or expected at this stage). Also, the plaintiffs fail to plead facts showing that they will suffer injury from the use of "group quarters imputation" or "differential privacy" in connection with the 2030 census.  Of course, on a full record, these issues would achieve greater clarity, especially after the Department and the Bureau answer and assert any affirmative defenses and after a reasonable amount of discovery.

26

With these additional remarks, I join in the majority's conclusion permitting the plaintiffs to amend the complaint.