## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNIVERSITY OF SOUTH FLORIDA
COLLEGE REPUBLICANS and its Pres-
ident, Michael Fusella, individually; PI-
NELLAS COUNTY YOUNG REPUBLI-
CANS, and its President, Parisa
Mousavi, individually; GRETCHEN ZO-
ELLER, individually; and BYRON L.
DONALDS, in his official capacity as a
Member of Congress,

      Plaintiffs,

v.

HOWARD W. LUTNICK, in his official
capacity as Secretary of Commerce,
GEORGE COOK, in his official capacity
as Acting Director of the U.S. Census Bu-
reau, and the UNITED STATES OF
AMERICA,

      Defendants.

Case No. 8:25-cv-02486

**THIRD AMENDED COM-
PLAINT**

**INJUNCTIVE RELIEF
REQUESTED**

**THREE JUDGES REQUIRED**

The Panel previously dismissed this case as untimely under the 4-year
"catch-all" statute of limitations for "'civil action[s] arising under an Act of Con-
gress enacted after' December 1, 1990." ECF No. 84 (quoting 28 U.S.C. §
1658(a)). The Panel dismissed with leave to amend. This amended complaint
clarifies that this suit is brought against the United States under the Admin-
istrative Procedure Act ("APA"), *see* Departments of Commerce, Justice, and

State, the Judiciary, and Related Agencies Appropriations Act, Pub. L. No. 105-119, § 209(c)(2), 111 Stat. 2440, 2482 (1997) (discussing "final agency action"); 5 U.S.C. § 702 (explaining that "[t]he United States may be named as a defendant" in an APA case); *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) ("The taking of the census is not one of those areas traditionally committed to agency discretion,") making the applicable statute of limitations six years, *see* 28 U.S.C. § 2401(a); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 804 (2024) (noting that "[t]he default statute of limitations for suits against the United States" is six years).

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. The 2020 Census was materially and fundamentally different from any previous census as a result of the COVID-19 pandemic.

2. While statistical methods have been used for decades in the collection and processing of census data, the Defendants' use of statistical methods in the 2020 Census went far beyond prior practice.

3. This extensive use of statistical methods resulted in inaccurate population counts in certain States, particularly Florida.

4. Even Defendants admit that Florida was undercounted by a statistically significant 3.48% or about three-quarters of a million people. Courtney Hill, Krista Heim, Jinhee Hong, and Nam Phan, *Census Coverage*

*Estimates for People in the United States by State and Census Operations*, U.S. Census Bureau 16 (2022),  https://perma.cc/X5EP-W8YW.

5.      Under Pub. L. No. 105-119, § 209(b) "aggrieved" persons can sue the government for using any statistical method (1) in violation of the Constitution or another provision of law; (2) in connection with a census; and (3) for the purposes of apportionment or redistricting.

6.      The statute, in clarifying what qualifies as "final agency action" for purposes of § 209, makes clear that these suits are brought under the APA. Pub. L. No. 105-119, § 209(c)(2).

7.      The 2020 Census suffered at least three legal defects cognizable under section 209 and the APA.

8.      First, Defendants violated Article I, Section 2 of the United States Constitution by failing to take an "actual enumeration" of the people.

9.      Although the Supreme Court said in *Utah v. Evans*, 536 U.S. 452, 477 (2002), that the Bureau's use of imputation in the 2000 Census did not categorically violate Article I, Section 2, the Court expressly left open the possibility that "substitution of statistical methods for efforts to reach households and enumerate each individual" may violate the Constitution. *Utah v. Evans*, 536 U.S. 452, 477 (2002). Defendants did just that in the 2020 Census.

10.      Second, Defendants violated 13 U.S.C. § 141(a). While this section delegates broad authority to the Secretary to determine the "form and content"

3

of the census, courts have put important guardrails around that authority, which the Secretary breached in conducting the 2020 Census.

11. Third, Defendants' decisions regarding the use of imputation in the 2020 Census violated the APA's reason-giving requirements in 5 U.S.C. § 706 and are therefore arbitrary and capricious.

12. For these reasons and those that follow, Plaintiffs seek relief from the Panel.

## PARTIES

13. Plaintiff University of South Florida College Republicans ("USF Republicans") is a Tampa-based chapter of the College Republican National Committee and is part of the Florida Federation of College Republicans. The purpose and goal of this organization is to recruit, train, engage, and mobilize students to advocate for conservative ideals, participate in civic events, and increase their members' knowledge of the political process. USF's main campus address is 4202 E Fowler Ave, Tampa, FL 33620. This address is in the 15th Congressional District of Florida, which Republican Laurel Lee represents. *See Find Your Representative*, U.S. House of Reps., https://perma.cc/U2MC-32PR.

14. Plaintiff Michael Fusella is the President of USF Republicans and resides in the 15th Congressional District of Florida and within the Middle District of Florida.

4

15.     Plaintiff Pinellas County Young Republicans ("Young Republicans") is a club intended to attract young people and provide for them an opportunity to achieve political expression and recognition, more effectively participate in the election process, and better develop and uphold the principles of the Republican Party as a service to the United States of America, the State of Florida, Pinellas County and its political subdivisions. The Young Republicans have an address at 9800 4th Street North, Suite 200, St. Petersburg, FL 33702. This address is in the 14th Congressional District of Florida, which Democrat Kathy Castor represents. *Florida's 14th Congressional District*, GOVTRACK.US, https://perma.cc/4BJS-NZQH.

16.     Plaintiff Parisa Mousavi is the President of the Young Republicans and resides in the 14th Congressional District of Florida and within the Middle District of Florida.

17.     Plaintiff Gretchen Zoeller resides in the 19th Congressional District of Florida and within the Middle District of Florida.

18.     Plaintiff Byron Lowell Donalds is an elected Member of Congress representing the 19th congressional district in Florida. He sues in his official capacity as an individual Member of Congress pursuant to Pub. L. No. 105-119, § 209(d)(2).

19.     Defendants, Commerce Secretary Howard Lutnick and Acting Director of the Census Bureau George Cook, are sued in their official capacities.

20.    Plaintiffs sue the United States under 5 U.S.C. § 702, which allows the United States to be named as a Defendant in an APA case.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346, 28 U.S.C. §§ 2201 and 2401, 5 U.S.C. § 706, Pub. L. No. 105-119, § 209(b) (codified at 13 U.S.C. § 141, note (Statistical Sampling or Adjustment in Decennial Enumeration of Population)), the U. S. Constitution, and the Court's equitable powers.

