UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>HOWARD W. LUTNICK, et al.,<br><br>    Defendants. | No. 8:25-cv-02486-WFJ-SDM-RSR |

**INTERVENORS' MOTION TO DISMISS
PLAINTIFFS' THIRD AMENDED COMPLAINT**

Plaintiffs' Third Amended Complaint substantially changes their legal theory in this case, but it does not solve any of the fundamental problems with Plaintiffs' claims. Plaintiffs still lack standing, because they still do not allege facts showing that the census methods they challenge—now, a broader set of imputation methods—reduced Florida's population count relative to other states', and they still do not show any concrete informational injury.

Plaintiffs' claims are still time-barred, because they accrued in 2021 when census results were released. Plaintiffs' efforts to invoke the Administrative Procedure Act ("APA") to get a longer limitations period fail, because Section 209 provides an "other adequate remedy" that precludes resort to the APA. 5 U.S.C. § 704. And Plaintiffs' extraordinary effort to demand a new census that would require all 50 states to draw new congressional districts more than halfway through the decennial cycle would be barred by laches in any event.

Finally, Plaintiffs' claims still fail on the merits, because *Utah v. Evans* remains controlling precedent holding that imputation does not violate the Census Clause of the U.S. Constitution as long as it is used to fill in missing data after attempting an "actual enumeration," which is all that Plaintiffs allege happened here. 536 U.S. 452, 478–79 (2002).

Plaintiffs have had three bites at the apple. The Court should dismiss with prejudice. *See Tuten v. Nocco*, No. 8:21-cv-2397-WFJ-AAS, 2023 WL

1

5016553, at \*4 (M.D. Fla. Aug. 7, 2023) (citing *Woldeab v. Dekalb Cnty. Bd. of Educ.*, 885 F.3d 1289, 1291 (11th Cir. 2018)).

## BACKGROUND

Plaintiffs challenge the alleged "extensive use" of "statistical methods" during the 2020 U.S. Census, which they claim "resulted in inaccurate population counts in certain States, particularly Florida." Third Amended Complaint, Doc. 88 ("TAC"), ¶¶ 2–3. Plaintiffs allege that "the COVID-19 pandemic" disrupted the Census Bureau's plans for the 2020 Census and led the Bureau to resort to various forms of imputation—"a statistical technique used to fill in missing information." *Id.* ¶¶ 48–62, 70 (citation omitted).

This is a change from Plaintiffs' prior Second Amended Complaint ("SAC"), which focused on only one form of imputation—Group Quarters Imputation—along with a wholly unrelated method, Differential Privacy. The Court dismissed the SAC because Plaintiffs' claims under Section 209 of Pub. L. No. 105-119, 111 Stat. 2440, 2481 (1997) ("Section 209"), were time-barred by 28 U.S.C. § 1658(a)'s default "four-year statute of limitations" on "civil action[s] arising under an act of Congress enacted after December 1, 1990." ECF No. 84 at 10. The Court explained that "Plaintiffs don't argue that a different statute of limitations" governs, and that Plaintiffs' claims accrued by either "April 26, 2021, when the Census Bureau released its counts that had used those" procedures or at the latest "August 12, 2021, [when] the Census

2

Bureau publicly released its more granular redistricting data." *Id.* at 10, 12–13. The Court accordingly dismissed the SAC but granted leave to amend.

Plaintiffs then filed the TAC, which drops any challenge to Differential Privacy or to the processes for the 2030 Census, but broadens the challenge to imputation in the 2020 Census to cover *all* imputation methods, not just Group Quarters Imputation. Plaintiffs allege that the Bureau used "three main types of imputation" during the 2020 Census: "(1) assignment; (2) allocation; and (3) substitution." TAC ¶ 72. "Assignment," according to Plaintiffs, consisted of determining missing response values for a person "based on other information provided for that same person or household." *Id.* ¶ 73 (citation omitted). "Allocation" consisted of determining missing values by "allocati[ng]" data "from another person within the housing unit (HU) or group quarter (GQ) or from a nearby HU/GQ." *Id.* ¶ 75 (citation omitted). "Substitution"—which Plaintiffs admit was applied only where "characteristics for every person in [a] HU [were] missing"—consisted of "us[ing] data from a nearby HU to represent the missing people." *Id.* ¶¶ 76–77 (citation modified).

