**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

|  |  |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, *et al.*, <br><br>     *Plaintiffs*, <br><br>     v. <br><br> HOWARD W. LUTNICK, Secretary of Commerce, *in his official capacity*, *et al.*, <br><br>     *Defendants*. | Case No. 8:25-cv-2486-WFJ-SDM-RSR |

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' THIRD AMENDED COMPLAINT**

Plaintiffs seek redress for alleged injuries they suffer due to a purported undercount of Florida's population in the 2020 Census through their claims under Pub. L. No. 105-119, § 209, and the Administrative Procedure Act ("APA"). But they filed this lawsuit years after the 2020 Census was completed, apportionment was finalized, state and local representatives selected, and any window for census-related challenges shut. As a result, Plaintiffs' claims are time-barred by laches and the applicable statute of limitations, and Plaintiffs lack Article III standing for failure of redressability. Further, Plaintiffs never identify a particular statistical method or technique employed during the 2020 Census, and instead make high-level allegations about the use of statistical imputation that do not meet the injury in fact requirements for standing. They also fail to plausibly link these general allegations about Census

Bureau imputation to their alleged injuries, and identify no final agency action under the APA. As a result, they do not allege facts that invoke this Court's Article III jurisdiction, nor have they plausibly alleged facts that state a claim for the extraordinary court-ordered relief that they seek. The Court should dismiss this case for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

## BACKGROUND

The U.S. Constitution requires that an "actual Enumeration" take place every ten years "in such manner as [the U.S. Congress] shall by law direct," U.S. CONST. art. I, § 2, cl. 3, to apportion representation in the U.S. House of Representatives among the states according to their populations. Pursuant to those provisions, Congress has directed the Secretary of Commerce to conduct a census, as of April 1, 1980, and every tenth year thereafter, "in such form and content as he may determine." 13 U.S.C. § 141(a). The Census Act further provides that the tabulation of population for congressional apportionment be completed within 9 months of the census and reported by the Secretary to the President. 13 U.S.C. § 141(b).

Under the Apportionment Act, the President then must transmit to Congress, during the first week of its next session, "a statement showing the whole number of persons in each State" (as ascertained under the decennial census just completed) "and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions." 2 U.S.C. § 2a(a). Within fifteen calendar days

2

after receipt of the President's statement, the Clerk of the House of Representatives must send to the Governor of each State "a certificate of the number of Representatives to which such State is entitled under this section." 2 U.S.C. § 2a(b).

Each decennial census is a vast undertaking, the planning and decision-making for which begins long before the enumeration, and Congress created the U.S. Bureau of the Census ("Bureau") within the Department of Commerce to aid the Secretary in this great responsibility. *See id.* §§ 2, 4. But despite the Bureau's comprehensive efforts to account for every person, "the Bureau has always failed to reach—and has thus failed to count—a portion of the population." *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 322 (1999); *see also Tucker v. U.S. Dep't of Com.*, 958 F.2d 1411, 1412 (7th Cir. 1992) ("The census takers try to account for everybody in America but of course they don't succeed."); *City of Detroit v. Franklin*, 4 F.3d 1367, 1371 (6th Cir. 1993) (similar). For the 2020 Census the Bureau faced unprecedented challenges due to the global COVID-19 pandemic and related lockdowns.

Statistical Imputation in the Census

During the decennial census, the Bureau seeks to learn key information about every household address in the United States, including (i) whether it is a real residence; (ii) whether it is occupied or vacant; (iii) how many people live there; and (iv) demographic characteristics about the people there, such as age, sex, and race. Pat Cantwell, U.S. Census Bureau, *How We Complete the Census When Households or Group Quarters Don't Respond* (Apr. 16, 2021, last revised Aug. 21, 2023) ("*How We Complete the Census*"), https://perma.cc/B5DK-BH2E (Plaintiffs cite *How We Complete the*

*Census* when referring to Defendants' use of imputation, *see* Compl. ¶ 69). Most households are accounted for in the initial data collection, but sometimes data is missing even after the Bureau follows up. *Id.* The missing data is often supplied by referencing other records, including prior census survey responses or tax return information. *Id.* If such administrative records are not available, the enumerators will visit the address again, and if the resident(s) remain nonresponsive, the enumerators obtain the information from someone else with knowledge, such as a neighbor or landlord. *Id.* Finally, and as a last resort, the Bureau sometimes uses a statistical technique called imputation to fill the remaining gaps in data. *Id.*

Imputation falls into two broad categories—(i) count imputation, which takes several forms and increases the population count for enumeration; and (ii) characteristic imputation, which fills in missing information about a household's characteristics, such as age, or race. *Id.* Unlike count imputation, characteristic imputation has no effect on the population count for enumeration. *See* Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* ("INR Report") 1 (2023), https://perma.cc/VQ2A-4R9K (noting that characteristic imputation is "applied after the household population is established;" Plaintiffs cite the INR Report extensively, *see* Compl. ¶¶ 70, 72–77, 84–87). Count imputation is used because filling in the missing data produces a more accurate census. *See How We Complete the Census* ("If we were to leave the count for an address blank after all attempts to obtain a response failed, it would be like assigning

4

a count of 0. This would be less accurate overall than imputing a number statistically, since we often have information that people are living there.").

Post-Census Analysis and Operational Planning

To provide data to improve future censuses, the Bureau uses many different tools and techniques to evaluate the quality of the census after census data are released. Since at least 1980, the Bureau has used variations of a Post-Enumeration Survey ("PES") as one method of measuring the accuracy of the census. *See* Shadie Khubba, Krista Heim & Jinhee Hong, U.S. Census Bureau, PES20-G-01, *National Census Coverage Estimates for People in the United States by Demographic Characteristics* 3 (2022) ("PES Coverage Estimates Report"), https://perma.cc/8RXP-PLQU (cited at Compl. ¶ 64). Notably, the PES does not conduct a full, second census to actually re-enumerate the populace. Instead, the PES surveys a sample of the population based on information obtained from only a select sample of housing units. *See* PES Coverage Estimates Report at 1. And the Bureau uses several statistical methods to produce the PES. *See, e.g.*, PES Coverage Estimates Report at 3; Timothy Kennel, U.S. Census Bureau, *2020 Post-Enumeration Survey: Defining Whole-Person Census Imputations* 1–4 (2023) ("PES Whole-Person Imputation Report"), https://perma.cc/33NM-SLA9 (cited at Compl. ¶ 79).

