## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> HOWARD W. LUTNICK, et al., <br><br>     Defendants. | Case No. 8:25-cv-2486-WFJ-SDM-RSR <br><br> **CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' AND INTERVENORS' MOTIONS TO DISMISS** |

## BACKGROUND

The Constitution commands that an "actual Enumeration" of the population be conducted every ten years to apportion congressional representation among the states. U.S. CONST. art. I, § 2, cl. 3. In 2020, the U.S. Census Bureau ("Bureau") failed to honor that command. Driven by the unprecedented disruptions of the COVID-19 pandemic, the Bureau abandoned its core mission of counting every person in America and instead resorted to statistical imputation on a scale never before seen in American history.

The pandemic struck the United States just two weeks before Census Day. The Bureau responded by suspending normal procedures and fundamentally altering its approach to data collection and processing: Mobile Questionnaire Assistance was scaled back; mailing materials were delayed; field enumeration operations were postponed; early non-response follow-up was eliminated entirely; door-to-door procedures were revised to prohibit knocking; and field training was overhauled to minimize in-person contact while logistical resources shifted to procuring masks and sanitizer rather than counting people. TAC ¶¶ 50, 54, 56, 61–62, 86–87. The Bureau's own reports catalog more than a dozen major changes driven by the pandemic. TAC ¶¶ 48–62.

Rather than exhaust every available means of reaching households, the Bureau turned to statistical imputation—a technique that fills in missing data by inference rather than direct contact—on an unprecedented scale.

1

TAC ¶¶ 65–69. Whole-person imputation nearly doubled from 5.99 million in the 2010 Census to 10.9 million in 2020, with some estimates suggesting the true figure may be as high as 17.1 million. TAC ¶¶ 79–80 & n.1. The result was not imputation "used sparingly only after [the Bureau] ha[d] exhausted its efforts to reach each individual." *Utah v. Evans*, 536 U.S. 452, 477 (2002). It was imputation deployed wholesale to substitute for reaching individuals.

The Bureau's own data confirms the damage. The Post-Enumeration Survey ("PES"), released in 2022, revealed that the 2020 Census produced statistically significant overcounts in eight states and undercounts in six—a dramatic deterioration from the 2010 Census, which reported no statistically significant undercount or overcount in any state. TAC ¶¶ 91, 94. The Government Accountability Office confirmed that "changes between the 2010 and 2020 Censuses caused these miscounts, including COVID-19-related procedural changes and intra-agency methodological choices." TAC ¶ 95.

Florida bore the brunt of the harm. The PES found that Florida was undercounted by 3.48%, or approximately 760,000 missing Floridians. TAC ¶¶ 115, 143–144. This undercount had severe consequences for apportionment, as Florida missed an additional congressional seat by just 171,561 people. TAC ¶ 145. And the consequences extend beyond representation. More than 350 federal programs allocate funding based on census data. TAC ¶ 148. Estimates indicate that Florida's 19th Congressional District alone lost more than $350

million, the 15th District lost more than $930 million, and the 14th District lost more than $300 million because of the undercount. TAC ¶¶ 159, 167, 174.

The inaccurate census data also corrupted Florida's redistricting process. Florida law requires the Legislature to base all apportionments on the federal decennial census. Fla. Stat. § 11.031(1) (2025). The Florida Legislature completed its post-2020 redistricting in April 2022, drawing congressional and legislative districts based on data the Bureau now admits missed more than 700,000 Floridians. TAC ¶¶ 131, 133.

Plaintiffs challenge the Bureau's unprecedented reliance on statistical imputation under Pub. L. No. 105-119, 111 Stat. 2440, 2481 (1997) ("Section 209") and the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 ("APA"), alleging that the Bureau's conduct violated the Constitution's mandate for an actual enumeration, exceeded the Secretary's statutory authority under 13 U.S.C. § 141(a), and was arbitrary and capricious. Defendants and Intervenors moved to dismiss the TAC for lack of jurisdiction and failure to state a claim. Plaintiffs respond to both motions in this consolidated brief.

## LEGAL STANDARD

To resolve a motion to dismiss for failure to state a claim, a court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and decide whether the plaintiff has stated a claim that is "plausible on its face," *Bell Atl. Corp. v. Twombly*, 550

3

U.S. 544, 570 (2007). "Specific facts are not necessary." *Erickson*, 551 U.S. at 93. Instead, a complaint survives dismissal if the allegations "raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability. *Twombly*, 550 U.S. at 556. Similarly, a facial attack on subject matter jurisdiction "'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *McElmurray v. Consol. Gov't*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citation omitted).

## ARGUMENT

### I.   Plaintiffs have Article III standing.

To establish standing, a plaintiff must allege: (i) that she has suffered or will likely suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Plaintiffs' allegations meet this standard.

#### A. Plaintiffs suffered concrete injuries.

##### 1.  Donalds suffered a concrete informational injury.

Donalds is a "person aggrieved by the use of any statistical method" in the decennial census because he is a "Representative or Senator in Congress." § 209(b), (d)(2). While "Congress's role" in the "assessment of Article III standing is necessarily limited," its "judgment" in elevating harms to create

4

statutory causes of action "may inform that assessment." *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 999 (11th Cir. 2020). Here, Congress's judgment that "the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States," combined with its creation of a cause of action for "any Representative or Senator in Congress" to vindicate that interest, underscores the concreteness of Donalds's injury. § 209(a)(6), (b), (d)(2). Unlike in *Trichell*, where Congress's judgment did not support the plaintiffs' claims, the "judgment of Congress" favors Donalds. *Trichell*, 964 F.3d at 999.

Defendants repeatedly cite *Trichell* to support their informational-injury arguments. But this case is more akin to *FEC v. Akins*, 524 U.S. 11 (1998) and *Public Citizen v. Dep't. of Just.*, 491 U.S. 440 (1989), which *Trichell* explicitly distinguished. The right at issue in *Trichell* was not one to receive information but rather a right to receive information that is neither misleading nor unfair, whereas *Akins* and *Public Citizen* were public disclosure laws. *Trichell*, 964 F.3d at 1004. Donalds's right to receive accurate census data is the right to receive that information in the first instance. In other words, the Bureau has a duty to publish the census data; it is *assumed* that it will be accurate.

