APPEAL,CLOSED,MEDIATION,STAYED

# U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: <u>8:25−cv−02486−WFJ−SDM−RSR</u>

| | |
|---|---|
| University of South Florida College Republicans et al v. Lutnick et al | Date Filed: 09/15/2025 |
| Panel: Judge William F. Jung | Date Terminated: 07/07/2026 |
|     Senior District Judg Steven D. Merryday | Jury Demand: None |
|     Circuit Judge Robin S. Rosenbaum | Nature of Suit: 890 Other Statutory Actions |
| Referred to: Magistrate Judge T. G. Wilson | Jurisdiction: Federal Question |
| Cause: 28:1331 Fed. Question | |

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **University of South Florida College Republicans** | represented by | **Robert Quincy Bird**<br>Weber, Crabb & Wein, P.A.<br>5453 Central Avenue<br>St. Petersburg, FL 33710<br>727−828−9919<br>Fax: 727−828−9924<br>Email: quincy.bird@webercrabb.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Alice Kass**<br>America First Legal Foundation<br>300 Independence Ave<br>Washington, DC 20003<br>301−778−7363<br>Email: alice.kass@aflegal.org<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Crystal Clanton**<br>America First Legal<br>611 Pennsylvania Avenue S.E.<br>Suite 231<br>Washington, DC 20003<br>561−718−1343<br>Email: crystal.clanton@aflegal.org<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Emily Percival**<br>611 Pennsylvania Ave. SE #231<br>Washington, DC 20003<br>904−540−5921<br>Email: emily.percival@aflegal.org<br>*ATTORNEY TO BE NOTICED* |

**James K. Rogers**
611 Pennsylvania Ave, SE #231
Washington, DC 20003
623−335−7771
Email: james.rogers@aflegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeremy David Bailie**
Weber, Crabb & Wein, PA
5453 Central Ave
St. Petersburg, FL 33710−8049
727−828−9919
Fax: 727−828−9924
Email: jeremy.bailie@webercrabb.com
*ATTORNEY TO BE NOTICED*

**Robert Andrew Crossin**
America First Legal Foundation
611 Pennsylvania Ave S.E.
Suite 231
Washington, DC 20003
202−596−9846
Email: bobby.crossin@aflegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Giannetti**
America First Legal
611 Pennsylvania Ave. SE #231
Washington, DC 20003
651−402−3821
Email: ryan.giannetti@aflegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy W. Weber**
Weber, Crabb & Wein, PA
5453 Central Ave
St. Petersburg, FL 33710−8049
727/828−9919
Fax: 727/828−9924
Email: timothy.weber@webercrabb.com
*ATTORNEY TO BE NOTICED*

**William Frank Scolinos**
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
202−964−3721
Email: william.scolinos@aflegal.org
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**President Michael Fusella**                                    represented by   **Robert Quincy Bird**
*individually*                                                                  (See above for address)
                                                                                *LEAD ATTORNEY*
                                                                                *ATTORNEY TO BE NOTICED*

                                                                                **Alice Kass**
                                                                                (See above for address)
                                                                                *PRO HAC VICE*
                                                                                *ATTORNEY TO BE NOTICED*

                                                                                **Crystal Clanton**
                                                                                (See above for address)
                                                                                *PRO HAC VICE*
                                                                                *ATTORNEY TO BE NOTICED*

                                                                                **Emily Percival**
                                                                                (See above for address)
                                                                                *ATTORNEY TO BE NOTICED*

                                                                                **James K. Rogers**
                                                                                (See above for address)
                                                                                *PRO HAC VICE*
                                                                                *ATTORNEY TO BE NOTICED*

                                                                                **Jeremy David Bailie**
                                                                                (See above for address)
                                                                                *ATTORNEY TO BE NOTICED*

                                                                                **Robert Andrew Crossin**
                                                                                (See above for address)
                                                                                *PRO HAC VICE*
                                                                                *ATTORNEY TO BE NOTICED*

                                                                                **Ryan Giannetti**
                                                                                (See above for address)
                                                                                *PRO HAC VICE*
                                                                                *ATTORNEY TO BE NOTICED*

                                                                                **Timothy W. Weber**
                                                                                (See above for address)
                                                                                *ATTORNEY TO BE NOTICED*

                                                                                **William Frank Scolinos**
                                                                                (See above for address)
                                                                                *PRO HAC VICE*
                                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

3

**Pinellas County Young Republicans**                    represented by    **Robert Quincy Bird**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alice Kass**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Crystal Clanton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emily Percival**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James K. Rogers**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeremy David Bailie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Andrew Crossin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Giannetti**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy W. Weber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Frank Scolinos**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**President Parisa Mousavi**                    represented by    **Robert Quincy Bird**
*individually*                                                   (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

4

**Crystal Clanton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emily Percival**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James K. Rogers**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeremy David Bailie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Andrew Crossin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Giannetti**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy W. Weber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Frank Scolinos**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Byron L. Donalds**<br>*in his official capacity as a Member of*<br>*Congress* | represented by | **Alice Kass**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Crystal Clanton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Percival**
(See above for address)
*ATTORNEY TO BE NOTICED*

5

**Robert Andrew Crossin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Giannetti**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Frank Scolinos**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James K. Rogers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gretchen Zoeller**                                  represented by    **Alice Kass**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Andrew Crossin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Percival**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Secretary of Commerce**                            represented by    **Kevin Bell**
*official capacity*                                                   DOJ–Civ
Civil Division, U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
202–880–0329
Email: kevin.k.bell@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathryn Alkire**
DOJ–Civ
1100 L Street NW
Washington, DC 20005
202–307–0184

Email: kathryn.l.alkire@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ron S Jarmin**                                   represented by   **Kevin Bell**
*in his official capacity as Acting Director*                        (See above for address)
*of the U.S. Census Bureau*                                          *LEAD ATTORNEY*
*TERMINATED: 11/12/2025*                                             *ATTORNEY TO BE NOTICED*

                                                                     **Kathryn Alkire**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Acting Director, U.S. Census Bureau**           represented by   **Kevin Bell**
*official capacity*                                                  (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Kathryn Alkire**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

**Intervenor**

**Alliance for Retired Americans**                represented by   **David Robert Fox**
                                                                     Elias Law Group LLP
                                                                     250 Massachusetts Ave NW
                                                                     Suite 400
                                                                     Washington, DC 20001
                                                                     202–968–4546
                                                                     Email: dfox@elias.law
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Frederick S. Wermuth**
                                                                     King, Blackwell, Zehnder & Wermuth, PA
                                                                     25 E. Pine St
                                                                     Orlando, FL 32801
                                                                     407/422–2472
                                                                     Fax: 407/648–0161
                                                                     Email: fwermuth@kbzwlaw.com
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Max Accardi**
                                                                     Elias Law Group LLP
                                                                     250 Massachusetts Ave NW Ste 400
                                                                     Washington, DC 20001
                                                                     816–896–2743
                                                                     Email: max.c.accardi@gmail.com
                                                                     *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Quinn B. Ritter**
25 East Pine Street
Orlando, FL 32801
407–422–2472
Fax: 407–648–0161
Email: qritter@kbzwlaw.com
*ATTORNEY TO BE NOTICED*

**Richard Alexander Medina**
Elias Law Group LLP
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
202–987–5010
Email: rmedina@elias.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tori Shaw**
Elias Law Group LLP
Litigation
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
202–987–4663
Email: tshaw@elias.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Manuel Guerrero**                    represented by   **David Robert Fox**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Frederick S. Wermuth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max Accardi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Quinn B. Ritter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Alexander Medina**

8

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tori Shaw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Cameron Driggers**                    represented by   **David Robert Fox**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Frederick S. Wermuth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max Accardi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Quinn B. Ritter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Alexander Medina**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tori Shaw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/15/2025 | 1 | COMPLAINT against Ron S Jarmin, Howard W Lutnick (Filing fee $405 receipt number AFLMDC–23870958) filed by University of South Florida College Republicans, Parisa Mousavi, Pinellas County Young Republicans, Michael Fusella. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons, # 3 Proposed Summons)(Bird, Robert) (Entered: 09/15/2025) |
| 09/15/2025 | 2 | AMENDED COMPLAINT against All Defendants filed by All Plaintiffs. Related document: 1 Complaintfiled by University of South Florida College RepublicansPinellas County Young Republicans, Parisa Mousavi, Michael Fusella.(Bird, Robert) (Entered: 09/15/2025) |

| 09/16/2025 | 3 | NEW CASE ASSIGNED to Judge William F. Jung and Magistrate Judge Thomas G. Wilson. New case number: 8:25–cv–02486–WFJ–TGW. (LAW) (Entered: 09/16/2025) |
|---|---|---|
| 09/17/2025 | 4 | SUMMONS issued as to Ron S Jarmin, Howard W Lutnick. (JVC) (Entered: 09/17/2025) |
| 09/17/2025 | 5 | NOTICE TO COUNSEL Jeremy David Bailie, Robert Quincy Bird and Timothy W. Weber of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who – unless the party changes the designation – remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (JVC) (Entered: 09/17/2025) |
| 09/17/2025 | 6 | NOTICE of Lead Counsel Designation by Robert Quincy Bird on behalf of Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. Lead Counsel: R. Quincy Bird. (Bird, Robert) (Entered: 09/17/2025) |
| 09/23/2025 | 7 | **STANDING ORDER regarding Discovery Motions. Signed by Magistrate Judge Thomas G. Wilson on 9/23/2025. (KMN)** (Entered: 09/23/2025) |
| 09/26/2025 | 8 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by University of South Florida College Republicans. (Bailie, Jeremy) Modified on 9/29/2025 as to docket text(LJC). (Entered: 09/26/2025) |
| 09/26/2025 | 9 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Michael Fusella. (Bailie, Jeremy) Modified on 9/29/2025 as to docket text (LJC). (Entered: 09/26/2025) |
| 09/26/2025 | 10 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Pinellas County Young Republicans. (Bailie, Jeremy) Modified on 9/29/2025 as to docket text (LJC). (Entered: 09/26/2025) |
| 09/26/2025 | 11 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Parisa Mousavi. (Bailie, Jeremy) (Entered: 09/26/2025) |
| 09/26/2025 | 12 | Amended DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by University of South Florida College Republicans. (Bailie, Jeremy) Modified on 9/29/2025 as to docket text (LJC). (Entered: 09/26/2025) |
| 09/26/2025 | 13 | Amended DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Michael Fusella. (Bailie, Jeremy) Modified on 9/29/2025 as to docket text (LJC). (Entered: 09/26/2025) |
| 09/26/2025 | 14 | Amended DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Pinellas County Young Republicans. (Bailie, Jeremy) Modified on 9/29/2025 as to docket text (LJC). (Entered: 09/26/2025) |
| 10/03/2025 | 15 | **ENDORSED ORDER directing Plaintiffs to serve process on the Defendants on an expedited basis and to file proof of service concerning same. Signed by Judge William F. Jung on 10/3/2025. (CCB)** (Entered: 10/03/2025) |
| 10/03/2025 | 16 | SUMMONS returned executed by University of South Florida College Republicans, Parisa Mousavi, Pinellas County Young Republicans, Michael Fusella. Ron S Jarmin |

| | | |
|---|---|---|
| | | served on 9/17/2025, answer due 11/17/2025; Howard W Lutnick served on 9/17/2025, answer due 11/17/2025. (Attachments: # 1 Exhibit A – Return of Service (Lutnick), # 2 Exhibit B – Return of Service (Jarmin), # 3 Exhibit C – Proof of Delivery (Lutnick), # 4 Exhibit D – Proof of Delivery (Jarmin), # 5 Exhibit E – Proof Delivery (Pam Bondi))(Bird, Robert) (Counsel notified to refile separate entries) Modified text on 10/6/2025 (MGB). (Entered: 10/03/2025) |
| 10/06/2025 | 17 | SUMMONS returned executed by University of South Florida College Republicans, Parisa Mousavi, Pinellas County Young Republicans, Michael Fusella. Howard W Lutnick served on 9/19/2025, answer due 11/24/2025. (Attachments: # 1 Exhibit A – Return of Service (Lutnick), # 2 Exhibit B – Proof of Delivery (Lutnick), # 3 Exhibit C – Proof Delivery (Pam Bondi))(Bird, Robert) Modified on 10/7/2025 to edit docket text (JDR). (Entered: 10/06/2025) |
| 10/06/2025 | 18 | SUMMONS returned executed by University of South Florida College Republicans, Parisa Mousavi, Pinellas County Young Republicans, Michael Fusella. Ron S Jarmin served on 9/19/2025, answer due 11/24/2025. (Attachments: # 1 Exhibit A – Return of Service (Jarmin), # 2 Exhibit B – Proof of Delivery (Jarmin), # 3 Exhibit C – Proof Delivery (Pam Bondi))(Bird, Robert) Modified on 10/7/2025 to edit docket text (JDR). (Entered: 10/06/2025) |
| 10/07/2025 | 19 | MOTION for James Rogers to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–23969838 for $150 by All Plaintiffs. (Bird, Robert) Motions referred to Magistrate Judge Thomas G. Wilson. (Entered: 10/07/2025) |
| 10/07/2025 | 20 | MOTION for Crystal Clanton to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–23969854 for $150 by All Plaintiffs. (Bird, Robert) Motions referred to Magistrate Judge Thomas G. Wilson. (Entered: 10/07/2025) |
| 10/07/2025 | 21 | MOTION for Ryan Giannetti to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–23969857 for $150 by All Plaintiffs. (Bird, Robert) Motions referred to Magistrate Judge Thomas G. Wilson. (Entered: 10/07/2025) |
| 10/07/2025 | 22 | MOTION for Miscellaneous Relief, specifically Convene Judicial Panel by All Plaintiffs. (Bird, Robert) (Entered: 10/07/2025) |
| 10/08/2025 | 23 | **ENDORSED ORDER granting 19 Motion to Appear Pro Hac Vice. Accordingly, James Roger is authorized to appear pro hac vice. Signed by Magistrate Judge Thomas G. Wilson on 10/8/2025. (KMN)** (Entered: 10/08/2025) |
| 10/08/2025 | 24 | **ENDORSED ORDER granting 20 Motion to Appear Pro Hac Vice; granting 21 Motion to Appear Pro Hac Vice. Accordingly, Crystal Clanton and Ryan Giannetti are authorized to appear pro hac vice. Signed by Magistrate Judge Thomas G. Wilson on 10/8/2025. (KMN)** (Entered: 10/08/2025) |
| 10/08/2025 | 25 | **ORDER of Referral to Chief Judge Pryor per 28 U.S.C. 2284. Signed by Judge William F. Jung on 10/8/2025. (Attachments: # 1 Appendix, # 2 Appendix)(CCB)** (Entered: 10/08/2025) |
| 10/08/2025 | 26 | **AMENDED ORDER of Referral to Chief Judge Pryor per 28 U.S.C. 2284. (Amended to replace the initial complaint with the amended complaint). Signed by Judge William F. Jung on 10/8/2025. (Attachments: # 1 Appendix, # 2 Appendix)(CCB)** (Entered: 10/08/2025) |
| 10/20/2025 | | Senior District Judge Steven D. Merryday and Circuit Judge Robin S. Rosenbaum added. (CTR) (Entered: 10/20/2025) |

11

| 10/20/2025 | 27 | **DESIGNATION OF THREE–JUDGE COURT. Signed by Judge William H. Pryor. Jr. on 10/17/2025. (CTR)** (Entered: 10/20/2025) |
|---|---|---|
| 10/22/2025 | 28 | **ENDORSED ORDER: The Court submitted an Order of Referral to the Chief Judge of the U.S. Eleventh Circuit Court of Appeals 25 26, having considered the 22 Motion to Convene. Thereafter, the Designation of Three–Judge Court was entered by Chief Judge Pryor 27. Signed by Judge William F. Jung on 10/22/2025. (CCB)** (Entered: 10/22/2025) |
| 10/28/2025 | 29 | MOTION to Intervene *as Defendants* by Alliance for Retired Americans, Manuel Guerrero, Cameron Driggers. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit Proposed Answer)(Wermuth, Frederick) (Entered: 10/28/2025) |
| 10/28/2025 | 30 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Alliance for Retired Americans. (Wermuth, Frederick) (Entered: 10/28/2025) |
| 10/28/2025 | 31 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Cameron Driggers. (Wermuth, Frederick) (Entered: 10/28/2025) |
| 10/28/2025 | 32 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Manuel Guerrero. (Wermuth, Frederick) (Entered: 10/28/2025) |
| 10/28/2025 | 33 | Unopposed MOTION for David R. Fox to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–24050132 for $150 by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) Motions referred to Magistrate Judge Thomas G. Wilson. (Entered: 10/28/2025) |
| 10/28/2025 | 34 | Unopposed MOTION for Richard Medina to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–24050209 for $150 by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) Motions referred to Magistrate Judge Thomas G. Wilson. (Entered: 10/28/2025) |
| 10/29/2025 | 35 | NOTICE of Appearance by Kevin Bell on behalf of Ron S Jarmin, Howard W Lutnick (Bell, Kevin) (Entered: 10/29/2025) |
| 10/29/2025 | 36 | NOTICE of Appearance by Emily Percival on behalf of Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans (Percival, Emily) (Entered: 10/29/2025) |
| 10/29/2025 | 37 | **ENDORSED ORDER taking under advisement 29 Motion to Intervene. Any objection by Plaintiff is due within 14 days. Signed by Judge William F. Jung on 10/29/2025. (Jung, William)** (Entered: 10/29/2025) |
| 10/29/2025 | 38 | **ENDORSED ORDER: Within 14 days, Plaintiffs and potential intervenors should file a brief memorandum concerning the necessity for a three–judge panel. Kindly consult the case law such as Alabama v. Department of Commerce, 2021 WL 1171873 (M.D. Ala. 2021)(Huffaker, J.), panel opinion 546 F. Supp.3d 1057 (M.D. Ala. 2021); Alabama v. Department of Commerce, 493 F. Supp.3d 1123 (N.D. Ala. 2020); Common Cause v. Trump, 2020 WL 9720064 (D. D.C. 2020); Fed. for Am. Imm. Reform v. Klutznick, 486 F. Supp. 564, 577–578 (D. D.C. 1080). Signed by Judge William F. Jung on 10/29/2025. (Jung, William)** (Entered: 10/29/2025) |
| 10/29/2025 | 39 | **As to any pleading preferences you may consult Judge Jung's preference page on the web site. Signed by Judge William F. Jung on 10/29/2025. (Jung, William)** |