22.    Venue is proper in this district under 28 U.S.C. §1391(b)(2) and (e)(1) because Plaintiffs reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

23.    Pursuant to Pub. L. No. 105-119, § 209(e)(1), this action "shall be heard and determined by a district court of three judges in accordance with [28 U.S.C. § 2284]."

24.    28 U.S.C. § 2284 provides, in pertinent part: "(a) a district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts."

25.    Plaintiffs remain entitled to a three-judge panel under section 2284 because Plaintiffs still challenge the constitutionality of apportionment based on the 2020 census in this amended complaint.

26.    Any final order of the panel shall be reviewable by direct appeal to the U.S. Supreme Court.

## HISTORICAL BACKGROUND

27.    Before ratifying the U.S. Constitution, the Framers debated whether representation should be apportioned equally among the States or according to population. Jason G. Gauthier, *History and the Census: 1788 Ratification of the U.S. Constitution,* U.S. Census Bureau (June 1, 2023), https://perma.cc/PNW6-KYSK.

28.    On July 16, 1787, delegates to the Constitutional Convention voted to accept Connecticut delegate Richard Sherman's "Great Compromise" requiring apportionment of the House of Representatives following a census. Jason G. Gauthier, *History and the Census: 1788 Ratification of the U.S. Constitution*, U.S. Census Bureau (June 1, 2023), https://perma.cc/PNW6-KYSK; Max Farrand, *The Framing of the Constitution of the United States* 99 (1913).

29.    The decennial census is described in the U.S. Constitution, which requires an "actual Enumeration" of the population within every ten years, "in such Manner as [Congress] shall by Law direct." U.S. Const. art. I, § 2, cl. 3.

30.    On March 1, 1790, Congress passed the first Census Act, requiring the marshals of the United States judicial districts to begin counting "inhabitants" on August 2, 1790. Jessie Kratz, *The 1790 Census and the First Veto*, U.S. Nat'l Archives (Apr. 4, 2022), https://perma.cc/3LSQ-33DG.

31.     The marshals were tasked with visiting every household, posting completed census schedules in public places within each jurisdiction, and sending the President the aggregate amount. Jessie Kratz, *The 1790 Census and the First Veto*, U.S. Nat'l Archives (Apr. 4, 2022), https://perma.cc/3LSQ-33DG.

32.     According to the 1790 Census, there were 3,929,214 inhabitants in the United States. Jessie Kratz, *The 1790 Census and the First Veto*, U.S. Nat'l Archives (Apr. 4, 2022), https://perma.cc/3LSQ-33DG.

## MODERN APPROACH TO THE CENSUS

33.     Now, 236 years later, the Census Bureau reports that 331,449,281 people reside in the United States as determined by the 2020 Census. *2020 Census Apportionment Results Delivered to the President*, U.S. Census Bureau (Apr. 26, 2021), https://perma.cc/G6BA-PL68.

34.     Marshals of each judicial district are no longer used. *U.S. Marshals*, U.S. Census Bureau (May 20, 2025), https://perma.cc/SV6K-KZ7Y.

35.     Posting of census-related information bulletins is now done online.

36.     And "visiting every household" has become less feasible.

37.     Article I, Section 2 requires an "Enumeration," a word that has a literal meaning but, for purposes of the census, has been reduced to a list of descriptors.

38.     The term "Enumeration" does not impose a duty on the government to conduct a literal count, but only implies a general "counting process,"

8

which does not implicate any particular "methodological details." *Utah v. Evans*, 536 U.S. 452, 474 (2002).

39.    The government may not estimate the population in the first instance, but it may use methods that "fill gaps or clarify confused information." *Utah v. Evans*, 536 U.S. 452, 475-76 (2002).

40.    What is important is the "contrast" between what the government *does* and a "kind of 'conjectur[e]'"—"rather than the particular phrase used to describe the [ ] process." *Utah v. Evans*, 536 U.S. 452, 475 (2002).

41.    Simply put, the only requirement of "enumeration" is that officials "seek to reach each individual household." *Utah v. Evans*, 536 U.S. 452, 477 (2002).

42.    Additionally, "[t]he text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration,'" and "Congress has delegated its broad authority over the census to the Secretary." *See Wisconsin v. City of New York*, 517 U.S. 1, 19–20 (1996) (citing U.S. Const. art. I, § 2, cl. 3).

43.    The Census Act grants the Secretary the authority to conduct the decennial census "in such form and content as he may determine, including the use of sampling procedures and special surveys." 13 U.S.C. § 141(a).

44.    However, the Secretary's authority is not "unbounded." *Dep't of Com. v. New York*, 588 U.S. 752, 771–72 (2019).

45.    The Secretary has "a duty to conduct a census that is accurate and fairly accounts for the crucial representational rights that depend on the census and the apportionment." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (internal quotation marks omitted).

46.    The Secretary's decisions about the "form and content" of the census must bear a "reasonable relationship to the accomplishment of an actual enumeration." *Dep't of Com. v. New York*, 588 U.S. 752, 768–69 (2019) (internal quotation marks omitted).

47.    "The Secretary is assisted in the performance of [his] responsibility by the Bureau of the Census and its head, the Director of the Census." *Wisconsin v. City of New York*, 517 U.S. 1, 5 (1996) (citing 13 U.S.C. §§ 2, 21).

## THE 2020 CENSUS

### The Count

48.    "Despite the Census Bureau's best efforts to plan for the execution of the 2020 Census, unexpected events, such as natural disasters, can occur," *2020 Census Operational Plan*, 5 U.S. Census Bureau 221 (2022), https://perma.cc/8XX6-YA5F, and did occur when the COVID-19 pandemic caused politicians to shut down the country two weeks before census day.

49.    Because of the COVID-19 pandemic, the Census Bureau suspended normal procedures and employed new data collection and processing methodologies.

10

50.    "Because of the COVID-19 pandemic," the scope of the Mobile Questionnaire Assistance was refined to focus on high-traffic COVID-19 supply or service areas. *2020 Census Operational Plan*, 5 U.S. Census Bureau 106 (2022), https://perma.cc/8XX6-YA5F.

51.    "Because of the COVID-19 pandemic," two additional mailings were added due to low response. *2020 Census Operational Plan*, 5 U.S. Census Bureau 106 (2022), https://perma.cc/8XX6-YA5F.

52.    "Because of the COVID-19 pandemic," the internet-based self-response time period was extended. *2020 Census Operational Plan*, 5 U.S. Census Bureau 106 (2022), https://perma.cc/8XX6-YA5F.