The TAC argues that these imputation methods: (1) violated the requirement in Article I, Section 2 of the U.S. Constitution to conduct an "actual enumeration," TAC ¶ 185–90; and (2) exceeded the Commerce Secretary's authority under 13 U.S.C. § 141(a), which empowers the Secretary to take the census "in such form and content as he may determine, including

the use of sampling procedures and special surveys," *id.* ¶ 193. Based on these alleged legal violations, the TAC brings claims under Section 209 and the APA.

## LEGAL STANDARD

In deciding a facial attack on subject matter jurisdiction, the Court takes the Complaint's non-conclusory factual allegations as true and asks whether they "sufficiently allege[] a basis of subject matter jurisdiction." *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232–33 (11th Cir. 2008) (per curiam) (citation omitted); *City of Pembroke Pines v. FEMA*, 510 F. Supp. 3d 1126, 1136 (S.D. Fla. 2021). A similar standard applies to a motion to dismiss for failure to state a claim: the Court considers "[t]he alleged facts, . . . stripped of all legal conclusions," and asks whether they "make a claim for relief not merely *possible*, but *plausible*." *Turner v. Williams*, 65 F.4th 564, 577 (11th Cir. 2023).

## ARGUMENT

### I. Plaintiffs lack standing.

To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024). Plaintiffs claim Article III standing based on three forms of purported injury, but none is adequately pleaded.

4

### A. Plaintiffs do not allege facts showing that the challenged imputation methods reduced Florida's population compared to other states'.

Plaintiffs' principal allegations of harm—loss of a seat in Congress and loss of federal funding—both arise from a purported "3.48% undercount" of Florida's population in the 2020 Census, which Plaintiffs say reduced Florida's population relative to other states' populations, and therefore cost Florida a House seat and reduced its share of federal funds. TAC ¶¶ 4, 115, 143, 144. But Plaintiffs entirely fail to allege facts linking the imputation methods they challenge to this undercount or otherwise showing that the use of imputation reduced Florida's population relative to other states' populations, as would be necessary for imputation to have caused the alleged harms and for a judicial order prohibiting imputation to redress them. *See Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (explaining that causation and redressability "often travel together").

The basic problem is that, as Plaintiffs admit, the post-enumeration survey on which the alleged 3.48% undercount is based "cannot answer why a particular state may have experienced an undercount." TAC ¶ 93 (alteration and citation omitted). The bare fact of an alleged undercount does nothing to show that it was caused by imputation, rather than by other factors such as lower relative response rates or the COVID-19 pandemic which, as Plaintiffs allege at great length, made taking the 2020 Census unusually difficult. *Id.*

¶¶ 48–62 (COVID-19); *id.* ¶ 167 (citing Fla. Chamber of Com., *Florida is Missing Billions of Dollars: The Cost of the 2020 Census Undercount by County*, https://perma.cc/BY6DZ85U (last visited Mar. 27, 2026)).

In fact, as Plaintiffs' allegations make clear, imputation only *increased* Florida's population count, and therefore necessarily *reduced* any undercount, by adding population for housing units that did not respond to census enumeration efforts. TAC ¶ 79. Without imputation, Florida's undercount would therefore have been worse, not better. And Plaintiffs cite no facts showing that more population was added in other states by imputation than in Florida, as would be necessary for imputation to have reduced Florida's population relative to other states' and potentially reduce its congressional representation and share of federal funds. Indeed, one of the challenged practices—"Group Quarters Imputation," *added* a total of 16,500 residents to Florida's population count, the second-most of any state.[1] Plaintiffs' allegation

---

[1] *See* U.S. Census Bureau, *Results from the 2020 Census Group Quarters Count Imputation* 20–22 (2023), https://perma.cc/3XSK-J5XH (attached as Ex. 26 to Plaintiffs' Motion for Summary Judgment, Doc. 50-27). This document is subject to judicial notice as a matter of public record. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999); *Whitaker v. Miami-Dade County*, 126 F. Supp. 3d 1313, 1322 n.3 (S.D. Fla. 2015) (taking judicial notice of U.S. Census figures); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1301 n.21 (S.D. Fla. 2002) (taking judicial notice of U.S. Census forms); *Sims v. Baggett*, 247 F. Supp. 96, 108 (M.D. Ala. 1965) (per curiam) (taking judicial notice of census reports showing the racial composition of particular counties).

that Florida would have gained population relative to other states had the Bureau conducted the Census without imputation is thus wholly speculative.