Consistent with its iterative approach to planning for the decennial census, the Bureau issued multiple versions of its 2020 Operational Plan during the pre-enumeration planning phase, which described the Bureau's design choices for conducting the 2020 Census, including the methodologies and procedures it would

employ, and plans for innovation. *See, e.g.*, U.S. Census Bureau, *2020 Census Operational Plan Version 1.1* (Nov. 2015), https://perma.cc/L3AC-6GG8.[1]

After the 2020 Census was completed, however, the Bureau issued Operational Plan Version 5.0 ("5.0 Plan"). *See* Compl. ¶ 48, (citing U.S. Census Bureau, *2020 Census Operational Plan Version 5.0* 221 (2022), https://perma.cc/8XX6-YA5F). Unlike earlier versions, the 5.0 Plan does not proscribe how the Bureau will conduct the census. Instead, describes the operations and underlying research supporting any adjustments that occurred during enumeration. Particularly, the 5.0 Plan addresses the way the Bureau responded to the COVID-19 pandemic. *See* 5.0 Plan at 96–173 (discussing, *inter alia*, the ways in which COVID-19 affected the response data).

Procedural History

Nearly five years after the 2020 Census, on September 15, 2025, Plaintiffs filed their Complaint. ECF No. 1. Intervenor-Defendants filed their Motion to Intervene a few weeks later, ECF No. 29, which the Court granted, ECF No. 55. On November 12, Plaintiffs filed their Second Amended Complaint, adding Congressman Donalds as a Plaintiff, and raising constitutional and statutory claims, including Pub. L. No. 105-119, § 209,[2] to challenge Defendants' use of two specific statistical methods in the

---

[1] The Court may take judicial notice of the existence of this plan, which is an earlier version in a series that includes the 5.0 Plan, a document that is central to the Complaint. *See* Compl. ¶¶ 48, 50–62, 201, 215. The starting point for this analysis is Fed. R. Evid. 201. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999). Rule 201 permits a district court to take judicial notice under certain circumstances, including when the fact at issue is not subject to reasonable doubt. Fed. R. Evid. 201(b)(2). The existence of the 1.1 Plan cannot reasonably be questioned—it is posted to the Bureau's website. Plaintiffs' discussion of the 5.0 Plan also brings the earlier version within the Court's notice.

[2] Department of Commerce, Justice, & State, the Judiciary, & Related Agencies Appropriations Act, 1998, Pub. L. 105-119, § 209(e)(2)[MC26.1], 111 Stat. 2440, 2482 (1997) ("Pub. L. No. 105-119")

2020 Census. *See* ECF No. 43. Shortly thereafter, Plaintiffs filed their Motion for Summary Judgment, ECF No. 50, which Defendants and Intervenor-Defendants opposed, ECF No. 69, ECF No. 71. In the interim, Intervenor-Defendants also moved to dismiss the Second Amended Complaint, ECF No. 60, which Plaintiffs opposed, ECF No. 65.

On February 3, 2026, this Court entered its Opinion & Order, ECF No. 84, in which it granted Intervenor-Defendants' Motion to Dismiss, ECF No. 60, dismissed the Second Amended Complaint without prejudice and with leave to amend, and denied Defendants' Motion for Summary Judgment as moot. The Court determined that Plaintiffs' claims were time barred by the four-year statute of limitations in 28 U.S.C. § 1658. ECF No. 84 at 10, 19. Plaintiffs then filed the Third Amended Complaint (hereinafter, "Complaint") on February 17, 2026, asserting claims about Defendants' general use of "statistics" in the 2020 Census under both Pub. L. No. 105-119, § 209, and the APA. ECF No. 88.

## LEGAL STANDARD

When "a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Under Rule 12(b)(1), when defendants "[f]acial[ly] attack[]" the Court's subject-matter jurisdiction, the Court must "look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his Complaint are taken as true for the purposes of the motion." *Lawrence v. Dunbar*, 919

F.2d 1525, 1528–29 (11th Cir. 1990) (last alteration in the original) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

Under Rule 12(b)(6), the Court must "accept[] the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). That said, "[c]onclusory allegations, [and] unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262–63 (11th Cir. 2004) (citation omitted). Rather, to avoid dismissal, the "Complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A Complaint is plausible on its face when it contains sufficient facts to support a reasonable inference that the defendant is liable for the misconduct alleged." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018).

## ARGUMENT

No matter how much they amend their Complaint, Plaintiffs cannot solve the basic problem that it was filed years after the 2020 Census. Reframing their challenges as APA claims does nothing to fix their laches and statute of limitations problems.

Plaintiffs' latest Complaint likewise remains at war with itself. Their core claim is that Defendants undercounted Florida in the 2020 Census by overusing statistical methods, which caused various injuries, including vote dilution, loss of federal funding, and informational injury. However, they allege no facts to plausibly link any statistical methods to an undercount and instead gesture generally towards

8

Defendants' use of imputation. *See, e.g.*, Compl. ¶ 206. But in fact, imputation can increase the population count, but it cannot have caused a potential undercount in Florida. *See How We Complete the Census*. These logical and pleading flaws are fatal to all of Plaintiffs' claims. Ultimately, Plaintiffs seek extraordinary court-ordered relief in the form of new Census apportionment and intrastate redistricting data that would undo any alleged potential undercount suggested in the PES. *See* Compl. ¶¶ 190, 195, 203, 209. But such demands are not redressable here.