Similar to the plaintiffs in *Akins* and *Public Citizen*, Donalds has alleged "consequential harms from the failure [of the Bureau] to disclose" accurate census data. *Id.* It is not disputed that Florida—the state in which Donalds's

5

district lies—was undercounted by 3.48%. TAC ¶¶ 4, 115, 143–144. Donalds alleges that the inaccurate Florida data undermined his ability to advocate for constituents and fulfill his constitutional duty of representation in ways that are distinct from members representing accurately counted states. Demanding that Donalds identify a specific legislative vote he would have cast differently imposes a burden that the informational standing doctrine does not require.

Defendants contend that Donalds failed to allege "downstream consequences" or "adverse effects." *See* ECF No. 97 at 22. But Donalds's harms are no less concrete and particularized than the plaintiffs' in *Akins* and *Public Citizen*. The court in *Trichell* specifically contrasted the plaintiffs' pleading in that case to that of the plaintiffs in *Akins* and *Public Citizen,* saying "[plaintiffs] have identified no comparable downstream consequences … ." *Trichell*, 964 F.3d at 1004. The TAC alleges that Donalds has cast votes on programs whose funding allocations were distorted by the undercount, has advised constituents based on eligibility thresholds derived from inaccurate data, and will continue to do so. *See* TAC ¶¶ 177–183. These "downstream consequences" are ongoing and concrete. The TAC need not specify the precise magnitude of each distortion at this stage. *See Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019).

Intervenors argue that Donalds's informational injury is a generalized "institutional injury" shared by every member of Congress, citing *Raines v. Byrd*, 521 U.S. 811, 829 (1997). But *Raines* involved a purely institutional

6

complaint about the diminution of legislative power. Donalds, by contrast, claims he has *personally* been deprived of accurate information needed to carry out concrete legislative functions for constituents in his uniquely disenfranchised district. TAC ¶¶ 143–144. That injury is sufficiently particularized. *Cf. Walker v. Cheney*, 230 F. Supp. 2d 51, 66 (D.D.C. 2002) (distinguishing institutional injuries from cases where a member has a concrete, personal stake in obtaining information).

Finally, Donalds's informational injury is prospective as well as retrospective. The Bureau's inaccurate 2020 Census data will be used for funding allocations and legislative decision-making through at least 2030. Donalds will continue to rely on this data in casting future votes and advising constituents. A judgment ordering correct data would directly redress this ongoing injury.

### 2. Florida Plaintiffs suffered a vote-dilution injury.

Both motions contend that Plaintiffs' vote-dilution claim is insufficiently particularized because Plaintiffs have not alleged that their particular districts experienced a disproportionate undercount relative to other Florida districts. But that argument misunderstands the allegation. Plaintiffs' vote-dilution claim is not an intra-state malapportionment claim similar to *Gill v. Whitford*, 585 U.S. 48 (2018), or a gerrymandering challenge requiring district-by-district analysis. It is an inter-state apportionment injury. Florida was denied a congressional seat to which it was entitled, and every Florida voter's

7

representation was correspondingly diluted.

"[V]ote dilution can be a basis for standing." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020). Defendants attempt to limit *Wood* to intrastate contexts requiring a "point of comparison" among districts. ECF No. 97 at 19–20. But the relevant point of comparison is between the states: Florida voters cast ballots in larger congressional districts than they would have if the state had received its rightful 29th seat. TAC ¶ 147. Every Florida voter's congressional representation was diluted when the state was denied the additional seat it was owed. That injury is particularized to Florida voters alone, not shared by the public at large.

Defendants conflate widespread injuries with generalized ones. An injury is not generalized simply because many people share it. *Massachusetts v. EPA*, 549 U.S. 497, 522 (2007) ("That [the] risks are 'widely shared' does not minimize [petitioner's] interest in the outcome of this litigation."); *Akins*, 524 U.S. at 23–24 (same). Every Floridian's vote carries less weight in congressional elections than it would with an additional House seat. That is concrete and particularized to Florida voters, even if all of them share it.

Defendants further contend that the vote-dilution claim rests on the "speculative" premise that Florida "would have had an additional Representative if the allocation had been done using some other source of 'more accurate'

8

data." ECF No. 97 at 19. But the TAC provides detailed, factual allegations to the contrary. For example, Plaintiffs allege that Florida missed an additional seat by approximately 171,561 people and was undercounted by approximately 760,000 people. TAC ¶¶ 115–116. The three states immediately ahead of Florida in the priority-value order—Minnesota, New York, and Ohio—were all overcounted according to the PES, while Florida and Texas were undercounted. TAC ¶¶ 121–125. Had the count been correct, Plaintiffs allege that the priority values and the allocation of House seats would have changed. TAC ¶¶ 119–120, 126. These factual allegations are supported by the Bureau's own data.

Defendants' reliance on *Fed'n for Am. Immigr. Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980), and *Citizens for Const. Integrity v. Census Bureau*, 669 F. Supp. 3d 28 (D.D.C. 2023), is misplaced. In both cases, the plaintiffs could not identify which states would gain or lose seats because they lacked any data on the direction or magnitude of the alleged counting error. Here, by contrast, the Bureau itself has published the PES data showing exactly which states were overcounted, which were undercounted, and by how much. That data, combined with the apportionment priority-value analysis, provides a plausible factual basis for alleging that Florida would have gained a seat but for the errors the Bureau has acknowledged.