| | | (Entered: 10/29/2025) |
|---|---|---|
| 10/29/2025 | 40 | **ENDORSED ORDER granting 33 David R. Fox's Motion to Appear Pro Hac Vice and granting 34 Richard Medina's Motion to Appear Pro Hac Vice. Signed by Magistrate Judge Thomas G. Wilson on 10/29/2025. (MEM)** (Entered: 10/29/2025) |
| 10/31/2025 | 41 | Unopposed MOTION for Robert Andrew Crossin to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC−24065927 for $150 by Michael Fusella, Parisa Mousavi. (Bird, Robert) Motions referred to Magistrate Judge Thomas G. Wilson. Modified docket text on 11/4/2025 (JG). (Entered: 10/31/2025) |
| 10/31/2025 | 42 | **ENDORSED ORDER granting 41 Motion to Appear Pro Hac Vice. Signed by Magistrate Judge Thomas G. Wilson on 10/31/2025. (MEM)** (Entered: 10/31/2025) |
| 11/12/2025 | 43 | Second AMENDED COMPLAINT against All Defendants filed by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Certification of Defendants' Consent to Amend)(Rogers, James) Modified on 11/12/2025 as to docket text (LJC). (Entered: 11/12/2025) |
| 11/12/2025 | 44 | PLAINTIFF'S BRIEF re 38 Order *re Necessity of Three−Judge Panel* filed by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. (Rogers, James) (Entered: 11/12/2025) |
| 11/12/2025 | 45 | RESPONSE in Opposition re 29 MOTION to Intervene *as Defendants* filed by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. (Rogers, James) (Entered: 11/12/2025) |
| 11/12/2025 | 46 | NOTICE TO COUNSEL Ryan Giannetti of Local Rule 2.01(b)(2)(B), which requires members of the Middle District bar to maintain with the clerk a current telephone number, mailing address, and email address. Update your contact information for the Middle District through PACER. (Signed by Deputy Clerk). (LJC) (Entered: 11/12/2025) |
| 11/12/2025 | 47 | DEFENDANT'S BRIEF re 38 Order *Proposed Intervenor's Brief Regarding the Need for a Three−Judge Panel* filed by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) (Entered: 11/12/2025) |
| 11/12/2025 | 48 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Acting Director, U.S. Census Bureau, Ron S Jarmin, Secretary of Commerce. (Bell, Kevin) (Entered: 11/12/2025) |
| 11/12/2025 | 49 | RESPONSE in Opposition re 29 MOTION to Intervene *as Defendants* filed by Acting Director, U.S. Census Bureau, Ron S Jarmin, Secretary of Commerce. (Bell, Kevin) (Entered: 11/12/2025) |
| 11/14/2025 | 50 | MOTION for Summary Judgment by All Plaintiffs. (Attachments: # 1 Exhibit Index, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26)(Percival, Emily) (Entered: 11/14/2025) |

| 11/14/2025 | 51 | STATEMENT of undisputed facts re: 50 MOTION for Summary Judgment by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. (Percival, Emily) Modified on 11/17/2025 to edit docket text (MSN). (Entered: 11/14/2025) |
|---|---|---|
| 11/14/2025 | 52 | Corrected STATEMENT of undisputed facts re: 50 MOTION for Summary Judgment , 51 Statement of undisputed facts by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. (Rogers, James) Modified on 11/17/2025 to edit docket text (MSN). (Entered: 11/14/2025) |
| 11/15/2025 | 53 | CASE MANAGEMENT REPORT. (Percival, Emily) (Entered: 11/15/2025) |
| 11/19/2025 | 54 | DEFENDANT'S BRIEF re 29 MOTION to Intervene *as Defendants*, 49 Response in Opposition to Motion *Proposed Intervenors Reply in Support of Motion to Intervene* filed by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Wermuth, Frederick) (Entered: 11/19/2025) |
| 11/20/2025 | 55 | **ENDORSED ORDER granting 29 Motion to Intervene pursuant to Fed. R. Civ. P. 24(b)(1)(B). Upon review of the record, the Panel grants permissive intervention of Movants. The Panel notes that Fed. R. Civ. P. 24(b)(3) cautions that such intervention should not cause undue delay. Signed by Judge William F. Jung on 11/20/2025. (Jung, William)** (Entered: 11/20/2025) |
| 11/20/2025 | 56 | **ENDORSED ORDER: All parties are reminded to consult and follow the M.D. Fla. Local Rules, including those related to font type, size, and page limits. Signed by Judge William F. Jung on 11/20/2025. (Jung, William)** (Entered: 11/20/2025) |
| 11/20/2025 | 57 | **CASE MANAGEMENT AND SCHEDULING ORDER: Discovery due by 2/20/2026. Defendants' Dispositive motion due by 2/27/2026. Conduct mediation hearing by 3/20/2026. Pretrial statement due by 7/10/2026. Final Pretrial Conference set for 7/17/2026 at 9:30 AM before Judge William F. Jung, Judge Steven D. Merryday, and Judge Robin S. Rosenbaum. Bench Trial set for the September 2026 Trial Term commencing 9/8/2026 at 9:00 AM (date certain and venue to be determined shortly) before the three–judge panel. Signed by Judge William F. Jung on 11/20/2025. (CCB)** (Entered: 11/20/2025) |
| 11/21/2025 | 58 | NOTICE of Appearance by Kathryn Alkire on behalf of Acting Director, U.S. Census Bureau, Ron S Jarmin, Secretary of Commerce (Alkire, Kathryn) (Entered: 11/21/2025) |
| 11/26/2025 | 59 | MOTION for Extension of Time to File Response/Reply as to 50 MOTION for Summary Judgment by Acting Director, U.S. Census Bureau, Ron S Jarmin, Secretary of Commerce. (Bell, Kevin). (Entered: 11/26/2025) |
| 11/26/2025 | 60 | MOTION to Dismiss Complaint for lack of subject–matter jurisdiction and failure to state a claim Intervenor–Defendants' Motion to Dismiss by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick). (Entered: 11/26/2025) |
| 11/26/2025 | 61 | RESPONSE in Opposition re 59 MOTION for Extension of Time to File Response/Reply as to 50 MOTION for Summary Judgment filed by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, |

14

| | | University of South Florida College Republicans. (Percival, Emily). (Entered: 11/26/2025) |
|---|---|---|
| 12/02/2025 | 62 | **ENDORSED ORDER granting 59 Motion for Extension of Time to File Response. Responses due by 12/19/2025 Reply due by 1/9/2026. Signed by Judge William F. Jung on 12/2/2025. (Jung, William)** (Entered: 12/02/2025) |
| 12/03/2025 | 63 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Byron L. Donalds. (Percival, Emily) (Entered: 12/03/2025) |
| 12/17/2025 | 64 | Unopposed MOTION for Tori Shaw to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–24244799 for $150 by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) Motions referred to Magistrate Judge Thomas G. Wilson. (Entered: 12/17/2025) |
| 12/17/2025 | 65 | RESPONSE in Opposition re 60 MOTION to Dismiss Complaint for lack of subject–matter jurisdiction and failure to state a claim *Intervenor–Defendants' Motion to Dismiss* filed by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. (Percival, Emily) (Entered: 12/17/2025) |
| 12/18/2025 | 66 | Unopposed MOTION to File Excess Pages by All Defendants. (Bell, Kevin) (Entered: 12/18/2025) |
| 12/18/2025 | 67 | **ENDORSED ORDER granting Defendants' unopposed 66 Motion to File Excess Pages as to Defendants' response and Plaintiffs' reply, as set forth on page 2 of the motion. Signed by Judge William F. Jung on 12/18/2025. (CCB)** (Entered: 12/18/2025) |
| 12/19/2025 | 68 | **ENDORSED ORDER granting 64 Motion to Appear Pro Hac Vice by Tori Shaw. Signed by Magistrate Judge Thomas G. Wilson on 12/19/2025. (MEM)** (Entered: 12/19/2025) |
| 12/19/2025 | 69 | RESPONSE in Opposition re 50 MOTION for Summary Judgment filed by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Attachments: # 1 Exhibit Index, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Wermuth, Frederick) Modified text on 12/22/2025 (BD). (Entered: 12/19/2025) |
| 12/19/2025 | 70 | RESPONSE re 51 Statement of undisputed facts filed by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) (Entered: 12/19/2025) |
| 12/19/2025 | 71 | RESPONSE in Opposition re 50 MOTION for Summary Judgment filed by Acting Director, U.S. Census Bureau, Ron S Jarmin, Secretary of Commerce. (Bell, Kevin) (Entered: 12/19/2025) |
| 12/19/2025 | 72 | RESPONSE re 51 Statement of undisputed facts filed by Acting Director, U.S. Census Bureau, Ron S Jarmin, Secretary of Commerce. (Bell, Kevin) (Entered: 12/19/2025) |
| 12/23/2025 | 73 | REPLY to Response to Motion re 50 MOTION for Summary Judgment filed by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. (Percival, Emily) (Entered: 12/23/2025) |
| 12/24/2025 | 74 | |

15

| | | |
|---|---|---|
| | | DEFENDANT'S BRIEF re 60 MOTION to Dismiss Complaint for lack of subject–matter jurisdiction and failure to state a claim *Intervenor–Defendants' Motion to Dismiss Intervenor–Defendants' Reply In Support of Their Motion to Dismiss* filed by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) (Entered: 12/24/2025) |
| 01/05/2026 | 75 | UNOPPOSED MOTION for Max Accardi to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–24290071 for $150 by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) Motions referred to Magistrate Judge Thomas G. Wilson. Modified on 1/6/2026 to edit docket text (JDR). (Entered: 01/05/2026) |
| 01/07/2026 | 76 | Unopposed MOTION to Stay Discovery *pending Resolution of Dispositive Motions* by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. (Percival, Emily) (Entered: 01/07/2026) |
| 01/07/2026 | 77 | **ENDORSED ORDER granting 75 Motion to Appear Pro Hac Vice. Signed by Judge William F. Jung on 1/7/2026. (CCB)** (Entered: 01/07/2026) |
| 01/08/2026 | 78 | RESPONSE to 76 MOTION to Stay Discovery filed by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Attachments: # 1 Exhibit Index, # 2 Exhibit A – Brunell – Expert Report, # 3 Exhibit B – Puelz – Expert Report)(Wermuth, Frederick) Modified text on 1/8/2026 (BD). (Entered: 01/08/2026) |
| 01/08/2026 | 79 | REPLY to Response to Motion re 76 Unopposed MOTION to Stay Discovery *Pending Resolution of Dispositive Motions* filed by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. (Percival, Emily) (Entered: 01/08/2026) |
| 01/09/2026 | 80 | NOTICE TO COUNSEL William Scolinos Local Rule 2.01(c), Special Admission – File a Motion to Appear Pro Hac Vice. Co–counsel with filing rights may electronically file the motion on behalf of the lawyer seeking Special Admission or the motion may be filed in paper format; Pay the Special Admission Fee; (Signed by Deputy Clerk). (MSN) (Entered: 01/09/2026) |
| 01/09/2026 | 81 | Unopposed MOTION for William F. Scolinos to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–24313136 for $150 by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans. (Crossin, Robert) Motions referred to Magistrate Judge Thomas G. Wilson. (Entered: 01/09/2026) |
| 01/12/2026 | 82 | **DOCKETED IN ERROR (JG). (Entered: 01/12/2026) |
| 01/13/2026 | 83 | **ENDORSED ORDER granting 81 Motion to Appear Pro Hac Vice by William Scolinos. Signed by Judge William F. Jung on 1/13/2026. (CCB)** (Entered: 01/13/2026) |
| 02/03/2026 | 84 | **ORDER granting 60 Motion to Dismiss. Per the Panel on 2/3/2026. (Jung, William)** Modified on 2/3/2026 (Jung, William). (Entered: 02/03/2026) |
| 02/03/2026 | 85 | **ENDORSED ORDER denying as moot 50 Motion for Summary Judgment. Signed by Judge William F. Jung on 2/3/2026. (Jung, William)** (Entered: 02/03/2026) |
| 02/03/2026 | 86 | |

16

| | | |
|---|---|---|
| | | **ENDORSED ORDER denying as moot 76 Motion to Stay Discovery. Signed by Judge William F. Jung on 2/3/2026. (Jung, William)** (Entered: 02/03/2026) |
| 02/04/2026 | 87 | NOTICE TO COUNSEL Tori Shaw, Max Accardi, William Scolinos Local Rule 2.01(c), Special Admission – Submit a Pro Hac Vice E–File Registration through PACER. Visit www.flmd.uscourts.gov/for–lawyers for details (Signed by Deputy Clerk). (LD) (Entered: 02/04/2026) |
| 02/17/2026 | 88 | AMENDED COMPLAINT against Acting Director, U.S. Census Bureau, Secretary of Commerce filed by Pinellas County Young Republicans, Michael Fusella, Parisa Mousavi, University of South Florida College Republicans, Byron L. Donalds, Gretchen Zoeller. Related document: 43 Amended Complaintfiled by Byron L. DonaldsUniversity of South Florida College RepublicansPinellas County Young Republicans, Parisa Mousavi, Michael Fusella.(Percival, Emily) (Entered: 02/17/2026) |
| 02/18/2026 | 89 | Unopposed MOTION for Alice M. Kass to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–24486620 for $150 by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans, Gretchen Zoeller. (Crossin, Robert) Motions referred to Magistrate Judge Thomas G. Wilson. (Entered: 02/18/2026) |
| 02/23/2026 | 90 | **ENDORSED ORDER granting 89 Motion to Appear Pro Hac Vice by attorney Kass. Kindly confer with the Clerk to assure all requirements are met. Signed by Judge William F. Jung on 2/23/2026. (Jung, William)** (Entered: 02/23/2026) |
| 02/25/2026 | 91 | ENTERED IN ERROR. (WLB) Modified on 2/25/2026 (LMW). (Entered: 02/25/2026) |
| 02/25/2026 | 92 | Unopposed MOTION for Extension of Time to Respond re 88 Amended Complaint by All Defendants. (Alkire, Kathryn) Modified on 2/25/2026 to edit docket text. (WLB). (Entered: 02/25/2026) |
| 02/25/2026 | 93 | **ENDORSED ORDER granting 92 Motion for Extension of Time to Answer. All Defendants per date requested. Signed by Judge William F. Jung on 2/25/2026. (Jung, William)** (Entered: 02/25/2026) |
| 03/23/2026 | 94 | Consent MOTION to File Excess Pages by Acting Director, U.S. Census Bureau, Ron S Jarmin, Secretary of Commerce. (Bell, Kevin) (Entered: 03/23/2026) |
| 03/24/2026 | 95 | **ENDORSED ORDER granting 94 Motion to File Excess Pages. Signed by Judge William F. Jung on 3/24/2026. (Jung, William)** (Entered: 03/24/2026) |
| 03/27/2026 | 96 | MOTION to Dismiss Third Amended Complaint *Intervenors' Motion to Dismiss Plaintiffs' Third Amended Complaint* by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) (Entered: 03/27/2026) |
| 03/27/2026 | 97 | MOTION to Dismiss Plaintiffs' Third Amended Complaint by All Defendants. (Bell, Kevin) (Entered: 03/27/2026) |
| 04/01/2026 | 98 | MOTION to Compel Production of the Administrative Record by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans, Gretchen Zoeller. (Percival, Emily) (Entered: 04/01/2026) |
| 04/13/2026 | 99 | |

| | | |
|---|---|---|
| | | Unopposed MOTION to File Excess Pages *in Consolidated Opposition Brief* by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans, Gretchen Zoeller. (Percival, Emily) (Entered: 04/13/2026) |
| 04/13/2026 | 100 | **ENDORSED ORDER granting 99 Motion to File Excess Pages. Signed by Judge William F. Jung on 4/13/2026. (Jung, William)** (Entered: 04/13/2026) |
| 04/15/2026 | 101 | RESPONSE in Opposition re 98 MOTION to Compel Production of the Administrative Record *Intervenors' Opposition to Plaintiffs' Motion to Compel Defendants to Produce the Administrative Record* filed by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) (Entered: 04/15/2026) |
| 04/15/2026 | 102 | RESPONSE in Opposition re 98 MOTION to Compel Production of the Administrative Record filed by Acting Director, U.S. Census Bureau. (Alkire, Kathryn) (Entered: 04/15/2026) |
| 04/17/2026 | 103 | RESPONSE in Opposition re 96 MOTION to Dismiss Third Amended Complaint *Intervenors' Motion to Dismiss Plaintiffs' Third Amended Complaint*, 97 MOTION to Dismiss Plaintiffs' Third Amended Complaint filed by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans, Gretchen Zoeller. (Percival, Emily) (Entered: 04/17/2026) |
| 04/22/2026 | 104 | REPLY to Response to Motion re 98 MOTION to Compel Production of the Administrative Record filed by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans, Gretchen Zoeller. (Percival, Emily) (Entered: 04/22/2026) |
| 04/24/2026 | 105 | RESPONSE to Motion re 96 MOTION to Dismiss Third Amended Complaint *Intervenors' Motion to Dismiss Plaintiffs' Third Amended Complaint Intervenors' Reply In Support of Their Motion to Dismiss Plaintiffs' Third Amended Complaint* filed by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) (Entered: 04/24/2026) |
| 04/29/2026 | 106 | **ORDER denying 98 Motion to Compel. Signed by Judge William F. Jung on 4/29/2026. (Jung, William)** (Entered: 04/29/2026) |
| 05/08/2026 | 107 | OPPOSED MOTION to Modify 57 Case Management Scheduling Order by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans, Gretchen Zoeller. (Percival, Emily) Modified on 5/11/2026 to edit docket text (ELA). (Entered: 05/08/2026) |
| 05/22/2026 | 108 | RESPONSE in Opposition re 107 OPPOSED MOTION to Modify 57 Case Management Scheduling Order filed by Alliance for Retired Americans, Cameron Driggers, Manuel Guerrero. (Wermuth, Frederick) (Entered: 05/22/2026) |
| 05/22/2026 | 109 | RESPONSE in Opposition re 107 OPPOSED MOTION to Modify 57 Case Management Scheduling Order filed by Acting Director, U.S. Census Bureau, Ron S Jarmin, Secretary of Commerce. (Alkire, Kathryn) (Entered: 05/22/2026) |
| 05/29/2026 | 110 | REPLY to Response to Motion re 107 OPPOSED MOTION to Modify 57 Case Management Scheduling Order filed by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans, Gretchen Zoeller. (Percival, Emily) (Entered: 05/29/2026) |

| 07/07/2026 | 111 | **ORDER granting 96 Motion to Dismiss With Prejudice. Signed by Judge William F. Jung on 7/7/2026. (Jung, William)** (Entered: 07/07/2026) |
|---|---|---|
| 07/07/2026 | 112 | **ENDORSED ORDER granting 97 Motion to Dismiss per Dkt. 111. Signed by Judge William F. Jung on 7/7/2026. (Jung, William)** (Entered: 07/07/2026) |
| 07/07/2026 | 113 | **ENDORSED ORDER finding as moot 107 Motion to Modify. Signed by Judge William F. Jung on 7/7/2026. (Jung, William)** (Entered: 07/07/2026) |
| 07/08/2026 | 114 | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non–party must move for relief before the seal expires. (Signed by Deputy Clerk). (LJC) (Entered: 07/08/2026) |
| 07/08/2026 | 115 | NOTICE OF APPEAL as to 112 Order on Motion to Dismiss, 111 Order on Motion to Dismiss by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans, Gretchen Zoeller. Filing fee $605, receipt number AFLMDC–25224259. ***Case Stayed. (Percival, Emily) (Entered: 07/08/2026) |
| 07/10/2026 | 116 | CORECTED NOTICE OF APPEAL as to 112 Order on Motion to Dismiss, 115 Notice of Appeal, 111 Order on Motion to Dismiss by Byron L. Donalds, Michael Fusella, Parisa Mousavi, Pinellas County Young Republicans, University of South Florida College Republicans, Gretchen Zoeller. Filing fee not paid. ***Case Stayed. (Percival, Emily) Modified on 7/10/2026 (LSS). (Entered: 07/10/2026) |