53.    "Because of the COVID-19 pandemic," contacting a respondent was removed from the manual processing stage of Non-ID processing. *2020 Census Operational Plan*, 5 U.S. Census Bureau 111 (2022), https://perma.cc/8XX6-YA5F.

54.    "Because of the COVID-19 pandemic," the early non-response follow-up was descoped from the operation. *2020 Census Operational Plan*, 5 U.S. Census Bureau 127 (2022), https://perma.cc/8XX6-YA5F.

55.    "Because of the COVID-19 pandemic," multiunit manager visits for non-response follow-up were not grouped correctly. *2020 Census Operational Plan*, 5 U.S. Census Bureau 127 (2022), https://perma.cc/8XX6-YA5F.

56.    "Because of the COVID-19 pandemic," field procedures in areas where housing units do not have mail delivered to a physical address were revised to eliminate the step of knocking on the door of a housing unit to ask about the address and additional living quarters. *2020 Census Operational Plan*, 5 U.S. Census Bureau 142 (2022), https://perma.cc/8XX6-YA5F.

57.    "Because of the COVID-19 pandemic," the Count Question Resolution schedule changed, creating delays in upstream processes. *2020 Census Operational Plan*, 5 U.S. Census Bureau 152 (2022), https://perma.cc/8XX6-YA5F.

58.    "Because of the COVID-19 pandemic," telephone response was added to "Island Area Censuses," where only in-person interviews had been permitted. *2020 Census Operational Plan*, 5 U.S. Census Bureau 155 (2022), https://perma.cc/8XX6-YA5F.

59.    "Because of the COVID-19 pandemic," field follow-up and end-of-field data collection schedules for Island Area Censuses were shifted by three and four months, respectively. *2020 Census Operational Plan*, 5 U.S. Census Bureau 155 (2022), https://perma.cc/8XX6-YA5F.

60.    "Because of the COVID-19 pandemic," call center staff positions at the Decennial Service Center were transitioned to work-from-home assignments. *2020 Census Operational Plan*, 5 U.S. Census Bureau 168 (2022), https://perma.cc/8XX6-YA5F.

61.    "Because of the COVID-19 pandemic," field training was generally modified across operations to minimize in-person contact. *2020 Census Operational Plan*, 5 U.S. Census Bureau 170 (2022), https://perma.cc/8XX6-YA5F.

62.    "Because of the COVID-19 pandemic," logistical management shifted to focus on procuring and distributing thousands of masks, hand sanitizer, sanitizing wipes, and similar products. *2020 Census Operational Plan*, 5 U.S. Census Bureau 173 (2022), https://perma.cc/8XX6-YA5F.

63.    Despite then Director of the Census Bureau Steven Dillingham assuring the American people that "[o]perations for the 2020 Census and our ongoing household surveys have procedures built in that specifically anticipate epidemics and pandemics," the Census Bureau had to fundamentally alter its approach to data collection and processing because of the COVID-19 pandemic. *Statement from Director Dr. Steven Dillingham*, U.S. Census Bureau (Feb. 26, 2020), https://perma.cc/KN8S-56NG.

64.    The Census Bureau admits in its Post Enumeration Survey ("PES") that it faced challenges driven by the pandemic and general trends of decreasing response to the survey. Shadie Khubba, Krista Heim & Jinhee Hong, *National Census Coverage Estimates for People in the United States by Demographic Characteristics: 2020 Post-Enumeration Survey Estimation Report* 3 (2022), https://perma.cc/8RXP-PLQU.

65.    Defendants failed to fulfill the fundamental task of "seek[ing] to reach each individual household," *Utah v. Evans*, 536 U.S. 452, 477 (2002), in the 2020 Census.

66.    Instead, Defendants used "statistical methods [to] substitute for any such effort"—something the "Framers did not believe the Constitution authorized." *Utah v. Evans*, 536 U.S. 452, 477 (2002) (citing *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 346–49 (1999)).

67.    And though the Supreme Court has recognized the use of statistical methods in conducting the census "after [the Census Bureau] has exhausted its efforts to reach each individual," the Bureau's efforts in the 2020 Census can hardly be considered exhaustive. *Utah v. Evans*, 536 U.S. 452, 477 (2002).

68.    In fact, the Bureau estimates that 18.8 million people were "omitted" from the 2020 Census. Shadie Khubba, Krista Heim & Jinhee Hong, *National Census Coverage Estimates for People in the United States by Demographic Characteristics: 2020 Post-Enumeration Survey Estimation Report* 5 (2022), https://perma.cc/8RXP-PLQU.

69.    The Bureau's attempt to "account" for "many of these omitted people" was to impute them into the count. Shadie Khubba, Krista Heim & Jinhee Hong, *National Census Coverage Estimates for People in the United States by Demographic Characteristics: 2020 Post-Enumeration Survey Estimation*

14

*Report* 5 (March 2022), https://perma.cc/8RXP-PLQU; Pat Cantwell, *How We Complete the Census When Households or Group Quarters Don't Respond*, U.S. Census Bureau (2021), https://perma.cc/B5DK-BH2E.

70.    "Imputation is a statistical technique used to fill in missing information." Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* 3 (2023), https://perma.cc/VQ2A-4R9K.

71.    Imputation is therefore by definition a statistical method because it statistically adjusts, "to add or subtract counts to or from the enumeration of the population as a result of statistical inference." Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, Pub. L. No. 105-119, § 209(h)(1), 111 Stat 2440, 2483 (1997).

72.    There are three main types of imputation that the Census Bureau used in the 2020 Census: (1) assignment; (2) allocation; and (3) substitution. Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* 3 (2023), https://perma.cc/VQ2A-4R9K.

73.    Assignment—the preferred imputation method—was used when "a response [was] either missing or not consistent with other responses and [the missing] value [could] be determined based on other information provided for that same person or household." Jessica DeJesus & Sarah Konya, *2020*

*Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* 3 (2023), https://perma.cc/VQ2A-4R9K.

74.    Allocation was used when "a response [was] either missing or not consistent with other responses and [the missing] value [could] not be determined based on information provided for that same person. Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* 3 (2023), https://perma.cc/VQ2A-4R9K.

75.    In this case, the Bureau would assign an "allocation" from another person within the housing unit (HU) or group quarter (GQ) or from a nearby HU/GQ. Jessicas DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* 3 (2023), https://perma.cc/VQ2A-4R9K.