Plaintiffs therefore have not plausibly alleged facts showing that Florida would receive "an additional Representative if [census data] had been [collected] using some other source of 'more accurate' data." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion). At best, "they can do no more than speculate as to which states might gain and which might lose representation" in the absence of the challenged statistical procedures. *Fed'n. for Am. Immigr. Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980); *see also Citizens for Const. Integrity v. Census Bureau*, 669 F. Supp. 3d 28, 23 (D.D.C. 2023) ("[T]o have standing . . . plaintiffs alleging vote dilution injuries must show that their states would have had an additional representative but for the government's error."), *aff'd*, 115 F.4th 618 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2818 (2025). As a result, "none of the plaintiffs are able to allege that the weight of [their] vote" was affected by the Bureau's use of imputation in 2020. *Klutznick*, 486 F. Supp. at 570.[2] And the same is true of Plaintiffs' claim that they lost federal funds as a result of the undercount.

---

[2] Plaintiffs no longer allege that their particular districts are overpopulated relative to other districts in Florida. They allege only that "[t]*he loss of a House seat* necessarily means that Florida Plaintiffs vote in larger congressional districts, thereby having their votes diluted." TAC¶ 147 (emphasis added).

## B. Plaintiffs do not allege any informational injury.

Plaintiffs also fail to allege facts showing that Representative Donalds suffered an "informational injury" because he was deprived of "accurate data." TAC ¶ 184. "[A]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020). Instead, to assert such an injury, a plaintiff must allege "downstream consequences" from being deprived of accurate information. *Id.*; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (same). Thus, a plaintiff who fails to allege that he "took [] or failed to take *any action* because of" the purported deprivation of information lacks standing. *Frank v. Autovest, LLC*, 961 F.3d 1185, 1188 (D.C. Cir. 2020); *see also Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 338 (7th Cir. 2019) (alleged informational injury did not confer standing on plaintiff who failed to "allege that she would have used the information at all"; "the bare harm of receiving inaccurate or incomplete information" was insufficient).

At the outset, Plaintiffs make no allegations to show that the use of imputation negatively affected the accuracy of 2020 census data, as would be necessary for there to be any informational injury from imputation. The Census Bureau uses imputation only "as a last resort" because it is "more accurate than leaving the gaps blank." ECF No. 50-22 at 3. As a result, the alternative to imputation is not greater accuracy but lesser accuracy:

8

prohibiting imputation would require the Census Bureau to "disregard the information" it has and to "us[e] a figure of zero" instead, leading to "a far less accurate assessment of the population." *Evans*, 536 U.S. at 478–79. Plaintiffs allege no facts to suggest that this analysis from the Supreme Court is not fully applicable here. Rather, their contention seems to be that the data is "inaccurate" simply because it was obtained using allegedly unlawful methods. But that is just another way of saying they were injured because "the law . . . has not been followed." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). "[A]n injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427.

Even aside from that issue, however, the TAC fails to identify *any* concrete harm Rep. Donalds suffered from allegedly being deprived of accurate census data. Rep. Donalds claims vaguely that inaccurate census data has hindered his ability to "cast votes concerning the HUBZone small business program," and that he "engages with [census data] in informing his vote" on "competitive grants [that] rely upon census data." TAC ¶¶ 179–80. But the TAC does not identify a single instance—including his vote on the HUBZone small business program—where alleged inaccuracies in the census data concretely affected his vote. Nor does he even explain in theory how his vote for or against a program that uses census data for funding allocations might depend on this information. The TAC never says how, in an alternative

9

universe in which the Census Bureau had not applied imputation, Rep. Donalds's consideration of vote on the HUBZone program and competitive grants would have differed in any respect. Because Rep. Donalds remains unable to identify a single instance where the challenged methods impacted his capacity to effectively vote, introduce legislation, or exercise oversight, he has failed to allege a concrete, redressable injury traceable to the challenged actions.

Similarly, Rep. Donalds alleges that he advises his constituents on "local funding programs, such as SNAP, certain Medicare and Medicaid programs, and FEMA monies, [that] are dependent on census data to set eligibility requirements." *Id.* ¶¶ 181–83. Even if eligibility for funding programs is altered by inaccurate census data, Rep. Donalds has not articulated how this influences the advice he gives to his constituents. Such conclusory allegations are not enough to show Article III standing; to survive even a facial attack, Plaintiffs must advance "a sufficient amount of *non-conclusory allegations*" showing that Rep. Donalds suffered an injury-in-fact. *Tomelleri v. Natale*, No. 19-CV-81080, 2020 WL 5887151, at *2 (S.D. Fla. July 16, 2020) (emphasis added). They have failed to do so.