Further, Plaintiffs allege no final agency action on which to base their APA claims in Counts 3 through 5. *Id.* ¶¶ 196–217.[3] Plaintiffs identify the 5.0 Plan in only conclusory terms, *see id.* ¶ 201, and make general references to the apportionment tabulation transmitted by Census to the President following the 2020 Census, *id.* ¶¶ 202–03, 207–09, 216–17. But the former is not the culmination of the agency's decisionmaking process or a decision from which legal consequences flow, and the latter cannot be challenged under the APA. In addition, Plaintiffs' requested relief focuses on the Bureau's post-census tabulation transmission to the President and preparation of state redistricting data (An Act to Amend Section 141 of Title 13, United States Code, Pub. L. No. 94-171, 89 Stat. 1023 (1975)). *Id.* ¶¶ 190, 195, 202, 203. But these too are insufficient, and Plaintiffs' APA claims must be dismissed for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1).

---

[3] Plaintiffs repackage their Pub. L. No. 105-119, § 209 claims in Counts 1 and 2 as "a form of special statutory review proceeding" under the APA or "standalone APA claims in the alternative." Compl. at 39 n.5. Under either construction, Plaintiffs' claims fail. *See infra* §§ II.D., III.

Finally, Plaintiffs fail to plausibly plead facts that permit the inference that the Bureaus' use of imputation in the 2020 Census violated any law, and the Complaint must also be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

### I.    The Doctrine of Laches Bars All Plaintiffs' Claims, While 28 U.S.C. § 1658 Continues to Bar His Claims Under Section 209.

To invoke laches, Defendants must show: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that the delay caused defendant undue prejudice." *Citibank, N.A. v. Citibanc Grp.*, Inc., 724 F.2d 1540, 1546 (11th Cir. 1984) (citation modified). This case satisfies all three elements.

Plaintiffs waited more than three years to bring this action. Even if the Court determines that the 5.0 Plan and apportionment transmission are the relevant final agency action (which they are not, *see infra* § II.D.), the Bureau published the 5.0 Plan on February 4, 2022, *see* 5.0 Plan, and the Bureau publicly released the 2020 Census apportionment data by April 2021, *see* Compl. ¶ 90. Plaintiffs knew of the 2020 Census methods for more than three years, and they identify no obstacle that prevented an earlier filing. *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1206 (11th Cir. 1997) ("[D]elay is to be measured from the time at which the plaintiff knows or should know she has a provable claim"); *see also Wood v. Raffensperger*, 501 F. Supp. 3d 1310 (N.D. Ga. 2020) (equal protection election law claims brought by voter who sat on his rights for approximately eight months were barred by laches), *aff'd*, 981 F.3d 1307 (11th Cir. 2020). "In determining the reasonableness of the delay, courts look to the cause of the delay." *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221,

1227 (9th Cir. 2012). But here, Plaintiffs do not even attempt to explain why they waited to file their Complaint. Their delay is inexcusable.

Further, Plaintiffs' delay caused undue prejudice. During the delay, federal, state, and local governments have relied on the final 2020 Census figures for redistricting, congressional representation, and budgetary allocations. These substantial reliance interests could not be unwound without significant disruption. *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 236 (6th Cir. 2007) ("[W]hen the relief sought will work an *unjust* hardship upon the defendants or upon innocent third parties, the courts, as a co-equal branch of the federal government, must ensure that judgments never envisioned by the legislative drafters are not allowed to stand."). *But cf. Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 687 (2014) (finding "no unjust hardship on innocent third parties").

Lastly, Counts 1 and 2 under Section 209, Compl. ¶¶ 185–95, continue to be time-barred by the statute of limitations in 28 U.S.C. § 1658. *See* Opinion & Order, ECF No. 84 at 14–19.

## II.    Plaintiffs Lack Article III Standing and Allege No Final Agency Action.

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. "To have a case or controversy, a litigant must establish that he has standing, which requires proof of three elements." *City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 636 (11th Cir. 2023) (citation omitted). To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or

11

will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). We begin with redressability because Plaintiffs' Complaint arrives far too late and their injuries are thus not redressable. *See Utah v. Evans*, 536 U.S. 452, 462–63 (2002).

### A.   Plaintiffs' alleged injuries are not redressable by corrected or supplemental Census data.

To demonstrate redressability, a plaintiff must show "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (citation omitted). When redressability "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, . . . [standing is] 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (first quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989), then quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). Indeed, Plaintiffs themselves allege that "the results of the 2020 Census are set in stone and completely immune from challenge." Compl. ¶ 103.

Plaintiffs seek supplemental apportionment and state redistricting data, Compl. ¶¶ 43–44, because they cannot request the relief that would redress their alleged injuries—an additional congressional seat and new statewide redistricting, along with a change to the distribution of federal funds and an opportunity for Representative

12

Donalds to incorporate new census data into unspecified votes and decisions he has already made. *See id.* ¶¶ 127–35 (state redistricting), ¶¶ 143–47 (vote dilution), ¶¶ 148–76 (funding injury), ¶¶ 177–84 (informational injury). However, this case does not qualify for an entitlement certificate[4] revision, and an act of Congress is the only remedy that could provide redress these injuries. Even if the Census Bureau were ordered to produce new data, this data would not, by itself, reapportion congressional seats among the states or redress Plaintiffs' other claimed injuries. Because of this mismatch between Plaintiffs' alleged injuries and the relief requested, their claims are not redressable and they lack standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

**1. This case does not qualify for entitlement certificate revision under *Utah v. Evans*, and only Congress can provide redress.**

Under *Utah v. Evans*, an entitlement certificate can be corrected if it is "found to rest upon a serious error—say, a clerical, a mathematical, or a calculation error, in census data or in its transposition." 536 U.S. 452, 462 (2002). But the *Evans* Court recognized the challenges that would arise with an entitlement certificate revision after Representatives have already been selected and limited its redressability holding to

---

[4] An "entitlement certificate" is referred to herein as the process by which the House informs each State of the number of Representatives to which it is entitled after a decennial census. Under 13 U.S.C. § 141(b), the decennial census is "reported by the Secretary to the President." The President then sends "Congress a statement showing the whole number of persons in each State" and "the number of Representatives to which each State would be entitled." 2 U.S.C. § 2a(1). The House must then send each State "a certificate of the number of Representatives to which such State is entitled." 2 U.S.C. § 2a(b).

cases where serious errors are "uncovered before new Representatives are actually selected." *Id.* Under those circumstances, relief is not "necessarily 'impracticable'" "if a lawsuit is brought soon enough after completion of the census and heard quickly enough." *Id.* at 463 (referencing "impracticable" from Pub. L. No. 105-119, § 209(a)(8)); *see also House of Representatives*, 525 U.S. at 332 (recognizing the inherent problem with judicial challenges to census operations once apportionment is complete by stating, "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issues presented here, because such a pause would result in extreme—possibly irremediable—hardship"). Congress also knew of this problem. *See* Pub. L. No. 105-119, § 209(a)(8) ("[I]t would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted . . . ."); *see also id.* § 209(e)(2) (requiring courts "hearing an action brought under this section . . . to expedite to the greatest extent possible the disposition of any such matter"). As such, an entitlement certificate revision in this case is years too late, and thus "impracticable." *See Evans*, 536 U.S. at 462.