### 3. Florida Plaintiffs suffered a concrete funding injury.

Defendants argue that Plaintiffs' funding injury is speculative because they have not connected the undercount to a specific county or district. The TAC, however, provides extensive district-specific funding data. More than 350 federal programs determine funding allocations based on census population totals. TAC ¶ 148. The TAC identifies specific programs, including the Highway Planning and Construction Program, and alleges Florida's 14th and 19th Districts have received more than $108 million from that program since 2021. TAC ¶ 151. The TAC further alleges, with citations to Florida Chamber of Commerce estimates, that the 19th District lost more than $350 million, the 15th District lost more than $930 million, and the 14th District lost more than $300 million because of the undercount. TAC ¶¶ 159, 167, 174.

Courts have accepted funding-injury standing based on far less. *See, e.g.*, *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (finding standing where plaintiffs alleged "concrete harm in the form of dilution of their votes and decreased federal funds flowing to their city and state"); *City of Willacoochee v. Baldridge*, 556 F. Supp. 551, 553 n.2 (S.D. Ga. 1983) (finding standing where plaintiffs alleged that an inaccurate census count would cause loss of federal aid distributed on the basis of population data). Here, the Bureau admitted a statistically significant undercount. The TAC identifies specific districts, specific programs, and specific dollar amounts tied to the undercount. That is more

10

than sufficient at the pleading stage.

**B. Plaintiffs' injuries are fairly traceable to Defendants' conduct.**

All the alleged injuries—informational, vote-dilution, and funding—are fairly traceable to Defendants' conduct. The TAC alleges that the Bureau conducted the 2020 Census using unprecedented levels of imputation; that the Bureau's own PES found these methods produced statistically significant overcounts in eight states and undercounts in six; that the three states immediately ahead of Florida in the apportionment priority order—Minnesota, New York, and Ohio—were all overcounted while Florida was undercounted; and that had the count been accurate, the allocation of House seats would have changed, TAC ¶¶ 48–62, 79–80, 88, 117–126. These allegations establish a causal connection between the Bureau's conduct and Plaintiffs' injuries.

Both motions argue that imputation only added to Florida's population count and therefore could not have caused an undercount. But apportionment is not a question of whether a state's absolute count went up or down; it is a relative competition among 50 states for 435 seats. A method that adds people inaccurately across states—undercounting some and overcounting others— distorts the relative count even if an individual state's count increases.

Defendants' argument that imputation always increases a state's count

11

in one sense proves too much.[1] As Plaintiffs have consistently maintained, the problem is not that imputation was used at all. Rather, the unprecedented expansion of imputation in the 2020 Census, driven by COVID-19-related operational failures, went beyond what is permitted by law and produced inaccurate results. TAC ¶¶ 88, 95–96. The Bureau doubled the number of whole-person imputations from 5.99 million in 2010 to 10.9 million in 2020. TAC ¶¶ 79–80. Imputation was not an independent variable; it was the Bureau's chosen replacement for the direct enumeration it failed to conduct. The Government Accountability Office confirmed that COVID-related procedural changes and methodological choices "caused these miscounts." TAC ¶ 95.

At the motion-to-dismiss stage, Plaintiffs need not prove which specific imputation method caused the undercount. They must allege facts supporting a plausible causal connection between the challenged conduct and the injury. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs allege (1) that the Bureau used excessive imputation; (2) that the Bureau's own PES found a statistically significant undercount in Florida; and (3) that the apportionment math would have changed with accurate counts. TAC ¶¶ 79–80, 115–126. This is more than sufficient to defeat a motion to dismiss.

---

[1] It is also false. One of many problems with statistical methods like imputation is that, when executed in a methodologically flawed manner, they can result in estimating a household, group quarter, or other residence at, above, or below the actual population. Using imputation always increases population relative to entering "zero" for nonresponsive residences, but does not necessarily increase population relative to the relevant baseline: actual population.

Defendants also argue that redistricting-related injuries are not traceable to the Bureau because the Bureau is "not involved in state redistricting decisions." ECF No. 97 at 25. But traceability requires only that the injury is "fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The Bureau is the sole source of the data that the Florida Legislature is legally required to use when drawing district lines. *See* Fla. Stat. § 11.031(1) (2025) (requiring that "[a]ll acts of the Florida Legislature based upon population and all constitutional apportionments shall be based upon the last federal decennial statewide census"). When the data is inaccurate, every redistricting decision based on it is necessarily infected. The Florida Legislature is not an "independent" third party exercising "unfettered" discretion; it is compelled by law to rely on the Bureau's data. That is precisely the kind of legally mandated reliance that satisfies traceability. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).

**C. Plaintiffs' injuries are redressable.**

**1. Plaintiffs' harms will be remedied by the requested relief.**

At the motion to dismiss stage, Plaintiffs' "burden to prove redressability is 'relatively modest.'" *S. River Watershed All. v. Dekalb Cty.*, 69 F.4th 809, 820 (11th Cir. 2023). Plaintiffs have plainly alleged that "a favorable decision 'would amount to a significant increase in the likelihood that the plaintiff[s]

would obtain relief that directly redresses the injur[ies] suffered.'" *Id.* Plaintiffs' requested relief mirrors that in *Utah*: "a declaration leading, or an injunction requiring, the Secretary to substitute a new 'report' for the old one" and a subsequent "change in a legal status" that would lead to relief. 536 U.S. 452, 463–64. The timing of Plaintiffs' request is no bar.

As discussed below, and contrary to Defendants' position that outside an act of Congress, "there are no other means for post-entitlement reapportionment in this case," the Court in *Utah* did not absolutely foreclose Plaintiffs' requested relief. ECF No. 97 at 15. The Court simply opined that it *could* be impracticable. 536 U.S. at 462–63. But the Court could not have appreciated the impact a global pandemic would have on census data collection, apportionment, and redistricting.

The thrust of Defendants' arguments is that true relief is too many steps removed from the requested relief for the requested relief to be meaningful. However, the TAC alleges events that are neither "speculative" nor "possible" but rather are "significantly more likely" with the Panel's order. For example, the TAC alleges that the President has called on Defendants to "immediately begin work on a new and highly accurate CENSUS." TAC ¶ 140. As for Congress, the statutory scheme makes the transmission of apportionment data largely ministerial: the Secretary reports tabulations to the President, 13 U.S.C. § 141(b), who transmits a statement to Congress showing the

14

apportionment, 2 U.S.C. § 2a(a). Neither the President nor Congress exercises the kind of independent, discretionary judgment that would break the causal chain for redressability.