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, MICHAEL FUSELLA, PINELLAS COUNTY YOUNG REPUBLICANS, PARISA MOUSAVI, GRETCHEN ZOELLER**, and **BYRON L. DONALDS**,

        Plaintiffs,

        **v.**

**SECRETARY OF COMMERCE** and **ACTING DIRECTOR, U.S. CENSUS BUREAU**,

        Defendants,

**ALLIANCE FOR RETIRED AMERICANS, MANUEL GUERRERO**, and **CAMERON DRIGGERS**,

        Intervenors-Defendants.

Case No. **8:25-cv-02486-WFJ-SDM-RSR**

**THREE-JUDGE COURT**

_____/

Before ROSENBAUM, Circuit Judge, and JUNG and MERRYDAY, District Judges.

PER CURIAM:

## OPINION & ORDER

Before the Court are Defendants Secretary of Commerce Howard W. Lutnick and acting Director of the U.S. Census Bureau George Cook ("Defendants"); and Intervenors-Defendants Alliance for Retired Americans, Cameron Driggers, and Manuel Guerrero's (collectively "Intervenors") Motions to Dismiss the Third

1

Amended Complaint ("Complaint"). Dkts. 96, 97. Plaintiffs, the University of South Florida College Republicans and its president, Michael Fusella; the Pinellas County Young Republicans and its president, Parisa Mousavi; Byron L. Donalds (in his official capacity as a Member of Congress); and Gretchen Zoeller (collectively "Plaintiffs") have responded in opposition. Dkt. 103. The Intervenors have also replied in further support. Dkt. 105. For the reasons discussed below, we grant the motions to dismiss the Complaint with prejudice.

## I.    Background[1]

### A. *The Parties*

Plaintiff University of South Florida College Republicans ("USF Republicans") is a chapter of the College Republican National Committee based in Tampa, within Florida's 15th Congressional District. Dkt. 88 ¶ 13. The group describes its goal as recruiting, training, and mobilizing students to "advocate for conservative ideals" and "participate in civic events," increasing their familiarity with the political process. *Id.* Plaintiff Michael Fusella is the president of USF Republicans. *Id.* ¶ 14. He resides in Florida's 15th Congressional District. *Id.*

Plaintiff Pinellas County Young Republicans ("Pinellas Young Republicans") is an organization designed to "attract young people and provide for them an opportunity to achieve political expression and recognition, more effectively participate in the election process, and better develop and uphold the principles of

---

[1] Unless otherwise noted, this section recounts facts as alleged in Plaintiffs' Complaint, which the Court accepts as true for purposes of resolving these motions to dismiss.

2

the Republican Party . . . ." *Id.* ¶ 15. Pinellas Young Republicans has an address in St. Petersburg, Florida, within Florida's 14th Congressional District. *Id.* Plaintiff Parisa Mousavi is a resident of the 14th Congressional District who serves as president of Pinellas Young Republicans. *Id.* ¶ 16. Newly added Plaintiff, Gretchen Zoeller, resides in the 19th Congressional District of Florida. *Id.* ¶ 17.

Plaintiff Byron L. Donalds is a member of the U.S. House of Representatives, where he represents Florida's 19th Congressional District. *Id.* ¶ 18. He has served in Congress since January 2021. *Donalds, Byron*, Biographical Directory of the U.S. Cong., https://bioguide.congress.gov/search/bio/D000032 [https://perma.cc/GU8P-FTZB] (last visited July 6, 2026).[2]

Defendant Howard W. Lutnick is the U.S. Secretary of Commerce. Dkt. 88 ¶ 19. In that capacity, he leads the U.S. Department of Commerce, which encompasses the U.S. Census Bureau. *See Bureaus and Offices*, U.S. Dep't of Com., https://www.commerce.gov/bureaus-and-offices [https://perma.cc/9TLJ-TY5S] (last visited July 6, 2026). Defendant George Cook is the Acting Director of the U.S. Census Bureau, which is responsible for conducting the decennial census. *See* 13 U.S.C. § 141(a); Dkt. 88 ¶ 19.

Intervenor Alliance for Retired Americans is a nonprofit organization with 4.4 million members nationwide, including more than 200,000 in Florida. Dkt. 29-1 ¶ 2.

---

[2] The Court may take judicial notice of official government publications and websites. *See* Fed. R. Evid. 201(b)(2); *Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018); *Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015).

3

Its membership consists of retirees, many of whom live in "group quarters like nursing homes and assisted living facilities." *Id.* ¶ 7. Intervenor Cameron Driggers is a graduate student at the University of Central Florida. Dkt. 29-2 ¶ 3. Driggers is a registered voter in Florida's 10th Congressional District, where he lives in on-campus student housing. *Id.* ¶¶ 2, 4. Intervenor Manuel Guerrero is an undergraduate student at the University of Central Florida. Dkt. 29-3 ¶ 3. Guerrero is also a registered voter in Florida's 10th Congressional District who lives in on-campus student housing. *Id.* ¶¶ 2, 4.

### B. Statistical Methods

In a change from the prior complaints, Plaintiffs now broadly challenge the "statistical methods" used during the 2020 U.S. Census, which allegedly "resulted in inaccurate population counts in certain States, particularly Florida." Dkt. 88 ¶¶ 2–3. "[T]he Census Bureau had to fundamentally alter its approach to data collection and processing because of the COVID-19 pandemic." *Id.* ¶ 63 (citation omitted); *see also* U.S. Census Bureau, *2020 Census Operational Plan Version 5.0* 173 (2022) [hereinafter "5.0 Plan"], https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan5-and-memo.pdf [https://perma.cc/8XX6-YA5F]. Plaintiffs allege the Bureau "omitted" an estimated 18.8 million people from the 2020 Census. Dkt. 88 ¶¶ 68–71 (citations omitted). The Bureau then attempted to "impute" the missing persons into the count. *Id.* ¶ 69.[3]

---

[3] There are two types of imputation: count imputation and characteristic imputation. *See* Pat Cantwell *How We Complete the Census When Households or Group Quarters Don't Respond*, U.S. Census Bureau, (Apr. 16, 2021, last

4

Count "[i]mputation is a statistical technique used to fill in missing information," which "add[s] or subtract[s] counts to or from the enumeration of the population as a result of statistical inference." *Id.* ¶¶ 70–71 (citations omitted). Filling in missing data with count imputation yields a more accurate census. *See* Pat Cantwell, *How We Complete the Census When Households or Group Quarters Don't Respond*, U.S. Census Bureau (Apr. 16, 2021, last revised Aug. 21, 2023) [hereinafter "*How We Complete the Census*"], https://www.census.gov/newsroom/blogs/random-samplings/2021/04/imputation-when-households-or-group-quarters-dont-respond.html [https://perma.cc/B5DK-BH2E] ("If we were to leave the count for an address blank after all attempts to obtain a response failed, it would be like assigning a count of 0. This would be less accurate overall than imputing a number statistically, since we often have information that people are living there."); Dkt. 88 ¶ 69 (citing *How We Complete the Census*).

Whole-person imputation is a form of count imputation that "uses administrative records or other 'imputation methods' based on people in a similar

---

revised Aug. 21, 2023), https://www.census.gov/newsroom/blogs/random-samplings/2021/04/imputation-when-households-or-group-quarters-dont-respond.html [https://perma.cc/B5DK-BH2E]. Count imputation increases the population counts for enumeration, while characteristic imputation fills in missing information about a household's characteristics, such as age or race. *Id.* While not specified in the Complaint, Plaintiffs are challenging the Bureau's use of count imputation, since characteristic imputation does not affect the population count for enumeration. *Id.*; *see* Dkt. 88 ¶¶ 2–3, 8, 69–71, 103. Curiously, despite the Complaint's challenge to the Bureau's use of count imputation, Plaintiffs extensively cite to the Bureau's *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century*, which is a report on the agency's use of characteristic imputation. *See* Dkt. 88 ¶¶ 70, 72–77, 84–87 (citing Jessica DeJesus & Sarah Konya, *2020 Census Item Nonresponse and Imputation Assessment Report: A New Design for the 21st Century* 1 (2023), https://www2.census.gov/programs-surveys/decennial/2020/program-management/evaluate-docs/EAE-2020-item-nonresponse-assessment.pdf [https://perma.cc/VQ2A-4R9K] ("Characteristic imputation, applied after the household population is established, is in scope for this assessment; count imputation is not in scope.")).

5

24

nearby household to fill 'person characteristics.'" *Id.* ¶ 81 (quoting *2020 Census Undercounts in Six States, Overcounts in Eight*, U.S. Census Bureau (May 19, 2022), https://www.census.gov/library/stories/2022/05/2020-census-undercount-overcount-rates-by-state.html [https://perma.cc/B49T-E6HZ]); *see also* Shadie Khubba et al., *National Census Coverage Estimates for People in the United States by Demographic Characteristics: 2020 Post-Enumeration Survey Estimation Report* 6 (2022) [hereinafter "PES Coverage Estimates Report"], https://www2.census.gov/programs-surveys/decennial/coverage-measurement/pes/national-census-coverage-estimates-by-demographic-characteristics.pdf [https://perma.cc/8RXP-PLQU] ("The [post-enumeration survey] tallied 10.9 million whole-person census imputations in the 2020 Census—all characteristics were imputed for these census person records.").

Plaintiffs claim that the Census Bureau's post-enumeration survey "found that 10.9 million people, or 3.4% of the population, were imputed through whole-person imputation in the 2020 Census." Dkt. 88 ¶ 79 (citing Timothy Kennel, *2020 Post-Enumeration Survey: Defining Whole-Person Census Imputations* 1 (2023) [hereinafter "*Defining Whole-Person Census Imputations*"], https://www2.census.gov/programs-surveys/decennial/coverage-measurement/pes/defining-whole-person-census-imputations.pdf [https://perma.cc/33NM-SLA9]); *see also* PES Coverage Estimates Report 4–6 ("Whole-person imputations represented 3.4 percent of the total census count. . . . The [post-enumeration survey] tallied 10.9 million whole-person census imputations in the 2020 Census.").

6

Importantly, the Bureau uses imputation only as a last resort to fill any remaining gaps in the census data. *See How We Complete the Census* (noting that if the Bureau does not get an initial response from an address it will take the following steps: (1) the agency will reference other administrative records, including prior census survey responses or tax return information; (2) if such administrative records are not available, the enumerators will visit the address again; (3) if the residents remain nonresponsive, the enumerators obtain proxy responses from someone else with knowledge, such as a neighbor or landlord; and (4) finally, as a last resort, the Bureau will use imputation to fill the remaining gaps in the census data).

The Census Bureau released numerous data sets and publications after the 2020 Census. Dkt. 88 ¶ 90. On April 26, 2021, it publicly released the state-by-state population figures used to apportion seats in the U.S. House of Representatives. *See* Press Release, U.S. Census Bureau, 2020 Census Apportionment Results Delivered to the President (Apr. 26, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-apportionment-results.html [https://perma.cc/X84Q-YLEU]; *see* 2 U.S.C. § 2a (requiring the President to submit state population to Congress, determining apportionment of congressional seats). A few months later, on August 12, 2021, the Bureau publicly released its "redistricting file" data set, *see 2020 Census: Redistricting File (Public Law 94-171) Dataset*, U.S. Census Bureau (Aug. 12, 2021), https://www.census.gov/data/datasets/2020/dec/2020-census-redistricting-summary-file-dataset.html [https://perma.cc/D8FN-ESLG], which Florida used to draw legislative district lines. Dkt. 88 ¶¶ 131, 134.

7

After each census, the Census Bureau conducts a post-enumeration survey ("PES") that seeks to estimate the possible "net coverage error rates at the national level" in the Bureau's population counts. *Id.* ¶ 79 (quoting PES Coverage Estimates Report 1). The PES data after the 2020 Census suggested that the Bureau undercounted Florida's population by approximately 3.48 percent. *Id.* ¶ 115 (citing Courtney Hill et al., *Census Coverage Estimates for People in the United States by State and Census Operations: 2020 Post-Enumeration Survey Estimation Report* 16 (2022) [hereinafter "*Estimates for People in the United States by State*"], https://www2.census.gov/programs-surveys/decennial/coverage-measurement/pes/census-coverage-estimates-for-people-in-the-united-states-by-state-and-census-operations.pdf [https://perma.cc/P6W8-SH8N]). However, the Bureau also reported that the use of whole-person imputation during the 2020 Census had "very little impact on net coverage error estimates." *See Defining Whole-Person Census Imputations* 5. Among the three theories of injury Plaintiffs claim to have suffered,[4] they allege that "Florida would have gained an additional House seat and an additional vote in the Electoral College" if the "vast use" of whole-person imputation had not been employed. Dkt. 88 ¶ 146.

### C. Procedural History

On September 15, 2025, nearly five years after the 2020 Census was finalized, Plaintiffs USF Republicans, Fusella, Pinellas Young Republicans, and Mousavi sued

---

[4] Specifically, the theories of injury are vote dilution, Dkt. 88 ¶¶ 143–47, funding injury, *id.* ¶¶ 148–76, and informational injury to Representative Donalds, *id.* ¶¶ 177–84.

8

27

Defendants, requesting a three-judge panel. Dkts. 1, 2.[5] Plaintiffs filed their Second Amended Complaint a couple of months later, in November 2025, adding Congressman Donalds to the case. Dkt. 43.

On February 3, 2026, the Court dismissed without prejudice the Second Amended Complaint because Plaintiffs' claims under Section 209 of Pub. L. No. 105-119, § 209(b), 111 Stat. 2440, 2481 (1997) [hereinafter "Section 209"], were time-barred by 28 U.S.C. § 1658(a)'s default four-year statute of limitations on "'civil action[s] arising under an Act of Congress enacted after' December 1, 1990." Dkt. 84 at 10 (quoting 28 U.S.C. § 1658(a)). We explained that "Plaintiffs don't argue that a different statute of limitations displaces Section 1658's four-year default," and that Plaintiffs' claims accrued by either "April 26, 2021, when the Census Bureau released its counts that had used" the previously challenged statistical methods or, at the latest "August 12, 2021, [when] the Census Bureau publicly released its more granular redistricting data." Id. at 10, 12–13. The Court accordingly dismissed the Second Amended Complaint as time-barred but granted leave to amend. Id. at 19.

On February 17, 2026, Plaintiff filed the operative Third Amended Complaint, arguing that the Bureau's imputation methods: (1) violated the U.S. Constitution's Enumeration Clause, U.S. Const. art. I, § 2; and (2) exceeded the Commerce Secretary's authority under 13 U.S.C. § 141(a), which empowers the Secretary to

---

[5] This case was randomly assigned to Judge William F. Jung, who referred Plaintiffs' request for a three-judge panel to the Chief Judge of the U.S. Court of Appeals for the Eleventh Circuit. See Dkt. 25. Chief Judge William Pryor designated the three judges forming this panel to hear the case together if the case warrants a three-judge panel. Dkt. 27. After receiving additional briefing on the question, the Court concluded that the three-judge panel should hear the case. See Dkt. 57 ¶¶ 5–6.

take the census "in such form and content as he may determine, including the use of sampling procedures and special surveys." Dkt. 88 ¶¶ 43, 187–188, 193. Based on these alleged violations, the Complaint brings five counts: Counts I and II under Section 209 and Counts III–V under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"). *Id.* ¶¶ 185–217. To remedy the alleged harms, Plaintiffs seek declaratory and injunctive relief, asking this Court to order a nationwide recount: the Court is to declare that "[t]he 2020 Census apportionment violates the U.S. Constitution and federal law," require Defendants to "account for the 18.8 million omissions by means of direct contact," and "prepare and publish a corrected or supplemental Pub. L. No. 94-171 redistricting file dataset for the 2020 Census that excludes population data that was substituted with results derived primarily from statistical methods and is otherwise a constitutionally compliant actual enumeration." Dkt. 88 ¶¶ 190, 195, 203, 209, 217; *id.* at 43–44. The Court is then asked to order Defendants to transmit the corrected and updated data to the President. *Id.* at 43–44. After Plaintiffs filed their Third Amended Complaint, Defendants and Intervenors filed the instant motions to dismiss, which are now pending before the Court. Dkts. 96, 97.