76.    Substitution—the least preferred method of imputation—was used when "characteristics for every person in the HU [were] missing." Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* 3 (2023), https://perma.cc/VQ2A-4R9K.

77.    In this case, the Bureau would use data from a nearby HU to "represent" the "missing" people. Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* 3 (2023), https://perma.cc/VQ2A-4R9K.

16

78.    Whole-person imputation is a type of substitution imputation. Timothy Kennel, *2020 Post-Enumeration Survey: Defining Whole-Person Census Imputations* 1 (2023), https://perma.cc/33NM-SLA9.

79.    The Census Bureau's PES—which admittedly uses statistical sampling to check the "net coverage error rates at the national level," Shadie Khubba, Krista Heim & Jinhee Hong, *National Census Coverage Estimates for People in the United States by Demographic Characteristics: 2020 Post-Enumeration Survey Estimation Report* 1 (2022), https://perma.cc/8RXP-PLQU— found that 10.9 million people, or 3.4% of the population, were imputed through whole-person imputation in the 2020 Census.[1] Timothy Kennel, *2020 Post-Enumeration Survey: Defining Whole-Person Census Imputations* 1 (2023), https://perma.cc/33NM-SLA9.

80.    This was up from 5.99 million whole-person imputations in 2010, and 5.77 million whole-person imputations in 2000. Shadie Khubba, Krista Heim & Jinhee Hong, *National Census Coverage Estimates for People in the United States by Demographic Characteristics: 2020 Post-Enumeration Survey Estimation Report* 6 (2022), https://perma.cc/8RXP-PLQU.

81.    "Whole-person imputation" uses administrative records or other "imputation methods" based on people in a similar nearby household to fill

---

[1] The Bureau indicated in the PES that there may be an additional 6.3 million whole-person imputations that should be added but weren't due to a definitional difference between the 2010 and 2020 Censuses, bringing the total closer to 17.1 million.

"person characteristics." America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

82.    It is used when a record is considered incomplete, or "when very little information about the household or the people in the household was obtained from direct data collection efforts." America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

83.    But "direct data collection efforts" were thwarted by the arrival of the COVID-19 pandemic. America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight,* U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

84.    "The COVID-19 pandemic may or may not have impacted unit response rates, which then would have an impact on [Item Nonresponse] rates and the amount of characteristic imputation needed." Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* § 1.1 (2023), https://perma.cc/SF5Q-8A2C.

85.    The COVID-19 pandemic "may have made people more hesitant to speak to an enumerator face to face." Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* § 1.1 (2023), https://perma.cc/SF5Q-8A2C.

86.    "The mailing materials were delayed." Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* § 1.1 (2023), https://perma.cc/SF5Q-8A2C.

87.    "Field enumeration operations were delayed." Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* § 1.1 (2023), https://perma.cc/SF5Q-8A2C.

88.    Imputation was not "used sparingly only after [the Bureau] ha[d] exhausted its efforts to reach each individual." It was used extensively and differed in "principle from other efforts used since 1800 to determine the number of missing persons." *Utah v. Evans*, 536 U.S. 452, 477 (2002).

89.    The Bureau admits that the 2020 Census results—as analyzed through the PES, including the net-error rates—were "fit for the purposes of apportionment and redistricting *upon their release*." America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022) (emphasis added), https://perma.cc/B49T-E6HZ.

90.    The apportionment and redistricting data was released in April and August 2021, respectively. *2020 Census Apportionment Results Delivered to the President*, U.S. Census Bureau (Apr. 26, 2021), https://perma.cc/G6BA-PL68.

91.    But the PES—which found 18.8 million people missing nationally, and nearly 760,000 from Florida—did not come out until Spring 2022. *Post-Enumeration Surveys*, U.S. Census Bureau, https://perma.cc/RZB4-899S.

92.    At this point after "their release", the Bureau revealed what many assumed given the nature of the COVID-19 pandemic—that the 2020 Census results were not fit for the purposes of apportionment and redistricting.

93.    And though the Bureau claims that the "PES data cannot answer why a particular state may have experienced [an undercount]," it is clear that the "COVID-19 pandemic and other long-standing challenges potentially affected the accuracy of 2020 Census counts." *2020 Census: Coverage Errors and Challenges Inform 2030 Plans*, U.S. Gov't Accountability Off. (Nov. 21, 2024), https://perma.cc/9J82-LBWK.

94.    In fact, in the 2010 Census, the Bureau reported no "statistically significant undercount or overcount in the population or housing units for any state," *Census Bureau Releases Estimates of Undercount and Overcount in the 2010 Census*, U.S. Census Bureau (May 22, 2012), https://perma.cc/E7GP-4YBY, whereas the 2020 Census yielded undercounts and overcounts in a total of 14 states.

95.    The changes between the 2010 and 2020 Censuses caused these miscounts, including COVID-19-related procedural changes and intra-agency methodological choices. *2020 Census: Coverage Errors and Challenges Inform*

20

*2030 Plans, GAO-25-107160*, U.S. Gov't Accountability Off. (Nov. 21, 2024), https://perma.cc/H6GL-EAGR.

96.    These changes led to more imputation, which led to inaccurate results.

97.    Any attempt by Defendants to assign blame away from their choice to use imputation to low response rate or inability to reach households due to shutdowns, fails particularly for Florida, which was one of the most "open" states during the COVID-19 pandemic. Scott A. Rivkees, *The Shifting Impact and Response to COVID-19 in Florida*, FRONT. IN PUB. HEALTH, Figure 1. (Feb. 19, 2024), https://perma.cc/E5BL-D8VF.

98.    The Bureau claims its goal "for the census is always to get a complete and accurate count," but the Bureau sacrifices accuracy for counts that are good enough, or "fit for" use. America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight,* U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

99.    The Constitution demands more than results that are simply "of suitable quality." America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

100.    The Bureau claims that the PES is simply an informational tool and "has never been intended to change the decennial Census." America

Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

101.    The Bureau "offers" the Count Question Resolution ("CQR") process for states to "request a review of their boundaries and housing counts to identify errors." America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

102.    However, the "CQR does not alter redistricting data, apportionment results, or other 2020 Census data products." America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

103.    In other words, despite Defendants' admission that it vastly used imputation in the 2020 Census that produced statistically significant overcounts and undercounts, which resulted in data sets that were not fit for apportionment and redistricting, the results of the 2020 Census are set in stone and completely immune from challenge.

**Apportionment**

104.    The President then sent this inaccurate estimation of the population to Congress to be used to reapportion congressional seats. *2020 Census Apportionment Results Delivered to the President*, U.S. Census Bureau (Apr. 26, 2021), https://perma.cc/G6BA-PL68.