Finally, even if Rep. Donalds was injured in his legislative capacity by inaccurate census data, his injury would be shared by every member of Congress. It is thus an "institutional injury" that is "wholly abstract and widely

10

dispersed." *Raines v. Byrd*, 521 U.S. 811, 829 (1997). Although "there is some authority . . . indicating that a *House of Congress* or a committee of Congress would have standing to sue to retrieve information to which it is entitled," Rep. Donalds is but a single member of the House. *Walker v. Cheney*, 230 F. Supp. 2d 51, 68 (D.D.C. 2002) (emphasis added); *see also id.* ("[I]t is of 'some importance' that, like the plaintiffs in *Raines*, the [plaintiff] here has not been expressly authorized by Congress to represent its interests in this lawsuit."); *cf. McGrain v. Daugherty*, 273 U.S. 135 (1927) (upholding congressional subpoena enforcement).[3]

## II.    The existence of the Section 209 cause of action precludes Plaintiffs' APA claims.

In an effort to evade the Court's ruling that their claims under Section 209 are time-barred, Plaintiffs attempt to replead them under the APA, and to add the United States as a defendant. But this effort must fail, because APA claims are available *only* if "there is no other adequate remedy in a court." 5 U.S.C. § 704; *see, e.g.*, *Harris v. DHS*, 18 F. Supp. 3d 1349, 1359–60 (S.D. Fla. 2014) ("[T]he APA does not provide an independent basis for judicial review where such judicial review is already provided for by a different statutory

---

[3] That Congress created a *cause of action* for Rep. Donalds under Section 209 is not the same as authorizing him to "represent" Congress in this case. *Raines*, 521 U.S. at 829. Congress cannot confer Article III standing merely by creating a cause of action. *TransUnion*, 594 U.S. at 426.

11

provision."); *Coggins v. United States*, 860 F. Supp. 845, 848 (M.D. Ga. 1994) ("A statute precludes judicial review under the APA if it offers another avenue of judicial relief from the agency . . . ."), *aff'd*, 53 F.3d 1287 (11th Cir. 1995).

As a result of this limitation, Plaintiffs cannot "exploit[] the APA's waiver [of sovereign immunity] to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). Nor can they use the APA to "duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (citation omitted). Rather, if Congress has offered litigants some other remedial scheme for their alleged injury that can "offer the same genre of relief," *Mize v. Pompeo*, 482 F. Supp. 3d 1317, 1343 (N.D. Ga. 2020) (citation modified), its existence is "the end of the matter"—no APA claim can be brought. *Patchak*, 567 U.S. 209 at 216 (citation omitted).

Here, Plaintiffs' resort to the APA is barred by Congress's creation of a specific cause of action in Section 209 for those "aggrieved by the use of any statistical method in violation of the Constitution or any provision of law (other than this Act)." Act of Nov. 26, 1997, Pub. L. No. 105-119, §209(b), 111 Stat. 2440, 2481 [hereinafter "Pub. L. No. 105-119"]. Plaintiffs expressly allege that their legal claims are "cognizable under section 209," and that Plaintiffs are "aggrieved persons" within the meaning of that statute. TAC ¶¶ 5, 7. And Plaintiffs' TAC focuses throughout on the "extensive use of statistical methods"

12

in the 2020 Census, *id.* ¶ 3—the precise claim that Section 209 was created to adjudicate.

Plaintiffs point to Section 209(c)(2)'s provision that "the Census 2000 Operational Plan shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census" to argue that Congress meant Section 209 suits to be brought under the APA. TAC ¶ 6. But that provision merely obviates any prudential (but not jurisdictional) ripeness concerns that might otherwise prevent a court from reaching the merits of the question. *See Glavin v. Clinton*, 19 F. Supp. 2d 543, 547 (E.D. Va. 1998); *see also Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999) ("[T]he District Court below correctly found that the case is ripe for review . . . ."). It does not mean that claims under Section 209—which says nothing about the APA while itself expressly creating a cause of action—are really brought under the APA. No doubt for that reason, courts adjudicating Section 209 claims have never suggested that the APA is relevant to the analysis. *E.g.*, *Dep't of Com.*, 525 U.S. at 326–27.