This case also does not involve "a clerical, a mathematical, or a calculation error, in census data or in its transposition," much less an error "uncovered before new Representatives are actually selected." *Id.* Voters elected Members to seats in the U.S. House of Representatives that were apportioned according to the 2020 Census results in 2022 and 2024, well before Plaintiffs filed suit here. This case is thus nothing like *Evans*.

14

Since they fall outside the *Evans* paradigm, Plaintiffs' alleged apportionment injuries are remediable only by an act of Congress. Under 2 U.S.C. § 2a(b), there exist two means by which State entitlement to congressional apportionment can be altered once the President transmits the decennial reapportionment statement to Congress. The first is through the process of conducting the next census and reapportionment under § 2a(a), and the second is Congress' enactment of a new statute. 2 U.S.C. § 2a(b) ("Each state shall be entitled, . . . until the taking effect of a reapportionment under this section or subsequent statute."). There are no other means for post-entitlement reapportionment in this case. The new census data Plaintiffs seek cannot redress their alleged injuries. *See Evans*, 536 U.S. at 462; Compl. ¶¶ 143–47.

> **2. Ordering the Secretary to produce new apportionment data or submit a new tabulation would not, by itself, reapportion congressional seats among the states or change the distribution of federal funds.**

Apportionment is reserved to Congress and the Executive Branch. *See* 2 U.S.C. § 2a. Even if Plaintiffs were to succeed and this Court were to order the Secretary to produce new Census apportionment data, Plaintiffs' alleged injuries would not be redressed "unless the President accepts the new numbers, changes his calculations accordingly, and issues a new reapportionment statement to Congress." *Franklin v. Massachusetts*, 505 U.S. 788, 824 (1992) (Scalia, J., concurring in part). However, the President "is not expressly required to adhere to the policy decisions reflected in the Secretary's report," *id.* at 799, and the President is neither a party to this action, nor could he be enjoined, *id.* at 802–03. ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (quoting

15

*Mississippi v. Johnson*, 71 U.S. (4. Wall.) 475, 501 (1866))). Similarly, a new census report could neither reallocate generally alleged, census-designated federal funding, *see* Compl. ¶¶ 148–76, nor could it resolve harms that allegedly occurred during Florida's state redistricting process, *see id.* ¶¶ 127–35. Redressability of Plaintiffs' claims "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (citation omitted). Plaintiffs have not alleged that the choices of those independent actors "will be made in such manner as to . . . permit redressability," *id.*, and thus Plaintiffs lack Article III standing.

### 3. Representative Donalds' alleged informational injury cannot be redressed by corrected or supplemental 2020 Census data.

Representative Donalds never identifies any particular legislative votes that he would have changed if he were in possession of different census data without the alleged undercount. *See* discussion *supra* § II.A. But even if he had done so, any potential resulting informational injury cannot be redressed. *Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (citation modified)); *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) ("The key word is 'likely.'" (citation omitted)). Any such injury occurred for (unspecified) votes that have already occurred, and even if the Census Bureau released new data without the alleged undercount, Representative Donalds would not be able to change his vote. Nor does a district court have the power to compel the Congress to exercise its legislative powers to allow Representative Donalds to vote

again. *Franklin v. Massachusetts*, 505 U.S. 788, 829 (1992) (Scalia, J., concurring in part) (stating courts cannot "direct . . . the Congress to perform particular legislative duties"). And his allegations as to any future potential informational injury are too speculative to support standing, *see infra* § II.A.3. As a result, Representative Donalds' alleged informational injury cannot be redressed, and he has no Article III standing to pursue his claims. *See Franklin*, 505 U.S. at 829.

### B.    Plaintiffs fail to allege an injury in fact that satisfies Article III.

"An injury in fact must be 'concrete,' meaning that it must be real and not abstract." *Food & Drug Admin.*, 602 U.S. at 381. The injury must also be "particularized; the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, n.1 (1992)). Finally, the injury must be "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* (citation omitted). The injury in fact requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.*

Plaintiffs assert three primary theories of injury—vote dilution, Compl. ¶¶ 143–47, funding injury, *id.* ¶¶ 148–76, and informational injury to Representative Donald, *id.* ¶¶ 177–84.[5] All are insufficient to meet Article III standards.

---

[5] To the extent Plaintiffs' state-redistricting allegations relate to other injuries, Defendants address those allegations separately. *See infra* § II.C; Compl. ¶¶ 127–35.

17

### 1. Plaintiffs' alleged vote dilution injury is neither concrete nor particularized.

First, Florida Plaintiffs attempt to link the 2020 PES—which estimated that the 2020 Census undercounted Florida by 3.48 percent—to Florida's loss of representation in Congress. *See* Compl. ¶¶ 143–47. But the PES is not an enumeration, and it is neither a substitute for nor a recreation of the decennial census. Rather, the PES surveys only "a sample of the population" based on information obtained from only a select sample of housing units. *See* U.S. Census Bureau, *Post-Enumeration Surveys* (last revised Mar. 12, 2024) https://perma.cc/G6WT-E6PE, (last visited March 20, 2025).[6] As a general matter, alleged vote dilution injuries from the results of a decennial census that are based on post-enumeration statistical sampling, as in the PES, are too speculative and uncertain to meet Article III requirements. *See Lujan*, 504 U.S. at 566 (noting that "[s]tanding is not an ingenious academic exercise in the conceivable" (citation modified)).