Additionally, the TAC alleges that Governor DeSantis has announced a special legislative session in April 2026 for congressional redistricting.[2] TAC ¶ 134. With respect to federal funding, Plaintiffs need only show a "sufficient likelihood" that corrected data would alter funding allocations, not that it definitely would. *Dep't of Com.*, 588 U.S. at 766–67. "[F]or standing purposes the relief sought need not be complete." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 927 (11th Cir. 2023). This is sufficient to defeat a motion to dismiss.

### 2. Plaintiffs' harms are redressable under *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349 (11th Cir. 2024).

Additionally, Plaintiffs sufficiently allege injuries that were the direct result of a procedural harm that Plaintiffs suffered: the unprecedented suspension of enumeration procedures and the Bureau's failure to attempt to reach every household, choosing instead to use imputation to fill in the gaps. These harms are analogous to those contemplated by the Eleventh Circuit in *Sustainable Coast*.

---

[2] To the extent that Defendants argue Plaintiffs failed to avail themselves using the Count Question Resolution (CQR) process, Defendants' timing is off. ECF No. 97 at 27. The undercount in Florida was not reported until May 2022. TAC ¶ 143. Florida began redistricting in January 2022, with the process culminating in April 2022. TAC ¶ 131. Florida had no way of knowing the true impact of the 2020 Census until after redistricting was complete.

In that case, the Court held that the failure of the Corps to complete "the full NEPA process" and to "choos[e] instead" a lesser process was a procedural harm for which the redressability analysis "is relaxed." *Sustainable Coast*, 100 F.4th at 1356. Similarly, in this case, the Bureau failed to complete the full enumeration process and chose instead to suspend many of the normal rules concerning enumeration and use imputation to complete the count. These "procedural rules" are in place to protect Plaintiffs' "concrete interests" in an accurate census and related apportionment data. *See id.* If such interests did not exist, Congress would not have created a cause of action to defend them.

Given the allegations that the Bureau "violated certain procedural rules," that these rules are in place to protect Plaintiffs' interests in an accurate census, and that violation of these procedural rules produced an inaccurate census that harmed the Plaintiffs, Plaintiffs have shown "injury in fact" and need only allege that there is "*some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* at 1356–57 (internal quotation marks omitted).

### 3. The retrospective relief Plaintiffs seek is practicable.

The Supreme Court in *Utah* expressly rejected the view that Section 209 is limited to prospective, pre-census relief. *See* 536 U.S. at 462–63 (rejecting the reasoning in *Utah v. Evans*, 182 F. Supp. 2d 1165, 1173–74 (D. Utah 2001)). Although the Court ultimately ruled for the government on the merits, its

16

analysis confirms that Section 209 does not categorically bar post-census relief. *See* 536 U.S. at 462–63.

Defendants make much of Congress's commentary concerning the impetus behind section 209 claims insofar as post-census relief from poorly planned or performed censuses would be "impracticable" in most scenarios. ECF No. 97 at 13–14. It is Defendants' position that *Utah* left open only a narrow window for aggrieved persons to seek retrospective relief under Section 209, when "brought soon enough after completion of the census and heard quickly enough." *Id*. However, the Court could not have contemplated the wholesale suspension of enumeration operations that occurred in 2020. This was not simply "a clerical, a mathematical, or a calculation error." *Utah*, 536 U.S. at 462. This was unlawful substitution that did not come to light until, at the earliest, 2022, when the PES admitted the undercounts. TAC ¶¶ 91, 94. What is practicable to correct a mathematical error necessarily is different from what is practicable to remedy what happened in 2020, and *Utah* does not contemplate otherwise.

Further, there is no third-party limitation to bar redressability. The Eleventh Circuit has squarely rejected the need to show downstream decision-making certainty in procedural rights cases. "[I]f certainty about future administrative outcomes was needed to show standing, citizen-suit provisions 'would be a dead letter.'" *Sustainable Coast*, 100 F.4th at 1357. Vacatur by the Panel

17

of the 2020 enumeration data is enough. The "procedural violation" of the Bureau failing to reach every household "is remedied by process," by the reinstitution of normal enumeration procedures and data collection mechanisms, and these processes "protect[] [Plaintiffs'] concrete interest[s]." *Id.* at 1359. Plaintiffs have "shown redressability."[3] *Id.*

## II.    Plaintiffs' claims are timely.

### A. All claims fall within the applicable statute of limitations.

None of Plaintiffs' claims are time-barred under 28 U.S.C. § 1658 because that "catch-all" provision does not apply to Plaintiffs' claims. All of Plaintiffs' claims are timely under the 6-year statute of limitations in 28 U.S.C. § 2401(a) because all the claims are entitled to review under the APA or—at the very least—are claims against the United States. Notably, Defendants (the United States) only summarily claim that the section 209 claims "continue to be time-barred by … 28 U.S.C. § 1658." ECF No. 97 at 11.

### B. All claims are reviewable under the APA.

At least two of Plaintiffs' five amended claims are pure APA claims. It is

---

[3] Defendants claim that Plaintiffs fatally fail to allege that the individual Plaintiffs are voters of their respective districts. Plaintiffs are voters in these districts and the Panel may take judicial notice of this fact. Further, it is "entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of . . . mere technicalities." *Foman v. Davis*, 371 U.S. 178, 181 (1962). "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Id.* at 181–82 (internal quotation marks omitted).

settled that section 2401(a) applies to APA claims. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11th Cir. 2007) (citing 28 U.S.C. § 2401(a)); *Ctr. for Bio. Div. v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006); *USX Corp. v. Barnhart*, 395 F.3d 161, 166 (3d Cir. 2004).