## II.     Legal Standards

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) tests whether the court has subject matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). This is because "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994).

10

It is presumed that a federal court lacks jurisdiction in a case until the plaintiff demonstrates the court has jurisdiction over the subject matter. *See id.* (citing *Turner v. Bank of N. Am.*, 4 U.S. 8, 11 (1799); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 182–83 (1936)). "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously [e]nsure that jurisdiction exists over a case . . . ." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

A defendant may challenge subject matter jurisdiction facially or factually. *See Douglas v. United States*, 814 F.3d 1268, 1274–75 (11th Cir. 2016). A facial attack requires the court to examine the complaint, taken as true, to determine whether the plaintiff has sufficiently alleged a jurisdictional basis. *Id.* at 1274. A factual attack "challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Id.* at 1278 (citation modified).

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to contain "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1238 (11th Cir. 2025) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That means that the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Courts will grant a Rule

11

12(b)(6) motion to dismiss based on the statute of limitations having run if the untimeliness is apparent on the face of the complaint. *Karantsalis v. City of Mia. Springs*, 17 F.4th 1316, 1319–20 (11th Cir. 2021). When assessing the "face" of the complaint, we must consider "the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Wells v. Brown*, 58 F.4th 1347, 1357 n.2 (11th Cir. 2023) (en banc) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

### III.   Discussion

Defendants and Intervenors request dismissal of Plaintiffs' Complaint because Plaintiffs lack Article III standing, the claims are time-barred by the four-year statute of limitations in 28 U.S.C. § 1658, and the new APA claims do not save this untimely suit. We agree and dismiss this case. We dismiss with prejudice because Plaintiffs did not request leave to amend and the persistent defects in their pleadings show amendment would be futile.

Our discussion follows in four parts. First, the Court explains that Plaintiffs lack Article III standing with respect to all three of their asserted injuries. Second, even if Plaintiffs had standing, we conclude that Plaintiffs' claims are still untimely under 28 U.S.C. § 1658(a), as the six-year statute of limitations under 28 U.S.C. § 2401(a) does not apply to Section 209 claims. We also clarify that Plaintiffs cannot recast their Section 209 claims as some sort of hybrid APA claim. Third, assuming

12

31

*arguendo* Plaintiffs' APA claims are cognizable, we note why there is no proper final agency action alleged. Fourth, we discuss why dismissal with prejudice is appropriate here.

### A. Article III Standing

Defendants and Intervenors spend substantial time challenging Plaintiffs' standing to bring this action. Article III, § 2, of the Constitution limits a federal court's jurisdiction to "cases" or "controversies." U.S. Const. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976)). As such, "[t]o establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citation omitted).

Here, Plaintiffs do not establish standing as to any of their alleged injuries. Plaintiffs allege three broad categories of injuries: vote dilution due to the loss of one U.S. House of Representatives seat, Dkt. 88 ¶¶ 143–47; the loss of funding for federal programs based on census population totals, *id.* ¶¶ 148–76; and Representative Donalds's informational injury based on his reliance on inaccurate census data, *id.* ¶¶ 177–84.

13

32

The first two alleged injuries, vote dilution and funding loss, fail on causation and redressability. The third, Representative Donalds's asserted informational injury, is neither cognizable as an injury in fact nor judicially redressable.

1. *Vote Dilution & Loss of Funding*

Each requirement of Article III standing is essential. For Plaintiffs' asserted vote-dilution and funding-loss injuries, the Court focuses on causation and redressability, two requirements that "often travel together." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1222 (11th Cir. 2025) (quoting *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021)).

a. *Causation*

To satisfy the causation requirement, a plaintiff must show that his asserted injury in fact is "fairly traceable to the challenged action of the defendant," i.e., the defendant's conduct that the plaintiff alleges was unlawful. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

Plaintiffs fail to establish this prong. They allege that Defendants used "statistical methods" in conducting the 2020 Census. *E.g.*, Dkt. 88 ¶ 2. They also allege that a post-census survey showed that Florida was undercounted in the 2020 Census. *See id.* ¶ 4. But Plaintiffs do not plausibly allege a causal connection between the two. The Complaint contains only conclusory allegations that unlawful statistical methods caused Florida's alleged undercount. *See id.* ¶¶ 103, 146. Even farther from the mark are the allegations that Defendants' use of statistical methods resulted in

14

"inaccurate" population counts, *id.* ¶ 3, or—even more vaguely—that Defendants used such methods in "producing" or "adding to and subtracting from" the census's results, *see id.* ¶¶ 188, 193, 200, 207, 213.

Although, on a motion to dismiss, "we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A conclusory statement that a statutory violation caused an injury is not enough . . . ." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 928 (11th Cir. 2020) (en banc). That's especially so here, where the Bureau has reported that the use of whole-person imputation during the 2020 Census had "very little impact on net coverage error estimates," *see Defining Whole-Person Census Imputations* 5, and Plaintiffs allege no facts to undermine this assessment. Plus, Plaintiffs cite *Estimates for People in the United States by State*, which states that Florida's whole-person imputation rate was 3.6%, while the nationwide rate was 3.4%. So based on Plaintiffs' own citations, excluding whole-person imputation data would thus seem to *increase* any undercount of Florida relative to the rest of the country.

Because Plaintiffs make only conclusory allegations that their alleged vote-dilution and funding-loss injuries are fairly traceable to Defendants' use of statistical methods, those injuries do not confer Article III standing.

### b. Redressability

Plaintiffs' failure on causation is dispositive. But Plaintiffs also fail to show that their alleged vote-dilution and funding-loss injuries would satisfy the

15

redressability requirement. Redressability has two settled principles. First, a plaintiff needs to show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Simon*, 426 U.S. at 38, 43). In other words, there must be a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quoting *Simon*, 426 U.S. at 45).

Second, "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (citation modified); *see also Lujan*, 504 U.S. at 562 (casting doubt on redressability theories that depend on "unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict"). Stated differently, whether a judicial ruling would redress an alleged injury cannot rest on speculation about how third parties might respond. *See Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) ("It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability.").

Plaintiffs request declaratory and mandatory relief. Dkt. 88 at 43–44. We consider whether Plaintiffs have shown a substantial likelihood that this relief would

16

redress their alleged vote-dilution and funding-loss injuries.[6] In other words, is it substantially likely that a declaration that Defendants had unlawfully produced the 2020 Census's total population count and redistricting files would remedy Plaintiffs' alleged injuries in fact? Or is it substantially likely that requiring Defendants to publish and send to the President corrected apportionment and redistricting data would do so?

For two reasons, we find that Plaintiffs have not carried their burden. First, the entitlement certificate revision remedy[7] outlined in *Utah v. Evans*, 536 U.S. 452 (2002), is not appropriate in the markedly different circumstances of this case. Second, Plaintiffs have not shown a substantial likelihood that a favorable judgment would cause absent third parties—"independent actors not before th[is] [C]ourt[]," *Lujan*, 504 U.S. at 562—to take actions that remedy these injuries.

After discussing these two points, we address Plaintiffs' unpersuasive attempt to reframe their injuries as procedural harms that enjoy a more relaxed redressability standard.

> i. *Utah v. Evans* relief is impracticable

Defendants concede, and we acknowledge, that Section 209 does not bar postcensus lawsuits. *See* Dkt. 97 at 13 (citing *Evans*, 536 U.S. at 462). In *Utah v.*

---

[6] We discuss the redressability of Representative Donalds's alleged informational injury below.

[7] An "entitlement certificate" is the process by which the House of Representatives informs each State of the number of Representatives to which it is entitled after a decennial census. Under 13 U.S.C. § 141(b), the decennial census is "reported by the Secretary to the President." The President then sends "Congress a statement showing the whole number of persons in each State" and "the number of Representatives to which each State would be entitled . . . ." 2 U.S.C. § 2a(a). The House must then send each State "a certificate of the number of Representatives to which such State is entitled . . . ." *Id.* § 2a(b).

*Evans*, the Supreme Court emphasized that Section 209 "does not say that it bars postcensus lawsuits," and that "if a lawsuit is brought soon enough after completion of the census and heard quickly enough," relief is not "necessarily impracticable." 536 U.S. at 463 (internal quotations omitted). As such, the redressability requirement may be satisfied by a plaintiff who quickly challenges the census results and could obtain "ultimate relief" by way of "an injunction requiring[] the Secretary to substitute a new [census] 'report' for the old one." *Id.* "Should the new report contain a different conclusion about the relative populations of [the States], the relevant calculations and consequent apportionment-related steps would be purely mechanical; and several months would remain prior to the first post–2000 census congressional election." *Id.* As to the actions of any independent third parties, the Supreme Court further commented that, in the circumstances of *Evans*, "it would seem . . . 'substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision[.]'" *Id.* at 464 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992)).

However, as Defendants correctly point out, this case is in a vastly different posture than *Evans*. Unlike in *Evans*, where the 2000 Census data had recently been released, no new Representatives had been selected, and several months remained before the first post–2000 Census congressional election, *id.* at 461–63, this action challenges the 2020 Census nearly five years after its completion. In those intervening years, 44 states have redrawn their congressional districts (some, like

18

37

Florida, more than once), all 50 states have redrawn state and local districts, two federal elections have been held (with another this year), and new Representatives have been elected based on the new districts.[8] The *Evans* Court recognized that relief from a post-census challenge seeking a revised entitlement certificate is not "necessarily impracticable" in a situation where a lawsuit is "brought soon enough after completion of the census," and "before new Representatives are actually selected," *id.* at 462–63, but none of those circumstances are present here, given the more-than-four-year delay in filing suit and the substantial changes in Representatives following two federal elections and ongoing nationwide redistricting. *See also Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 332 (1999) (recognizing that a postcensus challenge could "result in extreme—possibly irremediable—hardship"). In short, Plaintiffs cannot point to *Evans* to show that relief that depends on a corrected entitlement certificate would not be "impracticable," given the current circumstances. 536 U.S. at 463.

This conclusion is neither novel nor groundbreaking, as Congress understood this problem as well. Section 209 plainly states that "the decennial enumeration of the population is a complex and vast undertaking, and . . . it would be *impracticable* for the States to obtain, and the courts of the United States to provide, meaningful relief *after* such enumeration has been conducted." Pub. L. No. 105-119, § 209(a)(8) (emphasis added). Due to this impracticality concern, and understanding the need

---

[8] Many states are also undergoing current and ongoing redistricting efforts following the Supreme Court's decision in *Louisiana v. Callais*, 146 S. Ct. 1131 (2026).

19

for expediency, Congress mandated that a "district court hearing an action brought under this section" has a duty to "expedite to the greatest possible extent the disposition of" the case. *Id.* § 209(e)(2). Congress then permitted any final order or injunction to be directly appealable to the Supreme Court. *Id.* § 209(e)(1).

Along the same vein, during the 2000 Census, Congress even compelled the Bureau to issue a "comprehensive and detailed plan outlining [the Bureau's] proposed methodologies for conducting the 2000 Decennial Census and available methods to conduct an actual enumeration of the population." *Dep't of Com.*, 525 U.S. at 326 (quoting 1997 Emergency Supplemental Appropriations Act for Recovery from Natural Disasters, and for Overseas Peacekeeping Efforts, Including Those in Bosnia, tit. VIII, 111 Stat. 158, 217). Following the release of the 2000 Census Report and operational plan, Congress passed Section 209 on November 26, 1997, which deemed "the report . . . and the Census 2000 Operational Plan" to be a "final agency action" that was immediately "reviewable in a judicial proceeding." Pub. L. No. 105-119, § 209(c)(2).[9] Essentially, Congress indicated that any challenge to the Bureau's statistical methods for any decennial census should be made either before or soon after the census is complete, as "it would be impracticable for . . . the courts of the United States to provide[] meaningful relief after such enumeration has been conducted." *Id.* § 209(a)(8).

---

[9] Plaintiffs latch onto the "final agency action" language to argue that Section 209 claims can be brought under the APA. Dkt. 103 at 28. As discussed in greater detail below, this language did not transform every single Section 209 claim into some hybrid APA claim. Section 209 is an independent cause of action, independent of the APA.

20

Nor do Plaintiffs seek to correct "a clerical, a mathematical, or a calculation error[] in census data" that requires only a "mechanical revision" to apportionment. *Evans*, 536 U.S. at 462. To the extent that Plaintiffs request mandatory relief compelling Defendants to use "direct contact" to "account for" 18.8 million people Plaintiffs allege weren't directly enumerated in the 2020 Census, Dkt. 88 ¶¶ 190, 195, 203, 209, 217[10]—this would not "translate[] mechanically into a new apportionment of Representatives without further need for exercise of policy judgment." *Evans*, 536 U.S. at 462. Instead, the Bureau would need to make policy judgments about how it would attempt to contact directly the 18.8 million people it allegedly was unable to reach six years ago.

Even assuming the requested correction to the 2020 Census data is clerical or mathematical in nature (without the need for policy judgments), the timing of this suit makes *Evans* inapplicable in another way. The *Evans* Court reasoned that relief was practicable and correcting any error "makes good sense," when an error is discovered "before new Representatives are actually selected." 536 U.S. at 462. But again, millions of voters have already elected Representatives that were apportioned according to the 2020 Census in the 2022 and 2024 election cycles, well before

---

[10] In their prayer for relief, Plaintiffs request only that the court issue mandatory relief requiring Defendants to send to the President and publish new data "that excludes population data that was substituted with results derived primarily from statistical methods," with no mention of mandating an attempt to count millions of people anew. Dkt. 88 at 43–44. That relief would pose yet another redressability problem. As we've mentioned and we discuss further below, Plaintiffs cite *Estimates for People in the United States by State*, which states that Florida's whole-person imputation rate was 3.6%, while the nationwide rate was 3.4%. Excluding whole-person imputation data would thus seem to *increase* any undercount of Florida relative to the rest of the country, which would not redress Plaintiffs' alleged injuries.

Plaintiffs filed suit here. Although we do not hold that relief is always impracticable after a first election conducted using a new census's apportionment, this is yet another distinction from *Evans*.

Plaintiffs have not shown that their requested mandatory relief (i.e., sending new apportionment data to the President and publishing a corrected redistricting dataset) fits inside *Evans*' presumption that an amended entitlement certificate would likely follow. The disruptiveness of the remedy sought—which would affect congressional delegations in multiple states, not just Florida—makes it impracticable.[11]

ii.  Absent third parties

The impracticability concerns regarding Plaintiffs' requested relief are exacerbated because redress requires action by absent third parties. Plaintiffs have not satisfied their burden to show a substantial likelihood that judgment against Defendants would lead to redress of Plaintiffs' alleged vote-dilution and funding-loss injuries. *See Steel Co.*, 523 U.S. at 107 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

As discussed above, "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether

---

[11] To put a finer point on it, assuming the Court rules for Plaintiffs and the Supreme Court affirms, the Court would be ordering Defendants—in 2026 or 2027 at the earliest—to find and directly contact 18.8 million people whom the Bureau could not find in 2020 and who may live in different places now, regardless. This remedy seems exceedingly impracticable, if not impossible, since the Bureau has to find those who were imputed as unfindable in 2020, about seven years later.

22

directly or indirectly." *Lewis*, 944 F.3d at 1301 (citation modified). That means the relief sought must "affec[t] the behavior of the defendant towards the plaintiff." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (citations omitted). The Supreme Court has already noted that "[t]he President and other executive and congressional officials . . . would not be directly bound by . . . a determination" ordering mandatory relief. *Franklin*, 505 U.S. at 803 (plurality opinion).

Start with Plaintiffs' asserted vote-dilution injury. Even if we assume that Congress would not have to enact a new law to effectuate a remedy, *compare Evans*, 536 U.S. at 461–62, *with id.* at 512–13 (Scalia, J., dissenting), redress for Plaintiffs' injury requires action by the President. Any recalculation of the 2020 Census's total population by state will not redress any injury "unless the President accepts the new numbers, changes his calculations accordingly, and issues a new reapportionment statement to Congress." *Franklin*, 505 U.S. at 824 (1992) (Scalia, J., concurring in part). This Court, of course, is generally powerless "to enjoin the President in the performance of his official duties." *Id.* at 803 (plurality opinion) (quoting *State of Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)). And Plaintiffs have not carried their burden to show that the President would be "substantially likely" to respond to new census data by effectuating a new apportionment so late in the decennial process. *Evans*, 536 U.S. at 464 (quoting *Franklin*, 505 U.S. at 803). Plaintiffs cite a single social media post from August 2025, in which the President said he had instructed the Department of Commerce to "work on a new and highly accurate CENSUS based on modern day facts and figures," using information gained in 2024. Dkt. 88 ¶

23

140. This vague, off-point statement falls short of showing a "substantial likelihood," *Stevens*, 529 U.S. at 771 (quoting *Simon*, 426 U.S. at 45), that the President would do something entirely different—accept new, retrospective 2020 Census data from Defendants and send a new apportionment statement to Congress, *see* 2 U.S.C. § 2a(a). Plaintiffs make no allegations that he would. We cannot presume without factual support that a President would impose a massively disruptive burden on multiple states.[12]

To be clear, the *Evans* Court found an entitlement certificate revision "would bring about the ultimate relief that [the plaintiff] seeks" because it was "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision." *Id.* at 463–64 (quoting *Franklin*, 505 U.S. at 803). This finding, however, was based on circumstances where the 2000 Census had recently been released, no new Representatives had been selected, and "several months . . . remain[ed] prior to the first post–2000 census congressional election." *Id.* at 463. As discussed above, the timing and circumstances of this case are vastly different from those in *Evans*. In contrast to *Evans*, the four-year delay in filing suit means Plaintiffs' theory of

---

[12] Plaintiffs don't ask us to assume that the President would act out of an interest in partisan gain rather than concerns for accuracy and administrative feasibility. Even if they had, that argument would rely on pure speculation about which states would stand to gain or lose seats in Congress—and the partisan effects of those gains or losses. The only data source Plaintiffs point to is the 2020 Census's list of "priority values" for each state—the entirety of which Plaintiffs allege was "wrong." Dkt. 88 ¶ 118. One cannot establish redressability by speculating about a possible chain of events. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006); *Berrocal v. Att'y Gen. of U.S.*, 136 F.4th 1043, 1051 (11th Cir. 2025)

24

redressability hinges on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

Plaintiffs' funding-related injury suffers from a similar redressability problem. The Complaint alleges that more than 350 federal programs determine funding allocations "based on census population totals." Dkt. 88 ¶ 148. But Plaintiffs don't allege that any of the entities that manage those programs would likely update their funding formulas in response to a judgment from this Court and resulting release of new data from the Census Bureau.[13] So with funding loss, too, Plaintiffs fail to allege that absent third parties would be substantially likely to redress their injury if we granted relief.[14]

There's one more redressability problem with both the alleged vote-dilution and funding-loss injuries. The statistical method cited in the Complaint as being excessively used is whole-person imputation. *Id.* ¶¶ 78–81, 137. However, the data cited in the Complaint show that it is entirely speculative whether the imputation

---

[13] Notably, as stated in a document Plaintiffs' Complaint cites, the "Census Bureau itself does not distribute any federal funds, nor determine the amount or allocation of federal funding for any program, nor does the Census Bureau determine how data are used by federal programs or in any particular funding formulas." Ceci Villa Ross, U.S. Dep't of Commerce, U.S. Census Bureau, *Uses of Decennial Census, Programs Data in Federal Funds Distribution: Fiscal Year 2021*, at 41 (2023), https://www2.census.gov/library/working-papers/2023/decennial/
census-data-federal-funds-fy-2021.pdf [https://perma.cc/62GT-5J67]. Plaintiffs do not request relief binding the U.S. Department of Commerce with respect to any federal funding programs it administers, either.