22

105.    The Constitution requires that each state have at least one representative seat in the House of Representatives. U.S. Const. art. I, § 2 cl. 3.

106.    After allocating this initial seat, the Census Bureau uses an "apportionment calculation" to distribute the remaining 385 seats among the 50 states. Kristin Koslap & Steven Wilson, *How Apportionment is Calculated*, U.S. Census Bureau (Apr. 26, 2021), https://perma.cc/Z9X7-WNAV.

107.    The calculation attempts to minimize the percentage differences in the number of people per representative among the states. Kristin Koslap & Steven Wilson, *How Apportionment is Calculated*, U.S. Census Bureau (Apr. 26, 2021), https://perma.cc/Z9X7-WNAV.

108.    The calculation does this by (1) assigning priority values to each state based on apportionment population; (2) sorting these values from largest to smallest; and (3) allocating a seat to a state each time one of its values appears in the largest 385 values. Kristin Koslap & Steven Wilson, *How Apportionment is Calculated*, U.S. Census Bureau (Apr. 26, 2021), https://perma.cc/Z9X7-WNAV.

109.    At a very basic level, the higher apportionment population a state has, the larger priority values it will have, yielding more House seats.

110.    In 2020, there were a total of 3,450 priority values among the states. Kristin Koslap & Steven Wilson, *How Apportionment is Calculated*, U.S. Census Bureau (Apr. 26, 2021), https://perma.cc/Z9X7-WNAV.

111.   California's priority values appeared 52 times in the 435 largest values. *Priority Values for 2020 Census Apportionment*, U.S. Census Bureau https://perma.cc/ZE9T-RZJC.

112.   Florida's priority values appeared 28 times. *Priority Values for 2020 Census Apportionment*, U.S. Census Bureau, https://perma.cc/ZE9T-RZJC.

113.   Texas's priority values appeared 38 times. *Priority Values for 2020 Census Apportionment*, U.S. Census Bureau, https://perma.cc/ZE9T-RZJC.

114.   New York's priority values appeared 26 times and would have appeared a 27th time, but New York missed the 435th spot (or seat) by 89 people. *Priority Values for 2020 Census Apportionment*, U.S. Census Bureau, https://perma.cc/ZE9T-RZJC; *Top Ten Runner-Up States to Almost Gain Another Congressional Seat: 2020 Census,* U.S. Census Bureau tbl. B1. https://perma.cc/JFR6-H2F5.

115.   Defendants undercounted Florida by 3.48% or close to three-quarters of a million people. Courtney Hill et al., *Census Coverage Estimates for People in the United States by State and Census Operations 2020 Post-Enumeration Survey Estimation Report*, U.S. Census Bureau 16 (2022), https://perma.cc/X5EP-W8YW.

116.   Analysis shows that Florida missed an additional seat by 171,561 people, falling in the priority value order behind the following states: (1) New

York (436); (2) Ohio (437); and (3) Texas (438).[2] *2020 Apportionment Population Counts from CB*, Election Data Services, Inc. (Apr. 26, 2021), https://perma.cc/Q5EL-BETQ.

117.  But according to the PES, New York and Ohio were both overcounted. Courtney Hill et al., *Census Coverage Estimates for People in the United States by State and Census Operations 2020 Post-Enumeration Survey Estimation Report*, U.S. Census Bureau 1 (June 2022), https://perma.cc/X5EP-W8YW.

118.  So not only were the *Top Ten Runner-Up States to Almost Gain Another Congressional Seat: 2020 Census* values wrong, U.S. Census Bureau tbl. B1, https://perma.cc/JFR6-H2F5, but the entire *Priority Values for 2020 Census Apportionment* values were wrong, U.S. Census Bureau, https://perma.cc/ZE9T-RZJC.

119.  Had the Bureau done an actual enumeration and yielded accurate results, the priority values would have changed.

120.  Had the priority values changed, the allocation of House seats would have changed.

---

[2] Election Data Services, Inc. ("EDS") is a "political consulting firm specializing in redistricting, election administration, and the analysis and presentation of census and political data." EDS consults state and local governments regarding apportionment and redistricting. EDS President Kimball Brace was appointed to the 2010 Census Advisory Committee.  *Company Profile*, Election Data Services, https://perma.cc/K53V-WPPY.

121.   For example, Minnesota appeared in the 435th spot in the priority values. *Priority Values for 2020 Census Apportionment*, U.S. Census Bureau, https://perma.cc/ZE9T-RZJC.

122.   New York was in spot 436. *Priority Values for 2020 Census Apportionment*, U.S. Census Bureau, https://perma.cc/ZE9T-RZJC.

123.   Ohio was in spot 437. *Priority Values for 2020 Census Apportionment*, U.S. Census Bureau, https://perma.cc/ZE9T-RZJC.

124.   Texas and Florida were in spots 438 and 439, respectively. *Priority Values for 2020 Census Apportionment*, U.S. Census Bureau, https://perma.cc/ZE9T-RZJC.

125.   But the Bureau admits that Minnesota, New York, and Ohio were overcounted and that Texas and Florida were undercounted. Courtney Hill et al., *Census Coverage Estimates for People in the United States by State and Census Operations: 2020 Post-Enumeration Survey Estimation Report*, U.S. Census Bureau a 1 (June 2022), https://perma.cc/X5EP-W8YW.

126.   Had the count been correct, Texas and Florida would have moved into the top 435 spots and gained seats.

## Redistricting

127.   The Census Bureau also used the census estimates of state populations to produce the required Public Law. 94-171 Redistricting Data report

to the States. *Decennial Census P.L. 94-171 Redistricting Data,* U.S. Census Bureau (Nov. 29, 2023), https://perma.cc/YSG6-XVMM.

128.   Florida relies on an accurate "federal decennial statewide census" for "[a]ll acts of the Florida Legislature based upon population and all constitutional apportionments." Fla. Stat. § 11.031 (2025).

129.   "After each decennial Census the Legislature redraws the districts from which Florida voters elect their state representatives, state senators, and members of the U.S. House of Representatives." *Redistricting*, The Florida Senate, https://perma.cc/G6V7-SJT8 (last visited Feb. 13, 2026).

130.   Florida redistricts to account for "uneven growth rates in different parts of the state." *Redistricting*, The Florida Senate , https://perma.cc/G6V7-SJT8 (last visited Feb. 13, 2026).