Holding otherwise, or allowing claims under the APA as an alternative to Section 209 clams, would eviscerate important parts of the Section 209 cause of action, including: (1) the "aggrieved person" requirement; (2) the three-judge panel requirement; (3) the statute's expedited review provision; (4) the statute's allowance for direct appeal to the U.S. Supreme Court; and (5) the

13

prohibition on stays issued by a single Justice. *See* TAC ¶¶ 23, 26. Plaintiffs invoke many of those features of Section 209 in the TAC, and they cannot have it both ways by simultaneously claiming the benefits of a longer statute of limitations under the APA.

Because Section 209 provides an "other adequate remedy" for challenges to the use of statistical methods in the U.S. Census, Plaintiffs may not recast their time-barred Section 209 claims as APA claims.

## III.    Plaintiffs' claims are untimely

### A. Plaintiffs' claims are time barred.

As this Court has already held, Plaintiffs' claims under Section 209 are time barred by 28 U.S.C. § 1658's four-year limitations period for causes of action created since 1990. ECF No. 84. Plaintiffs' attempt to circumvent that holding by adding the United States as a defendant and invoking the six-year statute of limitations under 28 U.S.C. § 2401(a) fails, for two reasons.

First, Section 1658's four-year limitations period governs over Section 2401(a)'s longer, six-year period. Section 2401(a) "applies generally to suits against the United States unless the timing provision of a more specific statute displaces it." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024). Section 2401(a) provides that each "civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Unlike other statutes of

14

limitations, § 2401(a) "is a jurisdictional condition attached to the government's waiver of sovereign immunity, and as such must be strictly construed." *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006) (citation omitted).

Unlike § 2401(a)—which applies to every suit against the United States—§ 1658(a) applies *only* to suits "arising under an Act of Congress enacted after" December 1, 1990. Thus, § 1658(a) applies to a much narrower class of claims than § 2401(a), so it controls as "more specific." *See* Order, *Otoe-Missouria Tribe of Okla. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 5:08-cv-1297-F (W.D. Okla. Feb. 13, 2014), ECF No. 64 (concluding that the more specific § 1658(a) governs over § 2401(a)). Other courts have reached similar conclusions with respect to other specific statutes of limitations. *See Save Our Skies LA v. Fed. Aviation Admin.*, 50 F.4th 854, 865 (9th Cir. 2022) (holding that six-year statute of limitations in § 2401 was displaced by more specific statute); *Cal. Coastkeeper All. v. Cosumnes Corp.*, No. 2:20-CV-1703 SCR, 2024 WL 4819208, at *11 (E.D. Cal. Nov. 18, 2024) (same); *Myszkowski v. U.S. Gov't*, 553 F. Supp. 66, 67 (N.D. Ill. 1982) (two-year limit in § 2401(b), which dealt "specifically with tort claims," overrode six-year limit in § 2401(a)); *Baker Cnty. Med. Servs., Inc. v. Summit Smith L.L.C.*, No. 305-CV-541-J-33HTS, 2008 WL 2245587, at *14 (M.D. Fla. May 29, 2008) (more specific statute of limitations that "applies to a very specific class of a cause of action [sic]" governed, rather

15

than statute "dealing with a broad class of claims"); *Kasterowicz v. Walgreen Co.*, No. 2:14-CV-68-FTM-29, 2014 WL 1779262, at \*1–2 (M.D. Fla. May 5, 2014) (similar), *aff'd*, 597 F. App'x 560 (11th Cir. 2014). As the Southern District of New York has observed, "[i]t would indeed be anomalous to hold . . . that a federal catch-all provision governs . . . when there are available other relevant statutory provisions more specifically geared to the claim brought." *Coleman v. Nolan*, 693 F. Supp. 1544, 1548 (S.D.N.Y. 1988) (rejecting argument that § 2401(a) applied over a shorter, more specific time period).

This makes sense. Section 2401(a) is a limited waiver of the United States's sovereign immunity that "must be strictly construed." *Ctr. for Biological Diversity*, 453 F.3d at 1334 (citation omitted). To apply § 2401(a) over § 1658(a) would *extend* the timeframe to bring claims and thus *expand*— not limit—the United States's liability to suit. Such a result would be incongruous with § 2401(a)'s purpose of "set[ting] an *outside time limit* on suits against the United States." *Price v. Bernanke*, 470 F.3d 384, 388 (D.C. Cir. 2006) (emphasis added); *Lavery v. Marsh*, 918 F.2d 1022, 1026 (1st Cir. 1990) (similar). Here, there is a "more specific statute" that displaces § 2401(a): § 1658(a).