Nevertheless, on the basis of the undercount in Florida supposedly suggested by the PES, Plaintiffs allege that "[b]ut for Defendants' vast use of statistical methods on 2020 census data, Florida would have gained an additional House seat and an additional vote in the Electoral College." Compl. ¶ 146. In support of this statement, Plaintiffs allege that "Florida missed an additional seat by 171,561 people," falling in priority order immediately behind Minnesota, New York, and Ohio—states that

---

[6] The Court may consider evidence outside the pleadings when determining whether it has jurisdiction. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

Plaintiffs allege were overcounted—and Texas. *See id.* ¶¶ 116, 121–23, 125. But Plaintiffs also allege that Texas was undercounted, *id.* ¶ 125, and in the counterfactual world where the 2020 Census did not involve "Defendants' vast use of statistical methods," *id.* ¶ 146, it is entirely speculative that Florida would have moved ahead of Texas in the priority order for the next seat, or that the priority order would otherwise remain unchanged and to Florida's advantage.

As a result, Plaintiffs cannot show that Florida was deprived of an additional congressional representative due to the alleged PES undercount, much less that Florida "would have had an additional Representative if the allocation had been done using some other source of 'more accurate' data." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992); *see also Gill v. Whitford*, 585 U.S. 48, 70 (2018) (injury in fact for vote dilution requires "a showing of a burden on the plaintiffs' votes that is actual or imminent, not conjectural or hypothetical" (citation modified)).

Further, even if Plaintiffs' alleged undercount were concrete enough to support standing—it is not—Plaintiffs assert only a "generalized grievance" that is shared by every citizen of Florida. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020); Compl. ¶ 147 (alleging that Florida Plaintiffs, like all other Florida voters, vote in larger congressional districts because of the alleged "loss of a House seat"). In contrast, a particularized injury "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). Plaintiffs point to *Wood v. Raffensperger* for the proposition that "vote dilution can be a basis for standing." Compl. ¶ 147 (citing 981 F.3d at 1314). But as the Eleventh Circuit notes in *Wood*, vote dilution

19

"requires a point of comparison," such as when "in the racial gerrymandering and malapportionment contexts," "voters are harmed compared to 'irrationally favored' voters from other districts." 981 F.3d at 1314 (quoting *Baker v. Carr*, 369 U.S. 186, 207–08 (1962)).

Indeed, like plaintiffs in a case involving an alleged racial gerrymander, Plaintiffs here "ha[ve] standing to assert only that [their] own district has been" diluted. *Gill*, 585 U.S. at 66. But Plaintiffs make no allegation that their particular congressional districts experienced an undercount as compared to other Florida districts, and the individual Florida Plaintiffs do not even establish that they are registered voters, or that they voted in any elections or plan to vote in any future elections. Simply residing in a specific congressional district is too generalized to confer Article III standing. *See id.* at 49 ("A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, asserts only a generalized grievance against governmental conduct of which he or she does not approve." (citation modified)).

Thus, Plaintiffs show no particularized interest in avoiding vote dilution that can be differentiated from the interest of any other Florida voter. As a result, "any [Florida] voter could bring an identical suit," and their generalized grievance is insufficient for Article III standing. *See Wood*, 981 F.3d at 1314; *cf. Md. Election Integrity, LLC v. Md. State Bd. of Elections*, 127 F.4th 534, 539–40 (4th Cir. 2025) (reasoning that "generalized injury" from "vote dilution caused by the counting of an unknown number of invalid third-party votes" that "affects all voters in a State in the same way"

20

fails to support injury in fact for Article III standing).

### 2. Plaintiffs' alleged funding injury does not satisfy Article III.

Plaintiffs allege that "[h]ad the census yielded an accurate count for Florida, the congressional map would have been different, and funding allocations would have also changed." Compl. ¶ 176. Setting aside that their allegations as to the impact of an "accurate count" on the size Florida's congressional delegation are insufficient for Article III standing, *see supra* § II. Plaintiffs' statements about funding allocation are based on speculation unsupported by plausible factual allegation. As a result, they fail to plausibly allege an injury based on funding misallocation. *See Food & Drug Admin.*, 602 U.S. at 380.

In particular, Plaintiffs allege that the population of the counties that comprise Florida's 19th Congressional district increased in population by varying amounts following the 2020 Census, but that they "would have increased even more" if Florida were correctly counted. Compl. ¶¶ 154–57; *see also id.* ¶¶ 160–74 (similar, but as to other congressional districts and counties). But this conclusory allegation is entirely speculative, and Plaintiffs fail to allege how the undercount allegedly indicated by the PES sampling survey would have been reflected in any particular county or congressional district in Florida. In contrast, in cases where courts have accepted a funding injury based on an alleged undercount as a basis for standing, the allegations have some specific basis beyond mere speculation. *See Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) (finding to support funding injury, plaintiffs established "that a census undercount is inevitable"); *City of Willacoochee v. Baldrige*, 556 F. Supp. 551, 553

21

n.2 (S.D. Ga. 1983) (plaintiffs alleged a *specific* actual population for their city).

### 3.  Representative Donalds fails to allege a concrete informational injury.

To assert an informational injury, a plaintiff must identify "downstream consequences" from being deprived of accurate information. *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020). "An 'asserted informational injury that causes no adverse effects cannot satisfy Article III.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (quoting *Trichell*, 964 F.3d at 1004). Plaintiffs allege that "Representative Donalds relies on accurate census data to fulfill his constitutional duty of representation on behalf of the people of Florida and specifically the residents of the 19th Congressional district." Compl. ¶ 177. They further allege that he "uses census data to inform his votes in the House of Representatives," *id.* ¶ 178, and note that the "HUBZone small business program," *id.* ¶ 179, and "[m]any other competitive grants rely upon census data for adequate and accurate distribution of funds, and Representative Donalds engages with these facts and figures in informing his vote," *id.* ¶ 180. But these allegations fail to establish a concrete harm that has impacted his ability to perform his duties, such as actions that he "took [or] failed to take" because of the information he received. *Frank v. Autovest, LLC*, 961 F.3d 1185, 1188 (D.C. Cir. 2020).