Intervenors' attempted argument around this undeniable fact—claiming that Plaintiffs' APA claims are barred by the presence of the statutory Section 209 claims—fails. As discussed in detail below, section 209 claims are claims designed by Congress to be brought through the APA and its devices. Courts have affirmed this view time and again by subjecting those claims that are considered special statutory review processes to the 6-year statute of limitations in Section 2401(a) unless the enabling statute of the special review process provides a more specific limitations period. *See Nat'l Org. of Veteran's Advocs., Inc. v. Sec. of Veterans Affs.*, 981 F.3d 1360, 1385–86 (Fed. Cir. 2020); *see also, e.g.,* 28 U.S.C. §§ 2342 and 2344 (60-day limitations period for claims under the Hobbs Act). Congress knows how to create short limitation periods. Section 209 provides no such limitation period. Therefore, section 2401(a) must apply.[4]

---

[4] Intervenors allude to the Panel's prior holding and Plaintiffs' "second bite at the apple" throughout their brief. ECF No. 96 at 17. If this is an attempt to suggest that Plaintiffs waived this argument, Intervenors' suggestions are misplaced. To be clear, Plaintiffs' TAC supersedes the prior complaints and awards Plaintiffs another "bite." Plaintiffs cannot waive arguments only "issues." *Hi-Tech Pharms. v. HBS Int'l*, 910 F.3d 1186, 1194 (11th Cir. 2018). And most importantly, Plaintiffs cannot "waive the application of the correct law or stipulate to an incorrect legal test. To the contrary … even 'confessions of [legal] error do not relieve

Intervenors attempt to invoke the United States's waiver of sovereign immunity to shield it from the applicable statute of limitations. But Section 209 invokes the general waiver of sovereign immunity in 5 U.S.C. § 702 by outlining what constitutes final "agency action" for purposes of a Section 209 claim. Congress clearly intended that the APA be invoked in Section 209 actions and provided the general waiver of sovereign immunity to support it.

### C.  All claims are claims against the United States.

The claims have always been against the United States. In the TAC, Plaintiffs make this abundantly clear by adding the United States as a defendant, which they are entitled to do under the APA. 5 U.S.C. § 702 ("The United States may be named as a defendant in any such action.") If there were ever a "catch-all" statute of limitations to be applied, it is 28 U.S.C. § 2401(a) for suits "against the United States," not 28 U.S.C. § 1658 for suits "arising under an Act of Congress enacted after" December 1, 1990. Contrary to Intervenors' argument, the former *is* the more specific statute.

The text of these two provisions provides the answer: Section 2401(a) provides that "*every* civil action commenced against the United States" shall be barred unless filed within 6 years of accrual, and "every" means all. 28

---

this Court of the performance of the judicial function' because '[o]ur judgments are precedents, and the proper administration of the … law cannot be left merely to the stipulation of parties." *See Jefferson v. Sewon Am.*, 891 F.3d 911, 923 (11th Cir. 2018).

20

U.S.C. § 2401(a) (emphasis added); *Cf. Spannaus v. Dep't of Just.*, 824 F.2d 52, 55 (D.C. Cir. 1987) ("[T]his court's subsequent opinions clarify beyond dispute that § 2401(a) applies to all civil actions whether legal, equitable or mixed"). The only exception is for specified procurement disputes.

Section 1658 provides the important caveat that "[e]xcept as otherwise provided by law" it should apply, and that is exactly the situation in this case. 28 U.S.C. § 1658. It is "otherwise provided by" section 2401(a) that for "*every* suit against the United States" the action is subject to the 6-year limitations period. 28 U.S.C. § 2401(a) (emphasis added). Intervenors' reference to non-binding, inapposite cases to the "contrary" do not show otherwise but rather prove the point that in those cases, a more specific statutorily prescribed limitations period existed and controlled. The only case cited by Intervenors preferring section 1658 over Section 2401(a) is a non-controlling, out-of-circuit outlier that does not explain its finding that section 1658 is a more "specific statute" than section 2401(a). *See* ECF No. 96 at 15, citing *Otoe-Missouria Tribe of Okla.* v. *U.S. Dep't of Hous. & Urb. Dev.*, No. 5:08-cv-1297 (W.D. Okla. Feb. 13, 2014), ECF No. 64.

All Section 209 suits have been brought against the United States, and courts have treated them as such. *See, e.g.*, *Glavin v. Clinton*, 19 F. Supp. 2d 543 (E.D. Va. 1998) (suing the President, the Department of Commerce, the Secretary of Commerce, the Census Bureau, and the Acting Director of the

21

Census Bureau); *U.S. House of Rep's. v. U.S. Dep't of Com.*, 11 F. Supp. 2d 76 (D.D.C. 1998); *Ala. v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057 (M.D. Ala. 2021); *Utah v. Evans*, 536 U.S. 452 (2002) (suing the Secretary of the Department of Commerce and the Acting Director of the Census Bureau); *City of Los Angeles v. U.S. Dep't of Com.*, 307 F.3d 859 (9th Cir. 2002); *Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020) (suing the President, the Department of Commerce, the Secretary of the Department of Commerce, the Census Bureau, and the Director of the Census Bureau). There is no reason to treat this case any differently, and doing so would be a stark departure from settled precedent.

The 6-year statute of limitations outlined in 28 U.S.C. § 2401(a) applies to each of Plaintiffs' claims. That period has not run even from the Panel's earliest assumed date of accrual. *See* ECF No. 84 at 13 (suggesting that April 26, 2021 could have been the date of injury when the Census Bureau published the census data). Therefore, all of Plaintiffs' claims are timely.

### D. Laches is not available in this suit.

Laches cannot bar this suit for four independent reasons. First, it is black letter law that laches cannot bar claims that fall within a congressionally enacted statute of limitations. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 679 (2014) ("[I]n [the] face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief."). The Supreme Court has been unequivocal on this point: applying laches to timely claims would

22

impermissibly place courts in the role of "legislation-overriding," supplanting Congress's deliberate judgment with judicial discretion. *Id.* at 680.