[14] Although the issue wasn't briefed, we also don't see how Plaintiffs have shown that reduced funding is an invasion of a legally protected interest that is particularized as to them—part of the injury-in-fact requirement. *Lewis*, 944 F.3d at 1296. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way[,]' rather than being a generalized grievance. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). But even for the one specific funding program Plaintiffs discuss in the Complaint—highway funding, Dkt. 88 ¶¶ 150–51—they did not allege how a loss in highway funding affected them in a personal and individual way. So Plaintiffs' allegations about loss of federal funding do not show an injury-in-fact.

25

employed in the census for Florida increased or decreased the Florida head count relative to other States. For example, Plaintiffs cite *Estimates for People in the United States by State*, which states that Florida's whole-person imputation rate was 3.6%, while the nationwide rate was 3.4%. *See Estimates for People in the United States by State* at 15, 17. Of the 11 states with a whole-person imputation rate of 3.6% or higher, two had an undercount (Florida and Illinois), and three had an overcount (New York, Rhode Island, and Utah). *See id.* at 17–18. Of course, undoing a process that increased Florida's relative population would not redress Plaintiffs' alleged vote-dilution injury or any funding loss tied to relative population.

Perhaps some federal funding programs rely on absolute rather than relative population. But here the problem is even more stark. As Plaintiffs concede, imputing individuals who are missing after Defendants attempt other methods of contact increases the absolute population count compared to using a figure of "zero" for them. Dkt. 103 at 11–12 & n.1. A new data set that "excludes population data" supplemented with whole-person imputation, Dkt. 88 at 43–44, could only lower Florida's absolute population. Doing so could not mitigate a funding-loss injury from any program that distributes funds based on absolute population.

As such, it is (at best) pure speculation to assume the requested remedy of reducing whole-person imputation will resolve Plaintiffs' alleged vote-dilution or funding-loss injuries, as there is no indication that whole-person imputation is the cause of any undercount in Florida. An equally plausible argument could be made

26

that Florida's count should have been subject to more whole-person imputation due to the demographics of Florida's residents in 2020.

At bottom, at this late date in the decennial cycle, any persuasive effect a judicial order from this Court might have upon the President or executive branch officials, as absent nonparties who are not under Defendants' control, cannot suffice to establish redressability. *See Lewis*, 944 F.3d at 1305 ("If courts may simply assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees, then redressability will always exist." (quoting *Franklin*, 505 U.S. at 825 (Scalia, J., concurring in part and concurring in the judgment))). "Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Id.*; *see also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020). We therefore dismiss this action for lack of Article III standing.

### iii. Procedural harms

Plaintiffs resist this conclusion by raising a new standing argument. In an attempt to sidestep these redressability issues, Plaintiffs reframe their alleged injuries as "procedural harm[s]" that can survive under a more relaxed redressability standard for procedural rights cases. Dkt. 103 at 15–16 (citing *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1353 (11th Cir. 2024)). We are not persuaded for one fatal reason—there are no allegations that Defendants violated any procedural rights, rules, or regulations. As mentioned above, the section of the

27

46

Complaint listing Plaintiffs' injuries is clear—the Florida Plaintiffs allege voter dilution due to the loss of representation in Congress, Dkt. 88 ¶¶ 143–47, and the loss of funding for federal programs based on inaccurate census population totals, *id.* ¶¶ 148–76. Representative Donalds also asserts an informational injury based on his reliance on inaccurate census data. *Id.* ¶¶ 177–84. Absent is a single allegation that Defendants' actions violated Plaintiffs' procedural rights.

Moreover, the contrast between these Plaintiffs and the plaintiffs in *Sustainable Coast* is clear. In *Sustainable Coast*, the plaintiffs sued the U.S. Army Corps of Engineers for failure to comply with the National Environmental Policy Act's ("NEPA") "rigorous approval process for any 'major' projects, including both a formal environmental review and public notice and comment." 100 F.4th at 1354 (citing 33 C.F.R. § 325 app. B at 6a, 7a (2022)). The plaintiffs' aesthetic injury was based on the Army Corps' decision to "issue[] a letter of permission approving [a] proposed 500-square-foot dock—along with a gangway, pier head, and 200-foot walkway," which "allowed the Corps . . . to avoid NEPA's ordinary approval process." *Id.* The Eleventh Circuit ultimately reversed the district court's dismissal for lack of standing, reasoning that:

> [W]hen "a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury- causing party to reconsider the decision that allegedly harmed the litigant." *Cahaba Riverkeeper v. EPA*, 938 F.3d 1157, 1162 (11th Cir. 2019) (emphasis added) (quotation omitted). And that makes sense; if certainty about future administrative outcomes was needed to show standing, citizen-suit provisions "would be a dead letter." *Sugar Cane Growers Co-Op of Florida v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002).

28

> Those principles decide this case. The procedural injury here is the Corps's failure to comply with NEPA, and "that injury is plainly redressable." *Ouachita Watch League*, 463 F.3d at 1173. In fact, redressability in circumstances like these is ordinarily seen as so obvious that we have dispatched with it in just a few sentences. *See id.* at 1173; *Cahaba Riverkeeper*, 938 F.3d at 1163. Here, the district court could vacate the letter of permission through a court order, remand to the Corps for new proceedings under NEPA, or both. Each of those options would redress the Center's procedural injury.

*Id.* at 1357.

Unlike the plaintiffs in *Sustainable Coast*, we cannot glean a single allegation that demonstrates Plaintiffs suffered procedural harm when Defendants used whole-person imputation in the 2020 Census. Neither the Complaint nor Plaintiffs' response to the motions to dismiss directs the Court's attention to any statute, rule, or regulation that the Bureau circumvented, ignored, or abused when conducting the 2020 Census. To be sure, Plaintiffs make plenty of allegations that the 2020 Census used unlawful statistical methods in violation of the Constitution's "actual Enumeration" Clause and 13 U.S.C. § 141(a). *See* Dkt. 88 ¶¶ 5, 8, 186–95. But 13 U.S.C. § 141(a) enables the Secretary to conduct the census "in such form and content as he may determine, including the use of sampling procedures and special surveys. . . . authorized to obtain such other census information as necessary." 13 U.S.C. § 141(a). And the Supreme Court has previously found that Defendants' use of imputation in the decennial census is constitutional. *See Evans*, 536 U.S. at 478–79.

Contrary to Plaintiffs' claim that "failing to reach every household" is a procedural harm, Dkt. 103 at 18, any alleged failure to comply with the Enumeration Clause or 13 U.S.C. § 141 is a constitutional violation that can be brought under

29

48

Section 209—Congress's statutorily created cause of action for challenging an unconstitutional statistical method. *See* Pub. L. No. 105-119, § 209(b) ("Any person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law (other than this Act), in connection with the 2000 or any later decennial census . . . may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method."). A Section 209 claim is not a "procedural right" violation.

To the extent Plaintiff argues their procedural harm is based on "the Census Bureau suspend[ing] normal procedures and employ[ing] new data collection and processing methodologies" during the COVID-19 pandemic, Dkt. 88 ¶ 49, such an argument is without merit. We need not accept as true this "legal conclusion[] masquerading as fact[,]" *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002), because Plaintiffs (again) fail to allege what statute,[15] regulation, or administrative procedure was violated when the Bureau adjusted its operational plan in response to the COVID-19 pandemic. *See* Dkt. 88 ¶¶ 50–62. Again, the crux of the Complaint centers on the alleged "actual Enumeration" Clause violation arising from the increased use of imputation, not on any procedural injury. *See id.* ¶¶ 88, 96, 187–88.

---

[15] *See* 13 U.S.C. § 141(a) ("The Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the 'decennial census date,' in such form and content as he may determine[.]"). Beyond conclusory assertions that Defendants abused their authority, Dkt. 88 ¶ 10, Plaintiffs fail to articulate which part of 13 U.S.C. § 141(a) was violated, thereby causing *procedural* harm that could be remedied by providing process. *See Sustainable Coast*, 100 F.4th at 1357 n.7.

Finally, perhaps the most telling evidence that Plaintiffs are not bringing a procedural rights case is the type of remedy they seek from the Court. As *Sustainable Coast* made clear, the plaintiffs alleged "a *procedural injury* connected to the protection of that aesthetic interest: the Corps's failure to conduct [a] full NEPA review. . . . a court could remedy the [plaintiffs'] procedural harm—by requiring process." 100 F.4th at 1357 n.7. In contrast, Plaintiffs request declaratory and mandatory relief, Dkt. 88 at 43–44, and do not ask Defendants to follow any procedural process that was previously ignored or circumvented. Instead, the requested relief asks this Court to remedy the alleged constitutional violations that occurred during the 2020 Census by ordering Defendants to engage in "direct contact" to recalculate the final nationwide count. Dkt. 88 ¶¶ 190, 195, 203, 209, 217. Put simply, the alleged injuries in this case look nothing like the typical procedural rights case. *See, e.g.*, *Lujan*, 504 U.S. at 572 n.7 (hypothetical plaintiff would have standing to challenge failure to prepare an environmental impact statement); *Sierra Club v. Johnson*, 436 F.3d 1269, 1275, 1278–79 (11th Cir. 2006) (standing to challenge existing permit for insufficient public notice and comment). Plaintiffs have not identified, and we cannot find, any "different procedural inputs would lead to a different substantive outcome" in order to satisfy standing in a procedural rights case. *Sustainable Coast*, 100 F.4th at 1357–58. Nor have Plaintiffs alleged what concrete interest is being "remedied by process." *Id.* at 1359 ("A procedural violation is remedied by process, and so long as that process protects a concrete interest, the plaintiff has shown redressability."). Therefore,

31

50

because Plaintiffs failed to satisfy the redressability requirement, we dismiss this action for lack of Article III standing.

### 2. *Rep. Donalds's Alleged Informational Injury*

Finally, Representative Donalds's alleged informational injury is not cognizable as an injury in fact. Even if it were, Plaintiffs haven't shown that judicial relief would redress the injury they allege. To allege a concrete informational injury in fact, a plaintiff must identify "downstream consequences" from receiving incorrect information. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)). "An 'asserted informational injury that causes no adverse effects cannot satisfy Article III.'" *Id.* (quoting *Trichell*, 964 F.3d at 1004).

Plaintiffs state that Representative Donalds "uses census data to inform his votes" and "depends on accurate census data to inform his constituent services and relations." Dkt. ¶¶ 178, 181. But it's not enough to note vaguely that Representative Donalds "cast votes concerning the HUBZone small business program," a program that uses census data to set its eligibility requirements. Dkt. ¶ 179. Plaintiffs don't identify a single vote that Representative Donalds would have cast differently if he had access to different census data. And it was Plaintiffs' burden to show that the allegedly incorrect data adversely affected Representative Donalds. A plaintiff who "neither took nor failed to take *any action* because of [incorrect] statements" lacks an injury in fact. *Frank v. Autovest, LLC*, 961 F.3d 1185, 1188 (D.C. Cir. 2020).

32

Plaintiffs' allegations about constituent services are faulty, as well. Plaintiffs allege that Representative Donalds advises his constituents about programs such as SNAP and Medicare, which set eligibility requirements using census data. Dkt. 88 ¶ 182. But Representative Donalds operated from the same set of census data that the administrators of programs like SNAP and Medicare use. So Plaintiffs don't explain how Representative Donalds was stymied in advising his constituents on how to navigate those programs.

Representative Donalds's informational injuries are not cognizable for another reason. "Logically, 'a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past.'" *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (quoting *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992)). But Representative Donalds has not asserted a future injury in fact that could be redressed with prospective relief like the declaratory and mandatory relief that Plaintiffs request. *See Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1281 (11th Cir. 2024). Indeed, the Complaint contains no allegations of any future votes or constituent actions that would require Representative Donalds to possess "accurate" census data. *See* Dkt. 88 ¶¶ 177–84. This gap is particularly notable because Representative Donalds, a candidate for Governor of Florida, has not announced if he will be running for reelection to Congress in November 2026. It is far from clear that Defendants could issue any new data before that date, especially if we ordered them to "account for the 18.8 million omissions by means of direct contact," an enormous undertaking. Dkt. 88 ¶ 195.

33

For both of these reasons, Plaintiffs haven't established an informational injury-in-fact that is judicially redressable.

### B. Section 209 and the APA

Because the Court found that Plaintiffs lack standing to bring this action, we need go no further. Nevertheless, even if we set aside the redressability faults and assume Plaintiffs had Article III standing, the Court would still dismiss all of Plaintiffs' claims for two reasons.[16] First, Plaintiffs cannot claim that Counts III–V are some sort of hybrid APA and Section 209 claim.[17] Second, the four-year statute of limitations under 28 U.S.C. § 1658(a) continues to bar Plaintiffs' Section 209 claims in Counts I and II.

### 1. *Do Plaintiffs have hybrid Section 209 and APA claims?*

We begin with whether, on these peculiar facts, a Section 209 claim can be a hybrid APA claim. Faced with the prior ruling that their claims are untimely under 28 U.S.C. § 1658(a), Plaintiffs bring Counts III–V expressly as APA claims. They bring Counts I and II under Section 209, but add the caveat that "claims under Pub. L. No. 105-119, § 209 are a form of special statutory review proceeding under 5 U.S.C. § 703 and are therefore APA claims." Dkt. 88 at 39 n.5. The Intervenors push

---

[16] We discuss these problems, even though the court lacks jurisdiction over this case as a result of Plaintiffs' lack of standing, because these merits problems, in the fourth section of this order, help show the futility of amendment.

[17] Plaintiffs characterize Counts III–V as APA claims since 28 U.S.C. § 2401(a)'s six-year statute of limitations applies to APA claims. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11th Cir. 2007). This longer statute of limitations would, if applicable, avoid the timeliness issue previously addressed in the Court's prior dismissal order. *See* Dkt. 84 at 13 (dismissing the prior complaint as time-barred under 28 U.S.C. § 1658(a)'s four-year statute of limitations).

34

back, contending that Section 209 is actually a bar to any APA claims since the APA is only available if "there is no other adequate remedy in a court." Dkt. 96 at 11 (quoting 5 U.S.C. § 704). We agree with Intervenors. Counts III–V are duplicative of Section 209 claims. For that reason, Section 209's "special statutory review proceeding" and "other adequate remedy" prevent Plaintiffs from repackaging their claims under the APA. 5 U.S.C. §§ 703–704. Plaintiffs cannot forcibly meld the two statutes together in an effort to claim a longer statute of limitations applies.

It has long been established that the APA provides authorization of judicial review for cases in which "review [of agency action] is sought not pursuant to specific authorization in the substantive statute." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). Specifically, the APA provides:

> The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

5 U.S.C. § 703. "Thus, the APA does not provide an independent basis for judicial review where such judicial review is already provided for by a different statutory provision." *Harris v. Dep't of Homeland Sec.,* 18 F. Supp. 3d 1349, 1359 (S.D. Fla. 2014) (citing *Hamby v. Janer*, 808 F.2d 1433, 1434 n.4 (11th Cir. 1987)); *see also Jory v. United States*, 562 F. App'x 926, 928 (11th Cir. 2014) ("The APA delineates that

35

where the form of proceeding for judicial review is provided for by 'the special statutory review proceeding relevant to the subject matter'—as it is provided for here—the APA does not provide any alternative forms of review." (quoting 5 U.S.C. § 703)).

Similarly, 5 U.S.C. § 704 further states that "[a]gency action made reviewable by statute and final agency action for which there is *no other adequate remedy* in a court are subject to judicial review." 5 U.S.C. § 704 (emphasis added). When discussing this section, the Supreme Court has explained:

> [A]lthough the primary thrust of § 704 was to codify the exhaustion requirement, the provision as enacted also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action. As Attorney General Clark put it the following year, § 704 "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." At the time the APA was enacted, a number of statutes creating administrative agencies defined the specific procedures to be followed in reviewing a particular agency's action; for example, Federal Trade Commission and National Labor Relations Board orders were directly reviewable in the regional courts of appeals, and Interstate Commerce Commission orders were subject to review in specially constituted three-judge district courts.

*Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). In other words, "[w]hen Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate . . . established special statutory procedures relating to specific agencies." *Id.* The Supreme Court has reaffirmed this principle concerning 5 U.S.C. § 704, noting "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v.*

36

*Cisneros*, 509 U.S. 137, 146 (1993); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578

U.S. 590, 600 (2016) ("[A]n agency action is reviewable under the APA only if there

are no adequate alternatives to APA review in court." (citing 5 U.S.C. § 704)).