131.   Florida began the redistricting process after the 2020 Census in January 2022 and completed the process in April 2022. *Redistricting*, The Florida Senate, https://perma.cc/G6V7-SJT8 (last visited Feb. 13, 2026).

132.   Both the U.S. Constitution and the Florida Constitution require equal representation, meaning that "districts shall be as nearly equal in population as is practicable." Fla. Const. art. III § 21(b); U.S. Const. amend. XIV; *Reynolds v. Sims*, 377 U.S. 533, 539 (1964).

133. However, the Florida Legislature could not have meaningfully fulfilled this mandate when the Census Bureau admits that over 700,000 Floridians were missing.

134. Now, Governor DeSantis has announced that in April 2026, Florida will embark on a mid-decade special legislative session for the purpose of redistricting. Exec. Off. of the Governor Ron DeSantis, *Governor Ron Desantis Announces Special Legislative Session on Congressional Redistricting* (Jan. 7, 2026), https://perma.cc/XXY7-356Y.

135. These new boundaries are fraught from the outset due to the overreach of the Defendants in using statistical methods to vastly fill in the gaps during the 2020 Census.

## The Secretary's Authority Over the Census

136. The Defendants' decision to use extensive imputation during the 2020 Census did not bear "a reasonable relationship to the accomplishment of an actual enumeration." *Dep't of Com. v. New York*, 588 U.S. 752, 768–69 (2019) (quoting *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996)).

137. By imputing 10.9 million people to the count, the Secretary failed to provide an enumeration that "fairly account[ed] for the crucial representational rights that depend on the census and the apportionment." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (internal quotation marks omitted).

28

138.   Doubling down on this abdication of authority, the Secretary provided to the President an inaccurate "tabulation of total population by States . . . for the apportionment of Representatives of Congress among the several States." 13 U.S.C. § 141(b).

139.   The inadequate tabulation led the President to send to Congress inaccurate apportionment data, which led Congress to inaccurately reapportion representation among the states. *2020 Census Apportionment Results Delivered to the President*, U.S. Census Bureau (Apr. 26, 2021), https://perma.cc/G6BA-PL68.

140.   As recently as August 2025, the President has called for Defendants to "immediately begin work on a new and highly accurate CENSUS based on modern day facts and figures . . . ." Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Aug. 7, 2025, at 7:22 ET), https://perma.cc/TLB2-QFJZ.

141.   Instead of an accurate population count, the President, Congress, and the American people received "counts that provide a vivid portrait of our nation's people." America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

142.   The Constitution requires an enumeration, not an artistic rendering of something like the population.

## The Impact on the Plaintiffs

29

<u>Representation</u>

143.   Defendants undercounted the population of Florida by 3.48%. *See 2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ.

144.   A 3.48% undercount in Florida translates to about 760,000 people. *Florida Was Third-Largest State in 2020 With Population of 21.5 Million*, U.S. Census Bureau (Aug. 25, 2021), https://perma.cc/X3CD-CK58.

145.   Florida narrowly missed gaining an additional U.S. House seat, falling short by approximately 172,000 people. Election Data Services, *2020 Apportionment Population Counts from CB* (Apr. 26, 2021), https://perma.cc/Q5EL-BETQ.

146.   But for Defendants' vast use of statistical methods on 2020 census data, Florida would have gained an additional House seat and an additional vote in the Electoral College.

147.   The loss of a House seat necessarily means that Florida Plaintiffs vote in larger congressional districts, thereby having their votes diluted. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) ("To be sure, vote dilution can be a basis for standing.").

<u>Funding</u>

148.   More than 350 Federal programs determine funding allocations based on census population totals. Ceci Villa Ross, *Uses of Decennial Census*

*Programs Data in Federal Funds Distribution: Fiscal Year 2021* 41 (2023), https://perma.cc/8C7Y-XHX8.

149.  In many instances, the states receive these allocated monies and double down on the erroneous census-based presuppositions by further distributing funds based on local district, county, or city size.

150.  For example, the Highway Planning and Construction Program ("HPCP") allocates funding based on census numbers. *See* America Counts Staff, *Population Count Will Inform How and Where Billions of Dollars Will Be Spent for the Next Decade*, U.S. Census Bureau (Dec. 4, 2019), https://perma.cc/LC3T-HGMH.

151.  Florida's 14th and 19th districts have received more than $108,459,103  from the HPCP since 2021. *CFDA 20.205: Highway Planning and Construction Program*, USASpending, https://perma.cc/NFP5-NBRQ (subaward congressional district FL-14 & FL-19).

152.  Florida's 19th Congressional district contains all of Lee County, some of Collier County, and a sliver of Charlotte County. Florida Senate Committee on Reapportionment, *2022-2032 Florida Congressional Districts* (Apr. 22, 2022), https://perma.cc/LJ2G-CD6Z.

153.  After the 2020 census, all three of these counties' populations increased.

154.    The population of Lee County increased by more than 20%. Florida Redistricting[3], *County Population Change Web Map*, https://perma.cc/26G6-4K2T.

155.    The population of Collier County increased by 15%-20%. Florida Redistricting, *County Population Change Web Map*, https://perma.cc/9CK7-99PA.

156.    The population of Charlotte County increased by 15%-20%. Florida Redistricting, *County Population Change Web Map*, https://perma.cc/3G65-7MB2.

157.    Had Florida been counted correctly in the 2020 census, it is clear that the population of the 19th Congressional district would have increased even more.

158.    Federal funding tied to the 19th District's population would have also increased.

159.    In total, the Florida Chamber of Commerce estimates that the 19th District lost out on more than $350 million as a result of the undercounting of Florida's population. Fla. Chamber Fdn., *Florida is Missing Billions of Dollars: The Cost of the 2020 Census Undercount by County*, https://perma.cc/BY6D-Z85U.

---

[3] Florida Redistricting is a public information website created by the Florida Legislature for the purpose of informing the public on information related to the 2022 redistricting cycle.

160.   Florida's 15th Congressional district contains a large portion of Hillsborough County, some of Pasco County, and a sliver of Polk County. Florida Senate, *2022-2032 Florida Congressional Districts* (Apr. 22, 2022), https://perma.cc/UMY5-JBUX.

161.   After the 2020 census, all three of these counties' populations increased.

162.   The population of Hillsborough County increased by 15%–20%. Florida Redistricting[4], *County Population Change Web Map*, https://perma.cc/AKN4-RXCR.

163.   The population of Pasco County increased by more than 20%. Florida Redistricting, *County Population Change Web Map*, https://perma.cc/9EYB-ZP4N.