Second, Plaintiffs appear to contend only that Section 2401(a) governs their APA claims and their claims against the United States itself. TAC ¶ 20. In response to Intervenors' Motion to Dismiss the SAC, Plaintiffs did not

16

dispute that 28 U.S.C. § 1658(a) provides the applicable limitations period for Section 209 claims against the official capacity defendants. *See* ECF No. 84 at 10 (commenting that "Plaintiffs don't argue that a different statute of limitations displaces Section 1658's four-year default"). As explained in the prior section, however, the APA claims are precluded by the Section 209 cause of action, and Plaintiffs therefore cannot benefit from the APA's sovereign immunity waiver to sue the United States. The only potentially viable claims are therefore Plaintiffs' Section 209 claims against the official capacity defendants, which were the subject of the Court's prior order, and which the Court already held—absent any contrary argument from Plaintiffs—are subject to Section 1658's four-year period.

There is no reason for the Court to revisit that analysis and give Plaintiffs a second bite at the apple. But to the extent Plaintiffs may now argue that even non-APA suits against federal officials in their official capacity are treated as suits against the United States and are therefore subject to 28 U.S.C. § 2401, that is true only where sovereign immunity has been waived over the relevant claims. *See Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985) (citing 5 U.S.C. § 702). Here, as just explained, the APA's sovereign immunity waiver does not apply, so Plaintiffs' claims against the official capacity defendants cannot be "an 'action . . . against the United States'" but rather must proceed against the defendants individually on the theory that the

17

defendants acted *ultra vires* by violating the law. *See id.* at 1307 (alteration in original); *cf. Ex parte Young*, 209 U.S. 123 (1908). And because these claims are therefore not brought against the United States, Section 2401 does not apply to them.

Because, as the Court has already found, any alleged violation of Plaintiffs' rights occurred no later than August 2021, Mot. at 12–13, their claims under Section 209 are barred by the four-year statute of limitations in 28 U.S.C. § 1658.

### B. Plaintiffs' claims are barred by laches.

Even if Plaintiffs' claims would otherwise be timely, they would still be barred by laches. Under the doctrine of laches, a "defendant must show: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that the delay caused defendant undue prejudice." *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1546 (11th Cir. 1984) (internal quotation marks and citation omitted). And while laches does not bar legal relief for a claim brought within the relevant limitations period, it may still bar equitable relief in "extraordinary circumstances." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014). Each of those requirements is met here.

As for delay, the Court has already held that Plaintiffs were on notice of their claims by no later than August 2021, yet they waited more than four years to bring their case. ECF No. 84 at 13. That delay is substantial and

18

inexcusable. *See Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999) (laches barred gerrymandering claim when "Plaintiffs delayed bringing this action for at least five years" after learning of the alleged violation), *aff'd sub nom. Chandler v. Harris*, 529 U.S. 1084 (2000); *Sanders v. Dooly County*, 245 F.3d 1289, 1290–91 (11th Cir. 2001) (per curiam) (plaintiffs challenging districting plan who waited "over six years after the first use of the plan" had exhibited "inexcusable delay" that barred their claim for injunctive relief).

Plaintiffs' delay has caused substantial prejudice. During the nearly five years while Plaintiffs have sat on the sidelines, 44 states have redrawn their congressional districts in reliance on the 2020 Census Report, all 50 states have redrawn state and local districts, and two federal elections have been held in the newly drawn districts—with another to be held this year. If Plaintiffs prevail, all of that work would have to be redone. *See Petrella*, 572 U.S. at 687 (laches may bar a claim where the plaintiff's undue delay would "work . . . unjust hardship on innocent third parties"); *Motley v. Taylor*, 451 F. Supp. 3d 1251, 1278 (M.D. Ala. 2020) (noting that expending government resources is a relevant factor to consider when assessing a laches defense).