His general descriptions of his job responsibilities do not identify any specific harm and are insufficient to show concrete and particularized "downstream consequences." *Trichell*, 964 F.3d at 1004. Absent such concrete injury, Representative Donalds "can complain only about receiving information that had no impact on

[him]." *Id.* (emphasis omitted).

And Representative Donalds' general allegations are also insufficient to show a concrete future informational injury that could be remedied by prospective relief. "[T]here is a significant difference between (i) an actual harm that has occurred but is not readily quantifiable, as in cases of libel and slander *per se*, and (ii) a mere risk of future harm." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 437 (2021). If Representative Donalds is exposed to a risk of future harm from receiving allegedly inaccurate data from the Bureau, "time will eventually reveal whether the risk materializes in the form of actual harm." *See id.* at 436. But here, the allegations in the Complaint are too general to support a plausible inference of a concrete future injury, and Representative Donalds cannot make the required showing for injury in fact on that basis. *See id.* at 438 (no concrete injury in fact where there is no evidence of a serious likelihood of future harm).

In sum, his general allegations about the use of census data for the HUBZone small business program, and certain Medicare, Medicaid, FEMA and other programs does not establish that he would have voted or acted differently without the alleged undercount in Florida, or that he would do so in the future, and he fails to show Article III injury. *See, e.g.*, *TransUnion*, 594 U.S. at 437–39; Compl. ¶¶ 179–82.

   **C.    Plaintiffs' alleged injuries are not fairly traceable to the Bureau.**

Article III standing requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not

23

before the court." *Lujan*, 504 U.S. at 560–61 (citation modified). Plaintiffs fail to show such causal connection between their injuries and the Bureau's alleged misuse of statistics in the 2020 Census. As a result, Plaintiffs lack Article III standing.

### 1. Plaintiffs do not plausibly allege that the Census Bureau caused any undercount in Florida by using statistics.

Plaintiffs allege that:

> Defendants' extensive reliance on statistical methods in conducting the 2020 Census and producing its results violated the Constitution's mandate to conduct an 'actual Enumeration.' The unprecedented scope and manner of Defendants' use of statistical techniques went beyond permissible data supplementation and effectively substituted statistical modeling for a true enumeration of the population.

Compl. ¶ 188. But Plaintiffs never identify a particular statistical method or technique employed during the 2020 Census and instead make high-level allegations about the use of statistical imputation. *Id.* ¶¶ 69–88, 95–97. However, the Census Bureau's general use of imputation in the 2020 Census cannot have caused the undercount that Plaintiffs' claim led to their various injuries—where it impacts the population count at all, imputation is used by the Census Bureau to add a person to the population of an area that cannot otherwise be counted in the census, thus reducing any potential undercount. *See How We Complete the Census* (discussing how count imputation works and when it was used in the 2020 Census).

Indeed, Plaintiffs acknowledge that the Census Bureau used statistical imputation to account for people in the enumeration that it otherwise could not count. Compl. ¶ 69 (the Census Bureau allegedly accounted for some people who would otherwise be omitted from the census by imputing them into the count). Because the

24

Census Bureau's use of imputation added to, and did not decrease, the population of Florida, imputation cannot have caused the alleged undercount at the heart of Plaintiffs' claims. Further, the use of statistical imputation has been expressly endorsed by the Supreme Court as permissible under the Constitution and the statute that governs use of statistics in the decennial census. *Utah v. Evans*, 536 U.S. 452, 467 (2002) (distinguishing between permissible imputation and impermissible statistical sampling when considering claimed violation of 13 U.S.C. § 195 and the Census Clause).

Courts permit the use of imputation in part because they acknowledge that even the best decennial census must be conducted with limited resources and in a limited time, and thus necessarily cannot capture a perfect count of the population. *See, e.g.*, *Tucker*, 958 F.2d at 1412 ("The census takers try to account for everybody in America[,] but of course they don't succeed . . . .").

As a result, Plaintiffs cannot show that their alleged injuries are fairly traceable to the Census Bureau's alleged misuse of statistics, and they lack standing to pursue their claims. *See Lujan*, 504 U.S. at 560.

### 2. The Bureau is not involved in state redistricting.

Plaintiffs fail to show that any alleged state redistricting-related harms, *see* Compl. ¶¶ 127–35, are fairly traceable to actions by Defendants because Defendants are not involved in state redistricting decisions. *Lujan*, 504 U.S. at 560. Rather, the Florida Constitution requires the Florida Legislature to apportion the State of Florida into senatorial and representative districts. Fla. CONST. art. III, § 16. States have broad discretion when it comes to state redistricting, and some states, like Florida, elect to

use decennial census data for legislative and congressional redistricting. *See, e.g.*, Fla. Stat. § 11.031(1) (2025) ("All acts of the Florida Legislature based upon population and all constitutional apportionments shall be based upon the last federal decennial statewide census."). However, the Bureau is not involved in any intrastate redistricting decisions, including Florida Legislative apportionment duties, and Plaintiffs do not allege that the Florida Legislature would be required to use new intrastate data to redraw district lines after representatives have already been selected based on the current boundaries. Although the Bureau provides data to States that may be used in legislative redistricting, *see* Pub. L. No. 94-171, the Bureau does not control how that data is used or interpreted on an intrastate level. *See, e.g.*, U.S. Census Bureau, *Disclosure Avoidance for the 2020 Census: An Introduction*, at 2 (2021) https://perma.cc/Y74C-MNCH, (providing "key considerations and recommendations for data users working with the 2020 Census redistricting data," such as aggregating "very small geographic areas, such as census blocks," "into larger geographic areas before use").

Indeed, the Bureau provides a redistricting product to the states, but is transparent about its capabilities and quality so States can determine whether the product meets their intrastate redistricting needs. *See, e.g.*, Mem. from Albert E. Fontenot, Jr., Assoc. Dir. for Decennial Census Programs, U.S. Census Bureau, 2020 Census Program Memorandum Series: 2019.25, at 1 (Oct. 31, 2019), https://perma.cc/CA6V-52JW ("It is imperative that the Census Bureau show users that the 2020 DAS will produce high quality data, and to give those users an accurate

demonstration of the system's capabilities so that they can determine whether the products will meet their needs."). Since the Bureau has no actual role in intrastate redistricting decisions or the implementation of redistricting data in intrastate apportionment, and Plaintiffs fail to allege that any new data would result in intrastate redistricting to remedy their harms, Plaintiffs' alleged intrastate redistricting injuries are not fairly traceable to the Bureau, let alone to the use of any specific statistical method in the 2020 Census.