As explained above, Plaintiffs' claims were timely filed within the applicable statute of limitations. Defendants' laches defense is therefore unavailable as a matter of law and should be rejected without further analysis.

Second, even if laches could theoretically apply, neither Defendants nor Intervenors can satisfy their burden of establishing that any delay was "not excusable." *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1546 (11th Cir. 1984). The full scope of the Bureau's reliance on imputation did not and could not become apparent until long after the 2020 Census was conducted. The operative document, the 2020 Census Operational Plan 5.0 ("Plan 5.0"), was not published until February 4, 2022. *See* TAC ¶ 48. Only then did state-level nonresponse and imputation rates start coming to light, revealing the true extent to which statistical substitution had displaced direct enumeration. And even after that disclosure, Plaintiffs required time to analyze the data and appreciate the magnitude of the damage. Plaintiffs cannot be faulted for declining to file suit before the factual record was adequately developed to support their claims. As the Eleventh Circuit has recognized, the limitations clock runs not from the moment harm occurs, but from the moment a plaintiff "knows or should know she has a provable claim." *Kason Indus. v. Component Hardware Grp.*, 120 F.3d 1199, 1206 (11th Cir. 1997). That moment had not

23

arrived until Plaintiffs had access to—and could meaningfully evaluate—the Bureau's operational disclosures.

Third, the injury alleged by Plaintiffs is a continuing one. The effects of the flawed 2020 Census are suffered anew with each congressional election conducted under the incorrect apportionment and with each allocation of federal funds based on inaccurate data. Courts have recognized that laches is less applicable where the alleged harm constitutes a continuing violation. *See, e.g.*, *Thomas v. Bryant*, 366 F. Supp. 3d 786, 803 (S.D. Miss. 2019) (laches less likely to apply when plaintiffs allege ongoing injuries).

Fourth, Defendants' prejudice argument rests on a single, unremarkable premise: that correcting the census might require states to redraw congressional maps. But that is not prejudice—it is democracy working as intended.

States routinely redraw congressional and legislative districts. They did so after the 2020 Census itself. If anything, requiring states to redistrict on the basis of accurate data is less disruptive than allowing malapportioned districts to persist indefinitely. The inconvenience of compliance with the Constitution is not the kind of harm laches was designed to prevent.

Defendants' prejudice argument also fundamentally mischaracterizes the relief Plaintiffs seek. Plaintiffs do not ask this Court to unwind past elections or disturb settled results. They ask only for corrected or supplemental census data to govern *future* apportionment and federal funding decisions. This

distinction is legally dispositive. The Eleventh Circuit has held that laches "serves as a bar only to the recovery of retrospective damages, not to prospective relief." *Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1321 (11th Cir. 2008). The prospective nature of Plaintiffs' requested relief substantially undermines Defendants' prejudice argument.

Finally, even if the Court were to find some cognizable prejudice as to other forms of relief, Plaintiffs also seek a declaratory judgment. A declaratory order imposes no operational burden, compels no immediate action, and prejudices no one. Defendants offer no argument to the contrary, and their silence on this point speaks volumes. Laches does not bar declaratory relief.

## III.    Plaintiffs have stated plausible claims for relief.

### A. Plaintiffs have identified reviewable agency action.

An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and gives rise to "legal consequences." *Bennett*, 520 U.S. at 177–78 (internal quotation marks omitted). As Plaintiffs allege in the TAC, Plan 5.0 constitutes final agency action because it reflects the Bureau's final position on how the 2020 Census was conducted, including the statistical methods employed. *See* TAC ¶¶ 50–62, 201, 215.

Defendants contend that because earlier plans described what the Bureau intended to do, those documents constitute the relevant agency action. But a plan that sets forth future plans is, by definition, tentative and subject

to revision. It does not reflect the "consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177–78.

Moreover, Plaintiffs' claims arise under Section 209, which grants a cause of action to any person "aggrieved by the *use* of any statistical method in violation of the Constitution or any provision of law," (emphasis added), which necessarily does not limit suit to the *planned* use of a statistical method, but includes the *actual use* of one. § 209(b). Earlier operational plans may serve as the basis for a pre-census suit, but a person "aggrieved by the *use*" of prohibited methods necessarily must wait until the post-census plan explains the Bureau's actual, applied methodology. *Id.* (emphasis added). This is especially true given the unprecedented disruptions caused by the COVID-19 pandemic, which forced the Bureau to fundamentally alter its data collection and processing methodologies in ways that could not have been anticipated by earlier plans. *See* TAC ¶¶ 49–62. As Defendants note, "the 5.0 Plan addresses the way the Bureau responded to the COVID-19 pandemic" and describes "the operations and underlying research supporting any adjustments that occurred during enumeration." ECF No. 97 at 6. It was the 5.0 Plan that set forth what statistical procedures the Bureau actually used in the 2020 Census, as distinguished from what it had previously planned to use.

Plaintiffs have stated a claim under Section 209. Defendants contend that Plaintiffs "challenge no particular statistical method," ECF No. 97 at 31,

26

but doing so is not a requirement to state a claim under Section 209. Section 209(h)(1) defines "statistical method" to include any procedure that would "add or subtract counts to or from the enumeration of the population as a result of statistical inference." § 209(h)(1). Imputation is, by definition, a statistical method because it statistically adjusts, adds, or subtracts counts to or from the enumeration of the population as a result of statistical inference.

Defendants' contention that imputation can only increase population counts, and therefore cannot have caused an undercount, also misses the mark at this stage. Plaintiffs' claim is not merely that imputation reduced Florida's raw count (although it may have). Rather, Plaintiffs allege that the Bureau's unprecedented reliance on imputation—imputing 10.9 million people through whole-person imputation alone, nearly double the 5.99 million in 2010 and the 5.77 million in 2000—produced inaccurate results that did not bear "'a reasonable relationship to the accomplishment of an actual enumeration.'" *Dep't of Com.*, 588 U.S. at 769 (quoting *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996)). These "changes led to more imputation, which led to inaccurate results." TAC ¶ 96. And the Bureau's PES confirmed the inaccuracy, finding that Florida was undercounted by a statistically significant 3.48%, or roughly three-quarters of a million people. *Id.* ¶ 115. At the pleading stage, Plaintiffs need only allege facts supporting a plausible inference that the challenged statistical

27

methods produced inaccurate results that affected apportionment. Plaintiffs have met that burden here.