Here, Section 209 is the kind of "'special and adequate review procedure' that

will oust [this] [C]ourt of its normal jurisdiction under the APA." *Bowen*, 487 U.S. at

904. Plaintiffs seemingly agree with this conclusion by stating that Section 209 is a

"special statutory review proceeding," but then confusingly argue "Section 209 is not

a freestanding remedial scheme separate from the APA." Dkt. 103 at 28; *see also id.* at

19. Plaintiffs suggest that if a statute constitutes a "special statutory review

proceeding," then it is *not barred* under the APA; instead, the APA somehow

becomes the "broader substantive framework under which agency action . . . is

reviewed." *Id.* at 31. This position appears contrary to what "special statutory review

proceeding" and "no other adequate remedy" mean under 5 U.S.C. §§ 703 and 704.

First, the plain and unambiguous text of 5 U.S.C. § 703 states that "[t]he form

of proceeding for judicial review is the *special statutory review proceeding relevant to the*

*subject matter in a court specified by statute*." 5 U.S.C. § 703 (emphasis added). In this

case, Section 209 is the relevant subject matter statute—that is, it provides a cause of

action when challenging a "statistical method" that violates "the Constitution or any

provision of law." Pub. L. No. 105-119, § 209(b). We also know Section 209

contains a special statutory review proceeding since Congress mandated several

special procedures: "[a]ny person aggrieved by the use of any statistical method" can

sue for only "declaratory [and] injunctive" relief, *id.* § 209(b); the action can be heard

37

56

only by "a district court of three judges" under 28 U.S.C. § 2284, *id.* § 209(e)(1); all actions involving Section 209 in one circuit must be consolidated, *id.* § 209(e)(1); "[a]ny final order or injunction . . . that is issued . . . shall be reviewable by appeal directly to the Supreme Court of the United States," *id.* § 209(e)(1); a notice of appeal for any final order must be "filed within 10 days," and the jurisdictional statement must be "filed within 30 days" after the final order is issued, *id.* § 209(e)(1); "[n]o stay of an order issued pursuant to an action brought under this section may be issued by a single Justice of the Supreme Court," *id.* § 209(e)(1); and the district court and the Supreme Court have a duty to "expedite to the greatest possible extent the disposition" of Section 209 claims, *id.* § 209(e)(2).

In view of the foregoing, we are satisfied that Section 209 establishes a special statutory review proceeding by providing an expedited path for judicial review. Contrary to Plaintiffs' belief, the APA will apply only "[i]f no special statutory review proceeding is applicable," 5 U.S.C. § 703, and Section 209 clearly provides the form of review that Plaintiffs seek when challenging Defendants' use of imputation in the 2020 Census. As such, "where the form of proceeding for judicial review is provided for by 'the special statutory review proceeding relevant to the subject matter'—as it is provided for here [by Section 209]—the APA does not provide any alternative forms of review." *Jory*, 562 F. App'x at 928.

Second, the text of 5 U.S.C. § 704 supports this conclusion. This section says that "[a]gency action made reviewable by statute and final agency action for which there is *no other adequate remedy in a court* are subject to judicial review." 5 U.S.C. §

38

704 (emphasis added). This means 5 U.S.C. § 704 "does not provide additional judicial remedies in situations where . . . Congress has provided special and adequate review procedures." *Bowen*, 487 U.S. at 903. Here, Section 209 provides the "other adequate remedy" that Plaintiffs seek when challenging the Bureau's increased use of imputation during the 2020 Census. Again, we know that Section 209 provides a "special and adequate review procedure" since it mirrors the examples identified in *Bowen*—any final order or injunction can be immediately appealed to the Supreme Court, Pub. L. No. 105-119, § 209(e)(1), and Section 209 claims can be heard only by "a district court of three judges" under 28 U.S.C. § 2284, *id.* § 209(e)(1). *See Bowen*, 487 U.S. at 903 ("[F]or example, Federal Trade Commission and National Labor Relations Board orders were directly reviewable in the regional courts of appeals, and Interstate Commerce Commission orders were subject to review in specially constituted three-judge district courts.").

In light of Congress's intent to provide a special review procedure for legal challenges to the decennial census, permitting Plaintiffs' APA claims in Counts III–V would provide a duplicative remedy, in contravention of the APA's text. This Court may not authorize an end-run around Section 209's statutorily created process. Thus, we find that Counts III–V should be dismissed because Section 209 already establishes a special statutory review process and adequate alternative remedy for

allegedly unlawful use of statistical methods in connection with the decennial census.[18]

To be clear, we are not holding that Section 209 claims expressly preclude APA review of all actions by Defendants. Indeed, there is a long history of cases challenging the Bureau's (*non-statistical method*) census decisions under the APA. *See Nat'l Ass'n for Advancement of Colored People v. Bureau of Census*, 382 F. Supp. 3d 349, 365–66 (D. Md. 2019) (collecting cases on trial courts that have "vigorously . . . rejected arguments that they are powerless to review decisions of the Secretary regarding the conduct of the census"); *Dep't of Com. v. New York*, 588 U.S. 752, 763–64 (2019) (bringing an APA challenge to the Secretary of Commerce's decision to add a citizenship question to the 2020 Census questionnaire).

Section 209 provides a separate and distinct cause of action that is different from an APA challenge, *see, e.g.*, *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1067, 1072 (M.D. Ala. 2021) (differentiating between Section 209 claims and APA claims); *Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 696 (N.D. Cal. 2020) (noting a distinction between the plaintiffs' "APA claims" and "Enumeration Clause claim"), and Counts III–V are clearly duplicative of the Section 209 claims in Counts I and II,

---

[18] Plaintiffs argue that Count V does not overlap with Section 209 because it challenges the explanation Defendants gave for "departing so dramatically from prior census practice" rather than challenging the use of "statistical methods" per se. Dkt. 103 at 30. But Count V challenges the reasoning for Defendants' use of imputation, which Plaintiffs argue is "by definition a statistical method" within the meaning of Section 209. Dkt. 88 ¶ 71. We read Section 209 to permit a suit on that theory. We don't see why the statute's cause of action for "[a]ny person aggrieved by the use of any statistical method in violation of . . . *any provision of law*," would carve out violations of the APA's procedural requirements. Pub. L. No. 105-119, § 209(b) (emphasis added).

40

as all counts challenge the statistical methods used during the 2020 Census. Indeed, Plaintiffs characterize Counts III–V as APA claims, but then expressly allege these counts are "cognizable under [S]ection 209," claim to be "aggrieved" persons within the meaning of Section 209, invoke the provision's three-judge panel requirement, and repeatedly emphasize the "extensive use of statistical methods" and "reliance upon imputation" as violations of the "actual Enumeration" Clause and 13 U.S.C. § 141. Dkt. 88 ¶¶ 3, 5, 7, 8, 25, 119, 136, 196, 198–200, 204, 206–08, 210, 213, 215–16. Plaintiffs cannot invoke the many features of Section 209 in Counts III–V, while simultaneously claiming that these counts are brought under the APA. Therefore, because Counts III–V are duplicative Section 209 claims, Plaintiffs may not assert them under the APA.

However, one more issue remains. In an attempt to justify their untenable position, Plaintiffs point to Section 209's statement that "the Census 2000 Operational Plan shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census, thus making the question of their use in such census sufficiently concrete and final to now be reviewable in a judicial proceeding." Pub. L. No. 105-119, § 209(c)(2). Plaintiffs argue the phrase, "final agency action," means Congress must have intended to "situate Section 209 within the APA's existing review structure." Dkt. 103 at 29. Intervenors reject this argument, noting that this part "merely obviates any prudential (but not jurisdictional) ripeness concerns" about challenging the Bureau's statistical methods during the 2000 Census. Dkt. 96 at 13. We believe the Intervenors have the more

41

persuasive argument, as various federal courts that have considered this provision have treated it as resolving any ripeness concerns.

For example, in *Glavin v. Clinton*, the three-judge panel considered the "final agency action" language in its "Case is Ripe for Review" section and found that the language means the legal challenge to the use of statistical sampling in the 2000 Census was "ripe for adjudication." 19 F. Supp. 2d 543, 547 (E.D. Va. 1998). On appeal, the Supreme Court also cited the same "final agency action" language in its justiciability section when determining whether the parties in the case had standing. *Dep't of Com.*, 525 U.S. at 332. Similarly, the three-judge panel in *U.S. House of Representatives v. U.S. Dep't. of Commerce* cited the same language in its "Ripeness" section and found "[i]n light of this statutory declaration, this court is hard-pressed to understand how the statistical sampling plan can be construed as a merely tentative position . . . . The fact that the legislation deeming the Census 2000 Report as final agency action may have been the result of 'compromise,' or that it may have been passed with 'political rancor,' . . . does not direct this court to question the unambiguous declarations contained therein." 11 F. Supp. 2d 76, 91 (D.D.C. 1998), *appeal dismissed*, 525 U.S. 1133 (1999); *see also Utah v. Evans*, 182 F. Supp. 2d 1165, 1173–74 (D. Utah 2001) (three-judge court) (discussing Section 209's "sufficiently concrete and final" language as "in furtherance of [Congress's] goal" to "provide a vehicle for expedited review of the methods chosen by Defendants for use in the 2000 census prior to the actual undertaking and completion of the census"), *aff'd*, 536 U.S. 452.

42

In more recent times, at least one other court has questioned the APA's applicability to Enumeration Clause claims. The District of Maryland stated, "the Supreme Court's failure to incorporate the APA's 'arbitrary and capricious' or 'abuse of discretion' language into the test for reviewing an Enumeration Clause challenge to the Secretary's decisions regarding how to conduct a decennial census cannot be ignored." *Nat'l Ass'n for Advancement of Colored People*, 382 F. Supp. 3d at 367.

Taken together, these authorities strongly suggest that the brief mention of "final agency action" was intended only to resolve justiciability issues for potential challengers of "the Census 2000 Operational Plan." Pub. L. No. 105-119, § 209(c)(2). Plaintiffs do not cite, and we cannot find, any contrary authority holding that Section 209's use of the phrase "final agency action" turned it into a pseudo-APA statute. Accordingly, the Court finds that Plaintiffs may not recast their time-barred Section 209 claims as hybrid APA claims.

### 2. *28 U.S.C. § 1658(a) applies over 28 U.S.C. § 2401(a)*

Next, we consider whether 28 U.S.C. § 2401(a)'s six-year statute of limitations applies over 28 U.S.C. § 1658(a)'s four-year statute of limitations. Plaintiffs argue that because all their "claims have always been against the United States," 28 U.S.C. § 2401(a) will apply since the statute is used in suits "against the United States." Dkt. 103 at 20 (quoting 28 U.S.C. § 2401(a)). To support this argument, Plaintiffs claim that the United States has always been a defendant under 5 U.S.C. § 702. *Id.* ("Plaintiffs make this abundantly clear by adding the United States as a defendant, which they are entitled to do under the APA." (citing 5 U.S.C. § 702)). This

43

argument fails for two reasons. First, as extensively discussed above, Plaintiffs' so-called APA claims in Counts III–V are improper and duplicative of their Section 209 claims in Counts I and II, so Plaintiffs do not have a pre-1990 cause of action. Second, the case law on 28 U.S.C. § 1658(a) agrees that the four-year statute of limitations applies when Congress creates a post-1990 cause of action without a specific limitations period.

On the first point, the Court need not repeat its analysis for why Counts III–V are duplicative of the Section 209 claims in Counts I and II. Suffice it to say, Plaintiffs cannot invoke Section 209 to challenge Defendants' conduct while simultaneously claiming the benefits of a longer statute of limitations under the APA. The six-year statute of limitations in 28 U.S.C. § 2401(a) applies to APA claims, *see U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11th Cir. 2007), but there are no cognizable APA claims left.

On the second point, Plaintiffs' remaining Section 209 claims are still time-barred by 28 U.S.C. § 1658(a). *See* Dkt. 84 at 10–19. As to whether we should revisit our prior dismissal order and find that 28 U.S.C. § 2401(a) applies over 28 U.S.C. § 1658(a), we decline to do so. It is sufficiently clear that 28 U.S.C. § 1658(a) is the more specific statute that applies over 28 U.S.C. § 2401(a).

We begin with the text of 28 U.S.C. § 2401(a), which states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). This means "28 U.S.C. § 2401(a) merely sets an outside time limit on suits against the

44

United States." *Edwards v. Shalala*, 64 F.3d 601, 605 (11th Cir. 1995). Importantly, this outside time limit "cannot be read to mean that when Congress creates a cause of action without a specific limitations period, the general statute should govern." *Id.* (citation omitted). Indeed, it is "contrary to the Supreme Court's directives in *Stevens* [*v. Dep't of the Treasury,* 500 U.S. 1 (1991)] to apply a statute of general applicability when there are other more relevant statutory provisions." *Id.* (citations omitted). The Supreme Court has recently affirmed this interpretation of 28 U.S.C. § 2401(a), noting the statute "applies generally to suits against the United States unless the timing provision of a more specific statute displaces it." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024).

On the other hand, 28 U.S.C. § 1658 provides a default statute of limitations for "civil action[s] arising under an Act of Congress enacted after" December 1, 1990. 28 U.S.C. § 1658(a). "Except as otherwise provided by law," such actions "may not be commenced later than 4 years after the cause of action accrues." *Id.* When interpreting this statute, the Supreme Court has held that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990—and therefore is governed by § 1658's 4–year statute of limitations—if the plaintiff's claim against the defendant was made possible by a post–1990 enactment." *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). This makes sense, as the statute's purpose was to "spare[] federal judges and litigants the need to identify the appropriate state statute of limitations to apply to new [post–1990] claims . . . ." *Id.*

Since the Supreme Court's decision in *Jones*, federal courts have consistently applied 28 U.S.C. § 1658(a) whenever a post–1990 enactment creates a new cause of action. *See, e.g.*, *MSPA Claims 1, LLC v. Tower Hill Prime Ins. Co.*, 43 F.4th 1259, 1264 (11th Cir. 2022) (applying § 1658(a) to a Medicare Secondary Payer Act claim); *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1338 (11th Cir. 2008) (holding 42 U.S.C. § 1983 limitations period is determined under § 1658(a) for action based upon post-1990 amendments to 42 U.S.C. § 1981); *Tomei v. Parkwest Med. Ctr.*, 24 F.4th 508, 515 (6th Cir. 2022) (applying § 1658(a) to an Affordable Care Act claim); *McGreevey v. PHH Mortg. Corp.*, 897 F.3d 1037, 1042 (9th Cir. 2018) (applying § 1658(a) to the Servicemembers Civil Relief Act following a 2010 amendment that created a private right of action).

There is no question that Section 209 satisfies the Supreme Court's "bright-line rule" for when 28 U.S.C. § 1658 applies. *Tomei*, 24 F.4th at 513 ("Rather than inviting judges and litigants to investigate whether a plaintiff had a plausible claim before 1990, a bright-line rule—that a claim arises under the law that creates the cause of action—brings clarity and consistency."). In Counts I and II, Plaintiffs sue under Pub. L. No. 105-119, § 209(b), which Congress enacted on November 26, 1997. As such, Plaintiffs' Section 209 cause of action against Defendants was "made possible by a post–1990 enactment" and "therefore is governed by § 1658's 4–year statute of limitations." *Jones*, 541 U.S. at 382.

46

Plaintiffs resist this conclusion by contending that 28 U.S.C. § 2401(a) always displaces 28 U.S.C. § 1658(a)'s four-year statute of limitations when a federal official or agency is the defendant. We disagree for two reasons.

First, as we've mentioned, binding precedent contradicts this view. Section 2401(a)'s "outside time limit" on suits against the United States "cannot be read to mean that when Congress creates a cause of action without a specific limitations period, the general statute should govern." *Edwards*, 64 F.3d at 605; *accord Price v. Bernanke*, 470 F.3d 384, 388 (D.C. Cir. 2006) ("[T]here is nothing to suggest that Congress intended [§ 2401(a)] to govern any time a court finds a cause of action without a specific limitations period."); *Lavery v. Marsh*, 918 F.2d 1022, 1026 (1st Cir. 1990) ("Congress did not intend that this general statute should govern whenever Congress creates a cause of action without a specific limitations period.").

In contrast, "Section 1658(a) applies to *all* causes of action arising under federal statutes enacted after December 1, 1990 that do not otherwise set forth a specific limitations period." *Foudy v. Indian River Cnty. Sheriff's Off.*, 845 F.3d 1117, 1122 (11th Cir. 2017). The Supreme Court has recognized Congress's intent for Section 1658 to provide a "uniform federal statute of limitations" that applies broadly. *Jones*, 541 U.S. at 380. Because Section 209 does not have its own specific limitations period, case law is clear that we must apply the four-year period from 28 U.S.C. § 1658(a) rather than the six-year period from 28 U.S.C. § 2401(a).

Second, 28 U.S.C. § 1658(a) is both the "more specific," *Corner Post*, 603 U.S. at 808, and "more recent" of the two statutes, *Tug Allie-B, Inc. v. United States*, 273

47

F.3d 936, 948 (11th Cir. 2001). Section 1658 applies to a narrow class of claims—
only civil actions arising under federal statutes enacted since 1990. And Congress
enacted 28 U.S.C. § 1658(a) in 1990, 42 years after 28 U.S.C. § 2401(a). We
therefore find that 28 U.S.C. § 1658's statute of limitations is the more relevant
statutory provision because Section 209 is "an Act of Congress enacted after"
December 1, 1990, which created "a civil action" against Defendants for the use of
unlawful statistical methods. 28 U.S.C. § 1658(a); *see also* Pub. L. No. 105-119, §
209(b) ("Any person aggrieved by the use of any statistical method in violation of the
Constitution or any provision of law . . . in connection with the 2000 or any later
decennial census . . . may in *a civil action* obtain declaratory, injunctive, and any
other appropriate relief." (emphasis added)).

When applying 28 U.S.C. § 1658's four-year limitation to this case, the
"challenge[d] conduct . . . concluded, at the latest, in August 2021[,] [b]ut [Plaintiffs]
waited more than four years after that to sue, in September 2025[,] [s]o their claims
are time-barred." Dkt. 84 at 12.[19] Therefore, the Court once again finds that "the
Complaint is time-barred on its face." *Id.* at 19; *see Karantsalis*, 17 F.4th at 1319–20
("[D]ismissal for failure to state a claim on statute of limitations grounds is
appropriate only if it is apparent from the face of the complaint that the claim is time-
barred." (citation modified)).