164.   The population of Polk County increased by more than 20%. Florida Redistricting, *County Population Change Web Map*, https://perma.cc/WF9W-DAE2.

165.   Had Florida been counted correctly in the 2020 census, it is clear that the population of the 15th Congressional district would have increased even more.

---

[4] Florida Redistricting is a public information website created by the Florida Legislature for the purpose of informing the public on information related to the 2022 redistricting cycle.

166.   Federal funding tied to the 15th District's population would have also increased.

167.   In total, the Florida Chamber of Commerce estimates that the 15th District lost out on more than $930 million as a result of the undercounting of Florida's population. Fla. Chamber Fdn., *Florida is Missing Billions of Dollars: The Cost of the 2020 Census Undercount by County*, https://perma.cc/BY6D-Z85U.

168.   Florida's 14th Congressional district contains a large portion of Hillsborough County, and some of Pinellas County. Florida Senate, *2022-2032 Florida Congressional Districts* (Apr. 22, 2022), https://perma.cc/GVH2-FH3Z.

169.   After the 2020 Census, both of these counties' populations increased.

170.   The population of Hillsborough County increased by 15%-20%. Florida Redistricting, *County Population Change Web Map*, https://perma.cc/9EYB-ZP4N.

171.   The population of Pinellas County increased by 2%-6%. Florida Redistricting, *County Population Change Web Map*, https://perma.cc/9EYB-ZP4N.

172.   Had Florida been accurately counted in the 2020 census, the population of the 14th congressional district would have been even higher.

173.   Federal funding tied to the 14th District's population would have also increased.

174.   In total, the Florida Chamber of Commerce estimates that the 14th District lost out on more than $300 million as a result of the undercounting of Florida's population. Fla. Chamber Fdn., *Florida is Missing Billions of Dollars: The Cost of the 2020 Census Undercount by County*, https://perma.cc/BY6D-Z85U.

175.   Additionally, Florida uses census-based federal grant allocations to distribute funds among congressional districts.

176.   Had the census yielded an accurate count for Florida, the congressional map would have been different, and funding allocations would have also changed.

## Informational Injury: Member of Congress

177.   Representative Donalds relies on accurate census data to fulfill his constitutional duty of representation on behalf of the people of Florida and specifically the residents of the 19th Congressional district.

178.   Representative Donalds uses census data to inform his votes in the House of Representatives.

179.   For example, Representative Donalds cast votes concerning the HUBZone small business program, which bases its eligibility, in part, on census data.

180.    Many other competitive grants rely upon census data for adequate and accurate distribution of funds, and Representative Donalds engages with these facts and figures in informing his vote.

181.    Additionally, Representative Donalds depends on accurate census data to inform his constituent services and relations.

182.    Many local funding programs, such as SNAP, certain Medicare and Medicaid programs, and FEMA monies, are dependent on census data to set eligibility requirements.

183.    Representative Donalds and his office can only adequately advise constituents if they are given accurate information.

184.    Defendants harmed Representative Donalds by failing to provide him with accurate data on which he relies to fulfill his constitutional duty.

## CLAIMS FOR RELIEF

### COUNT I
### *Violation of U.S. Const. art. I, § 2, cl. 3, see Pub. L. No. 105-119, § 209*

185.    Plaintiffs reallege their allegations contained in paragraphs 1 through 181 as set forth herein.

186.    Pub. L. No. 105-119, § 209(b) provides that "[a]ny person aggrieved by the *use* of any statistical method in violation of the Constitution or any pro-vision of law . . . in connection with the 2000 or any later decennial Census, to determine the population for purposes of the *apportionment* or *redistricting* of

Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method." (emphasis added).

187. The U.S. Constitution requires a decennial "actual Enumeration" of the population for purposes of apportionment. U.S. Const. art. I, § 2, cl. 3.

188. As alleged above, Defendants' extensive reliance on statistical methods in conducting the 2020 Census and producing its results violated the Constitution's mandate to conduct an "actual Enumeration." The unprecedented scope and manner of Defendants' use of statistical techniques went beyond permissible data supplementation and effectively substituted statistical modeling for a true enumeration of the population.

189. By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the 2020 Census apportionment data and tabulation as reported to the President, *see* 13 U.S.C. §141(b) violated Article I, § 2 of the U.S. Constitution.

190. Plaintiffs are also entitled to mandatory relief that obligates the Defendants to correct the 2020 apportionment data and tabulation to account for the 18.8 million omissions by means of direct contact and, accordingly, update the P.L. 94-171 redistricting data and redistribute that data to the states.

## COUNT II
*Violation of 13 U.S.C. § 141(a), see Pub. L. No. 105-119, § 209*

37

191.   Plaintiffs reallege their allegations contained in paragraphs 0–181 as set forth herein.

192.   Pub. L. No. 105-119, § 209(b) provides that "[a]ny person aggrieved by the *use* of any statistical method in violation of the Constitution or any provision of law . . . in connection with the 2000 or any later decennial Census, to determine the population for purposes of the *apportionment* or *redistricting* of Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method." (emphasis added).

193.   The Secretary's extensive reliance upon imputation in producing the apportionment results and tabulation of total population to the President went beyond the Secretary's authority in 13 U.S.C. § 141(a) and was a clear abuse of discretion.

194.   By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the Secretary exceeded his authority under 13 U.S.C. 141(a) and that the 2020 Census apportionment data and tabulation as reported to the President, *see* 13 U.S.C. §141(b), are inaccurate.

195.   Plaintiffs are also entitled to mandatory relief that obligates the Defendants to correct the 2020 apportionment data and tabulation to account for the 18.8 million omissions by means of direct contact and, accordingly, update the P.L. 94-171 redistricting data and redistribute that data to the states.

## COUNT III

*Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)[5]*
*(Use of Statistical Methods, Contrary to U.S. Const. art. I, § 2, cl. 3)*

196.    Plaintiffs reallege their allegations contained in paragraphs 0–181 as set forth herein.

197.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

198.    Defendants' extensive use of statistical methods in conducting the 2020 Census was not "in accordance with the law."

199.    The U.S. Constitution requires a decennial "actual Enumeration" of the population for purposes of apportionment. U.S. Const. art. I, § 2, cl. 3.

200.    As alleged above, Defendants' extensive use of statistical methods in conducting the 2020 Census and producing the results violated the constitutional mandate to conduct an "actual Enumeration" because Defendants' unprecedented use of statistical methods rose to the level of substituting for enumeration.