Finally, extraordinary circumstances justify the application of laches here even if Plaintiffs' claims fall within the limitations period, because "the consequences of [Plaintiffs'] delay in commencing suit [are] of sufficient magnitude to warrant, at the very outset of the litigation, curtailment of the

19

relief *equitably* awardable." *Petrella*, 572 U.S. at 667 (emphasis added). Courts have applied this rule where allowing a belated but not time-barred claim would mandate the needless destruction of valuable property. *See Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 232, 236 (6th Cir. 2007) (holding it would be "inequitable" to mandate destruction of a housing project that used the plaintiffs' copyrighted architectural design based on a timely but delayed copyright suit) (cited in *Petrella*, 572 U.S. at 685–86); *New Era Publ'ns Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584–85 (2d Cir. 1989) (holding that laches barred injunctive relief that would have resulted in the "total destruction" of a book that had already been "printed, packed, and shipped") (cited in *Petrella*, 572 U.S. at 686); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 87–88 (D.D.C. 2017) (holding request to enjoin construction that was "days from completion" was barred by laches, though brought within statute of limitations).

The relief plaintiffs seek here—unwinding a census taken over five years ago and requiring the reconfiguration of nearly every congressional and legislative district in the country, after multiple federal elections have been held, members of Congress elected, redistricting lawsuits litigated, and much else—is "extraordinary" by that metric. The nationwide effects of such an order would be significantly more far-reaching and destabilizing than the injunctions sought in *Chirco*, *New Era*, or *Standing Rock*. And Plaintiffs brought their

20

claim years later than Utah did in *Evans*, where suit was filed the same year that census results were released. *See Utah v. Evans*, 182 F. Supp. 2d 1165 (D. Utah 2021), *aff'd*, 536 U.S. 452 (2002). Laches therefore bars relief even if Plaintiffs' claims are not time-barred.

## IV.   Plaintiffs' claims fail on the merits.

Plaintiffs' claims also fail on the merits. Plaintiffs allege that the Bureau's use of imputation in the 2020 Census violated Article I, Section 2 of the U.S. Constitution and 13 U.S.C. § 141(a).[4] But the Supreme Court already held in *Evans* that imputation does not violate the Constitution. And 13 U.S.C. § 141(a) is a *grant* of discretionary authority for the Secretary to use statistical methods in taking the census and imposes no substantive limitations on that authority.

### A. *Utah v. Evans* forecloses Plaintiffs' constitutional claims.

The Supreme Court's holding in *Evans* forecloses Plaintiffs' constitutional claim, which alleges that the Bureau violated the U.S. Constitution because it failed to conduct an "actual Enumeration" of the population that exclusively counted "whole persons." TAC ¶¶ 187–88. *Evans* squarely rejects the legal basis for this claim, holding that the "general word

---

[4] Procedural issues aside, Plaintiffs' APA claims rest on the same substantive legal arguments as their claims under Section 209, and therefore fail for the same reasons.

21

'enumeration' . . . refers to a counting process without describing the count's methodological details," and the Census Clause's reference to "'such Manner as' Congress itself 'shall by Law direct'" provides a "breadth of congressional methodological authority," not a limitation on that authority. 536 U.S. at 474. *Evans* therefore held that as long as the Census Bureau *tried* to reach each household and used imputation "only after it has exhausted its efforts to reach each individual," and did not "substitut[e] . . . statistical methods for efforts to reach households and enumerate each individual," there is no constitutional violation. *Id.* at 477.

That is precisely what happened here. Plaintiffs admit that imputation was used only "when very little information about the household or the people in the household was obtained from direct data collection efforts." TAC ¶ 82.[5] And the Bureau's "direct data collection" efforts were immense: the Bureau sought to contact every person and household in the country, often using multiple different approaches (e.g., by mail, internet, and in-person methods).[6]

---

[5] *See also* America Counts Staff, *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://perma.cc/B49T-E6HZ (cited throughout the TAC).

[6] *See* Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* 3 (2023), https://perma.cc/VQ2A-4R9K (cited throughout the TAC). Note that although Plaintiffs rely heavily on this resource to support their count-imputation allegations, it discusses only "[c]haracteristic imputation"—the imputation of

But despite the Bureau's best efforts, "some households [did not] respond even after the outreach efforts of nearly 400,000 partners across the country, a multilingual communications campaign, as well as a number of mailings and visits from census takers."[7] For such households, the Bureau used imputation "[a]s a last resort" rather than "leaving the gaps [in the data] blank."[8]