As Plaintiffs acknowledge, Census already provides a method for states to request data revisions for census processing errors. *See* Compl. ¶ 101. "The Bureau 'offers' the Count Question Resolution ('CQR') process for states to 'request a review of their boundaries and housing counts to identify errors.'" *Id.* ¶ 101 (quoting America Counts Staff, U.S. Census Bureau, *2020 Census Undercounts in Six States, Overcounts in Eight* (May 19, 2022, last revised Nov. 7, 2024), https://perma.cc/B49T-E6HZ). If Plaintiffs had information about particular census processing errors, the CQR process was available to seek a revision. But Plaintiffs make no such specific allegations about incorrect data. Other than acknowledging that the CQR data does not "alter redistricting data, apportionment results, or other 2020 Census data products," *id.* ¶ 102 (citation omitted), Plaintiffs fail to allege why Florida did not request amended redistricting data before any intrastate redistricting occurred, or why it could not supplement the allegedly inaccurate census data with its own analysis if it possesses information about Florida residents missing from the 2020 Census count.

Even if the Bureau were involved more directly in intrastate redistricting,

Plaintiffs fail to show a causal connection between any alleged intrastate redistricting injuries and the Bureau's use of any specific statistical method. Plaintiffs have not alleged what 2020 Census data the Florida Legislature used for redistricting that connects one of their injuries to the implementation of any specific statistical method in the 2020 Census. Instead, they generally allege that "the Florida Legislature could not have meaningfully fulfilled this mandate when the Census Bureau admits that over 700,000 Floridians were missing." Compl. ¶ 133. But Plaintiffs offer no supporting allegation about where any particular imputed counts from any statistical method used in the 2020 Census may have interfered with the state redistricting process, or that Florida sought more accurate data that failed to bridge this alleged gap. As a result, Plaintiffs fail to show any causal connection between any specific statistical method on the one hand, and a particular, concrete injury through state redistricting.

### D.    Plaintiffs fail to challenge any final agency action that is reviewable under the APA.

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions [are] subject to review by the courts." *Franklin*, 505 U.S. at 796. The APA provides for judicial review of only "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003) ("federal jurisdiction is similarly lacking when the administrative action in question is not 'final'"); *see also Jallali v. Secretary, U.S. Dep't of Educ.*, 437 Fed. App'x 862, 865 (11th Cir. 2011) (dismissing case for lack of jurisdiction because agency action challenged was not final under the APA).

28

Final agency action must (1) "mark the 'consummation' of the agency's decisionmaking process," and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted).

### 1. The 2020 Census Operational Plan 5.0 is not final agency action.

The 2020 5.0 Plan does not "mark the 'consummation' of the agency's decisionmaking process." *See Bennett*, 520 U.S. at 178 (citation omitted). Instead, the 5.0 Plan was approved in February 2022, after census operations were completed, and served to describe "design concepts and their rationale, identifying decisions made and remaining decisions, and . . . remaining risks." *See* 5.0 Plan at 1. The 5.0 Plan did not establish the methodology the Bureau used in the 2020 Census. Instead, it documented the operational adjustments that had already occurred during the enumeration, *see id.* at 57 (outlining information provided for each of 35 census operations), particularly those caused by the COVID-19 pandemic. *See id.* at 96–173 (detailing operations related to response data, and discussing the impact of COVID-19). Because the 5.0 Plan—which was approved in February 2022—documents prior operational changes, it cannot mark the consummation of the Bureau's decisionmaking process for the 2020 Census. *See Bennett*, 520 U.S. at 178.

Nor is the 5.0 Plan an action from which legal consequences flow. It imposes no obligations and determines no rights. The legal consequences Plaintiffs identify arise from the census results themselves, not from a later document describing operational adjustments that occurred during the enumeration.

Challenges to census methodology in operational plans target pre-enumeration operational plans that determine how the census will be conducted. *See, e.g.*, *Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 669 (N.D. Cal. 2020) (challenging the Operational Plan version 4.0 and discussing the Bureau's several pandemic-related adjustment decisions, which were announced beginning in March 2020). The 5.0 Plan, by contrast, was issued long after those operations occurred and reflects how the census was caried out in practice. Because the 5.0 Plan documents past operations rather than establishing methodology, it does not constitute final agency action, and it is not reviewable under the APA. *See Bennett*, 520 U.S. at 178.

Section 209(c)(2) states that "the report ordered by title VIII of Public Law 105–18 and the Census 2000 Operational Plan shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census," thus making it reviewable as final agency action. But that designation only speaks to one Operational Plan—the one from 2000—it does not transform all census-related Operational Plans or reports into final agency action. *See* Pub. L. No. 105-119, § 209(c)(2). Congress knew how to identify reviewable actions and did so only for one specific, pre-census decision, pertaining strictly to the 2000 Census. Congress's decision to treat only the pre-enumeration 2000 Operational Plan as final agency action reinforces the conclusion that the 5.0 Plan is not final agency action because it is neither the 2000 Operational Report, nor a pre-enumeration report. By expressly identifying one narrow reviewable planning decision, Congress did not convert every subsequent or retrospective census document into reviewable agency action. If

30

anything, it suggests the opposite—that an operational plan for the census does not constitute final agency action on its own; otherwise Section 209(c)(2) would have been nugatory. Thus, the 5.0 Plan does not independently qualify as final agency action under Section 209.

> ### 2. The apportionment tabulation of total population transmitted by Census to the President following the 2020 decennial census is not final agency action.