## B. Section 209 does not preclude Plaintiffs' APA claims.

Intervenors contend that the existence of Section 209's cause of action precludes Plaintiffs from bringing claims under the APA, citing the APA's limitation that judicial review is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704; *see* ECF No. 96 at 12. That argument fails for multiple reasons.

First, Section 209 is not a freestanding remedial scheme separate from the APA; instead, it is a special statutory review proceeding that operates within the APA framework. Section 209(c)(2) provides that the "Census 2000 Operational Plan shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census," § 209(c)(2), and goes on to provide specified and unique review jurisdiction with a three-judge panel of the district court. § 209(e)(1). The phrase "final agency action" is a term of art drawn directly from the APA, *see* 5 U.S.C. § 704, and Congress's use of it in Section 209 confirms that Congress understood Section 209 suits to be a species of APA review, not an alternative to it. *See* TAC ¶ 6; 5 U.S.C. § 703 (providing that the "form of proceeding for judicial review" of agency action may be any "special statutory review proceeding relevant to the subject matter"). Claims under Section 209 are precisely this—"a form of special statutory

28

review proceeding under 5 U.S.C. § 703"—and are therefore APA claims. *See* TAC at 39 n.5.

Intervenors respond that Section 209(c)(2)'s reference to "final agency action" merely "obviates any prudential (but not jurisdictional) ripeness concerns," and does not mean that Section 209 claims are APA claims. ECF No. 96 at 13 (citing *Glavin v. Clinton*, 19 F. Supp. 2d 543, 547 (E.D. Va. 1998)). But that reading drains Section 209(c)(2) of all significance. If Congress intended Section 209 to operate entirely outside the APA, there would have been no reason to invoke the APA's "final agency action" framework or specify the requirement for a three-judge panel at all. Congress could simply have said that suits may be brought to challenge the use of statistical methods in connection with the census. Instead, by deeming the operational plan a "final agency action," Congress situated Section 209 within the APA's existing review structure.

Second, even if Section 209 could be viewed as a remedy distinct from the APA, it is not an "adequate" remedy that precludes APA review over all of Plaintiffs' claims. The "other adequate remedy" bar in Section 704 applies only where the alternative remedy "offer[s] the same genre of relief." *Mize v. Pompeo*, 482 F. Supp. 3d 1317, 1343 (N.D. Ga. 2020) (citation omitted); *accord Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012). Section 209 by its terms is limited to challenges by persons "aggrieved by the use of any statistical method in violation of the Constitution

29

or any provision of law." § 209(b). Plaintiffs' APA claims, however, are not limited to challenges to "statistical methods." Count V, for example, alleges that the Bureau's decision-making was arbitrary and capricious under 5 U.S.C. § 706(2)(A) because it failed to adequately explain its reasoning for departing so dramatically from prior census practice—a quintessential APA claim that does not depend on whether imputation qualifies as a "statistical method" under Section 209(h)(1). TAC ¶¶ 210–217. Section 209 does not provide a remedy for that distinct legal theory, and cannot preclude APA review of it.

Third, Intervenors' policy argument that allowing APA claims would "eviscerate" the procedural features of Section 209—including the three-judge panel requirement, expedited review, and direct appeal to the Supreme Court—actually undercuts their position. *See* ECF No. 96 at 13. Those procedural features are the exact features contemplated by 5 U.S.C. § 703's "special statutory review" provision—they supplement, rather than replace, the APA's substantive standards. Plaintiffs have invoked the Section 209 procedures in this case, including the three-judge panel. There is no tension between applying Section 209's procedural framework and adjudicating claims under the APA's substantive standards.

Finally, Intervenors' suggestion that Plaintiffs are attempting to "exploit[] the APA's waiver [of sovereign immunity] to evade limitations on suit contained in other statutes," *Patchak*, 567 U.S. at 215, is misplaced. Plaintiffs

30

are not circumventing Section 209—they are bringing claims under it, along with additional independent claims under the APA. *See* TAC at 39 n.5. The Section 209 claims are "inescapably intertwined with a review of the procedures and merits surrounding" the Bureau's actions under the APA. *Soul Quest Church of Mother Earth, Inc. v. Att'y Gen., U.S.*, 92 F.4th 953, 971 (11th Cir. 2023). The APA's sovereign immunity waiver permits suit against the United States, 5 U.S.C. § 702, and Section 209's existence does not withdraw that waiver for claims that fall within the APA's independent scope. In *Department of Commerce v. New York*, the Supreme Court reviewed the Secretary's census-related decisions under the APA, confirming that the APA provides a viable avenue for challenging census methodology. 588 U.S. at 772–73. If the APA were categorically unavailable for census challenges because Section 209 exists, *Department of Commerce* would have been decided on different grounds.

In sum, Section 209 does not preclude Plaintiffs' APA claims. The two sources of authority work in tandem: Section 209 provides a specialized procedural vehicle for challenging statistical methods used in the census, while the APA provides the broader substantive framework under which agency action— including census methodology—is reviewed.

### C. The constitutional claims are not foreclosed by *Utah*.

The Constitution requires an "actual Enumeration" of each State's population. U.S. CONST. art. I, § 2, cl. 3. The text does not preclude the use of

31

imputation. Instead, as the Supreme Court has explained, "the text uses a general word, 'enumeration,' that refers to a counting process without describing the count's methodological details." *Utah*, 536 U.S. at 474. Plaintiffs do not contend that imputation is categorically prohibited.