### C. Final Agency Action

---

[19] For the sake of brevity, we incorporate by reference our prior analysis for why Plaintiffs' Section 209 claims
are time-barred under 28 U.S.C. § 1658(a). *See* Dkt. 84 at 10–18.

48

Finally, assuming *arguendo* that there are no redressability faults and that Plaintiffs' APA claims were proper, we would still conclude there is no final agency action for this Court to review. Plaintiffs allege that Defendants' "2020 Census Operational Plan 5.0 is [a] final agency action" since it describes how the Bureau adjusted its data collection efforts during the COVID-19 pandemic. Dkt. 88 ¶¶ 210, 215. Defendants, however, contend that the 5.0 Plan lacks the hallmarks of final agency action. Dkt. 97 at 29–31. We think Defendants' arguments prevail. This provides yet another reason to dismiss Counts III–V.

The APA's sovereign immunity waiver only applies to challenges to a "final agency action" that is not "committed to agency discretion by law." 5 U.S.C. §§ 701(a)(2), 704; *see Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260–61 (1999). Federal courts apply a two-part test to determine whether an agency action is "final" under the APA: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Hawkes Co.*, 578 U.S. at 597 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). In other words, "[t]he 'core question' about finality 'is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1255 (11th Cir. 2020) (quoting *Franklin*, 505 U.S. at 797). These same requirements apply in a census case. *See Franklin*, 505 U.S. at 797 ("The

core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.").

Here, the Court agrees with Defendants that the 5.0 Plan is neither a decisionmaking process nor an action from which legal consequences flow. Dkt. 97 at 29–30. First, Defendants correctly point out that the 5.0 Plan was approved on February 4, 2022, "after census operations were completed, and served to describe 'design concepts and their rationale, identifying decisions made and remaining decisions, and . . . remaining risks.'" *Id.* at 29 (quoting 5.0 Plan at 1). Indeed, the 2020 Census counts that Plaintiffs challenge were released in April and August 2021, Dkt. 88 ¶ 90, and the planning and implementation of the 2020 Census occurred well before enumeration began. *See* 5.0 Plan at 31–52 (discussing operational design and testing for the 2020 Census beginning in 2012 and ending in 2018). But the 5.0 Plan, the allegedly offending final agency action under the APA, was not issued until February 2022. *See generally id.* It was a retrospective summary issued after the contested compilation and enumeration.

Nor did the 5.0 Plan establish the data methodology used in the 2020 Census. Instead, it documented the operational adjustments that had already occurred during enumeration, *see* 5.0 Plan at 57 (providing "[a]n overview of the 35 operations"), including those caused by the COVID-19 pandemic. *See id.* at 96–173 (detailing operations related to response data, and discussing the impact of the COVID-19 pandemic on those response data area operations). As such, the 5.0 Plan cannot be the consummation of Defendants' decisionmaking process for the 2020 Census since

50

the memorandum is merely a recap—not a final decision—of the implemented design undertaken for the 2020 Census. *See id.* at 57 ("The v4.0 2020 Census Operational Plan represents the 'as planned' design, while the v5.0 2020 Census Operational Plan provides changes since the v4.0 plan and represents the 'as performed' design. Changes are separated into those that resulted from the COVID-19 pandemic and [those] that did not.").

Next, the Court cannot perceive any legal consequences that flow from the 5.0 Plan. As Defendants correctly note, "the legal consequences Plaintiffs identify arise from the census results themselves, not from a later document describing operational adjustments that occurred during the enumeration." Dkt. 97 at 29. That makes sense, since there were major legal challenges (under the APA) to the Bureau's various operational plans while the 2020 Census was ongoing—specifically, the Bureau's "COVID-19 Plan" and "Replan." *Nat'l Urb. League v. Ross*, 977 F.3d 698, 700 (9th Cir. 2020) (describing how the Bureau adopted a new COVID-19 plan "in April [2020] to accommodate the delays caused by COVID-19. . . . In early August [2020], a 'senior Department [of Commerce] official' directed the Bureau to change course and prepare a new plan for completing the census by the December 31, 2020, statutory deadline. . . . On August 3, 2020, the Bureau announced its adoption of the Replan, and its central feature: accelerating the COVID-19 Plan's deadline for the completion of field work and data collection"); *see Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 669–78 (N.D. Cal. 2020) (providing an extensive background on the Bureau's 4.0 Operational Plan, the COVID-19 Plan, and the Replan). It was these

51

2020 Census operational plans—especially the Replan—that directly affected

Plaintiffs and resulted in legal consequences. *See Nat'l Urb. League*, 508 F. Supp. 3d at

700–03 (holding the Replan constituted final agency action due to the various ways

the Replan directly affected the plaintiffs and gave rise to legal consequences,

including the fact that the Replan "effectively binds [the Census Bureau]—for the

next decade—to a less accurate 'tabulation of total population by States' under the

'decennial census.' . . . The result of this significant compression during this

unprecedented pandemic will be inaccuracies in the 'tabulation of total population' .

. . [that] harm constitutional and statutory interests" (citing 13 U.S.C. § 141(b)).

Conversely, the 5.0 Plan was issued after these legal challenges ended, after

the various operational plans went into effect, and after the 2020 Census concluded.

Its only purpose was to inform the public by summarizing how the 2020 Census was

carried out in practice. If Plaintiffs wanted to challenge Defendants' operational

changes due to the COVID-19 pandemic, *see* Dkt. 88 ¶¶ 48–63 (listing various

operational changes to the Bureau's data collection efforts due to the COVID-19

pandemic), they should have filed suit in 2020 and challenged the Bureau's

operational plans that actually determined their rights and obligations and gave rise

to legal consequences. We find that no legal consequences can flow from a document

issued after final enumeration that simply reviews the methodology and operational

changes made during the 2020 Census.

Because the 5.0 Plan does not constitute final agency action, it is not

reviewable under the APA. *See Bennett*, 520 U.S. at 178. For this reason, Counts III–

52

V are due to be dismissed for lack of subject matter jurisdiction. *See Canal A Media Holding*, 964 F.3d at 1255 ("In [the Eleventh] [C]ircuit, dismissal for the reason that the challenged agency action was not a final order is a dismissal for lack of subject-matter jurisdiction." (citing *LabMD, Inc. v. FTC*, 776 F.3d 1275, 1278, 1280 (11th Cir. 2015))).

\* \* \*

In sum, we find that Plaintiffs' Third Amended Complaint fails on multiple fronts. As a threshold issue, Plaintiffs lack Article III standing to bring their claims. Even if they had standing, we would still dismiss Plaintiffs' claims in Counts I and II as untimely and Counts III–V as foreclosed by the availability of an adequate alternative remedy. Finally, assuming Plaintiffs' APA claims are cognizable, there is no properly alleged final agency action for this Court to review, so we would (again) dismiss Counts III–V for lack of subject matter jurisdiction.

### D. Dismissal with Prejudice

Under Rule 15(a) of the Federal Rules of Civil Procedure, "[a] party may amend its pleading once as a matter of course." Fed. R. Civ. P. 15(a)(1). "In all other cases," leave to amend should be granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). Plaintiffs have already used up their amendment as a matter of course, *see* Dkt. 2, so Plaintiffs must either get "the opposing party's written consent or th[is] [C]ourt's leave." Fed. R. Civ. P. 15(a)(2). At the end of their response to the instant motions to dismiss, Plaintiffs briefly request leave to amend their Complaint. Dkt.

53

<u>103 at 35</u>. The Court, however, exercises its discretion and denies the request for leave to amend for two reasons.

First, as a general rule, "[a] district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, <u>314 F.3d 541, 542</u> (11th Cir. 2002) (en banc). Based on this rule, the Eleventh Circuit has held that "[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Pop v. LuliFama.com LLC*, <u>145 F.4th 1285, 1298</u> (11th Cir. 2025) (quoting *Newton v. Duke Energy Fla., LLC*, <u>895 F.3d 1270, 1277</u> (11th Cir. 2018)). "In such a case, the request for leave to amend possesses no legal effect." *Id.* (citation modified). Here, because Plaintiffs' request for leave to amend their complaint under Rule 15(a)(2) is "imbedded within an opposition memorandum," it has "no legal effect." *Id.* (citation omitted). Plaintiffs' request for leave to amend is therefore "null, meaning that—at least at first glance—[this] [C]ourt [is] free to dismiss [Plaintiffs'] complaint with prejudice." *Id.* (citing *Ounjian v. Globoforce, Inc.*, <u>89 F.4th 852, 862</u> (11th Cir. 2023)).

Second, even if the Court were inclined to provide Plaintiffs with "an extra dose of grace," we find it is not called for here since any fourth amended complaint would be futile. *Silberman v. Miami Dade Transit*, <u>927 F.3d 1123, 1133</u> (11th Cir. 2019). An "amendment is *not* warranted (1) where the plaintiff has indicated that he does not wish to amend his complaint, or (2) if a more carefully drafted complaint

could not state a claim." *Id.* (citation modified). "Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed." *Id.* (quoting *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007)). In other words, "[t]he futility issue is concerned less with whether [the plaintiff] *has* otherwise stated a claim against the [defendant] than with whether, when all is said and done, [the plaintiff] *can* do so." *Silberman*, 927 F.3d at 1133. Because we conclude that Plaintiffs' Third Amended Complaint fails on multiple grounds—specifically, lack of Article III standing, untimeliness, and no final agency action—we hold that a fourth amended complaint would be futile.

## IV.    Conclusion

For the foregoing reasons, it is hereby **ORDERED** and **ADJUDGED**:

1. Defendants' and Intervenors' Motions to dismiss the Third Amended Complaint, Dkts. 96, 97, are **GRANTED.**

2. The Third Amended Complaint, Dkt. 88, is **DISMISSED with prejudice.**[20]

3. The Clerk is directed to **TERMINATE** all pending motions and deadlines and **CLOSE** this case.

---

[20] While a dismissal for lack of Article III standing or failure to state a claim is usually a non-merits decision and generally without prejudice, *see Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008), we dismiss with prejudice based on the two grounds articulated above—failure to properly request leave to amend and futility.

55

**DONE AND ORDERED** on July 7, 2026.

s/ **ROBIN S. ROSENBAUM**
UNITED STATES CIRCUIT
JUDGE

s/ **WILLIAM F. JUNG**
UNITED STATES DISTRICT
JUDGE

56

Judge MERRYDAY dissenting:

## OPINION

In November 1997, Congress passed the "1998 Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act," § 209, 111 Stat. 2480, in which Congress finds, among other findings:

> (5) the decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs;
>
> (6) it is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States;
>
> (7) the use of statistical sampling or statistical adjustment in conjunction with an actual enumeration to carry out the census with respect to any segment of the population poses the risk of an inaccurate, invalid, and unconstitutional census;
>
> (8) the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted[.]

Pub. L. No. 105–119, Title II, § 209(a), 111 Stat. 2440, 2481.

The Act creates a private right of action for any "aggrieved person," that is, "any resident of a State whose congressional representation or district could be changed as a result of the use of a statistical method; any Representative or Senator in Congress; and either House of Congress."  Pub. L. No. 105–119, § 209(d), 111 Stat. at 2482.  The Act creates a private right of action in an extraordinarily broad array of persons, as well as an institutional right of action in both the House of

57

Representatives and the Senate and in each senator and representative.  The

remedies available under The Act to a successful litigant are declaratory judgment,

injunction, and any other "appropriate" relief.  Pub. L. No. 105–119, § 209(b), 111

Stat. at 2481.

The Act imposes on any court that hears an action under Section 209 a duty

"to advance on the docket and to expedite to the greatest possible extent the

disposition of any such matter" and provides for review by appeal directly to the

Supreme Court.  Pub. L. No. 105–119, § 209(e)(1), 111 Stat. at 2482.  In sum, The

Act instantiates a remarkable, explicit, and privately enforceable congressional

determination to correct an "inaccurate, invalid, and unconstitutional census"; to

ensure the "actual enumeration" of the population that the Constitution requires; to

protect "one of the most critical constitutional functions our Federal government

performs"; and to ensure that the census "be as accurate as possible."  The Act finds

that "statistical sampling or statistical adjustment . . . with respect to any segment of

the population poses the risk of an inaccurate, invalid, and unconstitutional census."

Finding an "actual enumeration" of the population and the resulting establishment

of just and accurate representation essential to a republican form of constitutional

government, Congress in The Act provides to the public and to itself and each

member of Congress a set of formidable tools to ensure the census is conducted and

reported with accuracy and integrity.

The plaintiffs, including Congressman Byron Donalds and other affected

Florida residents, allege that the COVID-19 pandemic struck the United States with

force immediately before Census Day in 2020 and that the Census Bureau:

> responded by suspending normal procedures and fundamentally altering its approach to data collection and processing: Mobile Questionnaire Assistance was scaled back; mailing materials were delayed; field enumeration operations were postponed; early non-response follow-up was eliminated entirely; door-to-door procedures were revised to prohibit knocking; and field training was overhauled to minimize in-person contact while logistical resources shifted to procuring masks and sanitizer rather than counting people. . . . TAC ¶¶ 48–62.

The plaintiffs allege that, because of these and other irregularities, novelties, and improvisations, "whole-person imputation" rose from about 5.99 million in the 2010 census to 10.9 million in the 2020 census, although some suggest the number is much higher.

The plaintiffs allege that the Bureau's 2022 "Post-Enumeration Survey" (PES) admits a statistically significant overcount in eight states and a statistically significant undercount in thirteen states, although the same report for the 2010 census confirmed that no comparable overcount or undercount occurred in any state during the 2010 census. The plaintiffs allege further that in 2020 Florida was undercounted by 3.48% or about 760,000 persons and that the undercount cost Florida an additional congressional seat because Florida fell only 171,561 persons short of the population necessary to gain that additional seat. The plaintiffs allege that the 2020 undercount of population and the consequent loss of federal money for certain federal programs are costing Florida hundreds of millions of dollars in lost revenue.

A closer look at the 2020 Post-Enumeration Survey reveals that the numbers both the parties and the majority use are somewhat misleading. For example, the

59

PES identifies eight states with an overcount — Hawaii, Minnesota, Ohio, New York, Massachusetts, Rhode Island, and Delaware — and six states with an undercount — Texas, Arkansas, Tennessee, Mississippi, Illinois, and Florida. In fact, the PES states no specific over- or under-count for any state; the PES states only a "confidence range" of 90% for the population count in each state.  In other words, for each state, the PES provides a range (for Florida the range is −4.98% to −1.98%) and stipulates that the undercount or overcount has a 90% probability of falling within that range.  But no place within that range is any more likely to prove accurate than any other place within the range, and the undercount or overcount has a 10% chance of falling outside that range.  The 3.48% undercount (−3.48% in PES terms) attributed to Florida is merely the simple, arithmetic average of the high end and the low end of the confidence range.  Actually, what the PES means is that — with a 90% chance of accuracy and 10% chance of inaccuracy — the error in Florida is somewhere, anywhere, within the range of −4.98% to −1.98%.  By comparison, the 90% confidence range in New York means that the overcount is between +1.89% and +4.99% with a 10% percent chance that the error is outside that range.  Oddly, for example, Maine is not included among the overcounted or undercounted states, but the confidence range for the Maine count is −0.93% to +5.33% with a simple, arithmetic average of +2.20%.  Montana shows an undercount with a confidence range from −10.48% to +1.70% with a simple arithmetic average of −4.39% (and, of course, the ever-present 10% chance that the range is more or less than the "confidence range").  In contrast, Nevada shows a confidence range of −1.24% to

60

+10.08% and a simple arithmetic average of a 4.42% overcount.  In fact, the PES shows a confidence range for every state, and the fluctuations are dramatic.

Because statistics are notoriously slippery, opaque, and difficult to understand with precision and clarity (and with awareness and comprehension of the necessary reservations and conditions) and because the "understanding" that one acquires from viewing statistics is often erroneous or, at least, partially erroneous, and because statistics, including those in the census and the PES include many assumptions and definitions and methods that are subject to reasoned disagreement (or refutation), the statistical methods employed in both the 2020 census and the 2020 PES warrant explanation and exploration on a full record, including expert testimony, developed by the parties and this panel after a full adversary hearing and presented to the Supreme Court on appeal.

The "confidence range" for each state is but one example of the problem. With nothing approaching a factual record, much less a full record subjected to the adversarial process, the majority uncritically accepts an array of the Bureau's self-vindicating notions such as "the Bureau uses imputation only as a last resort."  But, for example, paragraphs 49–67 of the third amended complaint allege a much different account, supported by specific facts, and conclude that the defendants "failed to fulfill the fundamental task of 'seek[ing] to reach each individual household."  The plaintiffs seem to allege that the Bureau, presented with the COVID-19 outbreak, hastily abandoned established procedures and obligations and adopted new statistical and other methods that resulted in a flawed census instead of

61

80

the constitutionally required "actual enumeration."  Similarly, the majority repeats the Bureau's claim that "whole person imputation" resulted in "very little impact on the net coverage estimates."  This claim, whatever the precise meaning of the several terms, is one of many that warrants a thorough inquiry but receives none.

Although each plaintiff, including a member of Congress, is a member of a category of persons explicitly granted by The Act a private right of action in the district court and although each plausibly alleges a claim, the majority in resolving a motion to dismiss adjudges that none of the plaintiffs has standing to sue and that Congress's grant of a private right of action is for each, including the member of Congress, a mere illusion.  Certainly, Article III standing is a constitutional requirement, but in my view the majority's determination to summarily disregard Congress's determination that certain persons have standing to assert the constitutionally important claims created in The Act is, at least, hasty and more likely wrong (a complete factual record and an adversarial fact finding would surely help in that determination).  The finding by Congress that the census is "one of the most critical constitutional functions our Federal Government performs" — a finding respecting a fundamental operation of legitimate government — is entitled to immense weight and respectful deference in assessing the sufficiency for Article III standing purposes of the injury to a party named in the statute and, based on that injury, awarded a cause of action in the district court.  In the present circumstance, the awarding by Congress of a cause of action to an array of affected plaintiffs seems sufficient to find standing and to warrant the continuation of this action and a

62

determination on a full record.  As Congress suggests, the accuracy and integrity of the census, intimately akin to the accuracy and integrity of both the vote and the vote count in an election, is the foundation of legitimate government; we ignore this at our imminent peril.  If the census and the vote are not right, nothing that follows from them is right.  Establishing in open court the accuracy of the census (or correcting the census, if the census is wrong), much like establishing the integrity of the vote and the vote count, is not a burden too great to bear but a boon too valuable to forbear.  Sometimes expediency — "kicking the can down the road," in the current phrase — yields the burden too great to bear, yields the price to dear to pay. If a person who receives a few unwanted voice or text messages has Article III standing to sue and a claim in the district court, why not someone whose congressional representation is diluted or distended and why not a member of Congress whose informational and representational interests are impaired and who, in both instances, is by Congress explicitly granted standing and a claim in the district court?