---

[5] Plaintiffs maintain that claims under Pub. L. No. 105-119, § 209 are a form of special statutory review proceeding under 5 U.S.C. § 703 and are therefore APA claims. *See* Pub. L. No. 105-119, § 209 (discussing "final agency action"); 5 USC § 704 (making final agency action reviewable under the APA). To the extent the Panel disagrees, Plaintiffs bring standalone APA claims in the alternative.

201.   The 2020 Census Operational Plan 5.0 is final agency action and reviewable by this Panel. Pub. L. No. 105-119, § 209(c)(2).

202.   By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the 2020 Census apportionment data and tabulation as reported to the President, *see* 13 U.S.C. §141(b) violated Article I, § 2 of the U.S. Constitution.

203.   Plaintiffs are also entitled to mandatory relief that obligates the Defendants to correct the 2020 apportionment data and tabulation to account for the 18.8 million omissions by means of direct contact and, accordingly, update the P.L. 94-171 redistricting data and redistribute that data to the states.

## COUNT IV
*Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)*
*(Use of statistical methods was contrary to 13 U.S.C. § 141(a))*

204.   Plaintiffs reallege their allegations contained in paragraphs 0–181 as set forth herein.

205.   Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law" or "in excess of statutory jurisdiction." 5 U.S.C. § 706(2)(A), (C).

206.   Defendants' extensive use of imputation was contrary to law and in excess of statutory limitations.

207.   The Secretary's extensive reliance upon imputation in producing the apportionment results and tabulation of total population to the President went beyond the Secretary's authority in 13 U.S.C. § 141(a) and was unlawful.

208.   By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the Secretary exceeded his authority under 13 U.S.C. 141(a) and that the 2020 Census apportionment data and tabulation as reported to the President, *see* 13 U.S.C. §141(b), are inaccurate.

209.   Plaintiffs are also entitled to mandatory relief that obligates the Defendants to correct the 2020 apportionment data and tabulation to account for the 18.8 million omissions by means of direct contact and, accordingly, update the P.L. 94-171 redistricting data and redistribute that data to the states.

### COUNT V
*Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A),
(C), (D) (Use of statistical methods was arbitrary and capricious)*

210.   Plaintiffs reallege their allegations contained in paragraphs 0–181 as set forth herein.

211.   Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A).

212.   The decision of Defendants to use imputation to the extent that they did when faced with unprecedented gaps in data due to the COVID-19

pandemic was arbitrary and capricious and violated the reason-giving require-ments of the APA. 5 U.S.C. § 706.

213.   Defendants' use of imputation altered the actual enumeration by adding to and subtracting from population counts based on statistical inference rather than an actual enumeration. Pub. L. No. 105-119, § 209(h)(1).

214.   This decision was arbitrary and capricious.

215.   The 2020 Census Operational Plan 5.0 is final agency action and reviewable by this Panel. Pub. L. No. 105-119, § 209(c)(2).

216.   By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment that the Defendants' actions were arbitrary and capricious under 13 U.S.C. 141(a) and that the 2020 Census apportionment data and tabulation as reported to the President, *see* 13 U.S.C. §141(b), are inaccurate.

217.   Plaintiffs are also entitled to mandatory relief that obligates the Defendants to correct the 2020 apportionment data and tabulation to account for the 18.8 million omissions by means of direct contact and, accordingly, up-date the P.L. 94-171 redistricting data and redistribute that data to the states.

## DEMAND FOR A THREE-JUDGE PANEL

**WHEREFORE**, Plaintiffs demand judgment against Defendants HOW-
ARD LUTNICK, GEORGE COOK, and THE UNITED STATES OF AMERICA
as follows:

(a) Convene a three-judge district court pursuant to Pub. L. No. 105-119,
§ 209(e)(1) and 28 U.S.C. § 2284;

(b) Issue a declaratory judgment that:

    1. The apportionment tabulation of total population transmitted to
the President following the 2020 decennial census was produced
unlawfully using statistical methods and therefore violated the
Constitution and federal law;

    2. The Pub. L. No. 94-171 redistricting data files delivered to the
states from the 2020 decennial census were unlawfully produced
using statistical methods and thereby violated the Constitution
and federal law;

    3. The 2020 Census apportionment violates the U.S. Constitution
and federal law;

(c) Issue mandatory relief:

    1. Obligating Defendants to prepare and send to the President cor-
rected or supplemental apportionment data and tabulation that
excludes population data that was substituted with results

derived primarily from statistical methods and is otherwise a constitutionally compliant actual enumeration.

2. Obligating Defendants to prepare and publish a corrected or supplemental Pub. L. No. 94-171 redistricting file dataset for the 2020 Census that excludes population data that was substituted with results derived primarily from statistical methods and is otherwise a constitutionally compliant actual enumeration.

(d) Award Plaintiffs' costs and attorneys' fees as appropriate; and

(e) Grant such other and further relief as this Court deems just and proper.

DATED: February 17, 2026                    Respectfully submitted,

*/s/ Emily Percival*
James K. Rogers (AZ Bar No. 027287)*      R. Quincy Bird (FBN 105746)
Emily Percival (FBN 119313)                Timothy W. Weber (FBN 86789)
Ryan Giannetti (DC Bar No. 1613384)*       Jeremy D. Bailie (FBN 118558)
Crystal Clanton (AL Bar No. 1746D29O)*     **Weber, Crabb & Wein, P.A.**
William Scolinos (DC Bar No. 90023488)*    5453 Central Avenue
Robert A. Crossin (IN Bar No. 39340-49)*   St. Petersburg, FL 33710
Alice Kass (MD Bar No. 2511201130)†        Telephone: (727) 828-9919
**America First Legal Foundation**         Facsimile: (727) 828-9924
611 Pennsylvania Ave., SE #231             timothy.weber@webercrabb.com
Washington, D.C. 20003                     jeremy.bailie@webercrabb.com
Phone: (202) 964-3721                      quincy.bird@webercrabb.com
james.rogers@aflegal.org                   Secondary:
emily.percival@aflegal.org                 lisa.willis@webercrabb.com
ryan.giannetti@aflegal.org                 honey.rechtin@webercrabb.com
crystal.clanton@aflegal.org                natalie.deacon@webercrabb.com
william.scolinos@aflegal.org

bobby.crossin@aflegal.org
alice.kass@aflegal.org

*Admitted *pro hac vice*

† *Pro hac vice* application forth-coming

*Counsel to Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

*/s/ Emily Percival*