Plaintiffs' allegations do not establish that the Bureau failed to make "all efforts . . . to reach every household," *Evans*, 536 U.S. at 479. They allege the COVID-19 pandemic may have impacted response rates and delayed some of the Census Bureau's outreach, *see* TAC ¶¶ 84–87. But they do not say what the *Census Bureau* could have or should have done differently under the circumstances. Plaintiffs' core allegation that imputation was used more "extensively" than in past censuses, *id.* ¶ 88, is therefore irrelevant—what matters is that the Bureau *tried* to reach every household before resorting to imputation. And, in any event, Plaintiffs do not offer any judicially manageable standard for how much imputation is too much. Nor do they dispute that "the Bureau's only choice [was] to disregard the information it ha[d], using a figure

---

information about a person, such as their age and sex—and notes that "count imputation is not in scope." *Id.* at 1.

[7] *See* Pat Cantwell, *How We Complete the Census When Households or Group Quarters Don't Respond*, U.S. Census Bureau (Apr. 16, 2021), https://perma.cc/B5DK-BH2E (cited throughout the TAC).

[8] *Id.*

23

of zero, or to use imputation in an effort to achieve greater accuracy." *Evans*, 536 U.S. at 478. Under *Evans*, the Bureau did not act unconstitutionally in choosing accuracy. *Id.*

### B. Plaintiffs fail to state a claim under 13 U.S.C. § 141(a).

Plaintiffs also allege that the Bureau's "extensive reliance upon imputation . . . went beyond the [Bureau's] authority in 13 U.S.C. § 141(a) and was a clear abuse of discretion." TAC ¶ 193. That argument is a nonstarter. Nothing in § 141(a) limits the Bureau's use of imputation, or, for that matter, any alleged statistical method, in conducting the census. Just the opposite. The statute expressly says: "The Secretary shall[, every ten years,] take a decennial census of population . . . *in such form and content as he may determine, including the use of sampling procedures and special surveys*." 13 U.S.C. § 141(a) (emphasis added). Section 141(a) is a *delegation of authority* to the Bureau, not a restriction on the Bureau's discretion. *See Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (citing § 141(a), and noting that "[t]hrough the Census Act, Congress has delegated its broad authority over the census to the [Bureau]"); *Evans*, 536 U.S. at 472 (similarly noting that § 141(a) "delegates to the Secretary the authority to conduct the decennial census 'in such form and content as he may determine'"). Nothing in § 141(a) provides any substantive limitations on the Bureau's alleged use of statistical methods. *See Tucker v. U.S. Dep't of Com.*, 958 F.2d 1411, 1417 (7th Cir. 1992) (holding that § 141(a)

24

does not "create justiciable rights" because it "say[s] nothing about how to conduct a census or what to do about undercounts"). Rather, where Congress has sought to restrict the Bureau's methodologies, it has done so with other statutes—such as in 13 U.S.C. § 195, which precludes the use of "statistical sampling" "for purposes of apportionment of Representatives." Plaintiffs, however, no longer allege that Defendants violated Section 195, or any other limitation on the Bureau's authority.

### C. The use of imputation was not arbitrary and capricious.

Plaintiffs do not allege why or how the Bureau's use of imputation was "arbitrary and capricious." TAC ¶ 214. It was not: the decision was both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). As described above, the alternative would have been a *less* accurate Census. And the Bureau thoroughly explained its reasons in documents cited in the TAC. *See supra* note 7; TAC ¶¶ 48–62.

### CONCLUSION

The Court should dismiss the Third Amended Complaint with prejudice.

25

Dated: March 27, 2026

Respectfully submitted,

*/s/ David R. Fox*
David R. Fox* (Lead Counsel)
Richard A. Medina*
Max C. Accardi*
Tori Shaw*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW,
Suite 400
Washington, D.C.
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law
maccardi@elias.law
tshaw@elias.law

*/s/ Frederick S. Wermuth*
Frederick Wermuth
Fla. Bar No. 0184111
Quinn B. Ritter
Fla. Bar. 1018135
**KING, BLACKWELL, ZEHNDER
& WERMUTH, P.A.**
25 East Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
fwermuth@kbzlaw.com

*Special admission

## LOCAL RULE 3.01(g) CERTIFICATION

The undersigned certifies that counsel for the Intervenor Defendants conferred by email with counsel for the Plaintiffs and the Defendants regarding the motion to dismiss, that the parties do not agree on the resolution of the motion, and that the motion is opposed.

*/s/ Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar. No. 0184111

26

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2026, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

*/s/ Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar. No. 0184111

27