"[T]he action that creates an entitlement to a particular number of Representatives and has a direct effect on the reapportionment is the President's statement to Congress, not the Secretary's report to the President." *Franklin*, 505 U.S. at 797. Since the transmission of the Secretary's report to the President "carries no direct consequences for the reapportionment . . . . It is, like 'the ruling of a subordinate official,' not final and therefore not subject to review [as final agency action]." *Id.* at 798 (citation omitted). The apportionment tabulation is not reviewable under the APA.

## III.    Plaintiffs Fail to State a Claim for Relief Under Section 209(h)(1) Because They Challenge No Particular Statistical Method and the Census Bureau's Use of Imputation Caused No Undercount.

Plaintiffs' claims under Pub. L. No. 105-119, § 209 in Counts 1 and 2, Compl. ¶¶ 185–195, fail because Plaintiffs challenge no specific statistical method, and the methods that are identified in their allegations cannot have caused the undercount at the heart of their claims. *See infra* § III. Because Plaintiffs fail to state a claim for relief, the Court should dismiss this case. *See* Fed. R. Civ. P. 12(b)(6).

Even considering Counts 1 and 2 as separate from the APA's requirements,[7] they fail to state a claim because Plaintiffs' Complaint is devoid of plausible allegations of wrongdoing as to the use of any particular statistical method. Plaintiffs request a declaratory judgment based on the Census Bureau's "extensive reliance on statistical methods in conducting the 2020 Census," but they fail to identify or challenge any specific statistical method used. *See* Compl. ¶¶ 188–89. Instead, they make general, high-level allegations about the Bureau's use of different types of imputation, *see id.* ¶¶ 69–82, and then allege that the Bureau's use of imputation "led to inaccurate results," *see id.* ¶ 96. But there are many different types of imputation, with sharply differing attributes. *See How We Complete the Census*; INR Report. Plaintiffs' conclusory allegations about uses of "imputation" in the 2020 Census are insufficient to establish a claim upon which relief could be granted. *See Jackson.*, 372 F.3d at 1262–63. Further, as shown by *Evans*, imputation is permissible. *Evans*, 536 U.S. at 467 (noting the differences between imputation and sampling "are important enough to place imputation outside the scope of" Pub. L. No. 105-119, § 209).

First, Plaintiffs allege that 18.8 million people were "'omitted' from the 2020 Census" nationwide, Compl. ¶ 68 (citation omitted), and that the Census Bureau "attempt[ed] to 'account' for 'many of these omitted people'" by imputation, *id.* ¶ 69 (citation omitted). Plaintiffs make no allegations about particular uses of statistics, other than to allege generally that Defendants used imputation improperly, and to

---

[7] *See* Compl. at 39 n.5 (recasting Counts 1 and 2 as APA claims).

32

conclude without factual support that this caused the undercount allegedly suggested by the PES. Plaintiffs never clarify what specific kind of imputation or use of imputation in the conduct of the 2020 Census concerns them. For example, Plaintiffs repeatedly cite a Census Bureau report about characteristic imputation, *see id.* ¶¶ 70, 72–77, 84–87, but this form of imputation does not affect the apportionment count and is used to fill in missing information about a person, such as their sex, race, or other information. *See* INR Report at 1 ("Characteristic imputation, applied after the household population is established, is in scope for this assessment; count imputation is not in scope.") (cited at Compl. ¶¶ 70, 72–77, 84–87). To the extent Plaintiffs allege that characteristic imputation caused an undercount in Florida in the 2020 Census, they cannot state a claim for relief.

Further, to the extent Plaintiffs allege that count imputation (of some unspecified type) caused the undercount that led to their alleged injuries, they also cannot state a claim for relief. *See* Compl. ¶ 69 (citing *How We Complete the Census* (discussing different forms of count imputation used in 2020 Census)). All of the many forms of count imputation used by the Census Bureau only added to the count of population in Florida, whereas Plaintiffs complain that Florida was undercounted. *See Id.* ¶¶ 133, 143–47, 157–59, 165–67, 172–74, 184.

To be clear, Plaintiffs do not allege that the Census Bureau undercounted Florida's population because it did not use statistical imputation aggressively enough, leading to an undercount. Nor do Plaintiffs allege any technical concerns with the particulars of how the Bureau used imputation that could have left some Florida

33

communities uncounted or undercounted as compared to the larger populations imputed to other states. Rather, Plaintiffs allege that the Census Bureau engaged in imputation so "extensively" that it "differed in 'principle from other efforts used since 1800 to determine the number of missing persons,'" *id.* ¶ 88 (quoting *Evans*, 536 U.S. at 477). They also conclude, without any supporting factual allegation, that the Census Bureau's increased use of imputation in the 2020 Census "led to inaccurate results," *see id.* ¶ 96. However, they provide no plausible basis for this inference, nor for their other inferences connecting imputation to the potential undercount. *See id.* ¶¶ 188, 193, 200, 207, 212.

Plaintiffs' Complaint is devoid of any allegations that would allow the plausible inference that some statistical method used by the Census Bureau caused the alleged undercount at the heart of their claims. As such, Plaintiffs fail to state a claim upon which relief can be granted as to any count. *See Iqbal*, 556 U.S. at 678; *Gates*, 884 F.3d at 1296.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case for lack of subject matter jurisdiction and for failure to state a claim. Because Plaintiffs have already filed a Third Amended Complaint and have yet to state a cognizable cause of action, further leave to amend would be futile.

34

Dated: March 27, 2026                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General

                                         ALEXANDER K. HAAS
                                         Director

                                         STEPHEN M. ELLIOTT
                                         Assistant Branch Director

                                         /s/ *Kevin K. Bell*
                                         KEVIN K. BELL
                                         (GA Bar No. 967210)
                                         KATHRYN L. ALKIRE
                                         (FL Bar No. 1050146)
                                         Trial Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L St. NW
                                         Washington, DC 20005
                                         Phone: (202) 305-8613
                                         E-mail: Kevin.K.Bell@usdoj.gov

                                         *Lead Counsel for Defendants*


## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for Federal Defendants certify that they conferred with counsel for Plaintiffs via email. Plaintiffs oppose this Motion.

Dated: March 27, 2026                    Respectfully submitted,

                                         /s/ *Kevin K. Bell*
                                         KEVIN K. BELL
                                         (GA Bar No. 967210)