But at the same time, *Utah* expressly left open the possibility that a constitutional violation could arise where the Bureau's reliance on imputation becomes so extensive that it effectively amounts to "substitution of statistical methods for efforts to reach households and enumerate each individual." *Id.* at 477. That is precisely what Plaintiffs allege happened here: that because of the COVID-19 pandemic, the Bureau "suspended normal procedures" and resorted to statistical methods on an unprecedented scale rather than exhausting its enumeration efforts. *See* TAC ¶ 49. Whether the Bureau's use of imputation crossed the line identified in *Utah* is a merits question that cannot be resolved at the motion-to-dismiss stage.[5]

### D. Plaintiffs have stated a claim under Section 141(a).

Intervenors argue that Section 141(a) "is a delegation of authority to the Bureau, not a restriction on the Bureau's discretion," and that "[n]othing in § 141(a) limits the Bureau's use of imputation." ECF No. 96 at 24. But the Secretary's authority under Section 141(a) is not "unbounded." *Dep't of Com.*, 588

---

[5] Intervenors contend that Plaintiffs' argument is deficient for failing to provide a workable alternative constitutional framework. ECF No. 96 at 23. However, there is no precedent from this Circuit requiring Plaintiffs to provide such a framework in the context of Plaintiffs' claims.

U.S. at 772. The Secretary has "a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment." *Id.* at 773 (internal quotation marks omitted). And the Secretary's decisions about the "form and content" of the census must bear "a reasonable relationship to the accomplishment of an actual enumeration." *Id.* at 768–69, 772 (internal quotation marks omitted).

The TAC plausibly alleges that the Bureau's extensive reliance upon imputation in conducting the 2020 Census exceeded these limits. The Secretary's authority to conduct the census "in such form and content as he may determine" does not authorize the wholesale substitution of statistical inference for actual enumeration. *See* 13 U.S.C. § 141(a). The Bureau imputed 10.9 million people through whole-person imputation—an unprecedented figure—and failed to pursue the fundamental task of "seek[ing] to reach each individual household" before resorting to statistical methods. TAC ¶ ¶ 65, 79. As such, the Secretary failed to provide an enumeration that "fairly account[ed] for the crucial representational rights that depend on the census and the apportionment." *Dep't of Com.*, 588 U.S. at 773 (internal quotation marks omitted).

It is no answer that Section 141(a) grants the Secretary broad discretion. Broad discretion is not *unfettered* discretion, and the Supreme Court has recognized that there are judicially enforceable limits on how the Secretary exercises that authority. The Secretary crossed those limits.

33

### E. Plaintiffs have stated a claim that the Bureau's use of imputation was arbitrary and capricious.

Plaintiffs have stated a claim that the Bureau's use of imputation was arbitrary and capricious. Intervenors appear to concede as much, arguing only the merits of the claim rather than offering more than a conclusory statement challenging the sufficiency of the pleading. *See* ECF No. 96 at 25.

The TAC alleges that the Bureau's decision to use imputation to the extent it did "when faced with unprecedented gaps in data due to the COVID-19 pandemic was arbitrary and capricious and violated the reason-giving requirements of the APA," TAC ¶ 212, and that the Bureau's use of imputation "altered the actual enumeration by adding to and subtracting from population counts based on statistical inference rather than an actual enumeration," *id.* ¶ 213. These allegations identify a specific agency action—the extensive use of imputation during the 2020 Census—and allege both that the action was unreasonable and that the Bureau failed to adequately explain its reasoning for departing so dramatically from prior practice.

Intervenors respond only that the Bureau's decision was "both 'reasonable and reasonably explained'" and that "the alternative would have been a less accurate Census." ECF No. 96 at 25. Such merits arguments might be appropriate for a dispositive motion after an appropriate administrative record has been produced, but are premature here. The dramatic escalation of whole

34

person imputation from 5.99 million in 2010 to 10.9 million in 2020 produced a census with statistically significant undercounts in six states and overcounts in eight—whereas the 2010 Census "reported no statistically significant undercount or overcount in the population or housing units for any state." TAC ¶¶ 79–80, 94, 143–145. These allegations support a plausible inference that the Bureau's unprecedented expansion of imputation was not adequately justified and produced dramatically more inaccurate outcomes. Those allegations state a claim under the APA.

## CONCLUSION

For the foregoing reasons, the Panel should deny the motions to dismiss. If the Panel grants the motions, the grant should be without prejudice. Defendants' assertion that further amendment would be futile fundamentally misrepresents the nature and purpose of the prior amendments. The first amendment was made solely to correct a clerical error, and the second was necessitated by the addition of counsel. Accordingly, Plaintiffs have not had repeated opportunities to cure substantive deficiencies in their pleading. Under these circumstances, leave to amend should be freely granted.

DATED: April 17, 2026

*/s/ Emily Percival*
Emily Percival (FBN 119313)
James K. Rogers (AZ Bar No. 027287)*
Ryan Giannetti (DC Bar No. 1613384)*
Crystal Clanton (AL Bar No. 1746D29O)*
Robert A. Crossin (IN Bar No. 39340-49)*
Alice Kass (MD Bar No. 2511201130)*
**America First Legal Foundation**
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
Phone: (202) 964-3721
emily.percival@aflegal.org
james.rogers@aflegal.org
ryan.giannetti@aflegal.org
crystal.clanton@aflegal.org
bobby.crossin@aflegal.org
alice.kass@aflegal.org

Respectfully submitted,

R. Quincy Bird (FBN 105746)
Timothy W. Weber (FBN 86789)
Jeremy D. Bailie (FBN 118558)
**Weber, Crabb & Wein, P.A.**
5453 Central Avenue
St. Petersburg, FL 33710
Telephone: (727) 828-9919
Facsimile: (727) 828-9924
timothy.weber@webercrabb.com
jeremy.bailie@webercrabb.com
quincy.bird@webercrabb.com
Secondary:
lisa.willis@webercrabb.com
honey.rechtin@webercrabb.com
natalie.deacon@webercrabb.com

*Admitted *pro hac vice*

*Counsel to Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2026, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

*/s/ Emily Percival*
Emily Percival (FBN 119313)

36