The majority addresses "redressability," but the discussion seems entirely misconceived.  The majority seems to hold that a party lacks standing to sue about a matter of prospective governmental misconduct unless the party shows that a "favorable judgment" from this court, which in this instance implies a mandate from the Supreme Court of the United States after an appeal, would cause "a substantial likelihood that 'independent actors not before th[is] court' to take actions that remedy these injuries."  I find this statement astonishing.  An Article III court of the

63

82

United States should not assume that any branch of government will ignore a mandate from the Supreme Court finding the census incorrectly determined, Congress incorrectly apportioned, appropriations unlawfully distributed, or citizens unlawfully represented. The majority's hypothesis of inaction, if correct, is more than alarming. But no plaintiff should have to establish, as a condition precedent to pursuing an action, that the government of the United States will act in good faith compliance with a mandate from the Supreme Court or otherwise will provide a complete remedy.

The majority finds that the plaintiffs' actions are barred by the four-year limitation in 28 U.S.C. § 1658(a), governing claims based on statutes enacted after 1990, and not the six-year limitation in 28 U.S.C. § 2401(a), governing claims based on actions against the United States. Although Section 1658(a) is the more recently enacted statute, governing all actions against any party, Section 2401(a) is the more specific statute, specifically governing an action against the United States. Section 1658(a) begins "[e]xcept as otherwise provided by law"; Section 2401(a) provides otherwise. To say the least, applying the general Section 1658(a) to supersede the more specific Section 2401(a) is not immediately and logically compulsory. To support this result, the majority cites a list of cases, but none of them is an action against the United States. The majority's most formidable citation, *Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799 (2024), decides nothing about whether Section 1658(a) governs the applicable limitation in an action against the United States otherwise governed by Section 2401(a). Also, the majority cites *Tug Allie-B v.*

64

*United States*, 273 F. 3d 936 (11th Cir. 2001), which affirms my decision in *In re Tug Allie-B*, 114 F. Supp. 2d 1301 (M.D. Fla. 2000), which was not an action against the United States but a maritime limitation action by a vessel to protect against a claim by the United States under the Park System Resource Protection Act. Although a sound and admirable affirmance by the circuit court of appeals, *Allie-B* says little about the present problem. The issue in *Allie-B*, a more difficult issue than the issue here, was the measure of damages and the party answerable for the damages and not the applicable limitation ("limitation" in *Allie-B* means "limitation of damages"). In *Allie-B*, the district judge and the three appellate judges, although agreeing on the result, had somewhat different reasoning; the fact that the PSRPA was the more recent statute did not permit a summary resolution of the matter on that basis.

In finding that the plaintiffs' claims in this action are barred, the majority finds that the four-year limitation began either on April 26, 2021, when the Bureau released the state-by-state population count used to apportion the House of Representative or on August 12, 2021, when the Bureau released the "redistricting file" data, used by the states, including Florida, to establish legislative districts. Assuming the four-year limitation applies and assuming the plaintiffs had sued on April 20, 2025, that is, within the four years the majority allows, the question arises whether the majority, employing the reasoning of the majority opinion in this action, would have permitted the action to persist. Apparently not. What of "redressability"? What of practicability? What of the certification? What of the convening and organization of a new Congress? What of laws passed, signed, and

65

84

enforced in the interim by a misaligned Congress or state legislature?  Under the

majority's reasoning, the plaintiffs' action is lost to impracticability long before

expiration of the applicable limitation.

The majority correctly cites *Utah v. Evans*, 536 U.S. 452 (2002), for the

proposition that "if a lawsuit is brought soon enough after completion of the census

and heard quickly enough, relief is not necessarily impracticable."  But

impracticability, under *Utah v. Evans* and the majority's view, bars any action long

before the applicable limitation (whenever begun and whenever expired) bars the

action.  In fact, *Utah v. Evans* and the majority's (perhaps legally correct) view leave a

prospective litigant an excruciatingly brief time, perhaps a matter of weeks, if any

time at all (a plaintiff must analyze the data and develop a good faith belief in the

basis for the claim, which probably requires retaining one or more of a specialized

genre of experts and permitting the experts time to conduct a study), within which to

begin an action after the Bureau releases the state-by-state population count or the

"redistricting file" data.[21]  All of these barriers occur in the face of a congressional

enactment that manifestly undertakes to broaden the number of qualified litigants

---

[21] In an earlier opinion (Doc. 84 at 26) and in discussing *Department of Commerce v. United States House of Representatives*, 119 S. Ct. 765 (1999), I noted that The Act seems to determine that the publication of the Operation Plan for the decennial census is sufficiently concrete and injurious to grant standing to sue, to accrue a cause of action, and to permit an action to challenge the plan if the plan is likely to cause damage. The 2020 plan appeared in November 2015. https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan.pdf  Did a cause of action accrue at that time?  Did a challenger have standing?  Did the limitation period begin at that time?  The 2030 plan appeared in July 2025. https://www2.census.gov/programs-surveys/decennial/2030/program-management/planning/operational-plan/2030-census-operational-plan.pdf  Did a cause of action accrue at that time?  Did a challenger have standing?  Did the limitation begin at that time?  Under the majority's holding, no litigant has standing and this congressional determination is a nullity.

66

and the circumstances under which the litigants can assert a claim respecting the census and legislative apportionment. If the majority is correct, Section 209 of the "1998 Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act" has become perhaps the most strictly construed remedial statute in the history of remedial statutes (but the government is not famous for encouraging inquiry into mistakes by the government). *Utah v. Evans* and the law as applied by the majority combine to create for a prospective litigant an unseemly and perhaps insurmountable barrier, a legal and temporal trap — in my view that trap must not stand. When the conclusions are incongruous, check the premises, at least one of which is likely wrong.

Because of the duty "to advance . . . and to expedite" and because of the exceptional burden on the Supreme Court to review by appeal any final decision, this panel should disfavor any piecemeal determination of the claims in this action and decide as many issues as possible on a record as complete as possible and present to the Supreme Court the best available opportunity to achieve in one appeal a final disposition of the action and a much-needed advancement of the law governing standing to assert the claims created in The Act, the applicable limitation, and the meaning and implementation of an "actual enumeration," which is what the Constitution requires. As Justice Thomas stated in his dissent in *Utah v. Evans*:

> To be sure, the Census Clause enables Congress to prescribe the "Manner" in which the enumeration is taken. The Court suggests that "enumeration" implies the breadth of Congress' methodological authority, rather than its constraints. See *ante*, at 474. But while Congress may dictate the manner in which the census is conducted,

67

86

it does not have unbridled discretion. For the purposes of apportionment, it must follow the Constitution's command of an "actual Enumeration."

. . . .

The text, history, and a review of the original understanding of the Census Clause confirm that an actual enumeration means an actual count, without estimation. While more sophisticated statistical techniques may be available today than at the time of the founding, the Framers had a great deal of familiarity with alternative methods of calculating population. They decided to constitutionalize the arduous task of an actual enumeration. I am persuaded that much like the earlier methods of estimation, hot-deck imputation — a modern statistical technique that the Census Bureau refers to as "estimation" — is not constitutionally permissible.

536 U.S. at 495, 506.  Justice Thomas's thoughtful and constitutionally faithful

dissent, based on an admirable account of the pertinent history, should provoke a

reconsideration of *Utah v. Evans* and provide guidance for achieving the result

required by the "actual enumeration" clause of the Constitution.

s/ **STEVEN D. MERRYDAY**
UNITED STATES DISTRICT
JUDGE

68

87

```
MIME-Version:1.0
From:cmecf_flmd_notification@flmd.uscourts.gov
To:cmecf_flmd_notices@localhost.localdomain
Bcc:
--Case Participants: Max Accardi (max.c.accardi@gmail.com), Kathryn Alkire
(fedprog.ecf@usdoj.gov, kathryn.l.alkire@usdoj.gov), Jeremy David Bailie
(honey.rechtin@webercrabb.com, jeremy.bailie@webercrabb.com,
natalie.deacon@webercrabb.com), Kevin Bell (fedprog.ecf@usdoj.gov, kevin.k.bell@usdoj.gov,
sarah.e.welch@usdoj.gov), Robert Quincy Bird (honey.rechtin@webercrabb.com,
natalie.deacon@webercrabb.com, quincy.bird@webercrabb.com), Crystal Clanton
(crystal.clanton@aflegal.org, crystal.clanton@ecf.courtdrive.com), Robert Andrew Crossin
(bobby.crossin@aflegal.org, bobby.crossin@ecf.courtdrive.com, docket@aflegal.org), David
Robert Fox (david-fox-0274@ecf.pacerpro.com, dfox@elias.law), Ryan Giannetti
(ryan.giannetti@aflegal.org, ryan.giannetti@ecf.courtdrive.com), Alice Kass
(alice.kass@aflegal.org), Richard Alexander Medina (rich-medina-0763@ecf.pacerpro.com,
rmedina@elias.law), Emily Percival (emily.percival@aflegal.org,
emily.percival@ecf.courtdrive.com), Quinn B. Ritter (courtfilings@kbzwlaw.com,
qritter@kbzwlaw.com), James K. Rogers (james.rogers@aflegal.org,
james.rogers@ecf.courtdrive.com), William Frank Scolinos (william.scolinos@aflegal.org),
Tori Shaw (tshaw@elias.law), Timothy W. Weber (lisa.willis@webercrabb.com,
timothy.weber@webercrabb.com), Frederick S. Wermuth (agonzalez@kbzwlaw.com,
courtfilings@kbzwlaw.com, fwermuth@kbzwlaw.com), Judge William F. Jung
(chambers_flmd_jung@flmd.uscourts.gov), Judge Steven D. Merryday
(chambers_flmd_merryday@flmd.uscourts.gov), Circuit Judge Robin S. Rosenbaum
(kristie_myers@ca11.uscourts.gov, kurt_walters@ca11.uscourts.gov,
robin_s_rosenbaum@ca11.uscourts.gov, rosenbaum_chambers@ca11.uscourts.gov), Magistrate
Judge T. G. Wilson (chambers_flmd_wilson@flmd.uscourts.gov,
karina_nieves@flmd.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:27449827@flmd.uscourts.gov
Subject:Activity in Case 8:25-cv-02486-WFJ-SDM-RSR University of South Florida College
Republicans et al v. Lutnick et al Order on Motion to Dismiss
```
Content–Type: text/html

## U.S. District Court

## Middle District of Florida

## Notice of Electronic Filing

The following transaction was entered on 7/7/2026 at 3:19 PM EDT and filed on 7/7/2026

**Case Name:**    University of South Florida College Republicans et al v. Lutnick et al

**Case Number:**    8:25–cv–02486–WFJ–SDM–RSR

**Filer:**

**Document Number:** 112(No document attached)

**Docket Text:**

**ENDORSED ORDER granting [97] Motion to Dismiss per Dkt. 111. Signed by Judge William F. Jung on 7/7/2026. (Jung, William)**

**8:25–cv–02486–WFJ–SDM–RSR Notice has been electronically mailed to:**

Timothy W. Weber    timothy.weber@webercrabb.com, lisa.willis@webercrabb.com

Frederick S. Wermuth    fwermuth@kbzwlaw.com, agonzalez@kbzwlaw.com, courtfilings@kbzwlaw.com

Robert Quincy Bird    quincy.bird@webercrabb.com, honey.rechtin@webercrabb.com, natalie.deacon@webercrabb.com

Jeremy David Bailie    jeremy.bailie@webercrabb.com, honey.rechtin@webercrabb.com, natalie.deacon@webercrabb.com

Quinn B. Ritter    qritter@kbzwlaw.com, courtfilings@kbzwlaw.com

Emily Percival    emily.percival@aflegal.org, emily.percival@ecf.courtdrive.com

James K. Rogers    james.rogers@aflegal.org, james.rogers@ecf.courtdrive.com

Crystal Clanton    crystal.clanton@aflegal.org, crystal.clanton@ecf.courtdrive.com

Ryan Giannetti    ryan.giannetti@aflegal.org, ryan.giannetti@ecf.courtdrive.com

Kevin Bell    kevin.k.bell@usdoj.gov, Sarah.E.Welch@usdoj.gov, fedprog.ecf@usdoj.gov

David Robert Fox    dfox@elias.law, david−fox−0274@ecf.pacerpro.com

Richard Alexander Medina    rmedina@elias.law, rich−medina−0763@ecf.pacerpro.com

Robert Andrew Crossin    bobby.crossin@aflegal.org, bobby.crossin@ecf.courtdrive.com, docket@aflegal.org

Kathryn Alkire    kathryn.l.alkire@usdoj.gov, fedprog.ecf@usdoj.gov

Tori Shaw    tshaw@elias.law

Max Accardi    max.c.accardi@gmail.com

William Frank Scolinos    william.scolinos@aflegal.org

Alice Kass    alice.kass@aflegal.org

**8:25−cv−02486−WFJ−SDM−RSR Notice has been delivered by other means to:**

89

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

|  |  |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA COLLEGE REPUBLICANS, MICHAEL FUSELLA, PINELLAS COUNTY YOUNG REPUBLICANS, PARISA MOUSAVI, GRETCHEN ZOELLER, and BYRON L. DONALDS,<br><br>        *Plaintiffs*,<br><br>v.<br><br>SECRETARY OF COMMERCE, ACTING DIRECTOR, U.S. CENSUS BUREAU, and the UNITED STATES OF AMERICA,<br><br>        *Defendants*,<br><br>ALLIANCE FOR RETIRED AMERICANS, MANUEL GUERRERO, and CAMERON DRIGGERS,<br><br>        *Intervenors-Defendants*. | Case No. 8:25-cv-2486<br>**THREE-JUDGE PANEL** |

## NOTICE OF APPEAL OF ORDER GRANTING MOTIONS TO DISMISS

Notice is hereby given that Plaintiffs appeal to the Supreme Court of the United States from this Court's July 7, 2026, Order dismissing the complaint with prejudice. Docs. 111, 112. This appeal is taken under Pub. L. No. 105-119, § 209(c)(2), 111 Stat. 2440, 2482 (1997).

1

DATED: July 8, 2026

Respectfully submitted,

*/s/ Emily Percival*
Emily Percival (FBN 119313)
James K. Rogers (AZ Bar # 027287)*
Robert A. Crossin (IN Bar # 39340-49)*
Alice Kass (MD Bar # 2511201130)*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
Phone: (202) 964-3721
emily.percival@aflegal.org
james.rogers@aflegal.org
bobby.crossin@aflegal.org
alice.kass@aflegal.org

R. Quincy Bird (FBN 105746)
Timothy W. Weber (FBN 86789)
Jeremy D. Bailie (FBN 118558)
WEBER, CRABB & WEIN, P.A.
5453 Central Avenue
St. Petersburg, FL 33710
Phone: (727) 828-9919
timothy.weber@webercrabb.com
jeremy.bailie@webercrabb.com
quincy.bird@webercrabb.com
Secondary:
lisa.willis@webercrabb.com
honey.rechtin@webercrabb.com
natalie.deacon@webercrabb.com

*Admitted *pro hac vice*

*Counsel to Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2026, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically served all counsel of record for the parties who have appeared.

*/s/ Emily Percival*
Emily Percival (FBN 119313)

2

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNIVERSITY OF SOUTH FLORIDA
COLLEGE REPUBLICANS, MICHAEL
FUSELLA, PINELLAS COUNTY YOUNG
REPUBLICANS, PARISA MOUSAVI,
GRETCHEN ZOELLER, and BYRON L.
DONALDS,

     *Plaintiffs*,

v.

SECRETARY OF COMMERCE, ACTING
DIRECTOR, U.S. CENSUS BUREAU, and
the UNITED STATES OF AMERICA,

     *Defendants*,

ALLIANCE FOR RETIRED AMERICANS,
MANUEL GUERRERO, and CAMERON
DRIGGERS,

     *Intervenors-Defendants*.

Case No. 8:25-cv-2486
**THREE-JUDGE PANEL**

## NOTICE OF APPEAL OF ORDERS GRANTING MOTIONS TO DISMISS

Notice is hereby given that Plaintiffs appeal to the Supreme Court of the United States from this Court's July 7, 2026, Orders dismissing the complaint with prejudice. Docs. 111, 112. This appeal is taken under Pub. L. No. 105-119, § 209(e), 111 Stat. 2440, 2482 (1997).

1

DATED: July 10, 2026

Respectfully submitted,

*/s/ Emily Percival*
Emily Percival (FBN 119313)
James K. Rogers (AZ Bar # 027287)*
Robert A. Crossin (IN Bar # 39340-49)*
Alice Kass (MD Bar # 2511201130)*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
Phone: (202) 964-3721
emily.percival@aflegal.org
james.rogers@aflegal.org
bobby.crossin@aflegal.org
alice.kass@aflegal.org

R. Quincy Bird (FBN 105746)
Timothy W. Weber (FBN 86789)
Jeremy D. Bailie (FBN 118558)
WEBER, CRABB & WEIN, P.A.
5453 Central Avenue
St. Petersburg, FL 33710
Phone: (727) 828-9919
timothy.weber@webercrabb.com
jeremy.bailie@webercrabb.com
quincy.bird@webercrabb.com
Secondary:
lisa.willis@webercrabb.com
honey.rechtin@webercrabb.com
natalie.deacon@webercrabb.com

*Admitted *pro hac vice*

*Counsel to Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2026, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically served all counsel of record for the parties who have appeared.

*/s/ Emily Percival*
Emily Percival (FBN 119313)

2